Exhibit A – Transcript of Plaintiff Nicholas Barnes' Deposition w/ exhibits

# NICHOLAS BARNES

## vs

# EAST ALABAMA MEDICAL CENTER FOUNDATION , et al.

## NICHOLAS BARNES

### April 23, 2025



www.alabamareporting.com  *  877.478.3376

Page 1

1   IN THE UNITED STATES DISTRICT COURT FOR THE
2       MIDDLE DISTRICT OF ALABAMA
3           EASTERN DIVISION
4
5   CIVIL ACTION NUMBER
6   3:24-cv-00512
7
8   NICHOLAS BARNES,
9       Plaintiff,
10  VS.
11  EAST ALABAMA MEDICAL
12  CENTER FOUNDATION D/B/A,
13  EAST ALABAMA MEDICAL
14  CENTER,
15      Defendant.
16
17
18
19
20      DEPOSITION TESTIMONY OF:
21      NICHOLAS BARNES
22      APRIL 23, 2025
23          10:00 a.m.

Page 2

1           S T I P U L A T I O N
2       IT IS STIPULATED AND AGREED by and
3   between the parties through their
4   respective counsel that the deposition of
5   NICHOLAS BARNES may be taken before Donna
6   Winters, CCR and Notary Public, State at
7   Large, at the law offices of Maynard
8   Nexsen, 1700 Regions/Harbert Plaza, 1901
9   Sixth Avenue North, Birmingham, Alabama
10  35203, commencing at approximately 10:00
11  a.m. on April 23, 2025.
12      IT IS FURTHER STIPULATED AND AGREED
13  that the signature to and the reading of
14  the deposition by the witness is waived,
15  the deposition to have the same force and
16  effect as if full compliance had been had
17  with all laws and rules of Court relating
18  to the taking of depositions.
19      IT IS FURTHER STIPULATED AND AGREED
20  that it shall not be necessary for any
21  objections to be made by counsel to any
22  questions, except as to form or leading
23  questions, and that counsel for the parties

Page 3

1   may make objections and assign grounds at
2   the time of the trial or at the time said
3   deposition is offered in evidence, or prior
4   thereto.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 4

1       APPEARANCES:
2   FOR THE PLAINTIFF:
3       VIRTUS LAW GROUP
4       Jon-Kaden Mullen
5       2017 Morris Avenue, Suite 100
6       Birmingham, Alabama 35203
7
8   FOR THE DEFENDANT:
9       MAYNARD NEXSEN
10      Warren B. Lightfoot, Jr.
11      Brock Phillips
12      1700 Regions/Harbert Plaza
13      1901 Sixth Avenue North
14      Birmingham, Alabama 35203
15
16      ALSO PRESENT: Kelli Truitt.
17
18
19
20
21
22
23



ALABAMA
COURT REPORTING

Page 5

1       EXAMINATION INDEX
2  EXAMINATION BY:   PAGE NO.
3  Mr. Lightfoot        9 - 210
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 7

1  EAMC/Barnes 291 - 294       162
2  13 February 2020 e-mails re: Two Weeks
3  Notice, Bate EAMC/Barnes 393 - 394    168
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 6

1       EXHIBIT INDEX
2  Defendant's
3  1 February 27, 2024 e-mails re: Urgent Matter, Bates
4  EAMC/Barnes 292 - 294           34
5  2 February 2023 through February 2024 text messages
6  between Nicholas Barnes and Ursula Means, Bates
7  EAMC/Barnes 327 - 391          37
8  3 Miscellaneous documents/text messages, Bates
9  VLG/Barnes 1 - 13               39
10  4 EAMC Employee Handbook, Bates EAMC/Barnes 37 - 71
11  60
12  5 4-18-2023 Print Exam EAMC    61
13  6 Trainings received, EAMC/Barnes 486 - 488  63
14  7 Charge of Discrimination, Bates EAMC/Barnes 7 - 12
15  67
16  8 Complaint              74
17  9 December 28, 2023 e-mails re: Time Clock, Bates
18  EAMC/Barnes 470 - 474      121
19  10 December 28, 2023 e-mails re: Employee Timecard
20  Issues, Bate EAMC/Barnes 480 - 485  125
21  11 February 19, 2024 e-mail re: Two Weeks
22  Notice, Bates EAMC/Barnes 172     138
23  12 E-mails re: Urgent Matter, Bates

Page 8

1       I, Donna Winters, a Certified Court
2  Reporter and a Notary Public for the State
3  of Alabama at Large, acting as
4  Commissioner, certify that on this date,
5  pursuant to the Alabama Rules of Civil
6  Procedure, and the foregoing stipulation of
7  counsel, there came before me at the law
8  offices of Maynard Nexsen, 1700
9  Regions/Harbert Plaza, 1901 Sixth Avenue
10  North, Birmingham, Alabama 35203,
11  commencing at approximately 10:00 a.m. on
12  April 23, 2025, NICHOLAS BARNES, witness in
13  the above cause, for oral examination,
14  whereupon the following proceedings were
15  had:
16       NICHOLAS BARNES,
17  having been first duly sworn, was examined
18  and testified as follows:
19
20       STENOGRAPHIC REPORTER:  Usual
21  stipulations?
22   MS. MULLEN:  Yes, ma'am.
23   MR. LIGHTFOOT:  Yes.



ALABAMA
COURT REPORTING

Page 9

1  EXAMINATION BY MR. LIGHTFOOT:
2  Q    Good morning, Mr. Barnes.  My name is
3  Warren Lightfoot, we just met.  Along with
4  Brock Phillips, we are the lawyers who
5  represent East Alabama in this lawsuit that
6  you brought against them.  Have you ever
7  been in a deposition before?
8  A    No.
9  Q    I'm going to be asking you a series
10 of questions here today and you're going to
11 be answering them, and Donna, our court
12 reporter, is going to be recording
13 everything, typing everything that we both
14 say.  So I would appreciate if you would
15 answer all the questions out loud and in a
16 way that she can understand them.  Some
17 things are helpful to talk about before we
18 even get started.  A few times today I'll
19 probably be asking you some questions that
20 are yes-no questions, and you may, like all
21 of us do in normal conversation, say
22 "uh-huh" or "huh-uh."  Well, that's hard
23 for the record, so I may prompt you.  I may

Page 10

1  say, "Is that a 'yes'" or "Is that a 'no,'"
2  not to be rude, but just so she gets a
3  clear record, okay?
4  A    Yes, I understand.
5  Q    And then she'll let you know if she
6  can't hear either of us, you know, so
7  you'll have to talk loud enough so she can
8  hear it.  Are you on any medication today
9  that prevents you from thinking clearly,
10 hearing me, or understanding me?
11 A    No.
12 Q    You'll also see, too, that the best
13 way -- the way it works best is, I'll be
14 asking you a bunch of questions, and if
15 you'll wait until the question is finished
16 before you answer, that would be great,
17 okay?
18 A    Okay.
19 Q    Also, you can take a break at any
20 time.  I'm sure your lawyer has told you
21 most of this already, but if there's a
22 pending question on the table, that is not
23 the time to take a break.  I'll need an

Page 11

1  answer to that before we take that break,
2  of course.  Okay.  State your name for the
3  record.
4  A    Nicholas Barnes.
5  Q    And what is your date of birth?
6  A    ████████████████
7  Q    And that makes you how old right now?
8  A    I'm 31.
9  Q    And what's the last four of your
10 Social?
11 A    ███████
12 Q    And what is your cell phone number?
13 A    ████████████████
14 Q    And who is your carrier?
15 A    T-Mobile.
16 Q    And about how long has that been your
17 cell phone?
18 A    I don't recall.
19 Q    It's fine to say you don't recall on
20 anything, but sometimes I may do a
21 follow-up to try to get you to give me your
22 best judgment.  So do you have -- it could
23 have been your cell phone for just a month

Page 12

1  or for ten years, what's your best
2  judgment?  Obviously, I won't hold you to
3  it.
4  A    Since I became a member.  Let's just
5  say ten years.
6  Q    Oh, so this has been your cell phone
7  number for a long time?
8  A    Long time.
9  Q    Got it, okay.  Do you have other cell
10 phones?
11 A    I have a work phone.
12 Q    Is this through your new employer?
13 A    Yes.
14 Q    Okay.  And you never had that before
15 your employment ended at EAMC?
16 A    No.
17 Q    What about, do you have e-mail
18 addresses?
19 A    Yes.
20 Q    Do you have a personal e-mail, like a
21 Gmail account?
22 A    Yes.
23 Q    What is your Gmail address?

ALABAMA
COURT REPORTING

Page 13

1  A   [redacted] Yes, that's
3  what it is.
4  Q   Is there a Yahoo as well?
5  A   No, it's just Gmail.
6  Q   It's just Gmail?
7  A   Yes.
8  Q   You do not have a Yahoo account?
9  A   Yes, I have a Yahoo.
10 Q   Do you have a @Yahoo.com?
11 A   Yes.
12 Q   Which do you use more, or do you use
13 both?
14 A   The one that's in Gmail.
15 Q   Do you use both?
16 A   No. The Yahoo is just one that was
17 made prior years ago but just forgot about.
18 I didn't have the pin, so the Gmail is
19 primary.
20 Q   Do you have any social media
21 accounts?
22 A   Facebook.
23 Q   You're on Facebook. Is it Nick

Page 14

1  Barnes?
2  A   Nicholas.
3  Q   So I assume Nicholas is your real
4  name, and do you sometimes go by Nick?
5  A   Yes.
6  Q   N-I-C or N-I-C-K?
7  A   N-I-C-K.
8  Q   Have you ever been married?
9  A   No.
10 Q   Do you have any children?
11 A   No.
12 Q   Do you live with anyone?
13 A   My girlfriend.
14 Q   And what's her name?
15 A   Alexia.
16 Q   Is this in Atlanta?
17 A   Yes.
18 Q   I knew you lived in Atlanta at some
19 point. I've seen an address that you put
20 in your interrogatory responses. Where do
21 you live?
22 A   [redacted]
23 Q   West Peachtree?

Page 15

1  A   Yes, Northwest.
2  Q   Is that a house or an apartment?
3  A   It's an apartment.
4  Q   What's the complex called?
5  A   [redacted]
6  Q   It's called [redacted]
7  A   Yes.
8  Q   Our building is called 1901, and I'm
9  always confused by that, funny name just to
10 say the address. So who lives with you and
11 Alexi?
12 A   Alexia.
13 Q   Alexia?
14 A   No one.
15 Q   And did y'all have an address before
16 that?
17 A   No.
18 Q   Did you have an address in Atlanta
19 before that?
20 A   My parents.
21 Q   Let me see what I was thinking about.
22 Interrogatory response, there it is, [redacted]
23 [redacted], I've got it.

Page 16

1  A   Yes.
2  Q   Does she have any children?
3  A   No.
4  Q   Have there ever been any children
5  that you took care of or you referred to as
6  your son or daughter?
7  A   My little brother.
8  Q   Your little brother has kids?
9  A   No, no, no.
10 Q   You refer to your little brother.
11 A   Yes, as mine.
12 Q   Do you sometimes call him your son?
13 A   Sometimes.
14 Q   What's your little brother's name?
15 A   [redacted]
16 Q   How old is [redacted]?
17 A   He's nine.
18 Q   He's nine?
19 A   Yes.
20 Q   What's his last name?
21 A   [redacted]
22 Q   Where does [redacted] live?
23 A   With my mother.



Nicholas Barnes                                                                    17..20

Page 17

1  Q    And where does your mother live?
2  A    In Alabama.
3  Q    Is that in Lanett?
4  A    Yes.
5  Q    Is that at ▮▮▮▮▮▮▮▮▮▮▮
6       ▮▮▮▮▮
7  A    Yes.
8  Q    In Lanett?
9  A    Yes.
10 Q    Has your mom lived there a long time?
11 A    Yes.
12 Q    Who lives there with her?
13 A    My stepfather, my brother, and I have
14 a younger cousin.  She lives there also.
15 Q    Do any children live there other than
16 ▮▮▮▮▮▮▮▮▮▮, anyone under 18?
17 A    Yes.  I have a younger cousin.
18 Q    Oh, the younger cousin.  And who is
19 that person?
20 A    Her name is ▮▮▮▮▮.
21 Q    And what's your brother's name?
22 A    ▮▮▮▮▮.
23 Q    Oh, sorry, you already told me that.

Page 18

1  You said he's your little brother, got it.
2  What is your stepfather and your mother's
3  names?
4  A    Tyrone and Belinda Welch.
5  Q    And do you stay there sometimes in
6  Lanett?
7  A    Yes.
8  Q    So over the last three years, how
9  often would you say you've stayed at the
10 Lanett house?
11 A    Often.
12 Q    Often?
13 A    Yes.
14 Q    Is it sometimes 50-50 Lanett and
15 Atlanta?
16 A    Yes.
17 Q    Oh, okay.  How far is the Lanett
18 house from EAMC?
19 A    Roughly 20 minutes.
20 Q    And how long is the Atlanta apartment
21 from EAMC?
22 A    Like an hour and 30.
23 Q    Did you go to high school?

Page 19

1  A    Yes.
2  Q    Did you graduate?
3  A    Yes.
4  Q    From what high school?
5  A    Valley.
6  Q    In Valley, Alabama?
7  A    Yes.
8  Q    In what year?
9  A    2012.
10 Q    Do you have any formal education past
11 high school?
12 A    Yes.
13 Q    I think I saw Faulkner.  You gave me
14 a list.
15 A    Yes.
16 Q    I see Faulkner in 2017.  What did you
17 do after you graduated from high school in
18 2012?
19 A    I went to college.
20 Q    You went to college where?
21 A    At Texas Southern University.
22 Q    For how long?
23 A    A year.

Page 20

1  Q    Were you playing ball?
2  A    Yes.
3  Q    So did you play basketball in high
4  school?
5  A    Yes.
6  Q    Were you good?
7  A    I mean, that's for you to, you know,
8  state.
9  Q    Well, did you make any All Star
10 teams?
11 A    Yes.
12 Q    All-State teams?
13 A    Yes.
14 Q    McDonald's All American?
15 A    No.
16 Q    So did you go to Texas Southern on a
17 scholarship?
18 A    Yes.
19 Q    Full?
20 A    Yes.
21 Q    And you went there for about one
22 year?
23 A    Uh-huh.

ALABAMA
COURT REPORTING

Page 21

1 Q   Is that a "yes"?
2 A   Yes.
3 Q   And then you left there?
4 A   Yes.
5 Q   And went where?
6 A   Snead State Community College in
7 Boaz, Alabama.
8 Q   That's right.  For how long?
9 A   One year.
10 Q   To play ball?
11 A   Yes.
12 Q   Where did you go after that?
13 A   Cincinnati State.
14 Q   To play ball?
15 A   Yes.
16 Q   How long?
17 A   One year.
18 Q   What was next?
19 A   What did I just give you last?
20 Q   Cincinnati State.
21 A   Alabama State.
22 Q   ASU, is that Montgomery?
23 A   Yes.

Page 22

1 Q   For how long?
2 A   One year.
3 Q   Did you play ball for them?
4 A   Yes.
5 Q   Did y'all play Auburn?
6 A   I don't recall.
7 Q   Who was next?
8 A   What did I just give you?
9 Q   ASU.
10 A   Faulkner.
11 Q   Faulkner, play ball?
12 A   Yes.
13 Q   And did you leave Faulkner?
14 A   I graduated.
15 Q   Oh, you graduated from Faulkner?
16 A   Yes.
17 Q   Is Faulkner a four-year school?
18 A   Yes.
19 Q   Did you major in pre-law?
20 A   Criminal justice.
21 Q   Oh, criminal justice.  So what year
22 did you graduate?  It looks like it was
23 somewhere around 2017?

Page 23

1 A   Yes.
2 Q   And your degree was in criminal
3 justice?
4 A   Uh-huh.
5 Q   Do you have any education after that?
6 A   Yes.
7 Q   Where?
8 A   University of Oklahoma.
9 Q   What did you do there?
10 A   Pre-law healthcare.
11 Q   Were you playing ball?
12 A   No.
13 Q   You said pre-law what, healthcare?
14 A   Healthcare.
15 Q   What took you to Oklahoma?
16 A   Just the program.
17 Q   Who paid for that?
18 A   Loans.
19 Q   Okay.  Did you get a degree?
20 A   Yes, master's.
21 Q   Was it a one-year master's program?
22 A   Two.
23 Q   Two-year.  Was that around 2019,

Page 24

1 straight after Faulkner?
2 A   I don't recall.
3 Q   Oh, I see.  You actually put 2022,
4 Master of Arts, pre-law.  You put May 2022.
5 Does that sound right to you?
6 A   Yes.
7 Q   Did you start working for EAMC in
8 2018?
9 A   Uh-huh.
10 Q   So how did you go to Oklahoma while
11 you were working?
12 A   Because it's remote.
13 Q   It's remote, okay.  Was Faulkner
14 remote?
15 A   No.
16 Q   Was University of Oklahoma remote?
17 A   Yes.
18 Q   Was it completely remote?
19 A   Yes.
20 Q   I see.  Did you ever play any pro
21 ball?
22 A   Yes.
23 Q   For whom?

Page 25

1  A    A lot of different teams.
2  Q    **Tell me some of them.**
3  A    Dominican Republic GUG.
4  Q    **Is that the name of the team?**
5  A    Yes.
6  Q    **What else?**
7  A    Dominican Republic, Charlie Vanel.
8  Keep going?
9  Q    **Sure.**
10  A    Nicaragua.  Nicaragua, I don't recall
11  the name of the team.
12  Q    **Those are the main ones, those three?**
13  A    Yes.
14  Q    **Did you ever play in Europe?**
15  A    No.
16  Q    **Were you paid to play for those**
17  **teams?**
18  A    Yes.
19  Q    **That's what I figured.  That's why**
20  **it's pro ball, right?**
21  A    Yes.
22  Q    **Well, actually not anymore.  Back**
23  **then, maybe.  What year did you play for DR**

Page 26

1  **GUG?**
2  A    I don't recall.
3  Q    **Had you already graduated from**
4  **Faulkner?**
5  A    Yes.
6  Q    **About how long did you play pro ball,**
7  **total?**
8  A    I don't recall.
9  Q    **A year?**
10  A    Longer.
11  Q    **Longer than a year?**
12  A    Yes.
13  Q    **Did you play any pro ball while you**
14  **were working at EAMC?**
15  A    Yes.
16  Q    **2018 was your date of hire?**
17  A    Uh-huh.
18  Q    **And I think you started in, was it**
19  **warehouse and then went to contracts?  I**
20  **may have gotten that wrong.**
21  A    Yes, that's correct.
22  Q    **So warehouse.  So when you started in**
23  **2018, where were you playing pro ball then?**

Page 27

1  A    I don't recall.
2  Q    **How did you play pro ball while you**
3  **were working at EAMC?**
4  A    Under Diane Greenlee.
5  Q    **Who is Diane Greenlee?**
6  A    She was the director.
7  Q    **At EAMC?**
8  A    Yes.
9  Q    **Of the warehouse?**
10  A    Of the materials and handling.
11  Q    **So which team were you playing for in**
12  **2018?**
13  A    I don't recall.
14  Q    **I think you just told me you were**
15  **still playing basketball?**
16  A    In 2018?
17  Q    **Right, after you started at EAMC.**
18  A    In 2018, I was playing.  I started at
19  EAMC in December of 2018.
20  Q    **I see.  You're saying you played pro**
21  **ball in 2018, then you started at EAMC in**
22  **December of 2018?**
23  A    Yes.

Page 28

1  Q    **Did you play any pro ball after you**
2  **started at EAMC?**
3  A    I did, in Nicaragua, I recall.
4  Q    **How did you do that?  Did you take a**
5  **leave of absence?**
6  A    My job was --
7  Q    **Was it part-time?**
8  A    No, it was full-time.  I think I took
9  two weeks off, vacation time.
10  Q    **And went to Nicaragua?**
11  A    Yes.
12  Q    **Was that just on one occasion that**
13  **you took two weeks off, or did you do that**
14  **more than once?**
15  A    I don't recall.
16  Q    **When is the last time you played pro**
17  **ball?**
18  A    I don't recall.
19  Q    **So we're in 2025.  Did you play any**
20  **pro ball -- Covid hit in March of 2020.**
21  **Did you play any pro ball after that?**
22  A    No.  No.
23  Q    **You told me you played in Nicaragua**



Page 29

1    sometime, I guess it would have been --
2    A    That was before.
3    Q    Right, before Covid, maybe 2019?
4    A    Yes.
5    Q    So was the Nicaragua team the last
6    team that you were paid to play basketball
7    for?
8    A    Dominican Republic.
9    Q    Charlie?
10   A    Yes, Charlie.
11   Q    Was that 2019?
12   A    I don't recall.
13   Q    Did you take time off from work to do
14   it?
15   A    Vacation.
16   Q    Vacation. Like two weeks, or how
17   long do you think you took?
18   A    A week.
19   Q    Were you still under Diane or someone
20   else at the time?
21   A    I don't recall.
22   Q    Did you think of something?
23   A    No.

Page 30

1    Q    How many jobs have you had prior to
2    going to work for EAMC, other than pro
3    basketball?
4    A    I don't recall, honestly.
5    Q    You said in your application -- well,
6    first, when you applied at EAMC, did you
7    tell the truth in your application?
8    A    Yes.
9    Q    And did you work at Hyundai GLOVIS?
10   A    Yes.
11   Q    What did you do there?
12   A    Parked cars.
13   Q    Is that in Montgomery?
14   A    No.
15   Q    Where is it?
16   A    Georgia.
17   Q    Did you work for Coca-Cola United in
18   West Point, Georgia?
19   A    Yes.
20   Q    And were you a sales rep?
21   A    Yes.
22   Q    Did you work as a receptionist at
23   Faulkner University?

Page 31

1    A    Yes.
2    Q    Did you work as an intern for the
3    Harris Law Office?
4    A    Yes.
5    Q    Is that in Valley, Alabama?
6    A    Lanett.
7    Q    It's in Lanett. Lanett and Valley
8    are close, right?
9    A    Yes, probably like two or three
10   minutes away.
11   Q    That's what I thought. Were you a
12   customer representative for Hyundai GLOVIS?
13   A    Yes.
14   Q    Anywhere else that you worked prior
15   to going to work for EAMC?
16   A    I don't recall.
17   Q    Were you ever terminated from any of
18   those jobs?
19   A    No.
20   Q    What was the job that you had last
21   before you went to work for EAMC in
22   December of 2018?
23   A    Basketball.

Page 32

1    Q    No.
2        MR. PHILLIPS: He wasn't asking
3    basketball, he's saying basketball.
4        MR. LIGHTFOOT: Oh, thank you.
5    Q    Basketball was before, thank you.
6    A    Yes.
7    Q    It does say, though, that you worked
8    from January through August of 2018 as a
9    sales rep for Coca-Cola United. Is that
10   correct?
11   A    Uh-huh.
12   Q    Is that a "yes"?
13   A    Yes.
14   Q    So that took you up to August of
15   2018, then you started at EAMC in December.
16   That's why I was asking that. Is that
17   right?
18   A    Yes.
19   Q    So do you remember where you worked
20   between August and December 2018?
21   A    Basketball.
22   Q    And which basketball was that?
23   A    I don't recall, actually.



Page 33

1  Q    Okay.  How did you learn about the
2  EAMC job?
3  A    Indeed.
4  Q    You produced some documents through
5  your lawyer in response to us asking
6  questions.  Do you have any audio
7  recordings that relate to this case in any
8  way?
9  A    No.
10 Q    Do you have any notes or diaries or
11 journals that relate to this case in any
12 way?
13 A    EAMC does, in the computer that I
14 had.
15 Q    So you had a computer at EAMC, and
16 you kept what?
17 A    A work computer.
18 Q    And you kept some notes?
19 A    Of all the incidents.
20 Q    Of all the incidents?
21 A    Yes.
22 Q    I'm aware of you sending Kelli Truitt
23 an e-mail on February 27th of last year —

Page 34

1  A    Yes.  When I returned to my office,
2  my computer was gone.
3  Q    Last year, yes.  So you made a list
4  there of about six or so things that you
5  were complaining of to EAMC.  Is that the
6  list you're talking about?
7  A    Yes.
8  Q    Did you compile that list from some
9  other list?
10 A    What do you mean?
11 Q    Well, tell me what list you're
12 talking about.
13 A    A list on the computer.
14 Q    I'll tell you what, I'll just go
15 ahead and show you that e-mail.  That will
16 be helpful.  It's 291 through 294 Bates
17 that we would have produced.  So what I'll
18 show you and your lawyer is, it looks like
19 an e-mail.
20 A    Yes, sir, that's correct.
21 Q    I'm going to mark that as Exhibit 1.
22        (Whereupon, Defendant's Exhibit
23 Number 1 was marked for identification, a

Page 35

1  copy of which is attached to the original
2  of the transcript.)
3  Q    So what I'm marking as Exhibit 1, is
4  that an e-mail string between you and Kelli
5  Truitt?
6  A    Yes, it is.
7  Q    On the last page of it, it looks like
8  you listed some things on February 27th of
9  2024 that you were complaining about during
10 your employment.  Is that right?
11 A    Yes.
12 Q    Is that the list that you were just
13 talking about that was on your work
14 computer?
15 A    There are more things on there.
16 Q    There are more things on your work
17 computer?
18 A    That was on the work computer.  It's
19 not my work computer, it's EAMC's work
20 computer.
21 Q    That's right.  Yes, that's right.
22 I'm sorry.  So it was EAMC's work computer,
23 of course, but that you were allowed to

Page 36

1  use?
2  A    Yes.
3  Q    So there were more things on there?
4  Well, then why weren't they included in the
5  list?
6  A    Because there was a long e-mail also.
7  Q    There's a longer e-mail?
8  A    No, because this e-mail was already
9  long.
10 Q    Oh, I see.  So you sort of put the
11 most important things into this?
12 A    Yes.
13 Q    Do you have any other lists, notes,
14 or diaries or lists, that relate to any
15 alleged mistreatment by EAMC?
16 A    No.
17 Q    And you don't have access to that
18 anymore, right?
19 A    No.
20 Q    I have seen some text messages, it's
21 about 60 pages of text messages between you
22 and Ursula Means.  Are you familiar with
23 what I'm talking about?

Page 37

1  A   Yes, from her.
2  Q   **I'll mark these as Exhibit 2.**
3      (Whereupon, Defendant's Exhibit
4  Number 2 was marked for identification, a
5  copy of which is attached to the original
6  of the transcript.)
7  Q   **Are these e-mails from your cell**
8  **phone -- what I'm marking as Exhibit 2, are**
9  **these e-mails from your cell phone --**
10 A   I don't have e-mails from my cell
11 phone.
12 Q   **I'm sorry, I meant texts, I misspoke.**
13 **If you'll look at that, it looks to me like**
14 **texts between you and Ursula Means between**
15 **like February of 2023 up until February of**
16 **2024. Is that what those are?**
17 A   Yes.
18 Q   **Are those all the texts that you have**
19 **between you and Ursula?**
20 A   Yes.
21 Q   **So I assume you like looked on your**
22 **cell phone, the cell phone you've already**
23 **told me about, and made a screenshot or**

Page 38

1  copies of those and gave them to your
2  lawyer?
3  A   Yes.
4      MR. PHILLIPS: These came from us.
5  Q   **Well, these actually came from EAMC,**
6  **so maybe we got these from Ursula. But do**
7  **you recognize them as your texts with**
8  **Ursula?**
9  A   Yes. So this seems like Ursula's
10 texts, right?
11 Q   **I understand this to be just texts**
12 **between just you and Ursula?**
13 A   No, no, I'm saying they are coming
14 from Ursula's phone.
15 Q   **I think that's right. Yes. Is that**
16 **what you --**
17 A   That's what I was asking you.
18 Q   **Got you. That's fine. You can ask**
19 **any clarifying question you want. Do you**
20 **recognize them as texts between you and**
21 **Ursula?**
22 A   Yes.
23 Q   **Are they still on your phone?**

Page 39

1  A   No.
2  Q   **Why not?**
3  A   Because I delete my phone, I delete
4  things in my phone.
5  Q   **How often do you delete texts?**
6  A   In the iPhone, there's a 30-day, yes.
7  Q   **So do you have any texts left from**
8  **Ursula?**
9  A   No.
10 Q   **Well, you produced one to us, so**
11 **where did you get that?**
12 A   I just basically switched it over
13 because my text message basically was long
14 enough, it was too long. You need space in
15 your phone. That's why I switched it over
16 to 30 days. That came out of my phone.
17 Q   **That's exactly what I was going to**
18 **ask you. You produced these to us, so**
19 **let's mark this as Exhibit 3.**
20     (Whereupon, Defendant's Exhibit
21 Number 3 was marked for identification, a
22 copy of which is attached to the original
23 of the transcript.)

Page 40

1  Q   **These are the documents that you and**
2  **your lawyer gave to us. Would you turn to**
3  **page 2, please?**
4  A   Okay.
5  Q   **Are these the documents that you gave**
6  **us?**
7  A   I gave them to you?
8  Q   **Through your lawyer.**
9  A   Yes.
10 Q   **I assume you probably gave them to**
11 **your lawyer?**
12 A   Yes, I did.
13 Q   **Would you look at page 2?**
14 A   Yes, I did.
15 Q   **Is that a text between you and**
16 **Ursula?**
17 A   If that's Ursula's cell phone number,
18 yes, it is.
19 Q   **I believe it is.**
20 A   It is.
21 Q   **I believe it is, because I've seen it**
22 **in this stack. So where did you get that**
23 **text that is page 2 of Exhibit 3?**

Page 41

1   A    On my cell phone.
2   Q    So why was it on there?
3   A    What do you mean?
4   Q    Well, I thought you said you delete
5   them after 30 days.
6   A    No, no.  I said I recently started
7   deleting them after 30 days because my
8   phone needed space.
9   Q    Oh, you kept them for a long time?
10  A    Yes.  So I don't have them anymore.
11  Q    How many texts did you keep from
12  Ursula?
13  A    I didn't keep any text messages from
14  Ursula.  You're saying like withheld them
15  from her?
16  Q    I'm just trying to understand, when
17  did you start deleting your texts?
18  A    I honestly don't recall, but it was
19  like recently.
20  Q    Recently, like in 2025?
21  A    2020 -- I don't recall, honestly.
22  Q    Was it after this lawsuit was filed?
23  A    Yes.  Yes.

Page 42

1   Q    This lawsuit was filed somewhere
2   around August of '24, so August of last
3   year?
4   A    So yes, it was after.
5   Q    It was after that, that you started
6   deleting your texts?
7   A    Yes, because I had different jobs.
8   Well, I had another job, so texts were
9   coming in from the other job also, so I had
10  a lot of different things on my phone.  So
11  to basically minimize and have storage, you
12  have to delete texts.  So instead of going
13  through and deleting all of them, I just
14  basically click, after 30 days delete -- if
15  you have an iPhone, you can go in there and
16  see.
17  Q    I do have an iPhone, but I've never
18  done what you're saying about deleting.  I
19  mean, I've deleted stuff but not in that
20  way.  So you started -- after you filed
21  this lawsuit, you started deleting your
22  texts.  And does that mean that you deleted
23  all your texts with Ursula?

Page 43

1   A    Yes.  Yes.
2   Q    On this second page of Exhibit 3, why
3   wasn't that one deleted?
4   A    This one?
5   Q    Correct, the second page of Exhibit
6   3.
7   A    When did I send it to my lawyer?
8   Q    I'm not allowed to know that.  It
9   probably was around when you were helping
10  him answer the questions.
11  A    So maybe it was sent to my lawyer
12  before the text message was started to be
13  deleted.
14  Q    Did you send him more than just one
15  text?
16  A    No.
17  Q    You sent him a bunch of texts?
18  A    No.  I think it was just one text.
19  Q    So at the time that you sent it, you
20  still had all of your texts with Ursula?
21  A    I don't know.
22  Q    But you did send him more texts than
23  just this one, or did you just send him

Page 44

1   this one?
2   A    I think I sent that one.
3   Q    And why this one?
4   A    Because from what was stated, and I
5   was talking to my lawyer, that's when they
6   made me feel uncomfortable.
7   Q    Did you have any other texts that
8   relate to your lawsuit at the time that you
9   sent this text to your lawyer?
10  A    No.  No.
11  Q    Did you have any texts with any other
12  EAMC employees still on your phone at the
13  time that you text this to your lawyer?
14  A    No.
15  Q    Like did you ever text with Laquesha
16  Lasseter?
17  A    Yes.
18  Q    Did you have any texts from her on
19  your phone?
20  A    No.
21  Q    Well, did you while you were employed
22  at EAMC?
23  A    Did I have texts from her?



Page 45

1  Q    Yes.
2  A    Yes.
3  Q    What happened to those texts?
4  A    They were probably deleted also.
5  Q    You mean you deleted them?
6  A    IPhone deleted them 30 days later.
7  Q    Oh, you informed the iPhone to delete
8  them, is what you're saying?
9  A    So basically, yes.
10  Q    And Facebook is the only place on
11  social media you have an account?
12  A    I have a Snapchat also.
13  Q    Okay.  What's the name of your
14  Snapchat?
15  A    I don't know.  Nicholas Barnes.
16  Nick, Nick Barnes, Nick.
17  Q    Do you have an Insta account?
18  A    What do you mean by "Insta"?
19  Q    Instagram?
20  A    Yes.
21  Q    What's the name there?
22  A    I honestly don't know.  I'm not on
23  there.  It's been a long time since I've

Page 46

1  been on there.
2  Q    Do you have a Twitter or X account?
3  A    It's been a long time since I've been
4  on there.
5  Q    What's your name on that one?
6  A    I don't know.
7  Q    So you're on there, it's just been a
8  while since you --
9  A    Yes.  Like maybe college, before
10  college.
11  Q    Have you ever been in a lawsuit
12  before?
13  A    No.
14  Q    Have you ever filed an EEOC Charge
15  before?
16  A    No.
17  Q    You obviously filed an EEOC Charge in
18  this case, right, so I'm not talking about
19  that.  Other than that, right?
20  A    Yes.
21  Q    Have you ever been sued?  Has anyone
22  ever sued you?
23  A    No.

Page 47

1  Q    Have you ever been arrested for a
2  crime?
3  A    Yes.
4  Q    I see that you were arrested for a
5  marijuana charge in 2018?
6  A    Uh-huh.
7  Q    Is that a "yes"?
8  A    Yes.
9  Q    Did you receive probation for one
10  year and a $2,500 fine?
11  A    Yes.
12  Q    And that was in Chambers County,
13  Alabama?
14  A    Yes.
15  Q    What city?
16  A    Lanett.
17  Q    Lanett.  Have you ever been arrested
18  for any other crime?
19  A    No.
20  Q    Did you work for Carpets for Kids in
21  West Point, Georgia?
22  A    I don't recall.
23  Q    So it lists that you worked for

Page 48

1  Carpets for Kids in West Point, Georgia
2  from 2014 to 2016, for two years.  Did you
3  do that?
4  A    Summertime?
5  Q    Don't know.
6  A    So probably summertime.
7  Q    But you have no memory of working for
8  Carpets for Kids?
9  A    I said I don't recall.
10  Q    Have you ever heard of Carpets for
11  Kids?
12  A    Yes.
13  Q    What does it do?
14  A    What do you mean?
15  Q    What does the entity do?  I've never
16  heard of it.
17  A    Create carpets for kids.
18  Q    It creates carpets for kids?
19  A    There are carpets that they create
20  for entities with kids, so boys and girls
21  clubs, schools, things like that.
22  Q    But you don't ever recall doing
23  anything for them and being paid for it?



Page 49

1  A    I don't know the exact dates, but for
2  summertime, I think I did, while I was in
3  college.  You know, people come back home,
4  so they get summers off.
5  Q    In West Point, Georgia?
6  A    Yes, West Point, Georgia.
7  Q    So when you're in West Point,
8  Georgia, that's not near Atlanta, is it?
9  A    45 minutes, maybe 50.  Everything is
10  close.
11  Q    I see.  When you started at EAMC, was
12  your first job as a supply clerk?
13  A    Warehouse worker.
14  Q    And did you work for Diane Greenlee?
15  A    Les.
16  Q    You worked for someone named Les?
17  A    Uh-huh.
18  Q    Do you know Les's last name?
19  A    No.
20  Q    Is Les a man, I take it?
21  A    Yes.
22  Q    Then who was your next supervisor?
23  A    Diane Greenlee.

Page 50

1  Q    Was this as a supply clerk, or was it
2  warehouse?
3  A    Started off as warehouse, then
4  transitioned to contract coordinator.
5  Q    Contract coordinator, is that done
6  outside the warehouse?
7  A    Yes.
8  Q    Were you a contract coordinator for
9  the rest of your employment at EAMC?
10  A    Yes.
11  Q    And what did you do?  What were your
12  duties as a contract coordinator?
13  A    My daily duties was to basically come
14  in and make sure that the contracts were
15  executed and basically sent through the
16  higher-ups, make sure there were no things
17  and read the clause.
18  Q    The contracts for supplies?
19  A    Contracts for materials and products.
20  Q    Materials and products.
21  A    Service contracts.
22  Q    Okay.  Anything else?
23  A    Not that I recall.

Page 51

1  Q    Was the job from 8:00 to 4:30, 8:00
2  in the morning to 4:30 in the afternoon?
3  A    I don't recall.  I know that it
4  switched sometimes.
5  Q    What did you recall the hours being?
6  A    It's been so long ago, I honestly
7  don't recall.
8  Q    I thought I had seen 8:00 to 4:30
9  somewhere.  Does that sound about right?
10  A    Yes, that sounds about right.  Yes.
11  Q    After Diane, who did you report to
12  after Diane?
13  A    I think it was Russ.
14  Q    Russ Ballard?
15  A    I don't know his last name.
16  Q    Who did you report to after Russ?
17  A    Nancy Ling.
18  Q    Then who after Nancy Ling?
19  A    Ursula Means.
20  Q    And were they all over the
21  contracting area?
22  A    Les was not.
23  Q    Les was not, okay.  He was supply

Page 52

1  clerk, yes.
2  A    Russ -- Russ was not, but I would
3  report to him.
4  Q    Was Diane Greenlee over contract
5  coordination?
6  A    Yes.  Yes.
7  Q    And Nancy was, correct?
8  A    Yes.
9  Q    And Ursula was?
10  A    Yes.
11  Q    Have you looked through the texts
12  that are listed here in Exhibit 2 --
13  A    No.
14  Q    -- basically the one year of texts
15  that you had with Ursula Means?
16  A    No.
17  Q    Did you know before now that EAMC had
18  produced these documents to you guys in
19  this lawsuit?
20  A    No.
21  Q    So you had not even seen these at all
22  before this deposition?
23  A    No.

Page 53

1  Q    If you'll look at them now, take a
2  look at them, please.  Obviously, I don't
3  want you to read 60 pages, but look at them
4  and see if you recognize this as being
5  texts back and forth between you and
6  Ursula.
7  A    Yes.
8  Q    It's from her phone, I think we've
9  determined -- I actually thought it was
10  yours, but it makes sense because it says
11  Nicholas Barnes, so it makes sense that's
12  her phone?
13  A    Yes.
14  Q    Well, let's see what yours looks
15  like.  Let's see what yours says at the
16  top.  Yours just has her number; is that
17  right?  That's her number up there,
18  202-9605, right?
19  A    If that's what you say it is.
20  Q    Well, I thought you told me this was
21  between you and Ursula.
22  A    Yes, if that's what you say it is,
23  her number is, yes.

Page 54

1  Q    I don't say anything about it, right,
2  because you're the one that gave us this
3  document.  Are you saying this is between
4  you and Ursula?
5  A    Yes.
6  Q    And I'm pointing to the second page
7  of Exhibit 3.  So this is between you and
8  Ursula, right?
9  A    Yes.
10  Q    And this is sort of the mirror image
11  of that?  Do you follow what I'm saying?
12  This is one document, those are about 60
13  documents that relate to texts.  Do you
14  follow me?
15  A    Yes.  What are the dates?
16  Q    It looks to me like they go from
17  February of '23 through February of 24, so
18  you can take your time and look through
19  them.
20  A    So these wouldn't be the mirror
21  image.
22  Q    I think they are.  Let's go to the
23  date.

Page 55

1  A    Because if you see this, see "Oh, see
2  you tomorrow," where is "see you tomorrow"?
3  Q    Well, hold on.  I'll tell you what,
4  let's do this.  Go to the date, or I'll do
5  it.
6  A    This is the date.
7  Q    Oh, these are the same dates?
8  A    Yes.  Is that the same thing?  Here's
9  Wednesday, "Oh, see you tomorrow," there's
10  no "see you tomorrow" on the one that I
11  have, then it says "OK," then it says
12  "Where are you," then it says, "Do you
13  think" --
14  Q    Let me look at that.  That's very
15  interesting.  Let's see if we can figure it
16  out.
17  A    So those wouldn't be the mirror
18  image.
19  Q    That's exactly what I'm trying to
20  figure out.  Let's see how close those are.
21  So this looks like --
22  A    You see?
23  Q    "In yeah, today is Wednesday!  I just

Page 56

1  wanted to see your pretty face.  See you
2  tomorrow."
3  A    Could you like not say that out?  It
4  really makes me feel some type of way, so
5  could you?
6  Q    Okay, there's a little thing there in
7  his version, okay.  "Oh" is missing?
8  A    It has "Where are you?"  It's missing
9  "Ok, see you tomorrow."
10  Q    It's missing these two.  It's missing
11  "Ok, see you tomorrow," and "Ok" on your
12  phone?
13  A    Yes.
14  Q    Yours has a little thing.
15  A    I was probably watching a video.
16  That comes up when you're watching a video
17  on iPhone, or I could have been on FaceTime
18  also.
19  Q    Who knows what it means, but it does
20  indicate -- it's the same -- this is the
21  same conversation that y'all were having on
22  text?
23  A    Yes.



Page 57

1  Q     Yours is just missing two short
2  texts?
3  A     Yes.
4  Q     Okay, that's fine.  That's what I was
5  trying to figure out.  Who knows?  That
6  doesn't really bother me at all.  So now,
7  have you flipped through these?  Do you
8  agree these are your texts with Ursula
9  Means?
10 A     Yes.
11 Q     And it's from February of 2023
12 through February of 2024, I'll represent
13 that to you.  So if you flip to the back,
14 I'll show you how far they go.  It looks to
15 me like towards the end -- oh, these are
16 two-sided, interesting.  It looks like
17 these are February of 2024, but I just
18 wanted you to see that.  Let's see if I can
19 find a 2024, or you may know these were
20 2024, right?
21 A     Yes.
22 Q     So she supervised you about during
23 this time period, from February 2023 until

Page 58

1  February 2024, correct?
2  A     No.  Nancy Ling supervised us until
3  Ursula came in and basically got used to
4  things.
5  Q     Right.
6  A     She didn't get used to them.  When
7  she first came in, she wasn't the contract
8  coordinator person.
9  Q     Right.  She actually started in
10 December of 2022?
11 A     Yes, but she didn't supervise us
12 until later.
13 Q     Exactly.  Around February of 2023; is
14 that right?
15 A     I don't recall.
16 Q     You don't recall exactly when she
17 began supervising you?
18 A     Yes, I don't recall, because she came
19 in working on a project, and the project
20 was like six months.
21 Q     So as you look through these -- have
22 you had a chance to sort of leaf through
23 them and see them?

Page 59

1  A     Yes.
2  Q     So you had a good professional
3  working relationship with Ursula Means,
4  didn't you, as shown in these text
5  messages?
6  A     What do you mean by "good
7  professional"?
8  Q     When I read through them, it looks to
9  me like it's a lot of texts of you sort of
10 keeping her posted on whether you can come
11 to work or whether you have to take care of
12 people that are sick in the hospital, like
13 your grandmother, "Can I have time off,"
14 "Can I work from home today," and her
15 saying, "Absolutely, just keep me
16 informed."  It looks like a good
17 professional relationship, and I'm just
18 asking if that's the case?
19 A     Okay, yes.
20 Q     So when you started work at EAMC, did
21 you get an employee handbook?
22 A     Yes.
23 Q     And I'll show you that handbook.

Page 60

1      (Whereupon, Defendant's Exhibit
2  Number 4 was marked for identification, a
3  copy of which is attached to the original
4  of the transcript.)
5  Q     I'll show you what I'm marking as
6  Exhibit 4.  You understood that this was
7  the EAMC Employee Handbook, correct?
8  A     Yes.
9  Q     That I've marked as Exhibit 4.  My
10 understanding is, the way they do it at
11 EAMC is they send it to you every year, and
12 you have to check electronically that
13 you've received it.  Do you recall that?
14 A     No, I don't recall that.
15 Q     Do you remember doing an electronic,
16 basically on your computer, it says,
17 "Please acknowledge that you've received
18 the handbook," more than just when you
19 started, like every year.  Do you recall
20 that?
21 A     No, I don't recall that.
22 Q     I will show you a couple of things
23 that relate to that.  So let me put it this

Page 61

1  way.  You recall receiving it when you
2  first started, right?
3  A    We received this at --
4  Q    "This" is Exhibit 4, yes?
5  A    Yes, we received Exhibit 4 at --
6  Q    Like orientation?
7  A    Orientation, yes.  That's what I was
8  asking.
9  Q    Exactly.  And I was asking a new
10 question.  I was saying, I know you got it
11 at orientation.  I know you got it also by
12 e-mail electronically, and you would
13 acknowledge that you received it later on
14 during your employment.  Do you recall
15 those times?
16 A    I don't recall.
17 Q    You're not denying it, you just don't
18 recall?
19 A    Yes, I'm not denying it, but I just
20 don't recall.
21     (Whereupon, Defendant's Exhibit
22 Number 5 was marked for identification, a
23 copy of which is attached to the original

Page 62

1  of the transcript.)
2  Q    I'll show you one example of it.  So
3  what I'm showing you now is an example, I
4  think, of that.  In April of 2023, that
5  looks to me like an e-mail that you got,
6  telling you that you got, you know, the
7  handbook, or maybe even an updated version
8  of the handbook.  Does that remind you a
9  little bit of getting those?
10 A    It doesn't remind me, but I'm not
11 denying it.
12 Q    Exactly, okay.  Do you recall
13 receiving training on various things while
14 you were -- on various topics, while you
15 were at EAMC?
16 A    Yes.
17     MR. MULLEN:  Can I interject real
18 quick?
19        MR. LIGHTFOOT:  Of course.
20        MR. MULLEN:  So for Defendants'
21 Exhibit 5, I just want to clarify, this
22 doesn't have a Bates label.
23     MR. LIGHTFOOT:  We just got it today.

Page 63

1      MR. MULLEN:  Just got it today, okay,
2  thanks.
3      MR. LIGHTFOOT:  You're exactly right,
4  and we'll, of course, get it to you Bates.
5  Yes, we just learned about it today because
6  I asked about it for that reason.
7      MR. MULLEN:  I just wanted to make
8  sure.  Perfectly fine.
9      (Whereupon, Defendant's Exhibit
10 Number 6 was marked for identification, a
11 copy of which is attached to the original
12 of the transcript.)
13 Q    Let me show you a training log and
14 ask you -- I'll show you what I'm marking
15 as Exhibit 6.  I'll bet you cannot recall,
16 because I wouldn't be able to, all of the
17 trainings that you received during your
18 employment at EAMC.  What I'm showing you
19 as Exhibit 6 is a list that EAMC kept of
20 the things that you were trained on, of the
21 courses.  Do you recall some of those
22 courses?
23 A    Yes.

Page 64

1  Q    Do you have any reason to doubt that
2  those are all materials that you were
3  trained on, that are on Exhibit 6?
4  A    No, I don't doubt it.
5  Q    And how would it work?  I don't know
6  if it worked the same way every time.
7  Would you receive things that were like
8  hard-copy documents like this --
9  A    No.
10 Q    -- or more like videos?  Tell me what
11 kinds of trainings you received.
12 A    They were just e-mails, I think they
13 were e-mails that came maybe 15 at a time.
14 Q    And you would need to acknowledge
15 that you had received them?
16 A    Yes.
17 Q    Would it make you sort of read
18 through them?
19 A    No.
20 Q    But you had the opportunity to read
21 through them?
22 A    Yes.
23 Q    Look on here, Exhibit 6, please, and

Page 65

1  tell me, are there any of these that you
2  remember?  One of them says Employee
3  Handbook, but tell me -- on the training
4  stuff, tell me any of the ones that you
5  recall, if you see one that you recall.
6  A    Okay.  Code delivery, for sure.
7  Q    Cold delivery?
8  A    Code delivery.
9  Q    What does "code delivery" mean?
10  A    There are codes that are basically
11  said when some things happen, when there's
12  an emergency, there's a code that is said
13  over the loud speaker.
14  Q    An emergency code?
15  A    Yes.
16  Q    Tell me about that training.  How did
17  you get that training?
18  A    E-mail.
19  Q    And what was the training?  It wasn't
20  a hard document?
21  A    No.  It would tell you basically
22  through different sceneries (sic) and
23  different things of what different codes

Page 66

1  were.
2  Q    So if you'll look over here, do you
3  recall -- like there's one in blue right
4  there, and it says Understanding and
5  Preventing Sexual Harassment in Healthcare.
6  Do you remember that?
7  A    Yes.
8  Q    Tell me what that one looked like.
9  A    It would basically state to go to
10  your director, and if your director
11  overlooks it, go to HR, which I did.
12  Q    If you're not satisfied with the
13  answer of your supervisor, go to HR, right?
14  A    Yes.  When you try to go to HR,
15  there's a "We'll get back to you."
16  Q    But what did this training look like?
17  Was it like slides or was it a document?
18  A    I don't recall.
19  Q    You remember getting it, you just
20  don't remember exactly what it looked like?
21  A    I just remember the steps that you
22  need to take.
23  Q    Exactly, when you believe you have

Page 67

1  been the victim of it?
2  A    Yes.
3      (Whereupon, at this time a short
4  break was taken.)
5  Q    I see in your Complaint that you are
6  claiming -- actually, I wanted to identify
7  something else first.
8      (Whereupon, Defendant's Exhibit
9  Number 7 was marked for identification, a
10  copy of which is attached to the original
11  of the transcript.)
12  Q    I'll show you what I'm marking as
13  Exhibit 7.  Is that your EEOC Charge?
14  A    Yes.
15  Q    And you swore that it was true and
16  correct and accurate, right?
17  A    Yes.
18  Q    And you brought this to the EEOC in
19  May of 2024?
20  A    Everything was roughly around, you
21  know, the time.
22  Q    Your signature is on May 6th on the
23  first page, right?

Page 68

1  A    Yes.  No, I'm saying from the
2  date-wise, Exhibit 8 date-wise, everything
3  is roughly around the same.
4  Q    I see what you're saying, okay.  I
5  see from the Complaint that you made in
6  this case, did you review this Complaint
7  before it was filed?
8  A    Yes.  Also, a supervisor I thought of
9  was Edward Kirk.
10  Q    You had another supervisor named
11  Edward Kirk?
12  A    Yes, his name was Edward Kirk.
13  Q    I'm trying to hear all of them, so
14  Edward Kirk.  How did he compare to Russ
15  Ballard, before or after?
16  A    Same time.
17  Q    Oh, Edward Kirk, okay.  Was he over
18  contracts?
19  A    We would just report to him, same as
20  like Russ.
21  Q    And you told me, when I asked you
22  your job duties, you said you sort of make
23  sure contracts were executed for materials



ALABAMA COURT REPORTING

Page 69

1  and products and service contracts and sent
2  to the higher-ups.
3  A    Uh-huh.
4  Q    Would you also do work with the
5  actual materials, sort of confirming that
6  they're there, and do warehouse work on
7  occasion?
8  A    That would not be my job duties, but
9  if I would go against it, it would be
10 basically said that "You'll do whatever I
11 tell you, because I can change your
12 duties."
13 Q    Yes, sure. So did you and Laquesha
14 also spend time in the warehouse with
15 materials?
16 A    I did. Laquesha would never.
17 Q    She did not?
18 A    She didn't ever.
19 Q    Oh, okay. Did you do some work in
20 the warehouse while you were the contract
21 coordinator?
22 A    Yes.
23 Q    Anybody else in the contracts team do

Page 70

1  work in the warehouse?
2  A    No.
3  Q    Was Lequesha on your team?
4  A    Yes.
5  Q    Was there anybody else on your team?
6  Let's go with just 2023 and 2024, because I
7  think some people came and went.
8  A    Yes. So I don't really recall. I
9  could tell you the names, but I don't
10 really recall who would go, you know.
11 Q    Who other than Laquesha?
12 A    Amanda.
13 Q    Amanda.
14 A    I think it was Amy. The contracts
15 team, that's all, I think, honestly.
16 Q    And what would you do in the
17 warehouse?
18 A    So in the warehouse, you would make
19 sure that basically when the truck comes
20 in, you would just make sure everything
21 stayed organized. You would pick up boxes
22 roughly around 50 pounds, you would
23 basically drive a forklift -- not forklift,

Page 71

1  I think it's a forklift.
2  Q    You drove the forklift some?
3  A    Yes. I think it's a forklift, the
4  handheld, the machine that picks up stuff.
5  Would that be a forklift?
6  Q    I'm not sure what you call that
7  thing.
8      MR. PHILLIPS: A jack?
9  Q    A jack, a dolly?
10 A    It's not as much as a dolly, but it's
11 like got the thing that lifts it up.
12 Q    It goes under, yes. I've heard them
13 sometimes called hand trucks. So you would
14 make sure what comes in stays organized?
15 A    Yes.
16 Q    You might move some of the things?
17 A    As a contract coordinator, I would do
18 everything that the warehouse worker would
19 do.
20 Q    And was that throughout your whole
21 employment?
22 A    Yes.
23 Q    I assume Laquesha did some of it but

Page 72

1  just not as much?
2  A    No.
3  Q    Laquesha like never did anything in
4  the warehouse?
5  A    Never. Never.
6  Q    Did Amanda do any of the stuff in the
7  warehouse?
8  A    Never.
9  Q    Were there warehouse workers?
10 A    Yes.
11 Q    So you would go down there and they
12 would be sort of doing their job, and then
13 you would kind of be doing less warehouse
14 job?
15 A    No, no, I would do more. I would do
16 more than what they were doing, because I
17 was a warehouse worker.
18 Q    You started as a warehouse worker?
19 A    Yes.
20 Q    I see. So you never quit doing
21 warehouse work?
22 A    Yes. Okay, yes.
23 Q    Is that correct?

Page 73

1   A    Yes, I never, basically.  I moved
2   over to contract coordinator, some people
3   would probably be out at the time, or they
4   would be in there and they would have
5   extra --
6   Q    Too much to do?
7   A    Not even too much to do.  They
8   wouldn't be as skillful as I was, so they
9   would call upon me.
10  Q    Got you, to help things stay
11  organized?
12  A    To deliver, help it stay organized.
13  Q    To deliver and organize, okay.
14  A    Just different things like that.
15  Q    Were you good at organizing and
16  delivering materials, is that why they kept
17  needing you to do that?  Or you were not
18  good at it?
19  A    I was okay, that's what I would say.
20  Q    You were good enough?
21  A    Yes.
22  Q    And could you tell if the warehouse
23  employees were good at what they did?

Page 74

1   A    I didn't know because I wasn't really
2   focusing on them.
3   Q    Right.  You were the contracts?
4   A    Yes, so.
5   Q    In your Complaint, I see about seven
6   or eight statements or actions that you
7   complain about, that you believe show that
8   EAMC sexually harassed you.  Are you
9   familiar with those things listed in your
10  Complaint?
11  A    Yes.
12  Q    Some of them are actually on that
13  e-mail, a lot of them are, and then some
14  are in your Complaint as well.  So your
15  Complaint is the legal Complaint, is what
16  I'm basing that on.  Let's just go ahead
17  and mark that.
18  A    And the EEOC?
19  Q    Well, that's a type of Complaint too.
20  I'll just show you the Complaint as well.
21      (Whereupon, Defendant's Exhibit
22  Number 8 was marked for identification, a
23  copy of which is attached to the original

Page 75

1   of the transcript.)
2   Q    What I'm marking as Exhibit 8, this
3   was drafted by your lawyer, but it
4   represents your claims, so this is the
5   legal Complaint.  I think you said you
6   looked at it before it was filed?
7   A    Yes.
8   Q    If you'll look through it, pages 4
9   through 7, pages 4 through 7 list those
10  seven or eight statements or actions that
11  you believe were sexual harassment.  Do you
12  see that?
13  A    Yes.
14  Q    The first one I see is Ursula Means
15  told you that you needed to wear scrub
16  pants rather than the formal clothing you
17  had worn under your previous manager.  Is
18  that correct?
19  A    Yes.
20  Q    When did she tell you that?
21  A    I don't recall the exact date or
22  time.
23  Q    You said in the Complaint that it was

Page 76

1   in June of 2022.
2   A    So it was roughly around that time.
3   I was just trying to --
4   Q    So she did not begin working at EAMC
5   until December of 2022, okay?
6   A    Okay.
7   Q    And she did not start supervising you
8   until February of 2023, okay?
9   A    Okay.
10  Q    So is that date wrong?
11  A    Yes, that date, yes.  I said it was
12  roughly, earlier when you asked me.  Those
13  dates would be roughly around the time.
14  Q    Did she ever tell you that you needed
15  to wear scrub pants?
16  A    A hundred percent, yes.
17  Q    But you don't know when that was?
18  A    I don't know the exact date or time,
19  but I can give you like a rough, you know.
20  Q    When?
21  A    Around the time that you said.  She
22  basically started supervising us.  So if
23  she started in December, she would come

Page 77

1  back to talk to us around -- well, if she
2  started in December, she came to greet
3  everybody around December.  January,
4  February, so you could say around about
5  February, then.
6  Q    And she told you folks in contracts
7  you needed to wear scrub pants?
8  A    No, no, no, no, it was me, just only
9  me.
10 Q    She told you that?
11 A    Yes, just only me.
12 Q    So you think it was in February?
13 A    Uh-huh.
14 Q    Was anyone around when she told you
15 that?
16 A    Charlotte Perchevi and Kay Yarby.
17 Q    And what did they do?  What were
18 their jobs?
19 A    Buyers.
20 Q    And where were y'all when she said
21 it?
22 A    I was in my office.  Their office is
23 roughly like this.  Everybody's office

Page 78

1  would basically fit in this room.  So if I
2  was in that corner, Charlotte was over
3  here, Kay, Laquesha.
4  Q    And you were still doing the
5  warehouse work, correct?
6  A    No.  So I was contract, I was
7  contract, but I would come in and help out
8  with the warehouse.
9  Q    Right.  And did she tell you it was
10 so that you wouldn't get your nice clothes
11 dirty?
12 A    No.  No.
13 Q    Was that in fact the case, that if
14 you wore scrubs, it would keep you from
15 getting your nice clothes dirty?
16 A    No.  I wore the same clothes that I
17 wore in the warehouse as a contract
18 coordinator.
19 Q    Okay.  What clothes were those?
20 A    Khaki pants and a navy collar shirt.
21 Q    Did you ever wear scrubs?
22 A    After she told me.
23 Q    You started wearing scrubs?

Page 79

1  A    After she told me, she told me that I
2  had to.
3  Q    Did you wear scrubs every day after
4  that?
5  A    Yes.
6  Q    You never wore khaki pants again?
7  A    I couldn't.
8  Q    Who else wore scrubs?  Other people
9  were wearing scrubs, right?
10 A    The storeroom people.
11 Q    The warehouse people, or are you
12 saying storeroom?
13 A    No, warehouse didn't.  Warehouse
14 would wear khakis and a collar shirt, like
15 a normal collar shirt.  The receiving dock,
16 they wouldn't.
17 Q    Storeroom would wear scrubs?
18 A    Storeroom would wear scrubs, some of
19 them.
20 Q    Some of them.  What was going on in
21 the storeroom?
22 A    They would just pick out like
23 materials.

Page 80

1  Q    Storeroom is different than the
2  warehouse?  The warehouse is where it comes
3  in from the trucks?
4  A    So storeroom is basically like a
5  small warehouse, so the older women would
6  wear scrubs, but everybody else wouldn't.
7  They would wear khakis and collar shirt.
8  Q    Did Laquesha ever wear scrubs?
9  A    No.  No.
10 Q    Laquesha never wore scrubs that you
11 saw?
12 A    I don't want to say never, but as I
13 saw, she would wear like clothing like they
14 have on.
15 Q    So are you saying you never saw her
16 wear scrubs?
17 A    I'm not saying that.  I just don't
18 recall.  So in the warehouse, I would be
19 the only person with scrubs.
20 Q    The statement in the Complaint says
21 that she said that you should wear scrubs,
22 correct?
23 A    Yes, correct.

ALABAMA
COURT REPORTING

Page 81

1  Q      Do you remember her exact words?
2  A      I don't remember right now.
3  Q      Did she say words -- not exact,
4  obviously, because you don't even remember
5  exact, you probably wouldn't, it was a long
6  time ago.  Did she say you should wear
7  scrubs so you don't get your other clothes
8  dirty?
9  A      No.  Those were the same clothes that
10  I wore in the warehouse, they were the same
11  exact clothes.
12  Q      Did she ever make any other comment
13  relating to scrubs at all?
14  A      When you mean by "comment," what do
15  you mean?
16  Q      Well, anything.  You're saying on one
17  occasion, you think it was probably
18  February, you're not sure --
19  A      Yes, I'm not sure of the date.
20  Q      -- February 2023, she said you should
21  wear scrubs?
22  A      Yes.  After she told me that, I went
23  to the place and got scrubs.

Page 82

1  Q      Like to, whatever it's called,
2  uniform place?
3  A      Yes, and just got scrubs.
4  Q      At EAMC?
5  A      It's not at EAMC.
6  Q      Oh, you go somewhere outside of EAMC?
7  A      Yes.
8  Q      But you don't have to pay for them?
9  A      Yes, I paid for them.
10  Q      Oh, I see, okay.  Well, did you ask
11  if EAMC had any scrubs you could wear?  You
12  didn't ask?
13  A      No.
14  Q      So that was in February of 2023, you
15  think, you're not sure exactly.
16  A      Yes.  This was in February, yes.
17  Q      So other than that time that she
18  mentioned scrub pants to you, did she ever
19  make any other comment about scrub pants to
20  you, ever?
21  A      So when she stated it, it was her
22  stating it.  After work, I got off, I just
23  went and got them.

Page 83

1  Q      So was that the only time she talked
2  to you about scrub pants?
3  A      Yes, it was just one time.
4  Q      And it was "You should wear scrub
5  pants," basically?
6  A      If that's how you want to say it,
7  yes.
8  Q      Well, you tell me.
9  A      So she came into my office and she
10  stated, "Hey, you know, I talked with
11  Nancy" --
12  Q      Nancy Ling?
13  A      Yes.  She said, "I talked with Nancy
14  and, you know, I think you should wear
15  scrubs," and I said, "Why?"  She looked me
16  up and down, started smiling, and then she
17  said, "Just get you some scrubs.  That's
18  over with."  "Okay, yes, ma'am.  I'll go
19  get the scrubs."  After work, I used my own
20  money, went and got the scrubs.  There was
21  nothing else out there, because after that
22  I was wearing scrubs.
23  Q      So that was that one occasion?

Page 84

1  A      Yes, that I can think of, that you're
2  talking about.
3  Q      And she never touched you?
4  A      She came into my office and she would
5  basically (witness indicating) all the
6  time, or she would come in there and close
7  the doors.  My office ain't no bigger than
8  this table.
9  Q      But you just did a motion and you
10  said she touched your shoulder?
11  A      Yes, she would come in there and
12  touch my shoulder, things like that.
13  Q      Okay.  But on this time with the
14  scrubs is the only one I'm talking about.
15  When she said you should wear scrub pants,
16  she didn't touch you that occasion, did
17  she?
18  A      I don't recall, but she touched me a
19  couple of times.
20  Q      Tell me, when did she touch you?
21  A      It should be in here.
22  Q      Well, I'm asking you, all right?  I'm
23  not asking what your lawyer wrote.  I want

Page 85

1  to know what happened.  You said she
2  touched you a couple of times, so let's
3  talk about them.
4  A    Yes.  I asked plain as day, asked her
5  plain as day, "Can you stop touching me?"
6  She got offended.  That's when she came
7  into my office and closed the door.  That
8  was one incidence, she came into my office
9  and closed the door.  She asked me, "What's
10  going on, why don't you want me to touch
11  you?"  I told her, "I don't think that's
12  professional."  She got an attitude, and
13  since then -- well, not even since then.
14  She tried to have a -- well, this is just
15  work type of ordeal.  That's an incident
16  also.  Another incident where we were doing
17  inventory --
18  Q    Hang on.  I need to ask you some
19  follow-up questions, okay?  I'll let you
20  say everything you want to say.  So you
21  said she touched you a couple of times, and
22  it was on the shoulder.  You showed me, it
23  was on the shoulder?

Page 86

1  A    Yes.
2  Q    So she touched you on the shoulder?
3  A    Uh-huh.
4  Q    So when was the first time she
5  touched you on the shoulder?
6  A    I really don't recall the first time,
7  because it happened so many times.
8  Q    Well, you said a couple of times.
9  You said the first time, you don't know
10  when the first time was?
11  A    No, I don't remember the first time,
12  but I remember asking her to not touch me.
13  Q    Was it in 2023?
14  A    Yes.
15  Q    Okay, it was in 2023.  Do you know
16  when?
17  A    No.
18  Q    Was anyone around?
19  A    No, it was in my office.
20  Q    Were you sitting or standing?
21  A    Sitting.
22  Q    She comes into your office standing
23  and you're sort of seated below her, and

Page 87

1  she touched you on the shoulder?
2  A    You could say, yes.
3  Q    Was she behind you or in front of
4  you?  Like did you face the door to your
5  office or did you have your back to the
6  door of your office?
7  A    My back to the door, but if you come
8  in, I turn around.
9  Q    Yes, but you didn't that time, right,
10  because I think you were telling me your
11  back was still to her, so she touched you
12  to get your attention?
13  A    No.  No.  No.  You don't have to
14  touch me to get my attention.  You can
15  "Nicholas" or you can (witness indicating).
16  Q    So she touched you?
17      MR. MULLEN:  Can the record reflect
18  that my client took his right hand, started
19  at the top of his shoulder and then came
20  down the front to about midway off the
21  front of his shoulder.  Is that accurate?
22      THE WITNESS:  Yes.
23  Q    So you're saying the first time she

Page 88

1  touched you, she touched you on which
2  shoulder?
3  A    I don't know which shoulder.
4  Q    And yet, you're testifying you
5  remember exactly how far her hand went?
6  A    Yes, for sure, because she did it
7  multiple times, but it wasn't --
8  Q    It went from the top of your
9  shoulder, you don't know which side and you
10  don't know when, but it went from the top
11  of your shoulder down six inches?
12  A    So if I can sit in -- can I
13  demonstrate, or could you demonstrate for
14  me?  Could you turn your back to that trash
15  can, and then I can tell you exactly which
16  shoulder it was?
17  Q    No.
18  A    I was trying to, you know.
19  Q    But you can describe it for me.
20  A    So if you turn your back to that
21  trash can and the door is open, so it would
22  be the left shoulder.  It would be the left
23  shoulder.



ALABAMA
COURT REPORTING

Page 89

1 Q    So you said she did that to your
2 shoulder?
3 A    Uh-huh.
4 Q    What did she say or what did you say?
5 A    I asked her like, "Can you not touch
6 me?"
7 Q    Got it.
8 A    She took offense to it, closed my
9 door, and asked me, "What's going on, why
10 can't I touch you?"
11 Q    And what did you say to that?
12 A    "I'd just rather not be touched."
13 Q    Did she ever touch you after that?
14 A    Yes.
15 Q    I assume after that, she quit
16 touching you?
17 A    No.
18 Q    Oh, she touched you another time?
19 A    Yes.
20 Q    Okay, when was the second time?
21 A    We were doing inventory in the
22 storeroom.  They were picking partners.  I
23 wanted to be a partner with Cameron

Page 90

1 Suttles.  Ursula told me, "No, you're going
2 to be my partner."  The aisles aren't that
3 big, but they're big enough for two people
4 to fit down.  She intentionally stood --
5 how can I say it?  I want to say it without
6 offending anybody --
7        MR. MULLEN:  Say it plainly.
8 A    Just say it plainly?  So she's not a
9 small woman.  She has hips, but they're not
10 so wide that two people can't walk beside
11 you.  So standing upon the aisle, she would
12 sit up there and brush-up against me on
13 purpose or bump me with her hips.  There
14 were cameras in there.  You probably can
15 pull the cameras and see.  She would bump
16 me with her hip.  She would say little
17 things and brush-up against me and stuff
18 like that, and I would just move, move, you
19 know.
20 Q    What was this thing that y'all were
21 doing on the inventory?
22 A    So inventory, you count stock.
23 Q    Count stock.  Does that happen every

Page 91

1 week or once a month, how often?
2 A    I'm not quite sure.  I think it's
3 like once a year or maybe twice a year.
4 Q    Oh, I see, once or twice a year.
5 A    But it's different days.
6 Q    And who does it?  Does the contracts
7 team do it?
8 A    We're not supposed to.
9 Q    But y'all were helping the warehouse?
10 A    But they just came in and got me.
11 Q    Well, they got Ursula too?
12 A    She's a supervisor, so she's supposed
13 to.  But it wasn't the warehouse.  That's
14 what you said, right?  It wasn't the
15 warehouse, it was the storeroom.
16 Q    Oh, it's the storeroom, I see.
17 A    Yes, because the aisles are in the
18 storeroom.
19 Q    Who else was doing that inventory?
20 A    I don't even know all the storeroom
21 clerks, but I know for sure it was Cameron
22 Suttles.
23 Q    Is Cameron a man or a woman?

Page 92

1 A    It's a man.
2 Q    Okay.
3 A    Edward Kirk, Edward was there.  I
4 don't know who else, honestly.
5 Q    So when was that inventory done that
6 you say she touched you?
7 A    I don't know the exact date.
8 Q    What year?
9 A    You could say 2023.
10 Q    Before or after she had touched you
11 on your shoulder?
12 A    It was after, it was after, for sure.
13 Q    You said she touched you by sort of
14 her hips touching your hips?
15 A    No, no, no.  It was like a bump.
16 Q    Oh, a bump?
17 A    The intentional bump like.
18 Q    And it was one second?
19 A    Yes, but it was a couple of times, so
20 you could say how many other seconds within
21 that one.
22 Q    A couple times, one second?
23 A    Yes.  And I stated to Edward Kirk,



Page 93

1   "Hey, Ed, I don't like that."
2   Q    But you didn't tell her to stop?
3   A    Yes.
4   Q    Oh, you did, like when she touched
5   you?
6   A    I was like, "Ms. Ursula, you bumped
7   me," and she just laughed.
8   Q    Is that all that was said?
9   A    Yes.
10  Q    Did she ever touch you any other
11  time?
12  A    Not that I can think of.
13  Q    On the scrub pants incident that we
14  talked about, going back to that --
15  A    Yes, sir.
16  Q    -- you never told her that what she
17  had done offended you, right?
18  A    No, I never said anything.
19  Q    And you did not report that to EAMC,
20  did you?
21  A    I reported it to Edward Kirk, Nancy
22  Ling, and Nancy Ling stated that she would
23  look into it.  After nothing, you know,

Page 94

1   helped, I basically went to HR to ask who
2   could I talk to.  The receptionist was a
3   black lady with glasses, kind of heavy-set.
4   She stated she would call someone, she got
5   on the phone.  She stated that they was in
6   a meeting and they would basically get back
7   to me.
8   Q    So you're saying on the scrub pants
9   incident, you told that to Ed Kirk and
10  Nancy Ling?
11  A    Uh-huh.
12  Q    So when did you tell that to Ed Kirk
13  and Nancy Ling?
14  A    I told Edward right before I got off.
15  I told Ms. Nancy roughly, we're going to
16  say, maybe an hour before I got off.
17  Q    On the same day?
18  A    Yes.  I seen Ms. Nancy in the hallway
19  and I was asking Ms. Nancy, "Hey,
20  Ms. Nancy, why I've got to wear scrub pants
21  when nobody else has to wear them," and
22  Ms. Nancy stated, "That's what Ursula
23  wants."

Page 95

1   Q    So what you said to Nancy was, you
2   just told me the complaint that you made to
3   Nancy, which is "Why do I need to wear
4   scrub pants?"
5   A    Yes.  Like, "Hey, Ms. Nancy, why do I
6   have to wear scrub pants and nobody else is
7   wearing them?"
8   Q    So you didn't report that she looked
9   you up and down to Nancy?
10  A    No.
11  Q    But you did tell that to Ed Kirk?
12  You did tell him what you just said, you
13  told him, "Why do I have to wear scrub
14  pants?"
15  A    Yes.  I told Edward that.  I told
16  Edward that she did look me up and down.
17  Q    Edward is not a manager, right?
18  A    Yes, he is.
19  Q    What is Edward's position?
20  A    I want to say manager supervisor.
21  Q    What did you tell Edward, then?  It
22  sounds like you told him something
23  different than Nancy.

Page 96

1   A    No.  The reason why I did that,
2   because Nancy brought in Ursula.  Nancy and
3   Ursula are best friends.  If you sit over
4   there and you tell Nancy anything, Ursula
5   is going to know.  So it's basically like a
6   retaliation.
7   Q    What did you tell Ed Kirk?
8   A    I told Edward, "Hey, Ed, why have I
9   got to sit up there and wear scrub pants
10  but, you know, nobody else has got to wear
11  them?"  He said, "You don't got to wear
12  scrub pants.  What are you talking about?"
13  I said, "Ms. Ursula just came back down and
14  told me that, and she's going to sit over
15  there and look me up and down."  Edward
16  made a joke, "Well, she maybe wants some."
17  I told her "No, I don't like that."
18  Q    You told Nancy Ling something --
19  A    I asked Ms. Nancy --
20  Q    "Do I have to wear scrubs?"
21  A    Yes.
22  Q    But you didn't talk about looking up
23  and down?



Page 97

1   A    No.
2   Q    What was Edward's position, Edward
3   Kirk?
4   A    He's like a manager supervisor.
5   Edward was over us also.
6   Q    So then you say you went that same
7   day to HR?
8   A    Yes.  Yes.  No, no, no.  What day are
9   you talking about?
10  Q    Well, you said you told Ed and Nancy
11  the day it happened.  Is that right?
12  A    Yes.
13  Q    And then you said you went to HR and
14  spoke to a heavyset black woman?
15  A    Yes.
16  Q    Was that the same day?
17  A    It probably was.  I'm not sure.  I
18  don't recall.
19  Q    What did you tell the woman in HR?
20  A    "I want to speak with someone
21  basically that I can talk to in HR because
22  I be feeling uncomfortable when my manager
23  talks to me."

Page 98

1   Q    So you just spoke generally, you
2   said, "Can I speak to someone in HR?"
3   A    Because I be feeling uncomfortable.
4   Q    Right.  She was not an HR
5   representative, she's the secretary, right?
6   A    Yes.
7   Q    Did she try to find someone in HR?
8   A    Yes, she did.
9   Q    And did she call someone on the
10  phone, do you know?
11  A    Yes, she did.
12  Q    And did you speak with anyone in HR?
13  A    No.  She told me that they said they
14  would get back with me.
15  Q    Okay.  And did they?
16  A    No.
17  Q    Did you ever raise it again with HR
18  that no one had gotten back with you?
19  A    I went down there on multiple
20  occasions, but nobody ever got back.
21  Q    Well, you never went down there and
22  said, "Someone didn't get back with me,"
23  did you?

Page 99

1   A    No.
2   Q    So you just let it drop?
3   A    That's what you could say.
4   Q    Well, my point is, you never spoke to
5   anyone in HR about that incident, correct?
6   A    Yes, I never spoke to anybody.
7   Q    Is that correct?
8   A    Yes, you're right.  You could say I
9   spoke to the secretary.  I don't know what
10  position she plays.
11  Q    Right, okay.  Yes, you told me you
12  spoke to the secretary.  Then you said you
13  were touched twice, and you told me about
14  each time.  Once was on your left shoulder,
15  you now say -- you first said you didn't
16  know which shoulder.  So now you were
17  touched on the shoulder once, and then you
18  say you also were bumped a couple of times
19  by Ursula.  You never mentioned that to
20  anyone in HR, did you?
21  A    No.
22  Q    And you never told that to your
23  manager, did you?

Page 100

1   A    Yes.
2   Q    You did?  Oh, I'm sorry, you already
3   told me.  You told Ed Kirk, right, that she
4   bumped you?
5   A    Yes.
6   Q    But you did not tell HR, correct?
7   A    No, other than that message that you
8   see.
9   Q    What message?
10  A    You produced an e-mail.
11  Q    Oh, yes, the Complaint that you sent
12  to HR on February 27th of 2024?
13  A    Uh-huh.
14  Q    Got it.  Is that "yes"?
15  A    Yes.
16  Q    I'm aware of you getting one
17  performance review from Ursula, and I think
18  that was in 2023.  And do you recall that
19  she gave you a performance evaluation?
20  A    I don't recall.
21  Q    Do you recall that she said that you
22  were a solid performer?  Do you recall that
23  at all?

Page 101

1  A    No, sir.
2  Q    I can show you that. It's in the
3  documents we gave you. Did you understand
4  that you were meeting expectations in the
5  job?
6  A    Yes.
7  Q    And you were never given any warnings
8  or any counselings that your performance
9  was poor, were you?
10 A    No.
11 Q    One time you got a counseling, I
12 think, about being careful about responding
13 to a phishing e-mail, a scam. Do you
14 remember that?
15 A    Yes.
16 Q    But that's not really performance.
17 That's being careful on the computer,
18 right?
19 A    Yes.
20 Q    After those two times that you were
21 touched by -- I think I've already asked
22 you this -- by Ursula, you said the second
23 time, you don't know when it was, but it

Page 102

1  was in the storeroom when y'all were doing
2  the inventory. She didn't touch you after
3  that, correct?
4  A    No, sir.
5  Q    At some point you learned, or did you
6  claim in your lawsuit that Ms. Means
7  commented to another employee that you
8  would run and hide and not protect anyone
9  if there was ever a shooting. Does that
10 ring a bell?
11 A    Yes, a hundred percent.
12 Q    Who told you that?
13 A    What do you mean? She did.
14 Q    Oh, Ursula said that to you?
15 A    In front of me, in the hallway of the
16 offices. She said something about I would
17 be a wimp or something.
18 Q    Okay. Who was the other employee
19 that Ursula Means said that to?
20 A    Kay Yarby and Charlotte Perchevi.
21 Q    The same two?
22 A    Yes.
23 Q    So tell me what she said.

Page 103

1  A    She came back there, she was talking
2  to Laquesha Lasseter. Laquesha basically
3  closed her door because she did not like to
4  basically be around Charlotte Perchevi and
5  Kay Yarby. My door was open, they were
6  joking around. A hospital, I want to say I
7  think a code came up earlier, and then we
8  had to basically sign like some papers
9  saying that we, you know, participated in
10 the code. And I think Kay brought it up,
11 stating that if it was a real shooting or
12 she thought it was a real shooting -- oh,
13 she said she thought it was a real
14 shooting, and then Ursula said, "If it was
15 a real shooting, we wouldn't have nobody to
16 protect us. Nick wouldn't protect us,"
17 like that.
18 Q    Did you have any reason to think that
19 that statement was based on your sex?
20 A    If I'm the only man back there and
21 she said that she stated that she can whoop
22 me.
23 Q    Are you saying she said in that

Page 104

1  statement that she could whoop you?
2  A    Yes.
3  Q    Well, you didn't say that just then.
4  What I heard you say was that y'all signed
5  paperwork relating to a code, they were
6  joking around, someone thought it was real,
7  and then Ursula said, "If it was real, Nick
8  wouldn't protect us," is what you told me.
9  A    Just then, yes.
10 Q    Nothing about her saying she could
11 whoop you.
12 A    Okay.
13 Q    So she never said that she could
14 whoop you?
15 A    She did.
16 Q    On that occasion or on another
17 occasion?
18 A    Yes, that occasion.
19 Q    Tell me what you are now claiming she
20 says about whooping you.
21 A    If there was a shooting, I would run
22 and hide, and then basically she stated
23 that, you know, she believed that she could

Page 105

1  whoop me so I couldn't protect them.
2  Q     What words did she say?
3  A     Exactly what I just said, I would run
4  and hide and that she could whoop me.
5  Q     And Charlotte and Kay were right
6  there?
7  A     Yes.
8  Q     Was Laquesha there, too?
9  A     Her door was closed.
10  Q     And you don't know when this was?
11  A     I don't have the exact date.
12  Q     Do you know what year?
13  A     I'm not sure, honestly.  It was a
14  long time ago, so I don't recall.
15  Q     Did you tell her you were offended by
16  that?
17  A     Yes.
18  Q     You did?
19  A     Yes.
20  Q     What did you say?
21  A     "That's not the case."
22  Q     Oh, you just said, "That's not the
23  case"?

Page 106

1  A     Yes.
2  Q     You didn't tell her you were
3  offended?
4  A     Okay.
5  Q     And you didn't say, "Don't say that"?
6  A     No, I didn't say that.
7  Q     And you didn't report that to anyone?
8  A     No.
9  Q     And she never said anything like that
10  again?
11  A     No.
12  Q     Do you claim Ursula Means told
13  employees that she intended to make you
14  quit?
15  A     Yes.
16  Q     Who told you that?
17  A     Laquesha Lasseter.
18  Q     When did Laquesha tell you that?
19  A     I don't know the exact date.  I don't
20  recall the date.
21  Q     Where were you when she told you?
22  A     I was in my office.
23  Q     So tell me everything that was said

Page 107

1  about it.
2  A     She stated that she wanted to bring
3  in someone from Baptist Memorial for my
4  position.  I think her name -- it was a
5  woman.  I'm not quite sure what her name
6  was.
7  Q     Is this Laquesha telling you that
8  Ursula said this?
9  A     Yes.
10  Q     Had she spoken to Ursula?
11  A     Yes.
12  Q     So she comes into your office, and
13  how does Laquesha start the conversation?
14  A     She comes into my office and said,
15  "Hey, don't say nothing to nobody, I don't
16  want them to know, but you need to be on
17  your Ps and Qs because Ursula wants to get
18  you up out of here.  She wants to bring
19  someone from Baptist Memorial," I think her
20  name was maybe like Ashley or Amber, for my
21  position.
22  Q     Was that all that Laquesha told you?
23  A     Yes.

Page 108

1  Q     What did she say Ursula had said?
2  A     What you mean?
3  Q     So what exact words?  Is she saying
4  that she heard Ursula say it?
5  A     She was having a conversation with
6  Ursula.
7  Q     And what words did she say Ursula
8  said?
9  A     She didn't say any words that Ursula
10  said.  She just stated what was said.
11  Q     She gave you the summary?
12  A     Yes.
13  Q     Then how did you respond to that?
14  A     I mean, I was just like "Okay."  She
15  was looking out for me.
16  Q     And you found Laquesha to be an
17  honest person?
18  A     If it benefits her.
19  Q     Have you ever known her to be
20  dishonest?
21  A     Yes.
22  Q     Did you --
23  A     She does whatever benefits her.

Page 109

1  Q    So how did it benefit her to come
2  talk to you?
3  A    We were friends so, you know, if
4  she's messing up on a contract or she
5  doesn't know how to do a contract, I would
6  help her out.
7  Q    When did Laquesha ever not be honest
8  with you?
9  A    There was an incident of where she
10 basically had messed up a contract and she
11 put it back on me, but I had nothing
12 whatsoever to do with the contract, so she
13 didn't want to get in trouble.
14 Q    Once you say Laquesha said that to
15 you, you didn't report that to anyone at
16 EAMC, did you?
17 A    No.
18 Q    And you have no reason to believe
19 that that comment was based upon your sex,
20 do you?
21     MR. MULLEN:  Object to the form.  You
22 can answer.
23     THE WITNESS:  Now?

Page 110

1      MR. MULLEN:  Yes, you can answer.
2  A    No.  It could have been, because she
3  made a statement to me to basically say
4  that she felt like men shouldn't be working
5  with women back there.
6  Q    So you're saying she made a comment
7  about --
8  A    That was later.  That was later, she
9  made a comment stating that men should not
10 be working with women.
11 Q    Ursula said this to you?
12 A    Yes.
13 Q    Who was around?
14 A    I was in Ursula's office.  It was
15 just me and Ursula.
16 Q    When was it?
17 A    I'm not quite sure on the date,
18 honestly.  The dates are all in their
19 computer, in their computer.
20 Q    So you're saying it was just the two
21 of you in her office?
22 A    Yes.
23 Q    So what statement did she make about

Page 111

1  men not working with women?
2  A    There was a point in time where there
3  was a buzz going around stating that a new
4  position would be created, a contract
5  administrator position, and I basically
6  asked, "Is the position real?"  She stated
7  "Yes, but, you know, I don't think you
8  should apply for it because I don't really
9  think that men should be around women, they
10 like you."
11 Q    Wait.  "I don't think men should be
12 around women, they like you"?
13 A    Yes.  She was stating that the other
14 women in the -- how can I say it better?
15 Help me out.  In the department liked me.
16 Q    You didn't tell her that offended
17 you, did you?
18 A    So how should I tell her it offended
19 me if other women like me?
20 Q    That's my question.  I asked you the
21 question.  Did you tell her that offended
22 you?
23 A    I told her that they did not like me,

Page 112

1  and I didn't have nothing going on with any
2  other women.
3  Q    Did you tell her not to make comments
4  like that?
5  A    At that time?
6  Q    Yes.
7  A    That was later on, so.
8  Q    So you did not tell her to stop
9  making comments like that?
10 A    I don't recall.
11 Q    You didn't report that to anyone at
12 EAMC, did you?
13 A    I told Ms. Nancy Ling that I don't
14 feel like that would be fair for her to
15 basically say that I can't go to or apply
16 for a position because she felt like others
17 liked me.  Because my performance never
18 slipped.  I never did anything wrong.
19 Q    You told Nancy Ling that Ursula had
20 made that comment?
21 A    I told Ms. Nancy Ling that Ursula
22 told me not to apply for the position
23 because of that comment, she felt that



Page 113

1  others liked me.
2  Q    When did you tell that to Nancy Ling?
3  A    I don't recall the date.
4  Q    Was it the same day that it was said?
5  A    No.  Yes, it was the same day.  That
6  was the same day.  She was in the hallway,
7  we were having a conversation, and Laura
8  Greer walked up and started talking to her.
9  Q    And it was after that?
10 A    No, no, it was before that.
11 Q    Before that?
12 A    Yes.  And then Laura walked up.  So
13 we was talking and then Laura walked up.  I
14 think Laura is the CEO.  You know, I gave
15 Laura all her attention.
16 Q    So what did you tell Nancy had
17 happened?
18 A    What do you mean?
19 Q    What did you tell Nancy?
20 A    I just stated it.
21 Q    That you were told not to apply?
22 A    Uh-huh, and I didn't feel like --
23 because my performance never had any issue.

Page 114

1  Q    Did Nancy respond in any way?
2  A    She told me she know what's going on,
3  just stay and she would create me a
4  position.  She would have me a position
5  created, just stay.
6  Q    You already had a position, right?
7  A    Contract coordinator, yes.  But the
8  position they were creating, I think it was
9  a contract administrator or a contract
10 manager.
11 Q    And she was saying, "I'll take care
12 of you, make sure you have a different
13 position"?
14 A    Nancy basically told me that she
15 would create a position.  I don't even
16 think it would be in that department, but
17 she would get a position created, because
18 she knows what's going on.
19 Q    And did it ever happen that that
20 position came open or there was a new job
21 created for contract --
22 A    Laquesha Lasseter has the position
23 now.

Page 115

1  Q    So this was all before Laquesha
2  worked for EAMC?
3  A    No, no, it was during the time.  So
4  Laquesha moved up and I guess they brought
5  someone else in.  You know, I just stated
6  the person that they were going to bring
7  in, Ashley, Amber.  That's what I just
8  stated there.
9  Q    So that position, there was a new
10 contract manager or administrator position
11 that did open up?
12 A    Yes, they created it.  It didn't open
13 up, they created it.
14 Q    They created it?
15 A    Uh-huh.
16 Q    Did you apply for it?
17 A    She told me not to.
18 Q    No, I asked you if you applied for
19 it.
20 A    No.
21 Q    You could have applied for it, right?
22 A    Not if she tell me not to.  You have
23 to listen to whoever your supervisor or

Page 116

1  your director is.  You just can't go over
2  and do what they don't tell you.
3  Q    Well, you certainly didn't go to HR
4  and say, "You're not going to believe
5  what's happening here.  My manager is
6  saying I can't even apply for an open
7  position, so I definitely want that job,
8  it's important to me, and I want to apply
9  for it."  Did you do that, did you talk to
10 HR like that?
11 A    I did not, because every time I went
12 to HR, you would always hear "They'll get
13 back to you."
14 Q    Well, so hold on.  You didn't go to
15 HR on this occasion, did you?
16 A    No, no, because every time --
17 Q    You didn't tell anyone that you
18 wanted that position?
19 A    I told Nancy that.
20 Q    Other than Nancy?
21 A    Nancy is the director, so who else
22 would I tell?
23 Q    You didn't tell anyone other than



Page 117

1   Nancy, did you?
2   A    Okay.  I probably told Edward Kirk.
3   Q    I'm not talking about probably.
4   A    Well, yes, I told Edward Kirk.
5   Q    Okay, now it's not probably.  Now you
6   did tell Edward Kirk.
7   A    Okay.
8   Q    Tell me what you told Edward Kirk.
9   A    I don't recall.
10  Q    Okay, that's what I thought.  So the
11  position came open and Laquesha Lasseter
12  got that position?
13  A    Yes, I believe she did get that
14  position.
15  Q    When was that?
16  A    I'm not quite sure.
17  Q    You never went to HR at any time
18  other than at the very end of your
19  employment when you went -- I'm sorry,
20  you've already told me about one time.  You
21  went and spoke to the secretary that time?
22  A    I went to the secretary like two
23  times, maybe two or three.

Page 118

1   Q    But you never ended up speaking to
2   anyone in HR on those occasions?
3   A    Because it was always someone was
4   busy.  I think it was Ms. Kelli Truitt was
5   busy, she would get in contact with you.
6   Q    You've told me about one time that
7   you came and you spoke to the heavyset
8   woman.  Tell me about any other time you
9   went to HR.  We're going to talk about when
10  you went at the end, of course, at the end
11  of your employment.  We'll talk about that,
12  and I've already shown you the e-mails.
13  But before that, you said you went one time
14  and spoke to the heavyset woman?
15  A    There was an incident where basically
16  I was almost about to lose my job, and I
17  asked Ms. Ursula, "Hey, Ms. Ursula, I just
18  received a phone call that I think I'm like
19  a half-a-point or a point away, and my time
20  has not been approved."  I would basically
21  work from home and I would basically tell
22  her, "Hey, can you approve my time?  Can
23  you approve my time?"  She never approved

Page 119

1   my time, so I went to HR -- well, I went to
2   Ms. Nancy first to see what was going on.
3   Ms. Nancy was not in the office.
4   Q    Okay, I'm listening.
5   A    So basically, when I went to HR, they
6   directed me to go to the time people,
7   whoever does time.  So I went over into the
8   office --
9   Q    I'm listening to you, sorry, I didn't
10  mean to interrupt.
11  A    So I went over into the office and
12  then -- keep going?
13  Q    Keep going.
14  A    They basically tried to figure out
15  what was going on.  So when they figured
16  out what was going on, there was, I want to
17  say, the director over there.  He reached
18  out to her and he was trying to figure out
19  what was going on.  So then I went back to
20  my office, she called me to her office, she
21  asked me did I snitch on her.
22  Q    Who called you into her office?
23  A    Ursula.  She asked me did I snitch on

Page 120

1   her.  Then Ms. Nancy had her door open and
2   she yelled out, "Nan, Nick done went over
3   there and snitched on me about the times
4   not being approved."  Ms. Nancy started
5   laughing.  She made a comment, but I don't
6   recall the comment.  And she told me that
7   if she got in trouble, she would have her
8   nephew and son to come up and whoop me,
9   Pooki and John-John.  I left there and went
10  back to --
11  Q    Hold on.  So Ursula said that she
12  would have her nephew --
13  A    Nephew and son John-John.
14  Q    Nephew John-John and Pooki?
15  A    Yes, Pooki and John-John to come up
16  to the parking lot and whoop me if she got
17  in trouble.
18  Q    So there was an issue with
19  clocking-out on EAMC's system, correct?
20  A    No, there was never an issue.  She
21  wasn't approving.  She would approve
22  Laquesha's time, but she wouldn't go in and
23  approve mine.  If me and Laquesha worked at

ALABAMA
COURT REPORTING

Page 121

1 the same time remotely, all you have to do
2 is go in and approve them.
3      (Whereupon, Defendant's Exhibit
4 Number 9 was marked for identification, a
5 copy of which is attached to the original
6 of the transcript.)
7 **Q     Let me show you what I'm marking as**
8 **Exhibit 9.**
9 A    These are the text messages, right?
10 **Q     About that issue?**
11 A    No.  So in the text messages, you can
12 see, if you read through them, I believe I
13 used to text her, "Can you approve my
14 time?"
15 **Q    I'll show you what I'm marking as**
16 **Exhibit 9.  Jon-Kaden, these have been**
17 **produced, but I don't have an extra copy.**
18 **Do you see an e-mail thread that I've**
19 **marked as Exhibit 9?**
20 A    Uh-huh.
21 **Q     Do you remember it?**
22 A    Yes.
23 **Q     If you'll go back, it looks like -- I**

Page 122

1 **think, going off memory, it's like you and**
2 **Laquesha.  Are there others involved in**
3 **those e-mails?  Ursula?**
4 A    Ursula.
5 **Q    I don't know if Nancy is involved.**
6 A    No.
7 **Q     Then I think the guy that's trying to**
8 **do Citrix.  What's his name?**
9 A    This is in December.
10 **Q     Exactly.  December of 2023?**
11 A    You said she just started in
12 December, right?
13 **Q     2022.**
14 A    Okay, so Citrix messed up that many
15 times?
16 **Q    I'm asking you, do you recall there**
17 **being a problem with clocking-out, with**
18 **your clocking-out being properly approved**
19 **in December of 2023?**
20 A    Yes.
21 **Q     And is that what y'all are talking**
22 **about in Exhibit 9?**
23 A    Exhibit 9, yes.

Page 123

1 **Q     And did they get it fixed by showing**
2 **you and Laquesha how to use the Citrix**
3 **system?**
4 A    Yes.
5 **Q     And did that fix the problem?**
6 A    No, it did not.
7 **Q    It did not fix it?**
8 A    No, it did not.  This happened in
9 2023.  The problem that I'm talking about,
10 when did I quit, 2024 or '25?
11 **Q     '24.**
12 A    So that happened in 2024.
13 **Q     The problem that you're talking about**
14 **happened in '24?**
15 A    Yes, where she stated that she would
16 send Pooki and John-John to whoop me.
17 **Q     Did that have to do with the**
18 **timekeeping?**
19 A    Yes, it did.  She stated that I
20 snitched on her, that's what I'm saying.
21 **Q     January 2024 is what you said in your**
22 **Complaint.  So this is just before that?**
23 A    So if that would have fixed it, that

Page 124

1 '24 would have never happened.
2 **Q    I don't see any evidence that it was**
3 **2024.  Do you have a reason to think it was**
4 **2024?**
5 A    I mean, they have the e-mail.  Ursula
6 has the e-mail also that she received from
7 the times people, the director of --
8 **Q     But what makes you think it was 2024?**
9 A    Because I know it wasn't 2023.
10 **Q     Well, this is like the last few days**
11 **of 2023.**
12 A    You're stating that it was 2023.
13 **Q    I'm looking at e-mails.**
14 A    Okay.  You're not looking at the
15 other e-mails.
16 **Q     Do you have those e-mails?**
17 A    EAMC does.  If you look at the
18 director -- if you ask the director over
19 there at EAMC, the timekeeping, time
20 people, if you just ask them.
21 **Q     Do you know exactly when the problem**
22 **was resolved?**
23 A    If you gave me this exhibit, it



Page 125

1  should have been resolved after he said
2  that it was fixed with Citrix, right?
3  **Q    Right.**
4  A    So that's when it should have been
5  resolved.
6  **Q    What e-mails are you aware of --**
7  A    I know for a fact the director of the
8  times, the timekeeping card, whatever you
9  call it, he sent her an e-mail. That's why
10  she called me into her office stating that
11  I was a snitch. If I had my computer, I
12  could tell you.
13          (Whereupon, Defendant's Exhibit
14  Number 10 was marked for identification, a
15  copy of which is attached to the original
16  of the transcript.)
17  **Q    I'll show you what I'm marking as**
18  **Exhibit 10. This talks about an employee**
19  **named Scottie Brown who helped fix the**
20  **issue. Do you know who Scottie Brown is?**
21  A    No, I do not.
22  **Q    I'll show you what I'm marking as**
23  **Exhibit 10. Oh, no, you're not involved.**

Page 126

1  **I'll tell you what. These e-mails show**
2  **that Scottie Brown got involved to try to**
3  **fix the issue and to make sure that you did**
4  **not get into any disciplinary trouble for**
5  **the punches that were not occurring. Do**
6  **you recall any of that?**
7  A    I was making the punches, so how were
8  they not occurring?
9  **Q    Were you disciplined for not having**
10  **punches?**
11  A    No, I wasn't disciplined, but
12  retaliation when she said that she would
13  have somebody jump on me for telling.
14  **Q    Do you have any reason to think that**
15  **the problem was not fixed right there at**
16  **the end of 2023 or right at the beginning**
17  **of 2024?**
18          MR. MULLEN: Object to the form. He
19  can answer.
20  A    No.
21  **Q    Did you ever tell anyone at EAMC that**
22  **Ursula Means said that she would send her**
23  **nephew and son, John-John and Pooki, to**

Page 127

1  **whoop you?**
2  A    Nancy Ling heard it.
3  **Q    Nancy Ling heard her say that?**
4  A    She was talking to Nancy Ling also.
5  **Q    Got it.**
6  A    Laquesha Lasseter was also in the
7  office. I went to HR and stated it also,
8  and basically it got back to me that "I'll
9  get back to you."
10  **Q    So you're claiming that you went to**
11  **HR a second time?**
12  A    It was more than a second time.
13  **Q    We're going to talk about every**
14  **single one, every single one.**
15  A    Yes.
16  **Q    We know you talked to HR around this**
17  **one, right at the end, which was the 27th,**
18  **right?**
19  A    Yes.
20  **Q    Because we have your complaint to**
21  **them on the 27th, and I believe you even**
22  **had a phone call with Kelli Truitt before**
23  **that?**

Page 128

1  A    Possibly.
2  **Q    Or maybe you met with her in person?**
3  A    No. I've never seen her.
4  **Q    So I'm not talking about that time**
5  **that you went to HR, okay? You've told me**
6  **about one time you went to HR and there was**
7  **a heavyset woman, you've already told me**
8  **about that?**
9  A    Yes.
10  **Q    Tell me any other time that you went**
11  **to HR.**
12  A    It was a long time ago. I really
13  don't remember, but I know that I went
14  multiple times.
15  **Q    So you did go a second time?**
16  A    Yes. I went multiple times to HR.
17  **Q    Can you tell me when any of those**
18  **were? A long time ago?**
19  A    Yes. I don't recall, honestly.
20  **Q    And you can't tell me any details**
21  **about any of those other visits to HR,**
22  **correct?**
23  A    I don't recall.

Page 129

1  Q     And you also, I think you told me
2  that you never actually met with anyone in
3  HR personally until you talked to Kelli?
4  A     I have never met her.
5  Q     But you were able to communicate with
6  Kelli, right, Kelli Truitt?
7  A     Yes.  That was the last time, yes,
8  basically because of everything that I had
9  put together.
10  Q     HR has a practice of when someone
11  comes to make a complaint to them about
12  being mistreated, that they put it in
13  writing.  Is that what Kelli Truitt told
14  you around February 27th of 2024?  Did she
15  ask you to put it in writing?
16  A     Is it in the e-mail that you see?
17  Q     No.  I think she probably verbally
18  told you that, but you can tell me.  My
19  understanding is you spoke to Kelli, maybe
20  it was on the phone, and said, "I have a
21  complaint," and that she asked you to put
22  it in writing.  But maybe that's not true.
23  You tell me.

Page 130

1  A     I don't recall that.  I had never
2  seen her but, you know, I don't recall.
3  Q     Well, that's fine.  Why did you send
4  this e-mail, then?  Let's see how it
5  starts.  You called her, "Ms. Kelli, I have
6  reached out to numerous directors and vice
7  presidents about my issues with Ursula
8  Means."  Did you just send this e-mail out
9  of the blue?  By the way, that e-mail is
10  contained in --
11  A     Exhibit 1.
12  Q     -- Exhibit 1.  So did you just send
13  that e-mail out of the blue, or did you
14  talk to her before?
15  A     It was probably out of the blue,
16  because the lady at the desk, nine times
17  out of ten, I think she told me her name,
18  but I didn't even know who to contact about
19  these complaints.  Because every time I
20  went down there to complain, it was always,
21  "They'll get back to you, they're busy
22  right now."
23  Q     So you remember going down there to

Page 131

1  HR, I think you said you remember going
2  down a second time.  Is that correct?  You
3  told me about one time with the heavyset
4  woman.
5  A     Yes, sir.
6  Q     So you think you may have gone a
7  second time, but you don't remember any
8  details about that; when it was, who you
9  spoke to, what the person looked like?
10  A     I think you wrote it down when I said
11  I went down there a second time.
12  Q     When did you go down there a second
13  time?
14  A     It should be in your notes.
15  Q     No, no, no, this is your testimony.
16  A     I mean, I don't recall.
17  Q     You don't recall any of that?
18  A     I don't recall.
19  Q     On the clock-out issue, which is
20  Exhibits 9 and 10, do you have any reason
21  to think that anything was done to you on
22  the basis of your sex?  Do you have any
23  reason to think that what you think Ursula

Page 132

1  did to you was on the basis of your sex,
2  with regard to the clock-out?
3       MR. MULLEN:  Object to the form.  You
4  can answer.
5  A     Yes.
6  Q     Why is that?
7  A     Because she stated that before when
8  she was talking to Laquesha, she would get
9  me out of there.  She stated to me also
10  that she don't feel like men should work
11  around women.  So her missing those
12  clock-outs, only missing with me, would be
13  purposefully.
14  Q     Did you learn from Exhibit 9, did you
15  learn that there were clock-out problems
16  relating to more employees than you?  Did
17  you learn there were clock-out problems
18  with Laquesha, how about that?
19  A     Yes, but Laquesha did not almost get
20  fired.  She would go in and properly clock
21  Laquesha out.
22  Q     When you say you were almost fired,
23  what do you base that on?



Nicholas Barnes                                                                133..136

Page 133

1   A    Because you have a point system.  My
2   points was almost to being fired.
3   Q    Oh, I see.  You were just tracking it
4   to the point system.  No one told you you
5   were about to be fired, correct?
6   A    They don't tell you until you
7   point-out.
8   Q    Is that correct, my question?  If
9   you'll listen to my question, my question
10  was, you just were counting the points
11  yourself.  No one said to you, you were
12  about to be fired, did they, Mr. Barnes?
13         MR. MULLEN:  Object to the form.  He
14  can answer.
15  A    When I went to the clock-out people,
16  they told me, "You were almost fired."
17  Q    Who told you that?
18  A    Let me go through a minute.  I want
19  to say Penny Stewart, I want to say Penny
20  Stewart.
21  Q    Penny Stewart said you were almost
22  fired?
23  A    Yes, I want to say Penny Stewart, but

Page 134

1   I don't know if it was Penny Stewart
2   directly, because I don't know her name.  I
3   don't know the lady's name.
4   Q    Did she say words to the effect of --
5   A    "You were almost fired."
6   Q    -- "You're about to point-out,"
7   something like that, under the point
8   system?
9   A    Completely, yes, a hundred percent.
10  Q    I see.  You complain in your
11  Complaint, Exhibit 8, that you were moved
12  to a utility closet.
13  A    She stated that she would move me to
14  a utility closet.  That may be -- if you
15  just define the definition of utility
16  closet, that may be utility closet as an
17  office.
18  Q    You were not moved to a utility
19  closet, were you?
20  A    What is your definition of utility
21  closet?
22  Q    You're the one making the claim,
23  Mr. Barnes.

Page 135

1   A    Yes, I was.
2   Q    So you're going to testify that you
3   were moved to a utility closet, fair
4   enough.  You can say whatever you want to
5   say.  In fact, you've done a lot of that.
6   So let's talk about that you now say you
7   were moved to a utility closet.  What does
8   that mean?
9   A    What do you mean, what does it mean?
10  Q    When did it happen?
11  A    When she gave Marie Sutton my office.
12  Q    Who gave it?
13  A    Ursula Means.
14  Q    Ursula Means gave Marie your office?
15  A    Yes.
16  Q    And you were moved into an office
17  with David, correct?
18  A    Yes.
19  Q    When she told you that you needed to
20  move, did you know that the clinical
21  engineering -- I'm sorry, that another
22  department needed to put an employee where
23  you had been?

Page 136

1   A    What do you mean?
2   Q    Did you know why you needed to move
3   from where you were?
4   A    Because she told me that men should
5   not be around women because she felt like
6   they liked me and it was messing with them.
7   She told me basically she would move me
8   somewhere else.
9   Q    Did she tell you you were being
10  moved; Ursula?
11  A    Yes.
12  Q    Was it Ursula or Nancy that told you?
13  A    It was Ursula, she came back there
14  and told me.
15  Q    Did she tell you that she would do
16  her best to find you another office by
17  yourself later?
18  A    No.
19  Q    Did you tell her that it was fine
20  that you were being moved because you and
21  David got along, and say words to the
22  effect of --
23  A    No.


ALABAMA
COURT REPORTING

Page 137

1  Q    -- did you say "It's cool"?
2  A    I never knew David.
3  Q    Did you say, "It's cool to be in an
4  office with David," did you use words like
5  that?
6  A    I don't recall.  I had never met
7  David before, like being down there with
8  him.
9  Q    Did you complain to anyone at EAMC
10 about having to move offices?
11 A    The director of clinical engineering,
12 John Morris; the director of -- oh, man,
13 what is his name?  I want to say Riley, I
14 think his name is Riley.  I also complained
15 to Nancy Ling.
16 Q    Do you have any reason to believe
17 that you were moved on the basis of your
18 sex?
19    MR. MULLEN:  Object to the form.  You
20 can answer.
21 A    Yes.
22 Q    Why?
23 A    As I stated, she told me already that

Page 138

1  men should not be around women, and I was
2  the only man back there.
3  Q    And you did not complain to HR about
4  being moved, did you?
5  A    No.
6       (Whereupon, at this time a short
7  break was taken.)
8  Q    So I'm going to show you an e-mail
9  that I'm marking as Exhibit 11.
10      (Whereupon, Defendant's Exhibit
11 Number 11 was marked for identification, a
12 copy of which is attached to the original
13 of the transcript.)
14 Q    Is that a resignation e-mail that you
15 sent to EAMC?
16 A    Yes, sir.
17 Q    And did you send it on Monday,
18 February 19th?
19 A    Yes, sir, that's what it says.
20 Q    I understand that you told some
21 employees that you were retiring from EAMC
22 or leaving EAMC and going to work for an
23 oil company.  What oil company was that?

Page 139

1  A    I never worked for an oil company.
2  Q    Did you tell an EAMC employee that
3  you were going to work for an oil company?
4  A    I don't recall if I told him that,
5  but I didn't go work for an oil company.
6  Q    Oh, I know you didn't.  I was asking
7  if you told an employee that.  You don't
8  recall?
9  A    Yes, I don't recall.
10 Q    What oil company did you talk to
11 about going to work for them?
12 A    I didn't go to an oil company.
13 Q    No, I didn't say that.
14 A    I didn't talk to any oil company.
15 Q    Okay, you did not talk to an oil
16 company?
17 A    No.
18 Q    When you turned in your resignation
19 notice on February 19th --
20 A    Yes.
21 Q    -- did you have a new job lined up?
22 A    No.
23 Q    Had you interviewed for a new job?

Page 140

1  A    No.
2  Q    Had you looked at all for a new job?
3  A    I was looking for a job while I was
4  at EAMC.
5  Q    So when had you started looking for a
6  new job?
7  A    When things got uncomfortable with
8  Ursula Means.
9  Q    When did you start looking for a new
10 job?
11 A    When things felt uncomfortable with
12 Ursula Means.
13 Q    Yes.  What date?
14 A    I'm not quite sure.  I don't recall.
15 Q    Was it in 2024?
16 A    Yes.
17 Q    So you left on February 27th, I
18 believe was the last day you were at EAMC.
19 Would it have been in February when you
20 looked for a new job, or January?
21 A    January.
22 Q    And tell me how you looked.
23 A    Through search engines.



Page 141

1   Q    Like Indeed?
2   A    Indeed, LinkedIn, many more.
3   Q    Monster?
4   A    No.
5   Q    That's a little outdated, it really
6 is, I think. How many places did you apply
7 before your last day at EAMC?
8   A    I don't recall, but it was a lot.
9   Q    A lot?
10   A    Yes, it was a lot.
11   Q    Did you do some of those in writing?
12   A    What do you mean, "in writing"?
13   Q    The application, like electronically,
14 probably, online?
15   A    Yes, through LinkedIn.
16   Q    What's that?
17   A    Through LinkedIn.
18   Q    Through LinkedIn?
19   A    Yes.
20   Q    I don't think --
21     MR. LIGHTFOOT: Jon-Kaden, you can
22 correct me, I don't think those have been
23 produced to us.

Page 142

1     MR. MULLEN: No, I don't believe so.
2   Q    So do you still have those?
3   A    I'm not quite sure how LinkedIn works
4 on saving jobs that you apply for.
5   Q    I'm sure you get something that says,
6 "We've received your application" for a
7 certain job through LinkedIn, right?
8   A    Through LinkedIn, if you click one
9 time, it says "one-time apply," and then
10 you go through, and then it says "You're
11 submitted," I think. I'm not quite sure.
12   Q    It says "You're submitted"?
13   A    Uh-huh.
14   Q    Have you gone back to look for any of
15 those LinkedIn applications back in
16 January 2024?
17   A    No.
18   Q    Here's what I think you gave us. I
19 think you gave us, and I'm not fussing at
20 you or your lawyer, I'm just trying to make
21 sure we get everything. They gave us, I
22 think, some of your activity after, you can
23 correct me also, Brock, if I'm wrong. I

Page 143

1 see after you were employed, but I'm not
2 sure I have any before his employment
3 ended. So will you look? Would y'all
4 look?
5     MR. MULLEN: Yes.
6   Q    I need you to get me everything where
7 you applied, through LinkedIn or otherwise,
8 for jobs, even before your resignation.
9   A    Okay.
10     MR. MULLEN: We'll look at LinkedIn
11 and I'll supplement everything.
12     MR. LIGHTFOOT: You'll supplement,
13 okay, thank you.
14   Q    Tell me some of the places that you
15 looked, you said, probably in January 2024.
16   A    I don't recall, honestly. Through
17 LinkedIn, if you just put in "contract
18 administrator," there are a lot of jobs
19 that come up, you can just do one click and
20 it will submit your resume through them.
21   Q    Did you get any interviews before
22 your resignation, or phone calls; in other
23 words, follow-ups to you having hit Submit?

Page 144

1 I assume you got some responses back?
2   A    Not through LinkedIn because there's
3 so many but, you know, if you submit ten,
4 you may hear from one.
5   Q    Okay. Who did you hear back from?
6 You probably heard back from Seneca. But
7 you tell me.
8   A    No, I didn't just have to hit the
9 click one link for Seneca. Seneca reached
10 out through my in-box.
11   Q    When did they reach out to you?
12   A    I don't recall the exact date.
13   Q    Were you still employed at EAMC?
14   A    Maybe it was the last day.
15   Q    The last day?
16   A    Yes. Not even like the last day.
17 Like maybe the day that I came back in
18 looking for my computer.
19   Q    Oh, and dropped off your badge?
20   A    I don't even think I dropped off my
21 badge. I went downstairs to look for my
22 computer and my computer wasn't there, so I
23 went up there and I asked Ms. Nancy Ling,

Page 145

1  "Hey, where's my computer?"  Then when I
2  went home, I think that's when I seen it.
3  I think that's when I seen it.
4  Q      Seneca?
5  A      Yes.
6  Q      And did they offer you a job?
7  A      Yes.
8  Q      Sort of right then?
9  A      Yes.
10  Q     And did you start the following
11  Monday?
12  A      No.  I think I was out.  I don't
13  recall, honestly.  I think I was off for
14  two weeks, though, without a job.
15  Q      Two weeks?
16  A      Yes, I think I was.
17  Q      And then you started Seneca?
18  A      Yes.
19  Q      Because the last day that you were
20  paid for was Friday, March 1, which was the
21  end of your -- yes, there it is, March 1 on
22  the e-mail, the resignation notice.  So you
23  think, then, you had two weeks that you

Page 147

1  to work.  I wrote him back and said, "Yes,
2  what do you have open?"  He said, "A
3  contract administrator position."
4  Q      So what you're saying is, why you
5  corrected me is because I was saying it as
6  if it was a response, but you're saying it
7  was more them reaching out to you?
8  A      Yes.
9  Q      Got you.
10  A      Because on LinkedIn, you have
11  opportunities for people to reach out to
12  you.
13  Q      So you're telling me that Seneca
14  reached out to you, you did not initiate?
15  A      Yes.
16  Q      Okay.  And then after that, he said,
17  "Are you open to work?"  I assume you said,
18  "Yes"?
19  A      Yes.
20  Q      And then you got an offer?
21  A      Yes, because I had no job.
22  Q      Did you do an interview?
23  A      No, no interview.

Page 146

1  were not employed?
2  A      Yes.
3  Q      So you probably didn't even have time
4  to file for unemployment, or did you?
5  A      I've never filed for that.  I don't
6  even know how, honestly.
7  Q      So you did not file for unemployment?
8  A      Yes.  I don't know how.
9  Q      Okay.  When did Seneca offer you the
10  job?
11  A      I don't recall.
12  Q      You said they responded to you right
13  around the time you went to look for your
14  computer?
15  A      No, I never said they responded to
16  me.  I said they reached out to me via my
17  in-box messages.
18  Q      What did it say?
19  A      So while working at East Alabama, the
20  entire time on my profile for LinkedIn, it
21  has "open to work."  So I think the guy --
22  I'm not a hundred percent sure.  I think he
23  reached out to me and asked me was I open

Page 148

1  Q      Where is Seneca based?
2  A      Sandy Springs.
3  Q      And you think you started -- you may
4  have put this in your responses.  Let's see
5  when you started.
6  A      Yes, I'm not quite sure when I
7  started.
8       MR. MULLEN:  It is in there.
9       MR. LIGHTFOOT:  Okay, good.  What
10  does it say, Jon-Kaden?
11       MR. MULLEN:  It says from March '24
12  until June '24.
13  Q      So it sounds like it might have been
14  three weeks.  You guessed two weeks.  So
15  either two or three weeks; is that right?
16  A      Yes, something like that.
17  Q      In your resignation e-mail, you gave
18  two weeks' notice, correct?
19  A      Yes.
20  Q      You told EAMC that your last day of
21  employment would be March 1st, right?
22  A      Yes.
23  Q      And you sent that to your supervisor,

Page 149

1   Ursula Means, correct?
2   A    Yes.
3   Q    And EAMC paid you through March 1st,
4   correct?
5   A    Yes.
6   Q    When did you reach out to HR -- I'm
7   sorry, let me back up.  I think I've
8   already given it to you, yes, and it's
9   already turned to the right page.  If you
10  will look at Exhibit 1, there's an e-mail
11  that you sent to Kelli Truitt, it's
12  entitled Urgent Matter, and you sent it at
13  12:05 p.m.  Do you see that?
14  A    Yes.
15  Q    And it starts with "Hey Ms. Kelli"?
16  A    This one, right?
17  Q    No.  When e-mails print out, they go
18  backwards, so the oldest ones are going to
19  be the last ones.  The first e-mail is the
20  last of the pages.  So if you'll go to the
21  next page, I'm starting to ask you
22  questions about that, okay?
23  A    Okay.

Page 150

1   Q    So you had turned in your resignation
2   notice --
3   A    Yes.
4   Q    -- the Monday before, and then about
5   eight days later, you made a complaint to
6   HR, correct?
7   A    Yes.
8   Q    So you were four days away from your
9   last day of employment, correct?
10  A    No.  So working remotely, Ursula told
11  me that I needed to basically come in and
12  finish up two complete weeks in the office.
13  Q    Exactly.  So that would have been the
14  weeks of February 19th --
15  A    I was still remotely on.
16  Q    -- the weeks of February 19th and the
17  weeks of February 26th, that began on those
18  Mondays, correct?
19  A    No.  I was still remotely working
20  those days.  She told me when I put in my
21  two weeks, that I needed to come in and
22  work in the office for two weeks.
23  Q    Exactly.  To help transition, right?

Page 151

1   I've seen the e-mail, I can show it to you,
2   where she said to help transition, right?
3   A    But what you're stating is, you're
4   stating that my two weeks would have been
5   up March, what, 4th?
6   Q    March 1st.
7   A    So you're saying March 1st, my two
8   weeks would have been up?
9   Q    Exactly.  I'm saying exactly what you
10  said in your e-mail.
11  A    But what I'm saying, after that
12  e-mail, I still was remotely -- well, those
13  other days, so my two weeks would have
14  started on March 1st because I still was
15  remotely.  She told me that I had to come
16  in physically after remote.  Do you see
17  what I'm saying?
18  Q    I don't understand that at all, but I
19  don't think I need to.  I don't think I
20  care.  So you told them you were resigning
21  and you gave them the two weeks' notice,
22  you told them the day that it started on
23  Monday, so you got two weeks after that,

Page 152

1   and Ursula told you you needed to come in
2   to help transition, correct?
3   A    For two weeks, correct.
4   Q    Got you.  And then about eight days
5   later, you sent an e-mail to Kelli Truitt,
6   which is dated February 27th at 12:05 p.m.,
7   correct?
8   A    Yes.  Correct.
9   Q    We've already talked about this a
10  little bit.  What caused you to send this
11  e-mail to Kelli Truitt?
12  A    Because Ursula basically had a
13  meeting with me, her, and Laquesha in her
14  office, and she made me feel uncomfortable.
15  Q    What made you feel uncomfortable?
16  A    Just the way that she was talking to
17  me, it was hostile.
18  Q    And was it on -- what day was that
19  meeting that made you feel uncomfortable?
20  A    I'm not quite sure, honestly.
21  Q    Well, you sent the e-mail on Tuesday,
22  the 27th.  Was it that day or the day
23  before?



Page 153

1   A    It maybe was that day.
2   Q    So it may have been the 27th?
3   A    Uh-huh.
4   Q    And it was you and Laquesha and
5   Ursula?
6   A    Uh-huh.
7   Q    Is that a "yes"?
8   A    Yes.
9   Q    And you don't remember what she said,
10  it just made you feel uncomfortable?
11  A    Yes.
12  Q    So you decided to send a complaint to
13  HR?
14  A    I decided to send an e-mail to
15  Ms. Kelli Truitt, yes.
16  Q    And I think I've already asked this
17  earlier, so I don't need to belabor the
18  point.  Ms. Truitt says that she spoke to
19  you on the phone about your complaint and
20  then she asked you to put it into writing.
21  I think what you said is, you don't recall
22  that; is that right?  Or maybe you can tell
23  me if you think it didn't happen.

Page 154

1   A    No, I don't recall.
2   Q    Okay.  So it may have happened?
3   A    Yes, it may have happened.  I'm not
4   denying it.
5   Q    And then you decided to put it in
6   writing?
7   A    Yes.
8   Q    And so you drafted this.  Where were
9   you when you drafted this?
10  A    In the office.
11  Q    By the way, when I say "when you
12  drafted this," this e-mail to Kelli is what
13  I'm talking about.  You were in your
14  office?
15  A    Yes.
16  Q    And is this where you said you kept a
17  list of things that you believed were
18  unfair to you?
19  A    Using that EAMC computer, yes.
20  Q    And then you sent this e-mail to her?
21  A    Yes.
22  Q    If you see there, it looks like she
23  responded to you, is that correct, at 2:45?

Page 155

1   A    Yes.
2   Q    She asked you, I guess, a follow-up
3   question, right?  She thanked you, she said
4   she was investigating, and she asked you
5   which vice president you had spoken to.  Is
6   that correct?
7   A    Yes.
8   Q    And if you go to the next page, I
9   guess you have to flip it, you basically
10  told --
11  A    Forward or back?
12  Q    I would go that way (indicating).  It
13  looks like you answered and told her the
14  vice president that you were referring to
15  was Nancy Ling.  Is that correct?
16  A    Yes.
17  Q    And then she thanked you for that; is
18  that correct?
19  A    Yes.
20  Q    And then did she inform you later on
21  that afternoon, did she tell you that EAMC
22  took your concerns seriously?
23  A    Yes.

Page 156

1   Q    Did she tell you that your last day,
2   that that day, the 27th, would be your last
3   day of actually physically working at the
4   facility, but that EAMC would pay you
5   through the Friday; in other words, the
6   four days after that to get you up to
7   March 1st?
8   A    Yes.
9   Q    And did she tell you to return the
10  EAMC belongings?
11  A    Yes, by Friday, March 1st.
12  Q    And did you do that?
13  A    They were already on her desk.
14  Q    So there was nothing to return, is
15  what you're saying?
16  A    Yes.  They had already got
17  everything.
18  Q    Did you ever come back in to the
19  office?
20  A    I don't think I even seen this e-mail
21  until later.  I don't think I seen this
22  e-mail until the next day, or something
23  like that, because I don't think I worked



Page 157

1  from 4:00 -- I think I worked at 3:30.
2  Q    So are you saying you don't recall if
3  you came back in to the medical center?
4  A    No, that's not what I'm saying.
5  Q    That was a Tuesday?
6  A    Yes.  I know I came back in on a
7  Wednesday, but I don't recall seeing this
8  e-mail.
9  Q    I got you.  In other words, you might
10 not have seen that e-mail until --
11 A    Before coming back in.
12 Q    Exactly, to realize that they were
13 saying, "You just ought to go home and not
14 continue showing up"?
15 A    Yes.
16 Q    "But we're going to pay you"?  So you
17 may have learned that on Wednesday?
18 A    Yes.
19 Q    Did you then go home?
20 A    Yes.
21 Q    So if you look at your Complaint
22 there that you made --
23 A    On which exhibit?

Page 158

1  Q    Exhibit 1, it's the last page.
2  A    Okay.
3  Q    I think we've covered all of those
4  topics here today.  Have we covered
5  everything that you brought to HR's
6  attention in your February 27th e-mail?
7  A    Yes, I think so.  Yes, from the
8  threats and everything, yes.
9  Q    Kelli Truitt called you at 7:50, just
10 before 8:00 on the next day, on Wednesday,
11 February 28th.  Did you see a record that
12 she called you?
13 A    What do you mean "see a record," in
14 the exhibits that you produced?
15 Q    No.  I'm just asking, do you remember
16 her calling you on February 28th and
17 leaving you a message?
18 A    I don't remember.  I don't recall.
19 Q    So your e-mail was about noon, a
20 little after noon on Tuesday, the 27th?
21 A    Yes.
22 Q    You don't recall Kelli calling you
23 the next morning, the 28th, and leaving you

Page 159

1  a voicemail, correct?
2  A    No, I don't recall.
3  Q    And you don't recall listening to a
4  voicemail from her?
5  A    I don't recall.
6  Q    But you did not call her on the 28th,
7  correct?
8  A    I think I spoke with Ms. Nancy Ling
9  when I went -- well, when I came back to
10 find my computer, it was not on the desk.
11 I think I went up to the office, asked
12 Ms. Nancy Ling what was going on.  And then
13 after she gave me -- oh, Nancy Ling told me
14 to go to HR, then I think I -- I'm not sure
15 if I spoke to Ms. Kelli Truitt or if there
16 was a call.  I'm not sure.  I don't know if
17 I called her or she called me.
18 Q    Well, this may be the call we're
19 talking about.  This may be before you sent
20 the e-mail.
21 A    You said she left me a voicemail, so
22 she can't call me if she left me a
23 voicemail.  You said on the 28th at 7:50

Page 160

1  she left me a voicemail.
2  Q    I did.
3  A    So how could that be the phone call
4  that you're talking about?
5  Q    If you don't understand my question,
6  you can tell me that.  Let me back up.
7  What day did you talk to Nancy?
8  A    Wednesday morning.
9  Q    The 28th?
10 A    Yes, when I came back in.
11 Q    And what did you talk to Nancy about?
12 A    My computer not being on my desk.
13 Q    How did you learn -- oh, I see.  At
14 that point did you know that EAMC had told
15 you that you should not keep coming in to
16 work, did you know that at that point?
17 A    No.
18 Q    I see.  So Nancy probably was telling
19 you you should talk to HR?
20 A    Yes.
21 Q    I see, okay.  Then did you talk to
22 Kelli Truitt in HR?
23 A    I don't think I talked to her.  I



Page 161

1  think I sent the e-mail. I'm not quite
2  sure. I don't recall.
3  **Q    But you somehow learned that you were**
4  **not supposed to keep coming in?**
5  A    Yes. Yes.
6  **Q    But that you would still be paid?**
7  A    Yes. Yes.
8  **Q    And you just don't remember how you**
9  **learned that?**
10  A    No, I just don't recall, honestly.
11  **Q    That's fair. So now back to my**
12  **question, Kelli said she called and left**
13  **you a voicemail on the morning of the 28th,**
14  **okay, Wednesday?**
15  A    Okay.
16  **Q    You never called her after that, did**
17  **you?**
18  A    I don't recall.
19  **Q    You did e-mail her, though, about a**
20  **week later on March 6th to ask her a**
21  **question, correct?**
22  A    Yes, "What's going on?" Yes.
23  **Q    It's actually on that exhibit, if**

Page 162

1  **you'll go to page 1 of Exhibit 1.**
2  A    Okay. It can't be on Exhibit 1.
3  **Q    No, you're right, it can't be on**
4  **that. I thought I had already given it, so**
5  **apparently I had not.**
6      MR. MULLEN: If you're looking for a
7  specific Bates label, I can tell you if
8  it's been --
9      (Whereupon, Defendant's Exhibit
10  Number 12 was marked for identification, a
11  copy of which is attached to the original
12  of the transcript.)
13  **Q    I'll show you what I'm marking as**
14  **Exhibit 12. I am sorry, I thought I**
15  **already had.**
16  A    Okay.
17  **Q    I thought I had already given it to**
18  **you, but I had not. Exhibit 12, did you on**
19  **March 6th, about a week later, did you**
20  **respond, did you e-mail Kelli and ask her a**
21  **question?**
22  A    Yes, I see the question.
23  **Q    Did you ask her to make sure that you**

Page 163

1  **were getting paid for Wednesday, Thursday,**
2  **and Friday of your final week?**
3  A    Yes, that's what the e-mail says.
4  **Q    And did she confirm that you would be**
5  **paid for that?**
6  A    Yes.
7  **Q    And in fact, you were paid for that,**
8  **correct?**
9  A    Yes.
10  **Q    Have you told me here today every**
11  **statement or action taken by EAMC that you**
12  **believe amounts to sexual harassment?**
13  A    Yes.
14  **Q    And Ursula Means is the only**
15  **supervisor who you claim sexually harassed**
16  **you in any way, correct?**
17  A    Yes. Did we speak about when she
18  stated that she would let me use her car or
19  take me home?
20  **Q    No. You're claiming that is another**
21  **statement that she made that was sexual**
22  **harassment, okay. When did she say that?**
23  A    Or did we speak about when she asked

Page 164

1  to take me to dinner?
2  **Q    No. Let's talk about that. Is that**
3  **the same instance?**
4  A    I think so. What instance are you
5  talking about?
6  **Q    You're the one telling me about the**
7  **instance. Tell me what you're saying.**
8  A    Before I went to HR, the reason why
9  she called me into the office, I want to
10  make it clear so you can state what I'm
11  saying. On that Tuesday, that Tuesday --
12  **Q    Of what?**
13  A    The 27th.
14  **Q    The 27th, okay.**
15  A    She asked to take me to dinner. I
16  declined, she got hostile. That's why I
17  felt uncomfortable.
18  **Q    This is after you had already turned**
19  **in your resignation notice, correct?**
20  A    Yes.
21  **Q    And that day you did not have**
22  **transportation from work, did you?**
23  A    Yes.

Nicholas Barnes                                                    165..168

Page 165

1  Q    You were without transportation that
2  day, right?
3  A    No, I had transportation.  If I
4  didn't have transportation, how could I
5  leave?
6  Q    Did you have transportation the day
7  before April 26th?
8  A    Yes.
9  Q    I'm sorry, February 26th.
10 A    Yes.
11 Q    Did Ursula ask you if you wanted to
12 order pizza or go to dinner with the
13 department to celebrate your last day or
14 your resignation?
15 A    No.  She asked me would me and her
16 like to go to dinner.  She said, "Would you
17 like for me to take you to dinner," was her
18 exact words.
19 Q    And what did you say?
20 A    "No."
21 Q    Anything else that she said to you in
22 that conversation?
23 A    She got hostile and I honestly don't

Page 166

1  remember what she said, but I remember her
2  putting her glasses on top of her head.
3  Like I stated, I don't remember exactly
4  what she said, but it was hostile and I
5  felt uncomfortable.  That's what made me go
6  over to HR.  When HR gave me the response
7  that they would -- I asked could I speak to
8  Kelli Truitt or someone that was over them,
9  they gave me a response back of they would
10 get back to me.  That's what made me send
11 the e-mail to Kelli Truitt, because I kept
12 getting, "We'll get back to you," "We'll
13 get back to you."
14 Q    So you didn't tell --
15 A    She didn't tell me anything about a
16 pizza party or dinner.
17 Q    You didn't tell Ursula that you were
18 offended by her request to go eat dinner,
19 did you?
20 A    No.  Not that I recall, no.  But I
21 don't think that would be a professional
22 thing if I'm leaving and you ask me, "Hey,
23 let's go to dinner."  "Do you want to go to

Page 167

1  dinner, me and you?"  "No."
2  Q    Ever eaten dinner with a co-worker
3  before in your life, Mr. Barnes?
4  A    No.
5  Q    Have you ever worked with anybody
6  that you consider a friend that you liked?
7  A    I always try to keep my jobs
8  professional.  After we clock-out, I don't
9  try --
10 Q    So you're someone who thinks that if
11 someone is even remotely nice to you at
12 work and suggests something outside of
13 work, you believe that to be hostile; is
14 that right?
15     MR. MULLEN:  Object to the form.  You
16 can answer.
17 A    It was the way that she said it.
18 Q    What about my question?
19 A    What was your question?
20 Q    Are you the type person who believes
21 if someone says, "Let's go have a drink or
22 go have a pizza or go eat dinner or go eat
23 lunch," that that's hostile by that

Page 168

1  co-employee to say to someone?  Is that
2  what you believe, Mr. Barnes?
3     MR. MULLEN:  Object to the form.  You
4  can answer.
5  A    No.
6  Q    You don't think that's hostile or
7  inappropriate?
8  A    Yes, I feel like that's
9  inappropriate.
10 Q    For a co-worker to say, "Let's go get
11 lunch together" or dinner together?
12 A    After everything that has happened,
13 and I told you I was uncomfortable, yes, I
14 feel like that's inappropriate.
15 Q    You never mentioned to HR that you
16 felt she inappropriately asked you to
17 dinner, did you?
18 A    Is it in the --
19 Q    I'm asking.
20 A    Hold on.  No, I don't see it here.
21     (Whereupon, Defendant's Exhibit
22 Number 13 was marked for identification, a
23 copy of which is attached to the original

Page 169

1   of the transcript.)
2   Q    I'll show you what I'm marking as
3   Exhibit 13.
4   A    Okay.
5   Q    Is this you? Jon-Kaden, I don't have
6   a good copy for you, but we produced it.
7   Did you tell Ursula that you did not have
8   transportation on Monday, April 26th?
9   A    Uh-huh.
10  Q    "Yes"?
11  A    Yes.
12  Q    Was that true?
13  A    After I told her that I didn't have
14  transportation, basically she gave me an
15  answer of basically "Come in," I basically
16  got transportation.
17  Q    Did you tell her that you did not
18  have transportation on Monday, the 26th?
19  A    After I told her that --
20  Q    Are you hearing my question? It's a
21  yes-or-no.
22  A    I'm giving you an explanation.
23  Q    I didn't ask for an explanation.

Page 170

1   A    But that's what I'm giving you.
2   Q    So I move to strike that. So I'll
3   ask the question again. Did you tell her
4   on the 20th that you did not have
5   transportation on the 26th?
6   A    Yes.
7   Q    Then in your EEOC Charge, if you'll
8   look at your EEOC Charge, number 7.
9   A    Okay. Which number?
10  Q    Number 25.
11  A    Okay.
12  Q    Is the statement that you're saying
13  that Ursula made to you, this actually says
14  it was on the 26th. So is that accurate,
15  or is what you're telling me today
16  accurate, that it was the 27th? It was the
17  26th, wasn't it?
18       MR. MULLEN: Object to the form.
19  A    No, that's wrong.
20  Q    You said here it was on the 26th,
21  right?
22  A    So let me explain to you.
23  Q    Sure.

Page 171

1   A    But on the 26th, Laquesha told me
2   that Ursula would try one last time.
3   That's what it states on the paper. And on
4   the 27th, that's what it seemed like, she
5   tried that one last time. Is that accurate
6   enough?
7   Q    Any other statements or actions? My
8   question earlier was "Have you told me
9   about every statement or action taken by
10  EAMC," which actually you've said it was
11  always Ursula Means, that you believed
12  amounts to sexual harassment. Then you
13  told me you believed you had told me
14  everything, then you remembered this last
15  one that you told me about, asking if you
16  wanted a ride or if you wanted to go eat
17  dinner?
18  A    You asked me that question and I took
19  a minute to pause to think, and then I gave
20  you those answers.
21  Q    Exactly.
22  A    But I don't think I said "yes" before
23  you said that, like you just said.

Page 172

1   Q    Well, you know what, the record will
2   show wherever it is, it's no big deal. I'm
3   acknowledging that you've told me there was
4   one more and we've talked about it.
5   Anything else?
6   A    No.
7   Q    Any other statement or action taken
8   by EAMC that you believe amounts to sexual
9   harassment, or have we covered it all?
10  A    I think you've covered it.
11  Q    And am I right that you are not
12  claiming that Ms. Means ever sent you any
13  inappropriate phone calls or texts?
14  A    I feel like the "I wanted to see your
15  pretty face" was inappropriate.
16  Q    You thought that was inappropriate?
17  A    Yes, I feel like that's
18  inappropriate.
19  Q    Anything else that she ever said in a
20  text that you thought was inappropriate?
21  A    Not that I recall.
22  Q    When she told you she wanted to see
23  your pretty face, did you tell her that



Page 173

1  offended you?
2  A    The next day when I came into the
3  office.
4  Q    Is that a "yes"?
5  A    Yes.
6  Q    What did you say?
7  A    "I don't like how you said I've got a
8  pretty face."
9  Q    Oh, you said that to her.  Okay.
10  What did she say?
11  A    She laughed and joked, "Your face is
12  pretty," "Okay."
13  Q    You didn't tell anyone else at EAMC
14  that happened, did you?
15  A    No.
16  Q    And you didn't report it to HR, did
17  you?
18  A    No.  Or did I?  No.
19  Q    And it never happened again, did it?
20  A    No.
21  Q    You were never demoted while you were
22  at EAMC, were you?
23  A    No.

Page 174

1  Q    You never suffered a decrease in pay
2  while you were at EAMC, did you?
3  A    No.
4  Q    You were never terminated from EAMC,
5  were you?
6  A    I resigned because of Ursula Means.
7  Q    But you were never terminated, were
8  you?
9  A    No.
10  Q    You made a claim for retaliation.  In
11  looking at your Complaint, what you say is
12  that after your February 27th complaint to
13  HR that you sent to Kelli Truitt, you
14  believed that EAMC retaliated against you.
15  Is that correct?  And I can show you that
16  in the Complaint, if you want to see it.
17  It's Exhibit 8.
18  A    Which page?
19      MR. MULLEN:  Page 9.
20      MR. LIGHTFOOT:  Is it page 9?  Okay,
21  thank you.
22  Q    So my question is going to be, is
23  that your claim of retaliation in this

Page 175

1  case?
2      MR. MULLEN:  Object to the form.
3  A    Can you like explain?
4  Q    You're claiming sexual harassment and
5  you're also claiming retaliation.  Do you
6  understand that?
7  A    Yes.  So the retaliation was when I
8  went to basically HR and then they sent me
9  over to the time clock, and they reached
10  out to her, and when I came back, she
11  stated that she would have Pooki and
12  John-John to jump on me, which made me feel
13  uncomfortable at the time.  I felt like
14  that was retaliation.
15  Q    Is that the only instance of
16  retaliation that you're complaining of in
17  this lawsuit?
18      MR. MULLEN:  Object to the form.  You
19  can answer.
20  A    The snitching, her calling me a
21  snitch, and basically saying her son would
22  jump on me.  Yes.
23  Q    So the thing about the time clock,

Page 176

1  snitching, and Pooki and John-John?
2  A    Yes, basically being in the parking
3  lot to whip me if she got in trouble.
4  Q    And she did not get in trouble, as
5  far as you know, right?
6  A    As far as I know, correct.
7  Q    And Pooki and John-John never beat
8  you up, did they?
9  A    No.
10  Q    And you never suffered any negative
11  consequence as a result of you bringing up
12  the time clock issue, did you?
13      MR. MULLEN:  Object to the form.  You
14  can answer.
15  A    No.
16  Q    And you weren't demoted, correct?
17  A    No.
18  Q    And you didn't suffer any decrease in
19  pay, right?
20  A    Right.
21  Q    And you certainly weren't terminated
22  after you brought up the clock issue,
23  correct?

Page 177

1  A    Correct.
2  Q    You never asked EAMC to undo your
3  resignation, did you?
4  A    No.
5  Q    You claim that you've been damaged in
6  this case.  Did you go three weeks without
7  pay before your next job?
8  A    If I was paid my last day on
9  March 1st and I received the job on
10  March 24th, that is three weeks without
11  pay, correct?
12  Q    It seems roughly that to me, yes.
13  A    Yes.
14  Q    Did you make $21 an hour at EAMC?
15  A    $18.20.
16  Q    Okay, $18 an hour.  The job you got
17  at Seneca paid, was it $31 an hour?  $35?
18  A    $35, yes.
19  Q    Then did you get bumped from $35
20  to $37 --
21  A    Yes.
22  Q    -- while at Seneca?
23  A    Yes.

Page 178

1  Q    $37.98?
2  A    Yes.
3  Q    Are you making more than that in your
4  new job?
5  A    Yes.
6  Q    How much per hour?
7  A    I want to say $40, I think.  I'm not
8  quite sure.
9  Q    So the only decrease in pay that you
10  had after your resignation was about the
11  three weeks that you were not paid.  Is
12  that correct?
13  A    Yes.  I probably would have been
14  still working at East Alabama because I
15  loved the job.  That was, honestly, like a
16  great job.  It was the best job, and I
17  loved that job.  It was just the hostile,
18  like man.
19  Q    Have you suffered any other kinds of
20  damage as a result of, you say, these
21  things that EAMC did to you, that we've
22  talked about here today?
23  A    What do you mean?

Page 179

1  Q    Have you been damaged in any other
2  way?
3  A    Mentally, yes.  A hundred percent,
4  yes, mentally.  I didn't see a therapist,
5  because I feel like seeing a therapist,
6  that's something that's not done in my
7  community.  But as far as like mentally,
8  yes.
9  Q    Oh, you're claiming you suffered
10  mental distress?
11  A    I don't know what you call it, but
12  mentally, yes.
13  Q    Tell me what mental distress you ever
14  suffered.
15  A    What do you mean?
16  Q    Well, you're the one claiming it in
17  this lawsuit.
18  A    I'm not claiming anything.  I just
19  said mentally it damaged me.  I didn't say
20  mental distress.  I don't know the
21  definition behind mental distress or
22  anything.
23  Q    Whatever words you want to call it.

Page 180

1  Mental damage, whatever you want to call
2  it.  Tell me what you claim you suffered.
3  A    Okay.  So just thinking of the things
4  that happened to me that were unfair, those
5  things should not ever occur.  You should
6  never call an employee a "snitch," you
7  should never sit up there and tell an
8  employee that you're going to have your son
9  and nephew jump on them and beat them up.
10  Like you should never make an employee feel
11  that if he go to HR, you're going to do
12  something to him.  An employee should
13  always be able to go to HR and speak to
14  them at any moment if something is not
15  right.  That was never the case.  I would
16  always get, "They're in a meeting,"
17  "They're in a meeting," "They're in a
18  meeting."  That's why I sent that e-mail.
19  Q    All right, so --
20  A    Those are the mental things that you
21  think that you want to call is distress?
22  Yes, I feel like it was.
23  Q    To be clear, you've never had any



Page 181

1  physical problems as a result of those
2  things, right?
3  A    No, I've never had physical problems.
4  Q    And you've never had to take any
5  medication, correct?
6  A    No.
7  Q    And you've never seen a medical
8  professional for any of those issues?
9  A    No.
10  Q    When did you feel that mental
11  distress or mental damage, whatever words
12  you want to use?
13  A    That's the whole reason for me
14  putting my resignation in, because it was
15  too much upon me. Like I stated in the
16  e-mail, things kept happening over and over
17  and over. There was never a point in time
18  of when this was going to stop. Like I
19  stated, I loved my job at East Alabama and,
20  nine times out of ten, could have still
21  been there today, I would have been there
22  today. But the way that she went around
23  things trying to basically manipulate me

Page 182

1  into leaving or basically saying, "I'm
2  going to bring in this person," "I'm going
3  to bring in that person to get him out of
4  the way," those are mental things that
5  happened.
6  Q    Did you feel that in January of 2024?
7  A    I felt those things like -- yes.
8  Yes, I did.
9  Q    Is that when it began, January 2024?
10  A    No, no, no, no. Like when she came,
11  no, when Ursula came, it was all the time,
12  it was all the time. Anyone can tell you
13  Ursula always was at me. There was never a
14  moment where she would stop. That's why
15  Nancy said, "I understand what's going on,
16  I see what's going on." There was never a
17  time when she stopped. She would always be
18  at me.
19  Q    How many times did you apply for
20  other jobs at EAMC to get away from Ursula?
21  Is the answer zero?
22  A    Yes, zero, because I feel like I
23  wasn't skilled in those departments.

Page 183

1  Q    You couldn't have done a warehouse
2  job?
3  A    She was basically in the warehouse,
4  over the warehouse.
5  Q    Oh, so you think that you were not
6  qualified for any other job at EAMC. Is
7  that what I hear you saying?
8  A    Or over-qualified.
9  Q    Regardless, you didn't apply for any
10  other jobs, did you?
11  A    No.
12  Q    And you knew you could, right? It's
13  set out in the handbook. We can go through
14  it, if you want. You knew you could apply
15  for other jobs?
16  A    In the handbook, does it say that
17  they can stop you from applying for a job?
18  Q    I don't know about that.
19  A    That's what I'm asking.
20  Q    Were you aware that there was a --
21  A    I was aware --
22  Q    Were you aware there was an ability
23  at EAMC to look at like a job board and

Page 184

1  look at openings and apply for other jobs?
2  Were you aware of that?
3  A    I feel like I was aware that they
4  could stop you from transferring
5  departments.
6  Q    But I'm asking you, were you aware
7  there was the ability to see other jobs and
8  to apply for other jobs?
9  A    Yes.
10  Q    And you never took advantage of that,
11  did you?
12      MR. MULLEN: Object to the form. You
13  can answer.
14  A    Not that I recall.
15  Q    And once you got away from EAMC, did
16  your mental damages stop?
17      MR. MULLEN: Object to the form. You
18  can answer.
19  A    No, not, honestly, because small
20  things like this conversation, or if she
21  was in the room, I would be like, "No,"
22  there would be damage. I wouldn't even
23  want to do this if she was in the room, so,

Page 185

1  no.
2  Q    Well, tell me anytime since you left
3  EAMC that you've had any mental issues,
4  related to these things we've talked about.
5      MR. MULLEN:  Object to the form.  He
6  can answer.
7  A    No.
8  Q    That hasn't happened, correct?
9      MR. MULLEN:  Object to the form.  He
10  can answer.
11  A    Correct.
12  Q    And you've told me you did not see a
13  medical professional for it?
14  A    I take that back.  No, I didn't see.
15      MR. MULLEN:  What are you taking
16  back?
17      THE WITNESS:  While working at EAMC
18  in downtown Opelika, they always have like
19  food trucks.  Me and a couple people used
20  to always talk about the food trucks, they
21  have food trucks there, food trucks there.
22  There was one incident where I seen her and
23  her family there.  I'm not saying that they

Page 186

1  can't go there, but me and my family
2  stopped going because of that.  If you want
3  to say that's mental, then that's fine, but
4  me and my family don't go anymore because
5  of that incident, because of threats.  She
6  said it wasn't even a threat, she said it
7  was a promise, things like that.
8  Q    Had you taken your son or daughter to
9  the food truck?
10  A    Yes, me and my family used to go
11  downtown Opelika.
12  Q    You do have a son and daughter?
13  A    Who I call my little brother and my
14  sister.  That's who I call that, because I
15  take care of them.
16  Q    You call your little brother and your
17  little sister your son and daughter?
18  A    Yes, because my parents are old, so
19  if anything happens, they are basically
20  like my kids.
21  Q    You never told anybody at EAMC -- you
22  never told Ursula that you call your little
23  brother and your little sister your son and

Page 187

1  daughter, did you?
2      MR. MULLEN:  Object to the form.
3  A    Yes, I did.
4  Q    You did tell her that?
5  A    Yes.
6  Q    When did you tell her that?
7  A    When I first asked -- I just don't
8  recall when I first told her, but she
9  noticed.
10  Q    She noticed what?
11  A    She knows.
12  Q    She knows.  Were you signed up for
13  medical insurance at EAMC?
14  A    Yes.
15  Q    When you took the job at Seneca, what
16  job did you take there, contract
17  administrator?
18  A    Yes.
19  Q    And you were paid, I think we've
20  already talked about what you were paid.
21  A    No insurance.
22  Q    Oh, there was no insurance?
23  A    No insurance, no dental.  I still

Page 188

1  don't have no insurance or dental.
2  Q    You worked at Seneca for about three
3  months; is that right?
4  A    Yes.
5  Q    Why did your employment end?
6  A    It was a contract position.  They
7  just needed someone to come in and do
8  exactly what I was doing at East Alabama.
9  Q    Where did you go to work next?
10  A    State of Georgia.
11  Q    Department of Human Services?
12  A    Yes, through a temp service called
13  Sumeru, Inc.
14  Q    Called what?
15  A    Sumeru, Inc.
16  Q    Summerall?
17  A    S-U-M-E-R-U, I-N-C.
18  Q    Do you still work for Sumeru?
19  A    Yes.
20  Q    And that's where you make about $40
21  an hour, or do you make more than that?
22  A    $40 an hour.
23  Q    Do you have any insurance?



Page 189

1   A    No.  No dental also.
2   Q    So you're choosing not to do
3   insurance or dental?
4   A    No.  They don't offer it.
5   Q    They don't offer it.  Was that the
6   same at Seneca?
7   A    I missed the enrollment period.  They
8   didn't have the enrollment period.  The
9   enrollment period was in like October.  I
10  wasn't there then, so it wasn't offered.
11  It's the same as there, it wasn't offered.
12  Q    Have you had any medical insurance
13  since you left EAMC?
14  A    No.
15  Q    Have you tried to get any?
16  A    Yes.  It's expensive.
17  Q    Have you been on anyone else's plan?
18  A    No.
19  Q    Does your girlfriend have medical
20  insurance?
21  A    I'm not sure.
22  Q    Who does Alex- --- I think you said
23  Alexia?

Page 190

1   A    Yes.
2   Q    Alexia Huguley?
3   A    Uh-huh.
4   Q    Who does Alexia Huguley work for?
5   A    I'm not quite sure.
6   Q    Is she employed?
7   A    Yes.
8   Q    Is she still your girlfriend?
9   A    Yes.
10  Q    Are y'all separated?
11  A    Yes.
12  Q    When did the separation start?
13  A    I want to say a month ago.
14  Q    What happened?
15  A    A death in her family, so I gave her
16  time.
17  Q    Did you move out?
18  A    Yes.  I'm at my mother's house right
19  now.
20  Q    Is she at the apartment in Atlanta?
21  A    The lease is up, so I don't know
22  where she is.
23  Q    I think you told me about some

Page 191

1   employees, some people that have
2   information about your claims.  Who have
3   you spoken to that either works -- first,
4   who have you spoken to that works at EAMC
5   relating to your claims in this lawsuit,
6   that still works at EAMC?
7   A    Nobody.  About the lawsuit, no one.
8   Q    Yes.  Who have you spoken to that --
9   A    I don't feel like that's -- I don't
10  feel like that's their business.
11  Q    Okay.  Who have you spoken to that
12  does not work at EAMC about your claims?
13  A    No one.
14  Q    You haven't talked with any former
15  employees?
16  A    No.  I don't feel like that's their
17  business.  That's not -- no.  When you're
18  going through a lawsuit, I don't feel like
19  that's -- even if I'm the plaintiff or the
20  defendant, I don't feel like that's the
21  right thing to do, speak on it.  And I
22  wouldn't down-talk East Alabama or
23  anything.  You know, that's not me.

Page 192

1   Q    You're willing to file a public
2   lawsuit about them, though, and say that
3   they did terrible things to you, right?
4   A    If people look at it, look for it,
5   then that's their decision to do, but I'm
6   not going to speak on it.
7        (Whereupon, at this time a short
8   break was taken.)
9   Q    Mr. Barnes, will you say that name
10  again?  It's the Georgia Department of
11  Human Resources is where you worked, and
12  it's called Sunumu or something like that?
13  A    S-U-M-E-R-U.
14  Q    Sumeru?
15  A    Inc., I-N-C.
16  Q    Sumeru, Inc., right?
17  A    It's a temp service that put me, you
18  know, at the Georgia Department of Human
19  Services.
20  Q    Georgia Department of Human Services?
21  A    Yes.
22  Q    And you started there right after
23  your Seneca job, or there may have been a

Nicholas Barnes                                                                 193..196

Page 193

1  gap?
2  A    Yes, there was a gap.
3  Q    But you've been there ever since?
4  A    Yes, I'm there now.  But it's about
5  to end.
6  Q    Is that a temporary job?
7  A    Yes.  Everything is like contract.
8  It's hard to find work through contract
9  administrator, so they come with a lot of
10  different contract positions.
11  Q    I know there's an enrollment issue,
12  but you could have gotten medical benefits,
13  right?
14  A    With Seneca, no.
15  Q    With Seneca, right, you could not,
16  they didn't offer it.  But they offer it
17  here with Georgia?
18  A    I don't -- you know, I really don't
19  know, but I think it's enrollment, it's
20  just enrollment time.  So when enrollment
21  time comes back around, then I can.
22  Q    But I think enrollment -- I think
23  when you start --

Page 194

1  A    No, through a temp service, it's not
2  like that.  There's no option because
3  you're going through a temp service.  See
4  what I'm saying?
5  Q    It occurred to me that you may not
6  want to pay for medical insurance.  Is that
7  right?
8  A    No, I ain't saying that.  I ain't
9  saying that.
10  Q    That's what I'm trying to get clear
11  on, because if you like really wanted it, I
12  bet you would have been asking them
13  questions about it.
14  A    You're talking about the temp people?
15  Q    The temp or Georgia.
16  A    So with the temp people, they're like
17  Pakistani, so I don't think that they're
18  here.  They just have, how can I say it,
19  like a mailing office here.  See what I'm
20  saying?
21  Q    Okay.
22  A    But as far as like getting insurance,
23  it would have to be like out of -- how can

Page 195

1  I say it, out of care?  It would have to be
2  like through something else on my own.
3  Q    I understand that.  It's called --
4  the word is -- yes, I've heard it.
5  A    So I couldn't get it with the Georgia
6  Department of Human Services, I couldn't
7  get it with them because I'm up under a
8  temp service.
9  Q    Have you dug in on it to try to make
10  sure?  Like do you want it badly, or not
11  really?
12  A    Yes, I do.  You know, you need
13  medical and dental.
14  Q    Right.  So I'm assuming you've talked
15  to someone in HR to say, "Can I get this?"
16  A    You can't, because I'm not under the
17  Georgia Department of Human Services.  I'm
18  just working through them with the temp
19  service.
20  Q    Exactly.
21  A    And Sumeru does not offer it.
22  Q    If you went permanent with Georgia,
23  then you would be able to get it?

Page 196

1  A    Yes, but they're not offering
2  permanent like jobs.
3  Q    Well, that was going to be one of my
4  questions.  Because you're not permanent
5  yet?
6  A    No.  They're not offering permanent.
7  They're offering like temporary like
8  because they just needed contracts -- they
9  have like a big load of contracts coming
10  in, and they needed several workers to
11  basically help with their contracts and
12  then it's over with.
13  Q    Okay.  How do you know Sumeru doesn't
14  offer, that it's not possible to get
15  medical benefits?
16  A    I spoke about it with them before I
17  even started.
18  Q    Who did you talk to?
19  A    Vikas, Vikas.
20  Q    Is that a person?
21  A    Yes.  So before I even started with
22  them, that was one of the things that I,
23  you know, looked into, the health and



Page 197

1  dental, who was it from, stuff like that,
2  but they don't even offer it.
3  Q    Did you look for jobs that did offer
4  medical insurance?
5  A    Yes. Yes.
6  Q    Did you have opportunities?
7  A    What do you mean, "opportunities"?
8  Q    To take a job that had medical
9  insurance.
10  A    No, no, no, no, no. So I took Sumeru
11  because I needed a job. That's why I took
12  Sumeru.
13  Q    And it had great pay?
14  A    Well, you could say great pay, but --
15  Q    I thought it was $40, compared to you
16  making $18 at EAMC.
17  A    The cost of living in Pakistan and
18  the cost of living in China is two
19  different costs of living.
20  Q    Did you live in China?
21  A    No. I'm just saying for explanation.
22  So the cost of living in Atlanta is
23  different than the cost of living at Auburn

Page 198

1  or -- well, Lanett, I'll say Lanett.
2  There's rent in Lanett, $500. You go to
3  Atlanta, you're not getting $500 rent.
4  Q    So you have looked for jobs that have
5  medical insurance?
6  A    Yes.
7  Q    You had an offer?
8  A    No, I didn't have an offer. I had
9  interviews.
10  Q    You had interviews?
11  A    So with Google, Microsoft, NCR, I had
12  those interviews, I was in the last stages.
13  Q    To be a contract administrator?
14  A    Yes.
15  Q    Located in Atlanta?
16  A    Well, they were like --
17  Q    Different places?
18  A    Yes. So when you're going through
19  Google, Microsoft, NCR, they basically give
20  interview process steps, so some might be
21  four, some might be three interviews, you
22  know, things like that. The majority of
23  those were four, to be a contract, you

Page 199

1  know, administrator, so it takes time. I
2  was out a job, just trying to find a job,
3  so I had to go with Sumeru. They was doing
4  $40 an hour. You know, they didn't offer
5  any type of dental or, you know, medical,
6  so I just looked at it as, okay, I just
7  need to pay bills; money is running low,
8  have nothing, I've got to get a job.
9  Q    Have you worked two jobs at any time?
10  A    No.
11  Q    Have you had an opportunity to work a
12  job that offers medical but maybe pays a
13  little bit less?
14  A    No, because I had to take Sumeru
15  because I was out of a job about a minute
16  and money was running low, so you've got to
17  take the first job that's offered.
18  Q    Do you have a bank account?
19  A    Yes.
20  Q    Where is your bank account?
21  A    Chase.
22  Q    Where is your bank?
23  A    Atlanta. It's in the negative.

Page 200

1  Q    Do you own any property?
2  A    No.
3  Q    Do you own a car?
4  A    No. I have a car. It's under my
5  mother's name, so it's not my car.
6  Q    That's what you drive?
7  A    Yes.
8  Q    A car under your mother's name?
9  A    Yes. So it's not my car, it's just
10  her car, but she's got another car.
11  Q    Do your parents provide you any
12  assistance for living?
13  A    What do you mean?
14  Q    Money?
15  A    No. No.
16  Q    Well, they let you stay at their
17  house?
18  A    Yes.
19  Q    They do provide that?
20  A    Yes. So as far as like living, the
21  car payment is like $600 a month, then you
22  have living. That's like, I want to say,
23  $2,000, $2,000 for rent, so you're only

Page 201

1  left with $400 or $500.  Insurance a month
2  would be how much?
3  Q    Other than the few times that you've
4  told me that Ursula said things that you
5  thought were -- said or did things that
6  were inappropriate, did you joke around
7  with Ursula some at work?
8  A    No. No. No.
9  Q    No, okay. Did Ursula joke around
10  with any of the other employees in the
11  department?
12  A    I'm not quite sure.
13  Q    Well, you told me earlier she would
14  joke around some, right?
15  A    She would try to make jokes, but
16  they're not funny to me.  She would try to
17  make jokes.
18  Q    I see. With others, but you're more
19  serious?
20  A    Yes.
21  Q    Do you think there's anything wrong
22  with her joking around, say, with other
23  people?

Page 202

1      MR. MULLEN: Object to the form. You
2  can answer.
3  A    No. It's just their relationship.
4  Q    And you just don't like to joke
5  around?
6      MR. MULLEN: Objection to form. You
7  can answer.
8  A    I just don't have that relationship
9  with her.
10  Q    Did you joke around with other people
11  that weren't Ursula at work?
12  A    No, not really.  I mean, I ain't even
13  going to say not really.  No.
14  Q    Because you were friends with Ed
15  Kirk, did you joke around with him some, or
16  David or anybody?
17  A    I really didn't talk to David.  David
18  was more of like work-wise.  I didn't know
19  him.  Edward, he was just a supervisor
20  that, you know, I wouldn't joke around with
21  him.  I would just, "Hey, Ed, I need this."
22  He would, "All right, then."  You know, he
23  would be friendly.  That's what I'm going

Page 203

1  to say, friendly other than joking.
2  Q    You read the employee handbook,
3  right?
4  A    Yes.
5  Q    And you knew that if you wanted to,
6  you could bring a complaint if you believed
7  something had been done to you that you
8  believed was harassment?  You could go to
9  your supervisor, you knew that, right?
10  A    Which was Ursula.
11  Q    Right.  Or someone above Ursula,
12  right?
13  A    Nancy Ling, yes.
14  Q    Right. And you knew you could go to
15  HR, right?
16  A    Yes.
17  Q    And you also knew you could call HR.
18  There was a number that was given for you
19  to call HR, right?
20  A    I didn't know that I could call them,
21  but I would go down to them and basically
22  try to reach them, but it was never just
23  brought up, "Hey, call this number."

Page 204

1  Q    Well, it actually was brought up.  If
2  you'll look at page 4, do you see now where
3  you could call them and not even have to go
4  down there?
5  A    Yes, I understand.
6  Q    So you were aware of that, right?
7  Were you aware of that?
8  A    Okay.
9  Q    And you never did that, did you?
10  A    Huh-uh.
11  Q    Is that "no"?
12  A    No.
13  Q    You stated in your Complaint to Kelli
14  Truitt that you believed you were worried
15  about your physical safety.  Is that true?
16  A    Yes. If you tell an employee that
17  you're going to have someone to jump on
18  them, what more could you sit up there and
19  say to them, "I'll have my son and my
20  nephew to come jump on you."  Yes, I'm
21  going to be worried about my safety.
22  Q    And to be clear, you never told
23  anyone at EAMC that until you told HR on

Page 205

1  February 27th?
2  A    I told Edward Kirk that, I told Nancy
3  Ling that.
4  Q    You never told HR that before
5  February 27th, correct?
6  A    Because I never got a chance to talk
7  to them.
8  Q    No, that's not my question.  You
9  never told anyone in HR that you felt
10  worried for your safety until
11  February 27th, did you?  February 27th of
12  2024, and I can show it to you.
13  A    No.
14  Q    And you never told the police that,
15  did you?
16  A    No.
17  Q    And you never told the security at
18  EAMC that, did you?
19  A    No.
20  Q    Did you ever ask security to escort
21  you out to the parking lot, Mr. Barnes?
22  A    No.
23  Q    Are you 6'-6"?

Page 206

1  A    I think so.
2  Q    How much do you weigh?
3  A    185, 180.
4  Q    On February 27th, I think you've
5  already told me that you don't recall?
6  A    Yes.
7  Q    But I know you told me, we talked
8  about the e-mail that you sent at noon.
9  A    Yes.
10  Q    Noon on Tuesday, the 27th.
11  A    Okay.
12  Q    Prior to sending that e-mail -- sure,
13  you can look at it.  Prior to that, do you
14  recall calling Kelli Truitt in HR and
15  leaving her a voicemail?
16  A    I don't recall, honestly.
17  Q    So you also don't recall that that
18  voicemail, you said, "I want to report
19  harassment," right?
20  A    I mean, I don't recall.
21  Q    And you also don't recall her calling
22  you back after she got that voicemail,
23  right?

Page 207

1  A    Yes, I don't recall.
2  Q    And you also don't recall her telling
3  you that if you make a complaint about
4  harassment at EAMC, you need to put it in
5  writing, you don't recall that either?
6  A    No, I don't recall, but you stated
7  that.  That's why this was made.
8     MR. LIGHTFOOT:  No further questions.
9     MR. MULLEN:  We're good.
10     (Whereupon, at this time a short
11  break was taken.)
12  Q    Do you see the third page of Exhibit
13  2, and I say third page, do we have front
14  and back?
15     MR. MULLEN:  Yes, this is front and
16  back, so Bates number 331.
17     MR. LIGHTFOOT:  330.  Maybe it's the
18  same.
19  Q    Do you see Bates number 330 in
20  Exhibit Number 2?
21  A    Yes.
22  Q    And is your response on the left and
23  Ursula on the right?

Page 208

1  A    Yes.
2  Q    And were y'all talking about you
3  being moved out of your office to a new
4  office?
5  A    Yes.  It says that Marie asked me for
6  my office and I told her, "No, I don't want
7  to trade with her."
8  Q    That's right.  You did not want to
9  move, right?
10  A    No, I didn't.
11  Q    But you still were told to move,
12  correct?
13  A    By Ursula, yes.
14  Q    It looks like Ursula, though, tried
15  to keep you from moving, right?
16  A    That's what it says, but she's the
17  only person that has power to basically
18  move me.
19  Q    Right, so it looks like either --
20  first, it looks like she tried to make it
21  so that you wouldn't have to move, right?
22  She told you that?
23  A    Yes, that's what it seems.

Page 209

1  Q    But then maybe someone above her
2  forced it to happen.  Is that what you
3  understand happened?
4  A    No, that's not -- from my
5  understanding, that's not what happened.
6  Q    You think Ursula changed her mind?
7  A    Yes.
8  Q    But do you know whether she changed
9  her mind or whether, sort of for the
10  greater good, EAMC told Ursula, "No, no,
11  Mr. Barnes needs to move out and Marie
12  needs to move in and we need to find a new
13  office for Mr. Barnes"?  Do you know how it
14  played out?
15      MR. MULLEN:  Object to the form.  You
16  can answer.
17  A    No one from EAMC told her that
18  because I asked Nancy Ling, and Nancy Ling
19  told me that she did not say that.  She
20  told me that I can keep my office.  Nancy
21  Ling is the director.  That's who's over --
22  Q    Well, if Nancy had told you you could
23  keep your office, she would trump Ursula,

Page 210

1  that's for sure?
2  A    No.
3  Q    Right?
4      MR. MULLEN:  Object to the form.  You
5  can answer.
6  Q    Wasn't she above Ursula?  I'm
7  confused.  Go ahead.
8      MR. MULLEN:  You can answer.
9  A    So no, so Ursula changed my office
10  after she sat up there and thought that the
11  other workers liked me, so she didn't want
12  me to be around any women.  This was before
13  knowing that the other workers liked me
14  So after she learned that the other workers
15  liked me or had a crush on me, was
16  interested in me, anything like that, then
17  she decided to, "Hey, let me move him."
18  Q    You think she changed her mind?
19  A    Yes.
20      MR. LIGHTFOOT:  Thank you.  That's
21  all.
22      (Whereupon, at this time the
23  deposition was concluded at 2:40 p.m.)

Page 211

1  FURTHER DEPONENT SAITH NOT.
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 212

1        C E R T I F I C A T E
2
3  STATE OF ALABAMA)
4  JEFFERSON COUNTY)
5
6      I hereby certify that the above and
7  foregoing proceedings were taken down by me
8  in stenotype, and the questions and answers
9  thereto were reduced to computer print
10  under my supervision, and that the
11  foregoing represents a true and correct
12  transcript of the testimony given by said
13  witness upon said proceedings.
14      I further certify that I am neither
15  of counsel nor of kin to the parties to the
16  action, nor am I anywise interested in the
17  result of said cause.
18      /s/Donna L. Winters
19
20      Donna L. Winters, ACCR #373
21      Expires 9-30-2025
22      Donna L. Winters, Commissioner
23      My Commission Expires 08-16-2025



**Kelli Truitt**

| | |
|---|---|
| **From:** | Kelli Truitt |
| **Sent:** | Tuesday, February 27, 2024 3:53 PM |
| **To:** | Nicholas Barnes |
| **Subject:** | Re: Urgent Matter |

Nicholas,

We take your concerns seriously. Due to this, we'd like to let today be your last day of employment and will pay you through Friday. Please return your hospital badge, computer and any other hospital property to Human Resources by Friday, March 1st.

Kelli

Get Outlook for iOS

---

**From:** Kelli Truitt <kelli.truitt@eamc.org>
**Sent:** Tuesday, February 27, 2024 3:21 PM
**To:** Nicholas Barnes <nicholas.barnes@eamc.org>
**Subject:** RE: Urgent Matter

Thank you, Nicholas. We are investigating your concerns.

Kelli

**From:** Nicholas Barnes <nicholas.barnes@eamc.org>
**Sent:** Tuesday, February 27, 2024 3:13 PM
**To:** Kelli Truitt <kelli.truitt@eamc.org>
**Subject:** RE: Urgent Matter

I spoke with Mrs. Nancy numerous times about the things that keep happening and she asked me would I like to have a sit down with the three of us but I feel like that she will try to intimate me into saying the things she wants me to say in the meeting honestly. Mrs. Kelli, I have worked here 5 years and everyone knows me for being a hard worker and not confrontational. For me and to feel uncomfortable about working this job is not right at all. I am not the only employee that is being treated like this. I may get treated worse for speaking out about the situation from her at times because but there are other employees that are treated in a horrible way also. I am sorry if I caused any problems but I feel like my wellbeing should mattered here at EAMC and I should not have to look around while going to my car because of threats from her.



1

CONFIDENTIAL

EAMC/Barnes_00292

Nicholas Barnes
Contract Coordinator
Supply Chain Services
The East Alabama Health Care Authority
2000 Pepperell Pkwy
Opelika, AL 36801
Office: (334)528-4247
Mobile: ▉▉▉▉▉
Sent from Mail for Windows

East Alabama
Health ✚

---

**From:** Kelli Truitt <kelli.truitt@eamc.org>
**Sent:** Tuesday, February 27, 2024 2:45:19 PM
**To:** Nicholas Barnes <nicholas.barnes@eamc.org>
**Subject:** RE: Urgent Matter

Nicholas,

Thank you again for bringing these concerns to my attention. I will continue to investigate this with Nancy Ling.
Could you please specify which Vice Presidents you spoke to about this?

Thank you,

Kelli

**From:** Nicholas Barnes <nicholas.barnes@eamc.org>
**Sent:** Tuesday, February 27, 2024 12:05 PM
**To:** Kelli Truitt <kelli.truitt@eamc.org>
**Subject:** Urgent Matter

Hey Mrs. Kelli,

I have reached out to numerous directors and vice presidents about my issues with Ursula Means. Mrs. Ursula has harassed me constantly to the point of making me put in my two weeks notice. I do not feel safe at all going to my car after work because of the comments that she has made towards me. There have been incidents happening over and over. I spoke with Nancy Ling, John Morris, Chris waits , Chuck beams, Brenda Clarke, Sutricia Johnson, and others about the problem that is going on.

2

EAMC/Barnes_00293

I have spoke with Mrs. Nancy Ling the director of the department on the matter numerous times and she has not done anything about the matter of the constant harassment from Mrs. Ursula Means. I fear that she has not done anything because she brought Mrs. Ursula in with her from her previous company. There has been numerous things that has happened.

1. I was told that I should stop wearing my formal clothing to work and only wear scrubs into work. I agreed to only wear scrubs to work but I mentioned that Mrs. Nancy stated that it was fine to wear them to work sometimes and Mrs. Ursula stated that she would rather seem me in scrub pants and made a sexual look at me. I acted as I didn't hear her and started back doing my work.

2. I also had a meeting with Mrs. Ursula in her office because she wanted to have a heart to heart talk. I took the meeting with her and stated that I would not like to be friends but I would like to keep things professional while working. She got upset and stated that I should leave her office with my ugly face.

3. The next day she came back to my office and stated that I look like a scary employee. That she could get someone to whoop on me.

4. Ursula Means stated that she was going to fire me or make me quit to a employee name Laquesha Lester that is in the department. Her and Laquesha are best friends in the department because they were brought into EAMC together by Mrs. Nancy from a different hospital. Laquesha told me this because she stated that I should start looking for a new job. Because Mrs. Ursula wanted to bring in someone named Ashley for my position.

5. I was working at my desk upstairs in the department and she stated that I should get my things and move them to the EVS closet because I was useless. I asked to please be moved some where else because the EVS utility closet is not for office use. She moved me to the Cath lab materials room. And gave my office to her Laquesha Lester.

6. Also I have noticed that my times were not being approved on time and it was giving me missed punches. It gave me 19 missed punches and I have never been over 7 before she came. I reach out to Mrs. Penny in payroll and she stated that it was not being approved by Ursula Means. And that she would talk to her. I asked Mrs. Penny and Lisa wolf please not state that I asked about it because it would only make the situation that I am in worse. After they reached out to Mrs. Ursula she called me into her office the same day and asked did I snitch on her. And stated that if she gets fired or in trouble she will have her son and nephew to mess me up and whoop me in the parking lot.

7. Today she called me into a meeting and she stated that she understands that I may have checked out and I stated that I have not checked out I am a loyal worker until the end, I have been a hard worker for 5 years but I can not continue to receive the parking lot threats. She pulled her glasses on top of her head and stated that she does and says whatever she chooses. They are not threats that they are promises.

**Nicholas Barnes**
Contract Coordinator
Supply Chain Services
The East Alabama Health Care Authority
2000 Pepperell Pkwy
Opelika, AL 36801
**Office:** (334)528-4247
**Mobile:**
Sent from Mail for Windows

3



9:24

Nicholas Barnes (E...

I left my phone on the dresser we had to evacuate my building this guy was trying to jump and kill himself. The Swat is here now

12:21 PM

Please make sure not to accrue overtime this week. I just checked your time and you're good. Have a great weekend!

12:37 PM

Ok and thank you no problem

12:39 PM

Friday, January 27, 2023

WTH! I approved your vacation. I see she canceled. I'll handle it!

11:06 AM

Thank you    11:11 AM

CONFIDENTIAL



DEFENDANT'S EXHIBIT

Barnes

EAMC/Barnes_00327



9:24

**Nicholas Barnes (E...**

Tuesday, February 21, 2023

Can we work from home tomorrow?   4:56 PM

6:58 PM   Yes. Sorry, 🚗 I got busy and forgot to respond.

Thank you so much   7:00 PM

7:00 PM   YW!

Tuesday, March 7, 2023

Is it possible if i can work from home also tomorrow since we do not have any meeting and Laquesha is not coming in ?   3:15 PM

3:16 PM   Approved

Thank you   3:16 PM

EAMC/Barnes_00328



CONFIDENTIAL

LAMC/Barnes_00329





EAMC/Barnes_00331





9:26

< Nicholas Barnes (E... ∨ ⋮

Sorry, I'm just seeing this message. I left my phone on my desk. I hope you went to take care of your mom.

3:25 PM

Wednesday, April 12, 2023

Mrs. Ursula
I am not going to be able to make it to work today. I dosed off and wrecked my rental car

6:10 AM

Good morning, Nicholas. That's fine. Please take care of yourself and handle your business with the wreck. I'll see you in the morning.

7:14 AM

Also, I'll key ETO for today.

7:15 AM

Can i jus come in next

CONFIDENTIAL

EAMC/Barnes_00333



EAMC/Barnes_00334



CONFIDENTIAL

EAMC/Barnes_00335



9:19

Nicholas Barnes (E... ⌄ ⋮

11:25 AM

: Party          *A Vendor TBD        ⊙
ther Partner                          ⊙
eturn:          The East
                Alabama Health
                Care Authority.

Why is WF33e31 showing
complete in my bucket?

MMS
11:39 AM

No ma'am that means
that you can complete
the phase by clicking it.
And when it is complete
that will disappear

11:40 AM

Who bucket is it in?







CONFIDENTIAL



EAMC/Barnes_00340





FAMC/Barnes_00342



CONFIDENTIAL

EAMC/Barnes_00343



< Nicholas Barnes (E... ∨ ⋮

Hey Ursula, I'm not going to be make it today. They only had 3 tires in stock and the 4th tire won't arrive until 3pm
10:19 AM

Ok. I'll put you down for pto
11:42 AM

Monday, July 3, 2023

Hey Ursula, would it be possible if i can work from home Wednesday. I am wanting to flight out to Houston see family today for the holiday.
4:07 PM

Ok . I'll see you in the office on Thursday.
4:09 PM

Thank you so much 4:11 PM

CONFIDENTIAL





EAMC/Barnes_00346



EAMC/Barnes_00347



EAMC/Barnes_00348



CONFIDENTIAL

EAMC/Barnes_00349







EAMC/Barnes_00352



CONFIDENTIAL

EAMC/Barnes_00353



EAMC/Barnes_00354







9:36

**Nicholas Barnes (E...**

Friday, September 15, 2023

Goodmorning Mrs. Ursula,
I have to come into the office today so MIS can fix my computer it keeps restarting and asking for a Bitcode locker.

7:08 AM

Please come see me when you get here.
Thanks

9:42 AM

Hey Nick. Who fixed your computer this morning?

1:20 PM

Ion kno his name but a heavy set guy. He did it standing with me in the hall he said when it goes into reboot loop restart it twice manually and press F1 and it should come back and mines did





EAMC/Barnes_00359



9:56

< Nicholas Barnes (E...  ∨  ⋮

Am I in trouble for coming to the hospital ? I'm not understanding and confused

3:44 PM

I apologize if me coming to get my computer fixed is causing any trouble. If you want to give me a write up disciplinary action because they didn't do a ticket. That is fine I will sign off on it Monday or can come in today and sign it if you would like

3:54 PM



EAMC/Barnes_00361



EAMC/Barnes_00362



EAMC/Barnes_00363



  EAMC/Barnes_00364



Nicholas Barnes (E...

4:45 AM  Ok

Thursday, October 26, 2023

Goodmorning Mrs. Ursula
I might walk up and see my grandmother while she is in the hospital on my break if that is ok with you . My daughter had been sick and my grandmother was watching her on Monday . And she had to get admitted to the hospital yesterday because she is sick now.    8:13 AM

Hi. You do not have to ask me if you can visit a family member in the hospital. Just let me know what you're doin' Hope everyone gets



Nicholas Barnes (E...

Thursday, October 26, 2023

Goodmorning Mrs. Ursula
I might walk up and see my grandmother while she is in the hospital on my break if that is ok with you . My daughter had been sick and my grandmother was watching her on Monday . And she had to get admitted to the hospital yesterday because she is sick now.    8:13 AM

Hi. You do not have to ask me if you can visit a family member in the hospital. Just let me know what you're doing. Hope everyone gets better soon.    9:51 AM

Ok thank you so much    10:13 AM

CONFIDENTIAL







9:38

Nicholas Barnes (E...

9:39 AM   Ok

Good evening Mrs. Ursula

My car should be done tomorrow evening around closing time. Would it be possible to work from home tomorrow? If not i will have to get a rental car in the morning

7:15 PM

You can, but I'll need you in the office Thursday a d Friday

7:25 PM

Ok   7:39 PM

Monday, December 11, 2023

Can i request off tomorrow for my birthday?

3:07 PM

CONFIDENTIAL

EAMC/Barnes_00369









EAMC/Barnes_00373



CONFIDENTIAL

EAMC/Barnes_00374



EAMC/Barnes_00375





EAMC/Barnes_00377





 EAMC/Barnes_00379



CONFIDENTIAL

EAMC/Barnes_00380









EAMC/Barnes_00384







EAMC/Barnes_00387



EAMC/Barnes_00388





EAMC/Barnes_00390



LAMC/Barnes_00391



East Alabama Medical Center
Payroll Department
412 E. Thomason Circle
Opelika, Alabama 36801

Tel: (334) 528-1768
Fax: (334) 528-1868

## Check Information for **Nicholas Barnes**

**Date:** 11/26/2021          **Check #:** 1787585

### ACH Deposits

| Bank | Amount |
|------|--------|
|  | 944.98 |
|  | 100 |
| Totals: | $1,044.98 |

### Earnings

| Pay Type | Pay Rate | Hours | Amount |
|----------|----------|-------|--------|
| REG PAY FIRST SHIFT | 18.20 | 73.6 | 1339.50 |
| EARNED TIME OFF | 18.20 | 8 | 145.60 |
| OVERTIME PREMIUM | 18.20 | 1.2 | 10.92 |
| Totals: | | | $1,496.02 |

### Deductions

| Description | Amount |
|-------------|--------|
| FEDERAL W/H TAX | 150.84 |
| Med Plan Employee | 95.37 |
| FICA TAX | 85.98 |
| STATE TAX | 56.41 |
| OPELIKA LOCAL TAX | 22.44 |
| FICA MEDICARE | 20.11 |
| Dental Employee | 13.85 |
| BIZILIA MEAL DED | 6.04 |
| Totals: | $451.04 |



VLG/BARNES 0001



9:45

103

please call me. I was driving when you first texted me and asleep on the second 🥴 one!

Yes ma'am. Thank you again

You're welcome

Aug 30, 2023 at 2:07 PM

Come see me please

I am working from home today. I come in the office this week on Thursday and Friday

Ih yeah, today is Wednesday! I just wanted to see your pretty face. See you tomorrow.

*oh

Aug 31, 2023 at 9:32 AM

Where are you

Aug 31, 2023 at 3:58 PM

Do you think yo can stay this afternoon to help with the warehouse?

+    Text Message

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☒ FEPA ☒ EEOC | |

_____ and EEOC

*State or local Agency, if any*

| Name (Indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Nicholas Barnes | ▓▓▓▓▓▓▓▓ | ▓▓▓▓▓ |

| Street Address | City, State and ZIP Code |
|---|---|
| ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two are named, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. (Incl. Area Code) |
|---|---|---|
| East Alabama Medical Center | 15+ | 3347493411 |

| Street Address | City, State and ZIP Code |
|---|---|
| 2000 Pepperell Pkwy | Opelika, AL 36801 |

| Name | No. Employees, Members | Phone No. (Incl. Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN
☐ RETALIATION ☐ AGE ☐ DISABILITY ☐ GENETIC INFORMATION
☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest 6/2022   Latest 2/2024
☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

See Exhibit A.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State or Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.  SIGNATURE OF COMPLAINANT |
| 05 / 06 / 2024     *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date | |

VLS/BARNES 0005

Doc ID: f62b86896c96fbe75eea7c35505cbbccb3eb69bb

EEOC Form 5 (11/09)

| **CHARGE OF DISCRIMINATION**<br>This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | Charge Presented To:<br>☐ FEPA<br>☐ EEOC | Agency(ies) Charge No(s): |
|---|---|---|
| | | and EEOC |

*State or local Agency, if any*

THE PARTICULARS ARE *(if additional paper is needed, attach extra sheet(s)):*

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State or Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief<br>SIGNATURE OF COMPLAINANT |
| _____    _____<br>Date            Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

ALG/BARNES 000-

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

**1. FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

**2. AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

**3. PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

**4. ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

**5. WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging party and respondent and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

## NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

## NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

VLG/BARNES 0005

Exhibit A

1. My name is Nicholas Barnes. I am a citizen of the United States.

2. On or about December 18, 2018, I began working at East Alabama Medical Center located in Opelika, AL as a warehouse worker and was promoted to contract coordinator.

3. While employed, a new manager of the supply chain, Ursula Means, began working.

4. On or around June of 2022 Ursula made a comment about how she did not want to see me wearing formal clothing anymore and wanted to see me in scrub pants.

5. During this interaction, she looked me up and down, stared at my genital area, smiled at me, and proceeded to rub my shoulders.

6. From that day on, I attempted to ignore Ursula, but the environment became hostile.

7. On or around August of 2022, Ursula was speaking to LaQuisha and Ursula stated that if there was ever a shooting, I would "run and hide," and not "protect anyone."

8. Ursula followed this statement by stating she thinks she could "whoop me," insinuating that she could beat me up.

9. On or around June of 2023, LaQuisha informed me that Ursula stated that she believed I was "useless," and was going to move me out of my office.

10. LaQuisha continued and stated further that Ursula stated she was going to hire an ex-employee, Ashley, from Ursula's previous place of employment and intended to make me quit.

11. Later that same day, Ursula stated that I should not be around women because they "like" me and desired that LaQuisha take my office and move me to a utility closet.

12. I asked not to be moved to a utility closet because it was not big enough and it was not clean.

13. However, on or about July of 2023, she moved me to a cardiology equipment room and stated that "men should not be working on the same floor as women."

14. I spoke with the Director, Nancy Ling, about the treatment I was receiving but no action was taken.

15. On or around January of 2024, I noticed that I had missed 19-time clock punches, and 20 missed time clock punches are cause for termination.

16. I spoke with payroll on or about January of 2024 to inquire why I had missed so many, and they informed me that the manager, Ursula, has not been approving my time punches.

17. Payroll contacted Ursula and told her to approve the missed punches and to delete them.

18. Later that day, she called me into the office and asked if I "snitched" on her.

19. I responded that I did not snitch on her and only inquired with payroll as to why I had missed so many punches.

20. After that interaction, she stated that if she would have gotten into trouble, she would have her son, John-John, and her nephew, to come to our place of employment and "mess" me up in the parking lot.

21. I reported this statement to Nancy while we were in the hallway on or about February of 2024.

22. Nancy stated that she would "look into it," but again, no action was taken.

23. On or about January 30, 2024, Ursula ordered me to do the workload of three employees because we were short-staffed, and that "it did not matter" what was in my job description and that I would have to "do whatever" she says.

24. After all of the hostile and sexually charged incidents with Ursula and reporting this conduct to Nancy and no action being taken, I put in my resignation on or about February of 2024.

25. On or about February 26, 2024, LaQuisha informed me that Ursula had told her that she was going to try "one last time," before I left the job and she asked me on my final day of employment if I wanted her to take me home, and if I wanted her to take me out to dinner.

VLG/BARNES 0007

Doc ID: f82b86896c96fbe75eea7c35505cbbccb3eb69bb

27. After this interaction with Ursula on my last day, I spoke with Director of Human Resources, Kelli Truitt, and she stated she was going to investigate the matter.

28. However, on or about February 29, 2024, Nancy informed me that I was terminated because I reported the issues to Human Resources.

29. I believe I have been subjected to hostile work environment and discrimination based on sex, both in violation of Title VII of the Civil Rights Act of 1964.

30. I declare under penalty of perjury that the preceding is true and correct.

30. I authorize the EEOC to release the content of this Charge of Discrimination to the Respondent.


Done this ___6th___ day of ___May___ 2024.


_____

Nicholas Barnes

VI G/BARNES 0008

**Dropbox Sign**                                                    Audit trail

| | |
|---|---|
| **Title** | EEOC Charge and Exhibit |
| **File name** | 24.05.06_EEOC_Charge_Form.pdf and 1 other |
| **Document ID** | f82b86896c96fbe75eea7c35505cbbccb3eb69bb |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | • Signed |

## Document History

| | | |
|---|---|---|
| **SENT** | **05 / 06 / 2024** 21:14:20 UTC | Sent for signature to Nicholas Barnes (nickdbarnes@yahoo.com) from info@vlgal.com IP: 71.45.172.168 |
| **VIEWED** | **05 / 06 / 2024** 23:49:07 UTC | Viewed by Nicholas Barnes (nickdbarnes@yahoo.com) IP: 104.28.77.17 |
| **SIGNED** | **05 / 06 / 2024** 23:50:05 UTC | Signed by Nicholas Barnes (nickdbarnes@yahoo.com) IP: 104.28.77.17 |
| **COMPLETED** | **05 / 06 / 2024** 23:50:05 UTC | The document has been completed. |

Powered by **Dropbox Sign**

VLG/BARNES 0009



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

Birmingham District Office
1130 22nd Street South, Suite 2000
Birmingham, AL 35205
(205) 651-7020
Website. www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 05/15/2024

**To:** Mr. Nicholas Barnes
262928 Ave SW
Lanett, AL 36863
Charge No: 420-2024-02960

EEOC Representative and email:    CHIQUITA DILLARD
Investigator Support Assistant
chiquita.dillard@eeoc.gov

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 420-2024-02960.

On behalf of the Commission,

*for* Bradley A. Anderson
District Director

VI C/BARNES 0010

**Cc:**
Warren B Lightfoot, Jr.
Maynard Nexsen, P.C.
1901 6TH AVE N STE 1700
Birmingham, AL 35203

Kelli Truitt
EAMC
2000 Pepperell Pkwy
Opelika, AL 36801

Brock Phillips
Maynard Nexsen, P.C.
1901 6TH AVE N STE 1700
Birmingham, AL 35203

SARAH HUGULEY
2000 Pepperell Pkwy
Opelika, AL 36801

Allan Armstrong Esq.
Virtus Law Group
2017 Morris Avenue Suite 100
Birmingham, AL 35203

Please retain this notice for your records.

VLG/BARNES 0011

Enclosure with EEOC Notice of Closure and Rights (01/22)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you** *receive* **this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 420-2024-02960 to the

VLB/BARNES 0012

Enclosure with EEOC Notice of Closure and Rights (01/22)

District Director at Bradley A. Anderson, 1130 22nd Street South Suite 2000, Birmingham, AL 35205.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 420-2024-02960 to the District Director at Bradley A. Anderson, 1130 22nd Street South Suite 2000, Birmingham, AL 35205.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

VLG/BARNES 0013

# TABLE OF CONTENTS

**I. STATEMENT OF MISSION** — 2

**II. ABOUT US**
A. Introduction — 3
B. Management's Duties — 3
C. Equal Employment Statement — 4
D. No Harassment Policy — 4
E. Our History — 5
F. The Joint Commission — 6

**III. JOINING US**
A. Your Job — 7
B. Orientation — 7
C. Introductory Period — 7
D. Keeping Our Records Current — 7
E. Employment of Relatives — 7
F. Transferring/Job Posting — 8

**IV. LEAVING US**
A. Termination — 9

**V. COMMUNICATION**
A. Your Supervisor — 10
B. Working with Other Departments — 10
C. Newsletter — 10

**VI. YOUR PAY**
A. ID Badges — 10
B. Pay Period/Pay Days — 11
C. Payroll Deductions — 11
D. Fair Base Pay — 11
E. Gainsharing — 12

**VII. EVALUATIONS**
A. Employee Evaluations — 12

**VIII. DAYS AND HOURS OF WORK**
A. Attendance — 13
B. How to Report Absences — 13
C. Hours of Work — 13
D. Overtime — 13

**IX. TIME OFF**
A. Earned Time Off (ETO) — 14
B. Long Term Sick Bank — 15
C. Leave of Absence — 16
D. Family & Medical Leave Act — 17
E. Other Leaves — 18

**X. OBLIGATION TO PATIENT AND**
A. Telephone System — 19
B. Use of Electronic Devices — 19
C. Outside Employment — 20
D. Conflicts of Interest — 21
E. Confidentiality — 21
F. Courtesy — 21
G. Courtesy Titles — 21
H. Solicitation — 22
I. Personal Appearance — 23
J. Lost and Found — 23
K. Safety — 24
L. EOP/FRP — 24
M. Standard Precautions — 24
N. Tips & Gifts — 24

**XI. EMPLOYEE BENEFITS**
A. Group Plans — 25
B. Workers' Compensation — 26
C. Unemployment Compensation — 26
D. Retirement — 26
E. Tuition Reimbursement — 26
F. Child Care — 26
G. Food Service — 26
H. Breaks — 27
I. Parking — 27
J. Service Awards — 27
K. Pharmacy — 27
L. Opinion Survey — 27
M. Bulletin Boards — 27
N. Credit Union — 28

**XII. CORRECTIVE ACTION**
A. Disciplinary Procedure — 29
B. Grievance Procedure — 32
C. Substance Abuse Policy — 33
D. Notification of Convictions — 34



DEFENDANT'S EXHIBIT
4
Barnes

## I. STATEMENT OF MISSION

EAMC Mission, Vision, and Values

MISSION - High quality, compassionate health care
> Our core purpose - our mission as an organization - is simple, yet important: to provide high quality, compassionate health care.

VISION - To be a national leader in quality, cost and service
> In order to achieve our vision, East Alabama Medical Center has made a commitment to the continued pursuit of excellence with all of our partners to improve the quality of life for those we serve, to measure our progress against the highest standards in quality of care and quality of service, and to be fiscally responsible with our assets.

VALUES - Excellence - Integrity - Compassion - Respect - Teamwork
> Values define what we fundamentally believe in and daily influence our decisions and actions. EAMC's shared core values are Excellence, Integrity, Compassion, Respect, and Teamwork.

East Alabama Medical Center is committed to serving its four constituencies:

- Patients who use our services deserve the highest quality care for their medical, physical, and emotional needs;

- Physicians who practice at EAMC are leaders of the health care team and must be provided with the resources and support they need to care for patients;

- Employees of EAMC, who provide most of the patient care and support services, must have an excellent work environment and opportunities to participate in the future of the Medical Center as well as opportunities for personal and professional growth for themselves;

- Community in which EAMC is located must have opportunity for the best health education and information, and a voice in the future of the Medical Center and health care in East Alabama;

East Alabama Medical Center pledges to listen to each of these four important groups of people in Alabama and meet the challenges provided in our commitment to excellence and quality service. If EAMC succeeds in meeting these challenges, the Medical Center along with its four constituencies, will be successful.

## II. ABOUT US

### A. INTRODUCTION

This handbook is designed to acquaint you with East Alabama Medical Center (also referred to as "EAMC" or "Medical Center" throughout) and sets forth many of the policy guidelines and practices under which the Medical Center operates. It will inform you about some of our programs and some of the things that are expected of you as an employee. The handbook and the policies contained herein are neither a contract of employment nor a promise of employment and should not be construed as such.

Employment is based on the consent of both the Medical Center and the individual employee. Irrespective of any statement contained herein or in any other document or statement issued by the Medical Center, employment is voluntarily entered into and is not guaranteed for any length of time. You are free to resign at any time, with or without cause. Likewise, the Medical Center may terminate the relationship at any time, with or without cause.

No employee of East Alabama Medical Center, other than the President, has the authority to enter into any contrary agreement; and, to be valid, any such agreement must be in writing and signed by the Medical Center's President.

It is important for you to understand your benefits and the Medical Center's policy guidelines. The description of the benefits and policy guidelines contained in this handbook or other materials are set forth for purposes of illustration only. In each case, the specific provisions are set forth in the full policy or full separate benefit plan that governs employee or dependent eligibility for benefits. The full plans and policies of the EAMC are available for inspection on Sharepoint under Policy Manager in the Human Resources section.

Our policy guidelines are under constant review and are revised whenever appropriate to keep them up-to-date and relevant. The Medical Center reserves the right to revise any of the policy guidelines and benefits contained in this handbook. In addition, exceptional cases sometimes occur where these policy guidelines do not apply. In such an event, the Medical Center reserves the right to handle these exceptional cases as it deems appropriate.

### B. MANAGEMENT'S DUTIES

In our Medical Center, there is a group of people who have collectively been given the ultimate responsibility to make decisions that maintain the efficiency and quality of patient care and that contribute to the health needs of the community. We refer to this group as Management. In fulfilling these responsibilities, Management maintains the right to determine the extent and type of work that must be performed. It also recognizes its responsibility to establish and maintain the most efficient procedures and methods possible to achieve this work. Considering these responsibilities, Management also sets forth the standards of performance necessary to realize the Medical Center's objectives.

The Medical Center has the responsibility to provide for a staff of fully qualified personnel. It therefore maintains the right to recruit and select its work force and to determine specifications for employment. To assure effective performance, the Medical Center also maintains the right to discipline, suspend, or dismiss employees for disciplinary reasons, to transfer employees for joint or separate advantage, and to release employees from duty due to lack of work or other legitimate reasons.

In reserving the right to perform all customary functions of management and to direct the work force, the Medical Center will be guided by the policies and practices set forth in this handbook.

## C. EQUAL EMPLOYMENT STATEMENT

It is the policy of the Medical Center to provide Equal Employment Opportunity for all applicants and employees. We hire, promote, compensate, and train employees based on their qualifications, without regard to race, religion, color, sex, age, handicap, or national origin.

## D. NO HARASSMENT POLICY

East Alabama Medical Center is committed to maintaining a work environment that is free from discrimination so that employees at all levels may devote their full attention and best efforts to their job. Accordingly, the Medical Center does not authorize, and will not tolerate, any form of harassment based on race, gender, religion, color, national origin, age, or disability. The term "harassment" includes any verbal or physical conduct relating to an employee's race, gender, religion, color, national origin, age, or disability which could interfere with a person's job performance.

❖ Sexual Harassment

Sexual harassment can include: (a) physical assaults or physical conduct that is sexual in nature (e.g. touching, pinching or brushing against another's body); (b) unwelcome sexual advances, propositions, comments, or requests for sexual favors; (c) sexual displays or publications such as calendars, cartoons, or graffiti; (d) other verbal or physical conduct of a sexual nature that would interfere with an individual's work performance or create an intimidating, hostile, or offensive work environment (e.g. sexually suggestive comments, sexually-oriented jokes, obscene language or gestures); and (e) retaliation for complaints of harassment.

❖ Racial, Religious, National Origin, Disability, or Age Harassment

Harassment based on race, religion, national origin, disability, or age can include any verbal, written, or physical act in which race, religion, national origin, age, or physical or mental disability is used to make an employee uncomfortable at work or which interferes with an employee's ability to perform the job. Examples of this type of harassment can include: (1) jokes which refer to race, religion, national origin, disability, or age; (2) the posting or distribution of cartoons, drawings, or any other material which adversely reflects on a person's race, religion, national origin, disability, or, age; (3) the use of "slurs" or other offensive language; or (4) practical jokes, horseplay, or teasing, which makes fun of a person's race, religion, national origin, disability, or age.

❖ How to Report Instances of Harassment

The Medical Center cannot resolve matters that are not brought to its attention. Any employee who experiences or who witnesses an act of harassment at work has a responsibility to bring the matter to EAMC's attention immediately. Employees may report harassment to their supervisor or the department manager. If the employee is uncomfortable making a report to these persons, the employee should contact the Human Resources Department at ext. 4188 for the Opelika campus or 0075/0076 for the Lanier campus. If the complaint or observation of harassment involves someone in the employee's direct line of command, or if the employee is uncomfortable discussing the matter with his or her direct supervisor, the employee is urged to go to another supervisor or one of the other officials listed in the final paragraph of this policy.

◆ How the Medical Center Will Investigate Reports

EAMC investigates all reports of harassment thoroughly and promptly. If the investigation confirms that harassment has occurred, EAMC will take appropriate corrective action up to and including immediate termination of employment for those found guilty of harassment. Where appropriate, a meeting with the employee making the report will be arranged to discuss the results of the investigation and to review the proposed resolution of the matter.

Reports of harassment are kept as confidential as possible, and no employee will be subjected to retaliation by EAMC for reporting an incident of harassment.

◆ Our Commitment to An Effective No Harassment Policy

Finally, if you feel that EAMC has not met its obligations under this policy, you should contact Human Resources. An effective No Harassment Policy depends on all of us, working together, to address this very important subject.

◆ Open Door Policy

In any organization that includes people working with each other, problems occasionally arise. In our spirit of open communication, the Medical Center believes in the "open door" policy. Because we are union free, all of us are permitted to talk with one another to get answers to questions, to communicate, and to resolve problems without the interference of a paid third party. Talk with your supervisor if any question or difficulty arises relating to any aspect of your job. Your supervisor should either be able to help you with the problem or refer you to someone who can. If your supervisor is unable to provide a satisfactory response, you should contact Human Resources.

By following this process, we should be able to resolve small problems before they become large problems. For that reason, you should always feel free to discuss your problems and questions with members of management.

E. OUR HISTORY

East Alabama Medical Center is a 314-bed regional, referral center with an active medical staff of more than 145 physicians. The Medical Center serves a six-county area and offers programs and services in nearly every medical specialty, including a full range of inpatient and outpatient procedures. With more than 3,000 employees, East Alabama Medical Center is the area's second largest employer. In addition, EAMC has more than 300 volunteers in its Auxiliary.

EAMC was established in 1952, as a public, non-profit hospital with 81 beds. Since that date, the Medical Center has undergone several major expansion and modernization programs to keep pace with the growing health care needs of East Alabama. Because of its commitment to quality and personal care, EAMC has received continuous accreditation from the Joint Commission on Accreditation of Healthcare Organizations since 1959.

Prior to the 1980s, the Medical Center was relatively small. However, cardiology services-including open-heart surgery-were established in the mid-1980s and were followed by the opening of the Cancer Center in 1992. Those two prominent service lines, coupled with various other new offerings, helped turn EAMC into the regional referral center that it is today.

In addition to the main campus in Opelika and EAMC-Lanier Campus in Valley, EAMC also has services in that include HealthPlus Fitness Center, RehabWorks (Auburn and Opelika), two nursing homes, the Spencer Cancer Center, and several physician offices.

F.  THE JOINT COMMISSION

The Joint Commission of the Accreditation of Hospitals has continuously accredited the Medical Center since February 1959. The East Alabama Medical Center is also licensed by the Alabama State Board of Health and is a member of the American Hospital Association, the Alabama Hospital Association, and the Southeastern Hospital Conference. The Medical Center is also certified for participation in the Medicare and Medicaid programs.

The primary service area for EAMC is Lee County, Alabama and the majority of its admissions originate there. The Medical Center is the only hospital within the primary service area. The secondary service area for the Medical Center is the five surrounding counties - Chambers, Macon, Randolph, Russell, and Tallapoosa. If you would like to find out how healthcare organizations rate with Joint Commission, go online at www.jointcommission.org and visit the online Quality Check™ where you can "check-up" on performance by reviewing the latest Quality Report.

If you would like to voice a concern, you can contact The Joint Commission by mail, e-mail, or fax. You may either submit your name and contact information or submit your concern anonymously. There will be no adverse actions taken against employees for having reported quality concerns.

The Joint Commission contact information:

E-mail: complaint@jointcommission.org
Fax: Office of Quality Monitoring
     630-792-5636
Mail: Office of Quality Monitoring
     The Joint Commission
     One Renaissance Blvd.
     Oakbrook Terrace, Il. 60181

If you have questions about how to file a concern with JCAHO, you may call 800-994-6610 on weekdays from 8:30 a.m. to 5:00 p.m.

If you would like to report a concern to someone in-house, you may call the compliance hotline at 334-528-1441.

CONFIDENTIAL

## III. JOINING US

### A. YOUR JOB

You will be given the opportunity to read and review a written description of your specific job duties and responsibilities. That description is the basis for the performance evaluation program and should be fully discussed with you by your Supervisor, Manager, or Department Director prior to beginning work. Job descriptions may be changed from time to time as conditions dictate.

### B. ORIENTATION

The Human Resources Department conducts an orientation program designed to familiarize each new employee with the Medical Center's operation, objectives, and personnel policies and procedures. However, the main responsibility for orienting new employees to their work situation rests with the Supervisor, Manager, or Department Director. As a new employee, you will receive specific orientation to your position from your Supervisor, Manager, or Department Director. This orientation should include review of the job description, an introduction to fellow employees, an explanation of your department functions, detailed instruction of the job to be performed, and other matters as your Supervisor, Manager, and/or Department Director deems necessary.

### C. INTRODUCTORY PERIOD

The first ninety (90) days of employment for all new employees is an orientation period. The purpose of this orientation period is to allow the employee an opportunity to learn more about the Medical Center and his or her job. It is also intended to allow the Medical Center to observe and evaluate the employee and determine whether the employee's interests and talents are suitable to the assigned position to insure satisfactory performance of duties. Employment is not guaranteed through the end of the orientation period, nor is the completion of this period a guarantee of continued employment.

### D. KEEPING OUR RECORDS CURRENT

It is important that your employment records stay up to date. For your convenience, employees should make changes to name, address, telephone number, federal and state tax withholdings, and life insurance beneficiaries through Employee Self Service. Be sure to send the Human Resources Department required documentation if there are changes made to name or marital status. Changes to military status, education status, and corrections to SS number can be in the Human Resources Department.

### E. EMPLOYMENT OF RELATIVES

The employment of relatives is permitted; however, the employment of immediate relatives in the same activity or unit must be pre-approved.

## F. TRANSFERRING TO ANOTHER DEPARTMENT

It is the policy of East Alabama Medical Center to consider current employees first when opportunities for promotion or transfer exist. Promotional consideration is given first to those employees within the department where an opening exists provided they possess the necessary knowledge, skills, and abilities to perform the job. If the position is not filled from within the department where the opening exists, the following policy applies:

◆ Job Posting Policy

The Human Resource Department will post open positions on the intranet. Each posting will remain for three (3) working days, including the day of the posting.

- Eligible employees wishing to apply for an available position must complete an application on the intranet. Requests received after the three (3) day period will be accepted, however, these requests will be considered with outside applicants.

- A separate transfer form should be completed for EACH position. Transfer forms are NOT held for future openings.

- An employee must be in their current position for at least one year before they can be considered for a position UNLESS they have approval from their current Manager/Director (approval must be sent to Human Resources in writing).

- Applicants will be screened in the Human Resource Department and referred to the Department Director where the opening exists. Employees must meet the minimum qualifications for the position for their application to be forwarded to the hiring manager. Once the application is sent to the hiring manager, the hiring manager determines what candidates will be interviewed. Applying for an opening does not guarantee that an employee will receive an interview.

- The hiring manager will review all disciplinary actions within the last 12months.

- Prior to an offer being extended, the hiring manager will be contacting the employee's current Manager/Director for a reference.

- The effective date of transfer will be arranged between the two department directors. The department director who is releasing the employee should make every effort to do so on the first day of the pay period following a two (2) week or one (1) month notice period (as per department notice policy). The releasing director is responsible for initiating a Personnel Action Form (PAF) to transfer the employee. Extended release periods require approval.

◆ Education Requirements

All positions at EAMC have a minimum education or licensure requirement listed on the job descriptions. As of April 2010, the Joint Commission requires that Human Resources verify all minimum job requirements prior to hire or internal transfer. If the position requires a licensure, the recruitment team in HR will verify the licensure through our primary source process. If the position requires a degree or diploma, the employee will be responsible for providing a copy to their new manager or to HR.

Employees are not allowed to transfer or receive any pay increase until licensure/education has been verified in HR. If there are any questions about the minimum requirements of a position, please contact the Recruitment Team in Human Resources for assistance.

## IV. LEAVING US

### A. TERMINATION

Employment with the Medical Center is based on the consent of both the Medical Center and the individual employee. Therefore, both the employee and the Medical Center have the freedom to terminate employment whenever either chooses to do so. We request that you provide written notice in advance of your decision to terminate employment to arrange for your replacement and to minimize interference with business operations.

Upon notice of your resignation, employees will be asked to complete an Exit Interview. This may be done in person at the Human Resources office or online by completing the Exit Interview Form. Human Resources will send the Exit Interview Form through email, postal mail, or both. The Exit Interview process provides you with an opportunity to give your reactions to your employment. This confidential information will be used to review the policies and procedures that directly affect remaining employees, as well as future employees. At that time, Human Resources will be able to answer any questions you may have as well as make any changes to your employee profile you may require (i.e. address change/ phone number change). If you have resigned and have given a timely written notice, you are entitled to a payout of half of your remaining Earned Time Off (ETO).

Information regarding your option to continue health and/or dental benefits (COBRA) will be mailed to you within thirty (30) days of termination. Should it become necessary for your employment to be terminated because of an economic reduction in force, you will be given as much notice as possible.

There are several types of termination procedures described below:

- Resignation

Employees who find it necessary to terminate their services with the Medical Center should give at least a two (2) week or four (4) week written notice (as per department notice policy) to their Supervisor, Manager, or Department Director and forward a copy to Human Resources, unless otherwise mutually agreed. In this way, Management will have an opportunity to secure a replacement. Management and professional personnel are expected to give at least a one (1) month written notice.

- Quitting

This term applies when employees leave without providing a two (2) weeks written notice (as per department notice policy), unless otherwise mutually agreed. This is a poor practice and results in an employee's record carrying an unfavorable termination report, as well as ineligibility for ETO payout.

- Dismissal

Dismissal is an immediate termination imposed by the authority of Management for serious reasons partially described in the section of this handbook titled "Corrective Action". Human Resources automatically reviews all such terminations and must approve them. Dismissed employees are ineligible for ETO payout and will NOT complete an Exit Interview with Human Resources.

## V. COMMUNICATION

### A. YOUR SUPERVISOR

Your Supervisor, Manager, and/or Department Director is usually the person to turn to with your problems, questions, criticisms, and suggestions. He or she is fully responsible for the day-to-day running of your department or section.

We stress communication here: Talk it over; talk it out; listen to each other; respect each other's abilities, talents, and difficulties. It works!

### B. WORKING WITH OTHER DEPARTMENTS

East Alabama Medical Center has many varied departments listed in the telephone directory. This may assist you in contacting a department about special problems or questions.

Although your Supervisor, Manager, and/or Department Director can direct you to the right department to get an answer, feel free to acquaint yourself with the functions of the various departments and the people who work there.

We encourage you to get to know each department because you will be in contact with every area of EAMC at one time or another.

### C. NEWSLETTER

The Medical Center publishes a weekly newsletter called "This Week @ EAMC". This publication's purpose is to keep all employees informed about important events, activities, and future plans. It also includes columns from various departments, interesting articles about our people, and information about policies and procedures.

## VI. YOUR PAY

### A. ID BADGES

Upon employment, you will be given an I.D. badge. It identifies you as a member of the Medical Center staff and must be worn during all on-duty hours.

Your I.D. badge remains the property of the Medical Center, and you must return it to the Human Resources Department upon termination. Please make every effort not to lose your badge as it can present a security risk if it falls into the wrong hands. If you do lose it, please notify Human Resources immediately.

CONFIDENTIAL
EAMC/Barnes_00046

## B. PAY PERIOD/PAY DAYS

The workweek begins Sunday morning at 12:00 a.m. and ends the following Saturday 11:59 p.m. The pay period consists of two (2) consecutive workweeks. Because of many factors involved in computing your paycheck, one week is required to prepare your paycheck after completion of the two-week pay period.

Employees may view or print their stubs and other pay information through INFOR. INFOR is accessed through SharePoint or through the INFOR icon on a computer within EAMC, and passwords are given at New Employee Orientation. Employees are paid bi-weekly (every two (2) weeks), so there will be twenty-six (26) pay periods/paydays each year.

## C. PAYROLL DEDUCTIONS

East Alabama Medical Center makes two types of deductions from your pay: mandatory and voluntary. Mandatory deductions are those the law requires us to make. These include Federal, State, and local city taxes, Social Security (FICA) payments, garnishments and others. Often, these deductions may change as they are affected by changes in the amount you earn, legislation, and/or the number of dependents you declare. Changes should be made in INFOR under Employee Self Service. If you wish to file tax exempt, please see the Human Resources Department.

Voluntary deductions are those you authorize us to make. Those include deductions by the Credit Union, insurance plans, Medical Center patient accounts, retirement plan, gift shop purchases, and others.

East Alabama Medical Center accepts personal checks from employees for purchases made in the cafeteria and gift shop. If an employee's check is returned by their bank for any reason, EAMC will payroll deduct the amount of the personal check(s) plus a service charge of $37.00 per check.

It shall be the policy of East Alabama Medical Center (EAMC) that all charges for services, all open accounts of any nature, and all other debt owed to EAMC, as incurred by the employee, shall be satisfied within a reasonable time period as per billing and/or other requests for payment. If, after ninety (90) days of unsatisfied debt, other arrangements have not been made, the employee agrees and understands that EAMC may invoke its right to be paid by payroll deduction. This payroll deduction shall not be less than twenty-five ($25.00) dollars per pay period, or of some other amount, that will satisfy the total balance owed in a period not to exceed sixty (60) months. The Vice President of Human Resources will review and/or approve any payroll deduction applied to a balance (total debt owed to EAMC by an employee) of ten thousand ($10,000.00) dollars or greater.

East Alabama Medical Center's pay program has two goals: 1) To compensate employees fairly, 2) To share additional pay with employees when the Medical Center meets or exceeds certain goals.

## D. FAIR BASE PAY

To compensate our employees fairly, we examine each of our jobs, and our Compensation Team organizes these jobs into pay grades. They also evaluate and rank new jobs that are established and reclassify jobs that have changed. The following factors are considered when a job is ranked: patient contact, knowledge or skill required, problem solving and decision-making responsibility, supervisory responsibility, communication requirements, and working conditions.

Jobs that are similar in scope and requirements are grouped together in the same pay grade. This provides internal equity - that is, the jobs compare fairly to each other within EAMC.

It is also important to look outside the Medical Center to see how our jobs compare to the outside market. We use local, regional and national job data from many salary and benchmark surveys. This ensures that our jobs have external equity - that is, they compare fairly to the outside job market.

Using this data, salary ranges have been determined for each grade. Each pay grade has a minimum, midpoint, and maximum level of pay. The middle of the range reflects the going rate of pay in the competitive labor market for fully trained and experienced employees. Employees who are new to a position are paid at or near the range minimum. Employees who are fully trained and experienced are paid near the middle of the range. Employees who are extremely experienced and competent are paid toward the upper end of the range. Employees move through the range based upon length of time in a pay grade.

The Medical Center is committed to keeping the pay structure current; therefore, the program is very flexible. Determining the value of each job is a process that never stops. Each year, Labor Management/HR will review the salary structure to see if adjustments should be made to keep pace with the market. As a result, an employee's base pay rate may increase if it is deemed necessary based on the job market and his or her time in the job.

### E. GAINSHARING

EAMC is committed to providing excellent service, working productively and efficiently, and continuing to grow and prosper as an organization. At the same time, we are committed to providing fair pay to our employees. This commitment to our organization, customers, patients and employees is the reason we offer the Gainsharing Program. Our Gainsharing Program combines quality, financial, and patient satisfaction goals to measure the success of the organization. Employees receive a check in November if the goals and triggers are met.

## VII. EVALUATIONS

### A. EMPLOYEE EVALUATIONS

Your job performance is evaluated based on your initiative, knowledge, skills, abilities, and potential for growth. Your progress is formally evaluated at the end of three (3) months and annually thereafter. Your immediate Supervisor will complete the evaluation form online and you may view it through the online performance management system. Once it is complete, you will have a meeting with your Supervisor to discuss the evaluation.

Evaluation interviews will be conducted in private and serve as an opportunity for an honest and frank discussion. Department Directors, Managers, and Supervisors are advised to consult with the Human Resources Department on unusual matters and matters of mutual interest.

Performance evaluations are important because they provide you with an assessment of your work abilities and can serve as a guide to improved performance. Base pay salary increases are not calculated based on these evaluations.

EAMC/Barnes_00048

## VIII. DAYS & HOURS OF WORK

### A. ATTENDANCE

Because of the nature of the Medical Center's responsibilities to provide uninterrupted patient care, regular attendance of all employees is very important. We expect each of our employees to report to work on time and to continue to work until the end of the workday. Inability to report for work as scheduled should be reported to your Supervisor, Manager, or Department Director at least one (1) hour prior to the beginning of the work shift (or per department notice policy).

An unsatisfactory attendance record and/or frequent tardiness may be cause for warnings. Should this continue, your attendance record could be reason for dismissal. Please refer to your own departmental policy guidelines as departments' requirements may vary.

### B. HOW TO REPORT ABSENCES

If it is necessary to be absent, whether for illness or for some other reason, and you know in advance, please tell your Supervisor, Manager, or Department Director. If such advance notice is not possible, please telephone your Supervisor, Manager, or Department Director as early as possible, in accordance with the policy established for your department, on the first day of absence. After that, you are required to call daily until you are able to report for work again. An employee who fails to call or report for 3 days will be classified as having resigned without notice ("quitting").

Any employee who has been absent from his/her job for five or more consecutive days due to illness shall be required to present a physician's note to his/her Department Director before resuming his/her duties.

### C. HOURS OF WORK

Most full-time employees are scheduled to work a normal forty (40) hour work week consisting of five (5) eight (8) hour days. Some employees, depending upon the needs of their departments may be required to work forty (40) hours per week in a different daily hour schedule; while other employees may be required to be on call for work over their regularly scheduled hours. Some positions may require employees to rotate shifts, so they will alternate between working days, evenings, and nights. Because patient care is a twenty-four (24) hours a day, seven (7) days a week responsibility, many employees are scheduled to work with varying days off. Request for special days off must be submitted to your Supervisor, Manager or Department Director. Every consideration, when at all possible, will be made to grant your request with consideration for the needs of your department.

### D. OVERTIME

East Alabama Medical Center compensates employees for overtime in accordance with federal and state laws, making every effort to plan required overtime with due regard to the needs of patients, the Medical Center, and the department. Certain exempt administrative and professional employees meeting federal requirements shall not be paid for time worked in excess of forty (40) hours per week.

Non-exempt employees are eligible to be paid at an overtime rate for all hours worked in excess of forty (40) hours in a work week. All overtime hours are subject to the approval of each Department Director. The overtime rate is calculated at one and one-half (1.5) times your regular hourly base rate.

If paid time off, such as ETO, jury duty, or bereavement falls in a work week or pay period, such time shall not count toward overtime pay.

Regularly scheduled overtime with a department will be distributed as equally as possible among employees of that department who can perform the required work.

## IX. TIME OFF

### A. EARNED TIME OFF (ETO)

It is the policy of East Alabama Medical Center to provide its employees with the benefit of paid time off. Earned time off is a reward for diligent service so you can gain rest and relaxation.

Earned Time Off (ETO) is a benefit plan that combines sick, holiday, and vacation into one bank called Earned Time Off. ETO is accrued for each full time and part time employee each pay period based upon hours worked. Accumulated ETO hours may be used at any time during the year, with supervisory approval, when an employee is absent from work and will not be used to figure overtime for that period.

Employees may accrue up to five hundred (500) hours of ETO per year. Once an employee has reached the 500-hour limit, they cannot be paid what they have missed, or earn ETO hours until their bank drops below 500 hours. It is each employee's responsibility to track and maintain their ETO hours.

You may also "cash-in" part of your ETO at any time during the year instead of using it to take time off. This is known as "Pay in Lieu of Time Off". A request form must be completed and is available from your department payroll representative. Employees must have eighty (80) hours left in the ETO bank before and after all cash-in transactions. ETO cash out must be done in ten (10) hour increments only and will be paid out at half of the cash-in value at the employee's current base rate of pay.

Holidays credit hours into the Earned Time Off account. Non-exempt employees scheduled to work on Thanksgiving Day, Christmas Day, and Easter Sunday will be paid at one-and-one-half (1.5) times their base rate for hours worked. All other holidays worked will be paid at the regular base rate.

Departmental seniority may be a determining factor in scheduling ETO time off during the holidays in the event that two or more people request the same time off.

If a holiday falls on a Saturday, the Medical Center will observe this holiday on the Friday before. If the holiday falls on a Sunday, the Medical Center will observe it on the Monday following.

## B. LONG TERM SICK BANK

Each year full-time employees will earn days into a separate bank called the Long-Term Sick Bank based on years of service. If an employee has been out for more than 40 hours and has been placed on an FML "Leave of Absence" in Human Resources, then the employee may use time from the Long-Term Sick Bank (see H.R. - Leave of Absence). For the first forty (40) hours, an employee must use ETO or go without pay if no ETO is available. To be paid out of the Long-Term Sick Bank, a LOA request form must be submitted to the Human Resources Leave Coordinator. The Long-Term Sick Bank is a benefit offered to employees as an insurance policy for when an employee or an employee's parent, spouse or child becomes sick.

The following chart outlines what employees will receive:

FULL-TIME EMPLOYEES (Excluding 7ON-7OFF employees)

| Years of Service | ETO Accrual Rate | Max hours per pay period (80 hours) |
|---|---|---|
| 0-5 | .0768 | 6. 15 |
| 6 - 10 | .0884 | 7.07 |
| 11-15 | .10 | 8.00 |
| 16+ | .108 | 8.61 |

| Years of Service | LTS Accrual Rate | Max hours per pay period (80 hours) |
|---|---|---|
| 0-5 | .042 | 3.38 |
| 6 - 15 | .039 | 3.08 |
| 16+ | .035 | 2.77 |

## PART-TIME EMPLOYEES

Part-time employees will also receive Earned Time Off (ETO) based on years of service (see chart below); however, ETO hours will be pro-rated based on hours worked. For example, if an employee is part-time with 1 year of service and worked 40 hours this pay period:

40 hours x (.0385) = 1.54 hours of ETO. At the end of one year working forty (40) hours a pay period, an employee would have earned 40.04 hours of Earned Time Off.

| Years of Service | ETO Accrual Rate | Max hours per pay period (80 hours) |
|---|---|---|
| 0-5 | .0385 | 3.08 |
| 6 — 10 | .0576 | 4.62 |
| 11 — 15 | .0692 | 5.54 |
| 16+ | .0769 | 6.15 |

EAMC/Barnes_00051

## C. LEAVE OF ABSENCE

A Leave of Absence with or without pay shall be granted as a privilege to full and part-time employees upon completion of six (6) months of employment when circumstances permit. In accordance with the Family and Medical Leave Act of 1993, leave will be granted for birth of a child or an adoption; need to care for a child, spouse, or parent with a serious health condition; or the employee's own serious health condition which makes them unable to perform their job. A "serious health condition" is defined as an illness, injury; impairment, or physical or mental condition that involves either inpatient care or continuing treatment by a health care provider. A written medical opinion or certification will be required for this type of leave. EAMC reserves the right to request a second opinion in the matter.

A Leave of Absence can be defined as a period of excused time off, granted for three (3) scheduled working days or more. FMLA Leave may be taken for a period of up to 12 weeks for medical, childbirth, or adoption reasons or to care for a child, spouse, or parent with a serious health condition. Employees shall complete a Leave of Absence Request Form with their manager and forward it to the Human Resources Department. Any leave of absence request shall be reviewed and approved or rejected by the Department Director and/or Manager, and the Leave Coordinator.

For all other types of leave (i.e. personal or educational), consideration will be given to the reason for the request, the employee's past work performance records and length of service, together with the needs of the department at the time of the request.

An employee is expected to return from a Leave of Absence on or before the date it expires. When you seek to return from a medical leave of absence, you must provide the Medical Center with a Return to Work Certification completed by your treating physician. This is necessary to ensure that you are medically able to perform your assigned duties without jeopardizing your health or the safety of others. The privilege of returning to work is subject to employment conditions prevailing at the time of return as set forth in the leave of absence policy.

In certain situations, leaves may be extended up to a maximum of six (6) months if requested in writing and approved by the Department Director or Manager, the Vice President of the employee's department, and the Vice President, Director, or Manager of Human Resources. If such an extension is not requested or approved, the employee may be automatically terminated at the expiration of the original leave period. The employee shall be notified of termination, in writing if possible.

Accrual of special employment benefits such as ETO or Long-Term Sick Bank hours shall be suspended, except for health care benefits, during an unpaid leave of absence. To ensure continued benefits during leave, employees should arrange in advance with the Human Resources Department for payment of the insurance premiums.

Employees will use accrued ETO for non-FMLA leaves approved by management.

### D. YOUR RIGHTS UNDER THE FAMILY AND MEDICAL LEAVE ACT OF 1993

FMLA requires covered employers to provide up to twelve (12) weeks of unpaid, job-protected leave to "eligible" employees for certain family and medical reasons. Employees are eligible if they have been employed by EAMC for at least one year, and have worked 1,250 hours over the previous twelve (12) months, and if there are at least 50 employees within 75 miles.

◆ Reasons for Taking Leave: Unpaid leave must be granted for any of the following reasons:

- to care for the employee's child after birth, or placement for adoption or foster care;
- to care for the employee's spouse, son or daughter, parent, who has a serious health condition;
- for a serious health condition that makes the employee unable to perform the employee's job.

At the employee's or employer's option, certain kinds of paid leave may be substituted for unpaid leave.

◆ Advance Notice and Medical Certification: The employee may be required to provide advance leave notice and medical certification. Taking of leave may be denied if requirements are not met.

- The employee ordinarily must provide 30 days advance notice when leave is "foreseeable".

- An employer may require medical certification to support a request for leave because of a serious health condition. The employer may also require second or third opinions (at the employer's expense) and a Fitness for Duty report/Return to Work Certification form to return to work.

◆ Job Benefits and Protection

- For the duration of FMLA leave, the employer must maintain the employee's health coverage under any "group health plan".
- Upon return from FMLA leave, most employees must be restored to their original or equivalent positions with equivalent pay, benefits, and other employment terms.
- The use of FMLA leave cannot result in the loss of any employment benefit that accrued prior to the start of an employee's leave.

◆ Unlawful Acts by Employers: FMLA makes it unlawful for any employer to:

- Interfere with, restrain, or deny the exercise of any right provided under FMLA; discharge or discriminate against any person for opposing any practice made unlawful by FMLA or for involvement in any proceeding under or relating to FMLA.

◆ Enforcement

- The U.S. Department of Labor is authorized to investigate and resolve complaints of violations.

An eligible employee may bring a civil action against an employer for violations.

FMLA does not affect any Federal or State law prohibiting discrimination or supersede any State or local law or collective bargaining agreement that provides greater family or medical leave rights.

EAMC/Barnes_00053

◆ Military Leave

If you are called into regular, active military service or enlist under terms of Federal Statutes granting re-employment rights, you will be placed on military leave without pay. When your military service ends, you will be eligible for re-instatement in the Medical Center under the terms of applicable Federal Statutes.

If you are a member of the National Guard or any branch of the Armed Forces Reserves, you will be granted a military leave without pay upon written request supported by a copy of your official orders and instructions. These training leaves will not exceed the actual period of time spent in military training and reasonable travel time. Accrued ETO may be used at your written request.

### E.  OTHER LEAVES (Not covered by FMLA)

◆ Jury Duty Leave

Regular full-time and part-time employees who are called for jury duty shall be expected to comply as civic-minded citizens. An employee receiving such a subpoena shall notify his department head or supervisor, who shall in turn notify the Human Resources Department. The summoned employee shall be paid his regular daily base rate of pay.

The employee advising his/her Supervisor, Manager, or Department Director of the receipt of a jury duty subpoena should complete a Leave of Absence form for Jury Duty. The completed form shall be given to the department director, manager, or supervisor, who shall forward it to the Human Resources Department and the money the employee receives for serving may be kept. Any attendance verification given by the court should also be given to the supervisor, manager, or department director and forwarded to Human Resources.

If an employee works second or third shift, has served at least six (6) hours on jury duty, and is expected to report for jury duty again the next day, he/she may be excused from their scheduled shift. An official receipt from the clerk's office must accompany the request.

You will be paid for only the time you are in court. This is benefit-pay and will not accumulate overtime.

◆ Bereavement Leave

A reasonable length of absence (not to exceed twenty-four (24) work hours) with pay may be granted to full-time employees for the purpose of attending the funeral service of a close relative. They are:

| | | | |
|---|---|---|---|
| Father | Children | Son-In-Law | Step-Father |
| Mother | Grand-Parents | Daughter-In-Law | Step-Mother |
| Spouse | Grand-Children | Brother-In-Law | Step-Sister |
| Sister | Father-In-Law | Sister-In-Law | Step-Brother |
| Brother | Mother-In-Law | Grandparents-In-Law | Step-Children |

Bereavement pay is not charged to ETO. To be eligible for bereavement leave, you should notify your Supervisor, Manager, or Department Director immediately. Your Supervisor, Manager, or Department Director may request an official record or some form of documentation to substantiate the request for paid leave upon your return to work. Accrued ETO time may be used for other relatives not listed above with management approval.

EAMC/Barnes_00054

## X. OUR OBLIGATIONS TO THE PATIENTS & PUBLIC

### A. TELEPHONE SYSTEM

To make an inter-office call, simply dial the correct extension (as found in your Telephone Directory).

To make local outside calls, dial "9-334" and then the telephone number. Some phones restrict calls outside of the Medical Center and will need to go through the Medical Center operator. EAMC-Lanier must dial "9-1-334" and then the telephone number.

Please ask your family and friends to call you at work only when there is a real emergency. Our lines must be kept open for calls affecting patient welfare, Medical Center business, and emergencies. If there is an emergency call for you, every effort will be made to get the message to you promptly.

### B. USE OF ELECTRONIC DEVICES

Electronic devices have become a common means of communication and information access in today's society. However, these devices have the potential to disrupt the orderly operation of this organization. Therefore, this policy governs the possession and use of electronic devices during work hours.

◆ Definition

"Electronic Device" means a privately-owned device that is used for audio, video, or text communication or any other type of computer or computer-like instrument.

Electronic Devices may include but are not limited to:

- Existing and emerging mobile communications systems and smart technologies (cell phones, smart phones, walkie-talkies, pagers, etc.);
- Personal Digital Assistants (PDAs) (I-phones, Droid, etc.);
- Handheld entertainment systems (video games, compact DVD players, MP3 players, iPods, etc.);
- Current or emerging wireless handheld technologies or portable information technology systems that can be used for word processing, wireless internet access, image capture/recording, sound recording and information transmitting, receiving, storing, etc.

◆ Possession and Use

While at work, employees are to exercise the same discretion in using electronic devices as is expected for the use of the EAMC's phones. Excessive personal calls or electronic communication during the workday, regardless of the device used, can interfere with patient care and productivity.

Employees are encouraged to make any personal phone calls or other electronic communication on non-work time where possible. The organization will not be liable for the loss of personal electronic devices brought into the workplace.

◆ Personal Use of EAMC-Issued Electronic Devices

Where job or business needs demand immediate access to an employee, the organization may issue a company device to an employee for work-related communications. Employees in possession of company equipment are expected to protect the equipment from loss, damage, or theft. Upon termination of employment, or at any time upon request, the employee must return the device.

EAMC/Barnes_00055

◆ Safety Issues for Electronic Devices

Employees whose job responsibilities include regular or occasional driving and who are issued an electronic device for business use are expected to refrain from using their device while driving. Safety must come before all other concerns.

◆ Video or Audio Recording Devices

The use of camera phones, PDA's or other audio or video recording capable devices within the organization may constitute not only an invasion of patient privacy but may also constitute an invasion of employees' privacy. Therefore, the use of camera or other video-capable recording devices within the organization is prohibited without the express prior permission of administration.

As with any policy, management staff is expected to serve as role models for proper compliance with the provisions above and are encouraged to remind employees of their responsibilities in complying with this policy. Violations of this policy will be subject to disciplinary actions, including termination.

## C. OUTSIDE EMPLOYMENT

Full-time employees may engage in outside employment or other work activity; however, this is not recommended. Department managers and supervisors are expected to devote all of their working energies to the performance of their duties at the Medical Center and, therefore, should not accept paid outside positions.

The Medical Center requires that employees' activities away from the job not compromise the Medical Center's interests or adversely affect the employee's job performance and ability to fulfill all responsibilities to the Medical Center. Failure to meet these requirements will subject the employee to discipline, up to and including termination.

EAMC/Barnes_00056

## D. CONFLICTS OF INTEREST

Employees have an obligation to conduct business within guidelines that prohibit actual or potential conflicts of interest. This policy establishes only the framework within which the Medical Center wishes to operate. The purpose of these guidelines is to provide general direction so that employees can seek further clarification on issues related to the subject of acceptable standards of operation.

An actual or potential conflict of interest occurs when an employee is in a position to influence a decision that may result in a personal gain for that employee or for a relative because of this organization's business dealings. For the purposes of this policy, a relative is any person related by blood or marriage, or whose relationship with the employee is similar to that of persons who are related by blood or marriage.

No "presumption of guilt" is created by the mere existence of a relationship with outside firms. However, if any employee has any influence on transactions involving purchases, contracts, or leases, it is imperative that he or she disclose the existence of any actual or potential conflict of interest to an administrator or other manager of the Medical Center as soon as possible so that safeguards can be established to protect all parties.

Personal gain may also result when an employee or relative receives any kickback, bribe, substantial gift, or special consideration because of any transaction or business dealings involving the Medical Center.

The materials, plans, ideas, records, and other business data of this organization are the property of the Medical Center and should never be given to an outside firm or individual except through normal channels and with appropriate authorization. Any improper transfer of material or disclosure of information, even though it is not apparent that an employee has personally gained by such action, constitutes unacceptable conduct. Any employee who participates in such practice will be subject to disciplinary action, up to and including discharge.

All conflicts of interest or potential conflicts of interest are to be reported in writing to the Chief Executive Office of the Medical Center.

## E. CONFIDENTIALITY

Information regarding patients and Medical Center activities is strictly confidential. Do not discuss such information inside or outside the Medical Center with anyone not directly concerned with the patient's care and treatment. Violation of this confidence will be grounds for immediate termination.

## F. COURTESY

Every employee must specialize in courtesy. Most of the people in the Medical Center are ill or are worried because of the illness of a loved one. Treat them with the consideration they need. A smile, a friendly greeting, or an offer of assistance has the potential to greatly diminish the difficulty of their situation.

## G. COURTESY TITLES

Courtesy titles such as Mr., Mrs., or Ms. and proper names should be used when addressing all persons on the Medical Center premises and in paging over the intercom system.

EAMC/Barnes_00057

## H. SOLICITATION AND DISTRIBUTION OF LITERATURE

To prevent interference with the Medical Center's patient care responsibility and inconvenience to employees, patients, and visitors, the following rules apply to the distribution of literature and solicitation on Medical Center property:

**◆ Non-employees**

Persons who are not employed by the Medical Center are not permitted to distribute literature or to solicit employees for any purposes whatsoever on Medical Center grounds or inside the Medical Center building at any time.

**◆ Employees**

Every employee's work deserves his or her full attention during working time. Employees may not distribute literature in working or patient care areas of the Medical Center at any time. Employees may not solicit other employees for any purpose during working time or during the working time of the employee being solicited.

Employees may not solicit other employees for any purpose at any time in an area strictly devoted to patient care, such as patients' rooms, operating rooms, and patient treatment areas, such as x-ray and therapy areas, or adjacent corridors, elevators, and/or stairways frequently used to transport patients.

Working time is that period during which an employee is obliged to perform Medical Center duties, exclusive of meal periods, breaks or other free time.

No employees shall place decals, banners, posters, and other items on Medical Center walls, fixtures, or equipment without the express approval of the Vice President of Human Resources.

**◆ Off-duty Employees**

Employees must leave the Medical Center promptly after their scheduled work period ends. Off-duty employees may not solicit or distribute literature inside Medical Center Buildings.

**◆ Enforcement**

Violation of these rules will be cause for appropriate discipline.

CONFIDENTIAL
EAMC/Barnes_00058

## I.  PERSONAL APPEARANCE

Due to the health service nature of East Alabama Medical Center, standards of personal appearance and personal apparel have been determined to improve the quality of patient care, to reduce the chance of cross-infection, and to maintain our positive public image.

These standards are:

- Confer with your supervisor regarding dress/uniform requirements for your position

- Always wear your Payroll/I.D. Badge on an outer garment, name and title side facing out.

- Keep your authorized attire or uniform clean and in good condition at all times.

- Choose appropriate clothing for work. Employees' attire should be appropriate and should not distract others. Each individual Department Director shall determine appropriate dress standards with overall guidance given by the appropriate Vice President. Each unit reserves the right to designate its own standard and will communicate that standard in writing to the employees affected.

- The pin of a professional society or the pin of a professional school may be worn. Insignia pins or other devices that are associated with non-professional organizations, political organizations, or pins or devices representative of a political belief are not permitted.

- Neatly combed and groomed hair is essential. Beards and mustaches must be neatly trimmed and possibly may be prohibited in certain jobs. Hairnets and facemasks may be required in certain areas to reduce the possibility of cross-contamination.

- Body odor, bad breath, cigarette smoke, and excessive use of fragrances or jewelry can be offensive to patients and co-workers. Precautions such as regular bathing, good dental hygiene, and the use of unscented deodorants should be taken. Jewelry should be kept to a minimum.

- Wash your hands thoroughly and frequently. It is an important precaution for you and our patients.

- Consider safety, comfort, quietness and appearance for acceptable footwear.

- No visible tattoos displaying foul language or that could be interpreted as vulgar.

Since we cannot cover every conceivable question on dress and grooming, the most effective aid in implementing standards of personal appearance is your own good judgment of what is best for our obligations to patient care. If you have questions regarding these standards, consult with your supervisor for further guidance.

East Alabama Medical Center reserves the right to ask any employee improperly dressed and/or groomed to go home and change clothing or to improve his/her appearance with loss of pay for time absent from the Medical Center.

## J.  LOST AND FOUND

The Medical Center maintains a lost and found area in Special Services, and EAMC-Lanier lost and found maintains a lost and found area in the security office so that items left behind by patients or employees may be returned to their rightful owner. If you find items left behind, they should be turned in to your supervisor. We cannot be responsible for valuables that might be lost or stolen; therefore, we urge you to protect your money and personal belongings from theft or loss by exercising caution.

## K. SAFETY

Safety is everyone's responsibility. For each employee to be safe, each must be safety minded. The Medical Center desires to prevent tragedy, pain, and economic loss because of accidents.

If you witness an accident, whether it is an employee, patient, or visitor, and regardless of how minor it may seem to you, report it at once to your immediate Supervisor, Manager, or Department Director and complete the required report in the SAFE.

If you have an accident while on duty, report it immediately to your Supervisor, Manager, or Department Director and complete the required report in the SAFE. If the seriousness of the accident is such that medical attention is necessary, your Supervisor, Manager, or Department Director, or House Supervisor for Lanier employees will arrange for you to receive attention in the Emergency Room. If the accident requires treatment beyond the Emergency Room and/or lost work time, please contact the HURT line. The House Supervisor, Employee Health, or Kristy Bowen will arrange for Lanier employees to go to the Emergency Room or schedule an appointment with the Workers' Comp approved physician, whichever is applicable.

## L. EMERGENCY OPERATION PLAN / FIRE RESPONSE PLAN

You are required to read and be expressly familiar with your Emergency Operation Plan and Fire Response Plan that is available on SharePoint under Policy Manager. These plans provide information so you will know what is expected of you in case of a disaster or fire. Be very familiar with the general instructions and codes and especially familiar with your department's requirements.

Periodic drills and training courses will be held to keep you alert and prepared for the possibility of a disaster or fire.

## M. STANDARD PRECAUTIONS

Since it is often not possible to know when an individual may be infected with HIV or other blood-borne agents, the consistent use of protective barriers and practices for avoiding exposure to potentially infected blood and body fluids is the most reliable method for minimizing the risk of transmission. This approach is referred to as "standard precautions" and has been mandated by the Centers for Disease Control (CDC) and is currently mandated by the Occupational Safety and Health Administration (OSHA). Universal precautions emphasize the need for all health care workers to consider all patients as potentially having infected blood and fluids or mucous membranes. Masks and eye protection should be worn when there is the likelihood of blood or other fluids being splashed onto mucous membranes, and gowns are indicated only when splashing is anticipated. All EAMC employees must also comply with the required protective measures and standards outlined in the exposure control plan.

## N. TIPS & GIFTS

Employees are not to accept or solicit tips or gifts from patients or visitors under any circumstances for services rendered.

EAMC/Barnes_00060

## XI. EMPLOYEE BENEFITS

A. GROUP PLANS

The following is a list of benefits offered to full-time and part-time employees:

HEALTH INSURANCE/VISION/PRESCRIPTION DRUG PROGRAM
DENTAL INSURANCE
VISION INSURANCE
BASIC LIFE AND ACCIDENTAL SUPPLEMENTAL LIFE AND AD&D INSURANCE (FULL-TIME ONLY)
LONG TERM DISABILITY (FULL-TIME ONLY)
SHORT TERM DISABILITY
457 RETIREMENT AND MATCHING PLAN

WORKERS' COMPENSATION

UNEMPLOYMENT

FINANCIAL PLANNING
HEALTH CARE REIMBURSEMENT ACCOUNT
DEPENDENT CARE REIMBURSEMENT ACCOUNT
MET LIFE PAYROLL DEDUCTED HOME AND AUTO INSURANCE
OTHER BENEFITS, AS OFFERED

The Medical Center participates in the premium cost of individual health, dental, long-term disability, and life insurance coverage for full-time employees. To be eligible for these benefits, full-time employees are regularly scheduled to work at least thirty-six (36) hours each week. The employee pays the cost for voluntary supplementary policies for his or her family. The premium payments are deducted through payroll deduction.

The Medical Center also participates in the cost of health insurance for part-time employees. To be eligible for these benefits, part-time employees must have regularly scheduled hours of thirty- two (32) hours per pay period or sixteen (16) hours per week. The employee pays the cost for voluntary supplementary policies for his or her family. The premium payments are deducted through payroll deduction.

Employees who are employed on a Per Diem, or "on call" basis, are not routinely scheduled for work and must maintain an active status in the Human Resources Department. Per Diem employees are not eligible for benefits other than the retirement program.

Employees health, dental, vision, retirement, and reimbursement account premiums are deducted on a pre-tax basis. The result for the employee is a reduction in the amount of taxable income; in other words, the employee may utilize the savings in taxes to purchase other benefits or to experience an increase in take-home pay.

Social Security is a shared expense between the Medical Center and the employee; however, the Medical Center pays all expenses for unemployment insurance and workers' compensation. The Medical Center also pays for Long Term Disability Insurance (full-time employees only). Employees are wholly responsible for the premium cost of the voluntary benefits.

When you begin employment, you may obtain booklets that explain these plans in detail. If you need additional information or further explanations of any of these plans, please call the Human Resources Department

B. WORKERS' COMPENSATION

East Alabama Medical Center provides insurance under the Workers' Compensation laws of the State for performing assigned duties. The law sets forth limitations on filing claims. For this reason, you must complete a report in the SAFE immediately (within 72 hours) after an injury is sustained on the job and call the HURT line at 334-528-HURT (4878) for the Opelika campus and 334-710-0164 for the Lanier campus. Once an employee calls the HURT line, Employee Health or Human Resources will direct the employee through the next steps. In the case that immediate medical attention is necessary, employees must go directly to the Emergency Room for treatment.

C. UNEMPLOYMENT COMPENSATION

The State Unemployment Compensation Act covers employees of East Alabama Medical Center; however, no payroll deductions are made for this purpose.

D. RETIREMENT

The Medical Center's retirement plan consists of a 457(b) and matching financial security plan.

As an employee, you may contribute to your 457(b) plan and all contributions are payroll deducted on a pre-tax basis.

Once enrolled in the 457(b) plan, EAMC will begin matching your contributions after 90 days of employment. This match is automatic as long as you are contributing to the plan as well. For every $1.00 you contribute, up to 6% of your earnings, EAMC will contribute $0.75. For the EAMC matching contributions (certain vesting restrictions apply). For more information on the retirement plan please call Frank Laxson, retirement representative, at 334-528-4296 or Human Resources at 334-528-4188.

E. TUITION REIMBURSEMENT

East Alabama Medical Center offers tuition assistance to full time and part time employees who are interested in improving their job performance or bettering their potential for advancement. The Medical Center may provide tuition assistance for approved job-related courses to full-time and part time employees who have completed one year of employment and who are in good standing.

If you wish to receive tuition assistance, obtain an application from the Human Resources Department or on SharePoint and submit it before registering for any courses. Your Supervisor, Manager, and/or Department Director must approve and countersign the application, at which time it will be submitted for committee approval.

In addition, the Medical Center offers its own education program of free seminars. Guest speakers and Medical Center employees who are experts in various areas conduct these seminars.

F. FOOD SERVICE

The Medical Center provides a cafeteria for the convenience of employees and visitors. The menu varies daily and features attractive, nutritionally balanced meals prepared by our Food Service staff. The cafeteria also offers a special diet meal every day at lunch and a selection of short order foods throughout the day. You may bring your meals to the Medical Center; however, they should be eaten in the cafeteria, not at the workstation.

EAMC/Barnes_00062

## G. BREAKS

You may take a ten (10) minute break (rest period) during the first half and second half of each shift of duty at the convenience of your department. We recognize that short breaks are necessary for a brief rest from the working routine; however, the break can only be provided as long as it is fairly observed, taken at a convenient time, and is not abused.

You will be assigned a thirty-minute meal period. We do ask, even though the meal period is your time, that you remain on the premises unless you are authorized to leave by your Supervisor, Manager, or Department Director.

## H. PARKING

Employees are issued parking decals during new employee orientation. Employees should display their decals while they are parked on the Medical Center campus and park in employee approved zones. Security personnel patrol the campus and provide safety rides for employees. The campus is also equipped with a video recording surveillance system. Employees are encouraged to lock their vehicles and lock purses or other items of value in the trunk. Please report any suspicious persons on the Medical Center campus or in the facility to Security. Violation of this parking policy will result in a penalty.

## I. SERVICE AWARDS

The Medical Center presents service awards to employees each year in recognition and appreciation for long and loyal service. A special awards program will be held each year to honor these employees. After completing five years of service and then every five years thereafter, employees will receive appropriate awards identifying the employee's length of service.

## J. Pharmacy

The Medical Center offers an on-site pharmacy for medical center employees. Please see medical plan details or call Human Resources at 334-528-4188 for more information.

## K. EMPLOYEE OPINION SURVEY/SUGGESTIONS

To provide a better working environment, the EAMC conducts Employee Opinion Surveys in which the Medical Center seeks employee opinions on the Medical Canter as a health-care provider, management, employee services, and other related issues. The survey is conducted hospital-wide and is anonymous.

## L. BULLETIN BOARDS

Every area has a bulletin board. Observe it regularly for any announcements that may affect you or your department. In addition, Medical Center bulletin boards are located on each floor and contain items of general policy nature, education programs, safety matters, and promotional opportunities pertaining to all employees and more than one department. Policy changes posted on the bulletin boards will be enforceable upon you; therefore, it is in your best interest to stay informed.

Human Resources maintains a posting board for employees to list personal items for sale. Forms are available in the Human Resources Department or in the form display stand in front of the Cashier Window on the first floor of the Medical Center. All advertisements must be displayed on the forms provided.

EAMC/Barnes_00063

## M. CREDIT UNIONS

### *East Alabama Community Federal Credit Union*

The employees of the Medical Center established the East Alabama Community Federal Credit Union in 1958. Since that time, the Credit Union has grown to 3,300 plus members and has now incorporated the city of Opelika employees, Care Center employees, Lee County Youth Development Center employees, Opelika Housing Authority employees, physicians, physicians' office staff, and members of the immediate family of all Credit Union members.

Members of the Credit Union may request that savings and/or loan payments be made through direct deposit. The Credit Union's other services include ATM/Debit cards, on-line banking, voice response, direct deposit, wire transfers, money orders, official checks, and discounted Six Flags and White-Water tickets.

The Credit Union maintains an office on the campus and is opened Monday through Friday from 7:30 am until 5:00 pm and Saturdays from 9:00 am to 12:00 pm (Drive -thru only). For information regarding membership and available savings and loan plans, the Credit Union can be reached at 334-364- 2850.

### *Chattahoochee Federal Credit Union*

On November 18, 1985, WestPoint Pepperell Employees Credit Association was born; now known as Chattahoochee Federal Credit Union. Here at CFCU, anyone who lives, works, worships or attends school in Chambers County is eligible to join CFCU. We have been serving EAMC-Lanier for over 20 years.

Chattahoochee Federal Credit Union offers a full range of personal financial products and services such as savings, IRA, checking, large variety of loan types and options with payroll deduction, no cost online account access with bill pay, mobile access, VISA gift cards, Six Flag and White Waters discount tickets and much more. We are also your local credit union. We have a local elected board of directors that's mission is to meet member's financial needs through quality service, at the best value, while maintaining financial stability. Plus, a friendly staff with a vision of building lifelong relationships one member at a time.

Chattahoochee Federal Credit Union is located at 519 Fob James Drive Valley, AL 36854.

| Lobby and Phones: | Monday, Tuesday, Thursday and Friday 9:00am – 5:00 pm |
| | Wednesday 9:00 am – 1:00 pm |
| Drive Thru: | Monday, Tuesday, Thursday and Friday 8:00am – 5:30 pm |
| | Wednesday 8:00 am – 1:00 pm |
| | Saturday 9:00 am – 12:00 pm |

## XII. CORRECTIVE ACTION

### A. DISCIPLINARY PROCEDURES

Our objective is to provide quality patient care and that can only be accomplished through the effective cooperation of every employee. To that end, there must be reasonable rules for employees to follow. These rules are in place to guard, correct, and protect you as a member of our health care team because the actions and conduct of employees may affect patients, their visitors, and fellow employees. Employees are therefore urged to conduct themselves with respect and consideration for others and to comply with the rules and policies of the Medical Center. Violations of Medical Center policies, failure to perform assigned duties in a satisfactory manner, insubordination, or unsuitable personal conduct will result in disciplinary action, including termination, depending on the severity and classification of the offense.

Disciplinary or corrective action may take the following forms:

1. A Supervisor, Manager, or the Department Director may give verbal warning/counseling as a matter of information and training. Documentation should be read and acknowledged by the employee and the Supervisor, Manager, or Department Director. The Department Director may retain a copy and the employee may retain a copy. The original counseling documentation will be placed in the employee's personnel file.

2. Written warnings are issued when the 1st warning/counseling does not bring immediate improvement. The Written Warning must be read and acknowledged by the employee and the Department Director. Both the Department Director and employee may retain a copy. The original counseling documentation will be placed in the employee's personnel file.

3. A final warning follows the written warning. A Final Warning may include suspension from one (1) to five (5) days, according to the severity of the offense. Before an employee is suspended, it is required that the decision to suspend be mutually agreed upon by the Department Director or Manager and Vice President, or the Director or Manager of Human Resources. A written record of the suspension must be read and acknowledged by the employee, Department Director, and Manager of Human Resources.

4. Dismissal from employment follows the final warning. Dismissals are to be in writing for employee records. Before an employee is dismissed it is required that the decision to dismiss from employment be mutually agreed upon by the Department Director or Manager and the Vice President or Director or Manager of Human Resources. All dismissals should be read and acknowledged by the employee, Department Director, and the Human Resources Department.

Following is a list of offenses and respective disciplinary measures which may result with failure to abide by the established work rules. Offenses are classified so that discipline will be administered consistently throughout the Medical Center. These classifications are not inclusive and are only intended as a general guide to all levels of supervision. They should be modified and supplemented as circumstances and good judgment require. Furthermore, East Alabama Medical Center cannot anticipate every problem or situation that may occur in the course of employment. This procedure is designed to solve problems. Occasionally, situations may arise where literal application of this policy is unacceptable, and the Medical Center reserves the right to deal with such situations at its own discretion.

1. A Minor Offense Shall Include:

- Failure to clock in or out properly
- Unauthorized absence from work area
- Neglect of safety rules, common safety practices, or hygienic rules

- Smoking in restricted areas
- Improper attire or appearance
- Violation of Medical Center parking regulations
- Inefficient or careless job performance, poor productivity

General Procedure for Minor Offenses:

- First Offense: 1st Warning
- Second Offense: Final Warning, possible suspension
- Third Offense: Dismissal; if committed within a twelve (12) month period of first offense

2. Major Offenses Shall Include:
   - Using abusive language or making false or malicious statements
   - Violation of solicitation/distribution of literature policy
   - Malicious practical joking, horseplay, or other forms of disorderly conduct
   - Soliciting or accepting gratuity
   - Unauthorized use of Medical Center property, equipment, materials, or facilities for personal business or needs
   - Doing personal work on Medical Center time
   - The commission of two (2) minor offenses in a twelve (12) month period

General Procedure for Major Offenses:

- First Offense: Written warning (at supervisor's discretion), possible suspension
- Second Offense: Possible suspension; Dismissal; if committed within twelve (12) months of first offense

3. Intolerable Offenses Shall Include:

- Fighting or physical assault, except in the case of being the victim of an unwarranted assault
- Threatening, intimidating, coercing, or interfering with employees or supervisors
- Insubordination - refusal to obey a direct and reasonable order given by supervisor
- Willfully recording another employee's time and/or willfully having someone record your time
- Unauthorized removal of private or Medical Center property; fraud or conversion
- Falsification of any Medical Center record including employment application, medical certificates, absence excuses, time record, patient records, etc.
- Willfully giving false statements to supervisors and/or other personnel
- Deliberate destruction or abuse of Medical Center property or another employee's property
- Deliberate oral or physical abuse of patient, guest, or employee
- Reporting to work while under the influence of intoxicating beverages or illegal drugs
- Possession or use of alcohol or illegal drugs on Medical Center premises

CONFIDENTIAL

EAMC/Barnes_00066

- Possession of firearms or weapons on Medical Center premises
- Gross negligence or conduct that contributes to willful neglect of job duties
- Conviction of a felony
- Breach of ethics - unauthorized release of information including release of confidential patient information

General Procedure for Intolerable Offenses:

- First Offense: Possible Suspension or Dismissal

EAMC/Bames_00067

## B. GRIEVANCE PROCEDURE

### ◆ Step 1

East Alabama Medical Center encourages employees to resolve all complaints and problems at the lowest organizational level possible; however, if it becomes necessary to utilize a formal grievance procedure, the following should apply:

If your complaint is related to one specific employment decision or action, you should begin the grievance procedure within five (5) days of the incident. You must provide written documentation to Human Resources within five (5) days of the incident detailing the events that took place leading up to the grievance.

### ◆ Step 2

Human Resources will then provide your written documentation to the Vice President over your department and the Vice President or Director of Human Resources who will investigate your complaint. This step may involve meetings with your Director and/or Vice President. Human Resources will respond to you within five (5) working days of those meetings. If your complaint is not related to a suspension or termination, this decision is final.

### ◆ Step 3

If your complaint involves a suspension or termination and you are not satisfied with the response from your Vice President, you should file your request for a final review with Human Resources within five (5) working days. Upon receipt of your request, Human Resources will schedule a meeting for you with the Grievance Panel, which consists of EAMC's Vice Presidents, excluding the one responsible for your department.

Human Resources will notify you of the Grievance Panel's decision within five (5) working days of your meeting with the panel. This decision is final.

## C. SUBSTANCE ABUSE POLICY

As a Medical Center, we are acutely aware of the adverse effects that drugs and alcohol can have on our employees' safety and health. The abuse of alcohol and drugs leads to increased accidents and medical claims. It can also lead to the destruction of an employee's health and adversely affect his or her family life. The Medical Center will help any employee who seeks help for a substance abuse problem on his or her own. It is too late, however, to request help once you have been selected for a random drug screening.

Employees who are identified through this testing program as being substance abusers may be discharged. The possession, use, transfer, manufacture or sale of alcohol, illegal drugs, or legal drugs without a valid prescription on Medical Center property or on Medical Center time will result in disciplinary action, up to and including termination. Employees who are discharged because of a positive drug or alcohol test or because they refuse to cooperate with any requirements of this policy may be ineligible, under the law of Alabama, to receive workers' compensation benefits and/or employment benefits.

EAMC/Barnes_00068

## ◆ TESTING OF EMPLOYEES

Reporting for duty or working with drugs present in the body or while affected by alcohol will be handled as a disciplinary matter. Testing may be required under the following circumstances:

- When an employee is involved in certain accidents or incidents
- When the Medical Center has reasonable cause and suspicion
- After an employee has been referred for counseling or rehabilitation under this policy
- In accordance with a Last Chance Agreement between an employee and the Medical Center
- When an employee requests a test (if approved by management)

No employee will be requested to submit a drug or alcohol screening test unless a Medical Center official has granted specific authorization for such a test. The Medical Center intends to utilize the most accurate and reliable testing method available. Failure or refusal by an employee to cooperate with the program, to sign any required document, or to submit to such a test when requested may be grounds for termination of employment.

## ◆ OFFICIAL SUBSTANCE ABUSE POLICY

This document is only a summary of the Medical Center's official Substance Abuse Policy. The official copy is available to all employees for their review and should be consulted with respect to any specific questions. Neither this Summary nor the Medical Center's official Policy is intended to affect the Medical Center's right to manage its work place, discipline its employees, guarantee employment, or guarantee terms and conditions of employment. No contract for employment, either expressed or implied, is created.

## ◆ TESTING OF APPLICANTS

Applicants to whom an offer of employment has been extended may be required to undergo a drug and alcohol-screening test. Employment will be denied to any applicant whose drug screen test reveals the presence of alcohol, illegal drugs, or prescription drugs, without a valid prescription. Applicants who have been denied employment under this policy may be considered for employment no earlier than ninety (90) days after being denied employment.

## ◆ CONFIDENTIALITY

All information concerning medical examinations, drug or alcohol testing results, or rehabilitation and treatment of an individual employee will be treated as confidential information.

EAMC/Barnes_00069

## D. NOTIFICATION OF CONVICTIONS

Under federal law, any employee convicted of any criminal offense committed on Medical Center property or while on Medical Center business must notify the Medical Center of the conviction within five days after the conviction. The Medical Center must then notify each federal government agency with which we hold an applicable government contract that the conviction has occurred. The Medical Center will then take appropriate personnel action against the employee, up to and including discharge.

EAMC/Barnes_00070

## RECEIPT OF HANDBOOK

I have received instructions on where to find the Employee Handbook, which outlines the benefits and policies of East Alabama Medical Center, as well as my responsibilities as an employee. I will familiarize myself with the information contained in the handbook and accept responsibility for staying informed of all future changes. I also understand that there is an employee handbook available for me in the Human Resource Office should I have any question relating to the company benefits or policies. I agree to abide by the policies and procedures of the Medical Center as a condition of my employment.

Employee Signature _____

Employee Name (please print) _____

Employee Number _____

Date _____

EAMC/Barnes_00071

**Print Exam**

## East Alabama Medical Center

Org: EAMC

Participant: NICHOLAS  BARNES

Date: 04/18/2023

Test: Employee Handbook Exam  (E/E-L: 2023), Grade: 100

Course: Employee Handbook (E/E-L: 2023)

| Correct Answer | User Answer | Question and Answers |
|---|---|---|
| | | Question 1: I have received instructions on where to find the Employee Handbook, which outlines the benefits and policies of the East Alabama Health (EAH), as well as my responsibilities as an employee. I will familiarize myself with the information contained in the handbook and accept responsibility for staying informed of all future changes. I also understand that there is an employee handbook available for me in the Human Resource Office should I have any questions relating to the company benefits or policies. I agree to abide by the policies and procedures of EAH as a condition of my employment. |
| x | x | 1. True |
| | | 2. False |

© 2025 symplr. All rights reserved.



| LastName | FirstName | EmployeeID | DateOfHire | JobTitles | CourseTitle | Status |
|---|---|---|---|---|---|---|
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Acceptable Use Policy for Network Services (E/E-L: February 2022) | 08/09/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Active Shooter Video (E/E-L: 2022) | 08/26/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Attendance and Clocking/Time Verification Policy (E/E-L: 2023) | 03/16/2023 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Benefits Open Enrollment (E/E-L: 2022) | 10/07/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Code Delivery Team STAT (E: March 2022) | 03/22/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Code Green Walker Update (E/E-L: December 2021) | 01/24/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Corporate Compliance Policy & Standard of Conduct (E/E-L: 2023) | 07/11/2023 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | COVID-19 Vaccination Requirements (E/E-L: 2022) | 01/24/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Disruptive Visitors (E/E-L: 2022) | 08/09/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Disruptive Visitors (E/E-L: 2023) | 07/11/2023 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Diversity in Healthcare (E/E-L: 2023) | 07/11/2023 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | East Alabama Health 2024 Open Enrollment (E/E-L: 2023) | 10/02/2023 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Email Security Awareness Training (E/E-L: 2023) | 04/18/2023 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Employee Fatigue Management (E/E-L: 2023) | 04/18/2023 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Employee Handbook (E/E-L: 2022) | 08/09/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Employee Handbook (E/E-L: 2023) | 04/18/2023 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | HealthcareSource: Abuse, Neglect, and Exploitation | 08/09/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | HealthcareSource: Bloodborne Germs for Nonclinical Staff v1.5 | 08/09/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | HealthcareSource: Communication through the Lifespan v1.5 | 08/10/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | HealthcareSource: Diversity in Health Care v1.5 | 08/10/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | HealthcareSource: Electrical Safety v1.5 | 08/10/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | HealthcareSource: Emergency Management Planning v1.5 | 08/10/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | HealthcareSource: Ethics in Providing Patient Care v1.5 | 08/10/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | HealthcareSource: Fire Safety v1.5 | 09/16/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | HealthcareSource: General Radiation and MRI Safety for Nonclinical Staff v1.5 | 09/16/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | HealthcareSource: Health Care Safety and Injury Prevention v1.5 | 09/16/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | HealthcareSource: Health Care Security v1.5 | 09/16/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | HealthcareSource: Infection Prevention and Control for Nonclinical Staff v1.5 | 08/26/2022 |

CONFIDENTIAL



EAMC/Barnes_00486

| LastName | FirstName | EmployeeID | DateOfHire | JobTitles | CourseTitle | Status |
|---|---|---|---|---|---|---|
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | HealthcareSource: Latex Allergy v1.5 | 08/26/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | HealthcareSource: Life Safety v1.5 | 08/10/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | HealthcareSource: Medical Equipment Management v1.5 | 08/10/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | HealthcareSource: Organ Donation v1.5 | 08/10/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | HealthcareSource: Patient Rights, Confidentiality, and HIPAA Privacy v1.5 | 08/10/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | HealthcareSource: Patient Safety Goals for Nonclinical Staff v1.5 | 08/09/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | HealthcareSource: Preventing Infant Abduction v1.5 | 08/09/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | HealthcareSource: Understanding and Preventing Sexual Harassment in Health Care—What Employees Need to Know v1.5 | 08/10/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | HealthcareSource: Understanding and Preventing Tuberculosis for Nonclinical Staff v1.5 | 08/09/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | HealthcareSource: Utilities Management v1.5 | 08/09/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | HealthcareSource: Values, Integrity, and the Code of Conduct v1.5 | 08/09/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | HealthcareSource: Workplace Violence v1.5 | 08/09/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Help Desk Self-Service (E/E-L: 2023) | 07/11/2023 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Infection Prevention and Control-Non-Clinical (E/E-L: 2023) | 07/11/2023 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Parking Policy (E/E-L: 2022) | 08/09/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Policy & Procedures (E/E-L: 2022) | 08/09/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Policy & Procedures (E/E-L: 2023) | 04/18/2023 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Propio Language System (E/E-L: 2022) | 12/12/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Regulatory Refresher: Employee Education-All Staff (E/E-L: 2023) | 10/02/2023 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Regulatory Refresher: Employee Safety-All Staff (E/E-L: 2023) | 07/11/2023 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Regulatory Refresher: Environment of Care-All Staff (E/E-L: 2023) | 07/11/2023 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Regulatory Refresher: Module 1-All Staff (E/E-L: 2022) | 08/09/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Regulatory Refresher: Module 2-All Staff (E/E-L: 2022) | 08/09/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Regulatory Refresher: Module 4-All Staff (E/E-L: 2022) | 08/09/2022 |

CONFIDENTIAL

| LastName | FirstName | EmployeeID | DateOfHire | JobTitles | CourseTitle | Status |
|----------|-----------|------------|------------|-----------|-------------|--------|
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Regulatory Refresher: Patient Rights & Safety (E/E-L: 2023) | 07/11/2023 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Right of Conscientious Objector Policy (E/E-L: 2022) | 08/09/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Right of Conscientious Objector Policy (E/E-L: 2023) | 04/18/2023 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Run Hide Fight: Surviving an Active Shooter Event Video v.23 | 07/11/2023 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Safe Haven (E/E-L: 2023) | 04/18/2023 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | symplr: Bloodborne Germs for Nonclinical Staff v2.0 | 07/11/2023 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | symplr: Patient Safety Goals for Nonclinical Staff v2.0 | |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | symplr: Preventing Infant Abduction v2.0 | 07/11/2023 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | symplr: Understanding and Preventing Sexual Harassment in Health Care—What Employees Need to Know v2.0 | 07/11/2023 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | symplr: Understanding and Preventing Tuberculosis for Nonclinical Staff v2.0 | 07/11/2023 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Weapons Policy (E/E-L: 2022) | 08/09/2022 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Weapons Policy (E/E-L: 2023) | 04/18/2023 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Workplace Violence (E/E-L: 2023) | 07/11/2023 |
| BARNES | NICHOLAS | 14483 | 1/2/2019 12:00:00 AM | CONTRACT COORDINATOR | Workplace Violence High Risk v2 (E/E-L: 2022) | 08/09/2022 |

CONFIDENTIAL

EEOC Form 5 (11/09)

| **CHARGE OF DISCRIMINATION** | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☒ FEPA ☒ EEOC | |

_____ and EEOC

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Nicholas Barnes | | (b)(6); (b)(7)(C) |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two are named, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Incl. Area Code) |
|---|---|---|
| East Alabama Medical Center | 15+ | 3347493411 |

| Street Address | City, State and ZIP Code | | |
|---|---|---|---|
| 2000 Pepperell Pkwy | Opelika, AL 36801 | | |

| Name | No. Employees, Members | Phone No. (Incl. Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☐ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ GENETIC INFORMATION
☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: 6/2022    Latest: 2/2024

☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s).)

See Exhibit A.

DEFENDANT'S EXHIBIT
Barnes

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State or Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 05 / 06 / 2024        [signature] | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date        Charging Party Signature | |

EEOC Form 5 (11/09)

| **CHARGE OF DISCRIMINATION**<br>This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | Charge Presented To:<br>☐ FEPA<br>☐ EEOC | Agency(ies) Charge No(s): |
| --- | --- | --- |

and EEOC

_State or local Agency, if any_

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.<br><br>I declare under penalty of perjury that the above is true and correct. | NOTARY – When necessary for State or Local Agency Requirements<br><br>I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br><br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(month, day, year) |
| --- | --- |

_____    _____
Date                        Charging Party Signature

Doc ID: f82b86896c96fbe75eea7c35505cbbccb3eb69bb

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

**1. FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

**2. AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

**3. PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

**4. ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

**5. WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging party and respondent and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

Doc ID: f82b86896c96fbe75eea7c35505cbbccb3eb69bb
EAMC/Barnes_00009

## Exhibit A

1. My name is Nicholas Barnes. I am a citizen of the United States.

2. On or about December 18, 2018, I began working at East Alabama Medical Center located in Opelika, AL as a warehouse worker and was promoted to contract coordinator.

3. While employed, a new manager of the supply chain, Ursula Means, began working.

4. On or around June of 2022 Ursula made a comment about how she did not want to see me wearing formal clothing anymore and wanted to see me in scrub pants.

5. During this interaction, she looked me up and down, stared at my genital area, smiled at me, and proceeded to rub my shoulders.

6. From that day on, I attempted to ignore Ursula, but the environment became hostile.

7. On or around August of 2022, Ursula was speaking to LaQuisha and Ursula stated that if there was ever a shooting, I would "run and hide," and not "protect anyone."

8. Ursula followed this statement by stating she thinks she could "whoop me," insinuating that she could beat me up.

9. On or around June of 2023, LaQuisha informed me that Ursula stated that she believed I was "useless," and was going to move me out of my office.

10. LaQuisha continued and stated further that Ursula stated she was going to hire an ex-employee, Ashley, from Ursula's previous place of employment and intended to make me quit.

11. Later that same day, Ursula stated that I should not be around women because they "like" me and desired that LaQuisha take my office and move me to a utility closet.

12. I asked not to be moved to a utility closet because it was not big enough and it was not clean.

13. However, on or about July of 2023, she moved me to a cardiology equipment room and stated that "men should not be working on the same floor as women."

Doc ID: f82b86896c96f5e75eea7c35505cbbccb3eb69bb

14. I spoke with the Director, Nancy Ling, about the treatment I was receiving but no action was taken.

15. On or around January of 2024, I noticed that I had missed 19-time clock punches, and 20 missed time clock punches are cause for termination.

16. I spoke with payroll on or about January of 2024 to inquire why I had missed so many, and they informed me that the manager, Ursula, has not been approving my time punches.

17. Payroll contacted Ursula and told her to approve the missed punches and to delete them.

18. Later that day, she called me into the office and asked if I "snitched" on her.

19. I responded that I did not snitch on her and only inquired with payroll as to why I had missed so many punches.

20. After that interaction, she stated that if she would have gotten into trouble, she would have her son, John-John, and her nephew, to come to our place of employment and "mess" me up in the parking lot.

21. I reported this statement to Nancy while we were in the hallway on or about February of 2024.

22. Nancy stated that she would "look into it," but again, no action was taken.

23. On or about January 30, 2024, Ursula ordered me to do the workload of three employees because we were short-staffed, and that "it did not matter" what was in my job description and that I would have to "do whatever" she says.

24. After all of the hostile and sexually charged incidents with Ursula and reporting this conduct to Nancy and no action being taken, I put in my resignation on or about February of 2024.

25. On or about February 26, 2024, LaQuisha informed me that Ursula had told her that she was going to try "one last time," before I left the job and she asked me on my final day of employment if I wanted her to take me home, and if I wanted her to take me out to dinner.

27. After this interaction with Ursula on my last day, I spoke with Director of Human Resources, Kelli Truitt, and she stated she was going to investigate the matter.

28. However, on or about February 29, 2024, Nancy informed me that I was terminated because I reported the issues to Human Resources.

29. I believe I have been subjected to hostile work environment and discrimination based on sex, both in violation of Title VII of the Civil Rights Act of 1964.

30. I declare under penalty of perjury that the preceding is true and correct.

30. I authorize the EEOC to release the content of this Charge of Discrimination to the Respondent.


Done this _6th_ day of __May__ 2024.


_____

Nicholas Barnes

Doc ID: f82b86896c96fbe75eea7c35505cbbccb3eb69bb
EAMC/Barnes_00012

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☒ FEPA<br>☒ EEOC | |

and EEOC

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.)<br>Mr. Nicholas Barnes | Home Phone (Incl Area Code)<br>7065188993 | Date of Birth |
|---|---|---|

| Street Address<br>262928 Ave SW | City, State and ZIP Code<br>Lennett, AL | |
|---|---|---|

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two are named, list under PARTICULARS below.)

| Name<br>East Alabama Medical Center | No. Employees, Members<br>15+ | Phone No. (Incl. Area Code)<br>3347493411 |
|---|---|---|

| Street Address<br>2000 Pepperell Pkwy | City, State and ZIP Code<br>Opelika, AL 36801 | |
|---|---|---|

| Name | No. Employees, Members | Phone No. (Incl. Area Code) |
|---|---|---|

| Street Address | City, State and ZIP Code | |
|---|---|---|

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN<br>☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION<br>☐ OTHER (Specify) | Earliest: 6/2022   Latest: 2/2024<br>☒ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

See Exhibit A.

DEFENDANT'S EXHIBIT

7

Barnes

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - When necessary for State or Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 05 / 06 / 2024<br>Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(month, day, year) |

EAMC/Barnes_00007
Doc ID: f82b86896c96fbe75eea7c35505cbbccb3eb69bb

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☐ EEOC | |

and EEOC

*State or local Agency, if any*

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

NOTARY – *When necessary for State or Local Agency Requirements*

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE: *(month, day, year)*

_____     _____
Date                    Charging Party Signature

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

**1. FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

**2. AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

**3. PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

**4. ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

**5. WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging party and respondent and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

Doc ID: f82b86896c96fbe75eea7c35505cbbccb3eb69bb
EAMC/Barnes_00009

## Exhibit A

1. My name is Nicholas Barnes. I am a citizen of the United States.

2. On or about December 18, 2018, I began working at East Alabama Medical Center located in Opelika, AL as a warehouse worker and was promoted to contract coordinator.

3. While employed, a new manager of the supply chain, Ursula Means, began working.

4. On or around June of 2022 Ursula made a comment about how she did not want to see me wearing formal clothing anymore and wanted to see me in scrub pants.

5. During this interaction, she looked me up and down, stared at my genital area, smiled at me, and proceeded to rub my shoulders.

6. From that day on, I attempted to ignore Ursula, but the environment became hostile.

7. On or around August of 2022, Ursula was speaking to LaQuisha and Ursula stated that if there was ever a shooting, I would "run and hide," and not "protect anyone."

8. Ursula followed this statement by stating she thinks she could "whoop me," insinuating that she could beat me up.

9. On or around June of 2023, LaQuisha informed me that Ursula stated that she believed I was "useless," and was going to move me out of my office.

10. LaQuisha continued and stated further that Ursula stated she was going to hire an ex-employee, Ashley, from Ursula's previous place of employment and intended to make me quit.

11. Later that same day, Ursula stated that I should not be around women because they "like" me and desired that LaQuisha take my office and move me to a utility closet.

12. I asked not to be moved to a utility closet because it was not big enough and it was not clean.

13. However, on or about July of 2023, she moved me to a cardiology equipment room and stated that "men should not be working on the same floor as women."

14. I spoke with the Director, Nancy Ling, about the treatment I was receiving but no action was taken.

15. On or around January of 2024, I noticed that I had missed 19-time clock punches, and 20 missed time clock punches are cause for termination.

16. I spoke with payroll on or about January of 2024 to inquire why I had missed so many, and they informed me that the manager, Ursula, has not been approving my time punches.

17. Payroll contacted Ursula and told her to approve the missed punches and to delete them.

18. Later that day, she called me into the office and asked if I "snitched" on her.

19. I responded that I did not snitch on her and only inquired with payroll as to why I had missed so many punches.

20. After that interaction, she stated that if she would have gotten into trouble, she would have her son, John-John, and her nephew, to come to our place of employment and "mess" me up in the parking lot.

21. I reported this statement to Nancy while we were in the hallway on or about February of 2024.

22. Nancy stated that she would "look into it," but again, no action was taken.

23. On or about January 30, 2024, Ursula ordered me to do the workload of three employees because we were short-staffed, and that "it did not matter" what was in my job description and that I would have to "do whatever" she says.

24. After all of the hostile and sexually charged incidents with Ursula and reporting this conduct to Nancy and no action being taken, I put in my resignation on or about February of 2024.

25. On or about February 26, 2024, LaQuisha informed me that Ursula had told her that she was going to try "one last time," before I left the job and she asked me on my final day of employment if I wanted her to take me home, and if I wanted her to take me out to dinner.

27. After this interaction with Ursula on my last day, I spoke with Director of Human Resources, Kelli Truitt, and she stated she was going to investigate the matter.

28. However, on or about February 29, 2024, Nancy informed me that I was terminated because I reported the issues to Human Resources.

29. I believe I have been subjected to hostile work environment and discrimination based on sex, both in violation of Title VII of the Civil Rights Act of 1964.

30. I declare under penalty of perjury that the preceding is true and correct.

30. I authorize the EEOC to release the content of this Charge of Discrimination to the Respondent.


Done this __6th__ day of __May__ 2024.


_____

Nicholas Barnes

## Ursula Means

| | |
|---|---|
| ım: | Nicholas Barnes |
| ₃ent: | Thursday, December 28, 2023 8:03 AM |
| To: | Ursula Means |
| Subject: | RE: Time Clock |

I clocked out when my ride came to get me. I walked to the door and she gave me my other badge that was in the car.

**Nicholas Barnes**
Contract Coordinator, Supply Chain Services
The East Alabama Health Care Authority
2000 Pepperell Pkwy
Opelika, AL 36801
Office: (334)528-4216
Mobile █████████
Sent from Mail for Windows

**From:** Ursula Means
**Sent:** Wednesday, December 27, 2023 3:45 PM
**To:** Nicholas Barnes
**Subject:** RE: Time Clock

The system will automatically charge you an <u>occurrence</u> for "not clocking in properly". How were you able clock out?

Sincerely,

**Ursula Means**
Value Analysis/Contracts Manager
Supply Chain Services

East Alabama Health
2000 Pepperall Pkwy
Opelika, Alabama 36801
**Office:** 334.528.4474
**Fax:** 334.528.1506

Email: ursula.means@eamc.org
www.eastalabamahealth.org

**From:** Nicholas Barnes <nicholas.barnes@eamc.org>
**Sent:** Wednesday, December 27, 2023 3:37 PM

EAMC/Barnes_00470



**To:** Ursula Means <ursula.means@eamc.org>
**Subject:** Time Clock

·y Mrs. Ursula,

My time clock badge did not clock me in this morning. I have two badges and grabbed the wrong badge this morning, so the time did not go in because this badge is deactivated.

**Nicholas Barnes**
Contract Coordinator, Supply Chain Services
The East Alabama Health Care Authority
2000 Pepperell Pkwy
Opelika, AL 36801
Office: (334)528-4216
Mobile ███████████
Sent from <u>Mail</u> for Windows

**Ursula Means**

| | |
|---|---|
| From: | Laquesha Lasseter |
| Sent: | Friday, December 29, 2023 4:33 PM |
| To: | Ursula Means |
| Cc: | Nicholas Barnes |
| Subject: | RE: Kronos |

Mrs. Ursula,

I am unable to clock out through Citrix. See below snippet for error message.



Thank you,

*LaQuesha Lasseter*
*Contract Coordinator, Supply Chain Services*
*The East Alabama Health Care Authority*
*2000 Pepperell Pkwy*
*Opelika, AL 36801*
*Office Hours: Monday – Friday (8:00am-12:30pm / 1:00pm-4:30pm)*
*Office: 334-528-2739 (Tuesday - Thursday)*
*Mobile:* ▓▓▓▓▓▓ *(Working Remotely on Monday & Friday)*
*Fax: 334-528-4756*
*Email: laquesha.lasseter@eamc.org*
*Website: www.eastalabamahealth.org*

East Alabama
Health ⁛

**From:** Laquesha Lasseter
**Sent:** Friday, December 29, 2023 1:32 PM
**To:** Ursula Means <ursula.means@eamc.org>
**Cc:** Nicholas Barnes <nicholas.barnes@eamc.org>
**Subject:** RE: Kronos

Mrs. Ursula,

know how to do it. I clocked in prior to viewing the email.

Thank you,

    EAMC/Barnes_00472

**LaQuesha Lasseter**
*Contract Coordinator, Supply Chain Services*
*e East Alabama Health Care Authority*
*⌐ɔoo Pepperell Pkwy*
*Opelika, AL 36801*
*Office Hours: Monday – Friday (8:00am-12:30pm / 1:00pm-4:30pm)*
*Office: 334-528-2739 (Tuesday - Thursday)*
*Mobile:* █████████ *Working Remotely on Monday & Friday)*
*Fax: 334-528-4756*
*Email: laquesha.lasseter@eamc.org*
*Website: www.eastalabamahealth.org*

East Alabama
Health ⁞⁞⁞

**From:** Ursula Means <ursula.means@eamc.org>
**Sent:** Friday, December 29, 2023 12:12 PM
**To:** Laquesha Lasseter <laquesha.lasseter@eamc.org>
**Cc:** Nicholas Barnes <nicholas.barnes@eamc.org>
**Subject:** Re: Kronos

Ok. The system should allow you to clock in/out without my approval. Nicholas do you mind showing LaQuesha own you clocked in?

Thank you both! Have a great weekend!

**، rom:** Laquesha Lasseter <laquesha.lasseter@eamc.org>
**Sent:** Friday, December 29, 2023 10:47 AM
**To:** Ursula Means <ursula.means@eamc.org>
**Cc:** Nicholas Barnes <nicholas.barnes@eamc.org>
**Subject:** RE: Kronos

Mrs. Ursula,

I haven't received the instructions. I've inputted my time as usual and I will use the Citrix Kronos to clock, if it will let me with the pending approval of my clock in time.


*Thank you,*

**LaQuesha Lasseter**
*Contract Coordinator, Supply Chain Services*
*The East Alabama Health Care Authority*
*2000 Pepperell Pkwy*
*Opelika, AL 36801*
*Office Hours: Monday – Friday (8:00am-12:30pm / 1:00pm-4:30pm)*
*Office: 334-528-2739 (Tuesday - Thursday)*
*Mobile:* █████████ *(Working Remotely on Monday & Friday)*
*⌐ax: 334-528-4756*
*.nail: laquesha.lasseter@eamc.org*
*Website: www.eastalabamahealth.org*

EAMC/Barnes_00473

East Alabama
Health ⸬

**From:** Ursula Means <ursula.means@eamc.org>
**Sent:** Thursday, December 28, 2023 4:01 PM
**To:** Nicholas Barnes <nicholas.barnes@eamc.org>; Laquesha Lasseter <laquesha.lasseter@eamc.org>
**Subject:** Kronos

You both have been have been added to the Citrix Kronos Clocking group.

You show receive instructions from Access Management on how to clock in.
Sincerely,

**Ursula Means**
Value Analysis/Contracts Manager
Supply Chain Services

East Alabama Health
2000 Pepperall Pkwy
Opelika, Alabama 36801
**Office:** 334.528.4474
**Fax:** 334.528.1506

Email: ursula.means@eamc.org
www.eastalabamahealth.org

**Ursula Means**

| | |
|---|---|
| **ᴠm:** | Jennifer Wolf |
| **ᴄᴇnt:** | Thursday, December 28, 2023 3:22 PM |
| **To:** | Ursula Means; Scotty Brown |
| **Cc:** | Genia Odom, Penny Stewart; Kelli Truitt |
| **Subject:** | RE: Employee Timecard issues |

Sounds good, please let us know if you need any help.

Jennifer Wolf
Payroll Specialist
511 East Thomason Circle
Opelika Al, 36801

334-528-5604
334-528-1868

**From:** Ursula Means
**Sent:** Thursday, December 28, 2023 3:21 PM
**To:** Jennifer Wolf <jennifer.wolf@eamc.org>; Scotty Brown <Scotty.Brown@eamc.org>
**Cc:** Genia Odom <Genia.Odom@eamc.org>; Penny Stewart <penny.stewart@eamc.org>; Kelli Truitt <kelli.truitt@eamc.org>
**ᴠbject:** RE: Employee Timecard issues

Hi Jennifer,

Yes, I will forgive those occurrences in infor on Nicholas Barnes.

I appreciate your assistance.

**Ursula Means**
Value Analysis/Contracts Manager
Supply Chain Services

East Alabama Health
2000 Pepperall Pkwy
Opelika, Alabama 36801
**Office:** 334.528.4474
**Fax:** 334.528.1506

Email: ursula.means@eamc.org
www.eastalabamahealth.org



**From:** Jennifer Wolf <jennifer.wolf@eamc.org>
**Sent:** Thursday, December 28, 2023 12:54 PM
**To:** Scotty Brown <Scotty.Brown@eamc.org>; Ursula Means <ursula.means@eamc.org>
  Genia Odom <Genia.Odom@eamc.org>; Penny Stewart <penny.stewart@eamc.org>; Kelli Truitt <kelli.truitt@eamc.org>
**Subject:** RE: Employee Timecard issues

Thank you scotty for taking care of their Citrix access.
@Ursula Means if you could let us know where we are at with forgiving the missing punches on Nickolas's attendance records and if you are needing any assistance in doing so please reach out to us.

Jennifer Wolf
Payroll Specialist
511 East Thomason Circle
Opelika Al, 36801


334-528-5604
334-528-1868



**From:** Scotty Brown
**Sent:** Thursday, December 28, 2023 12:38 PM
**To:** Ursula Means <ursula.means@eamc.org>; Jennifer Wolf <jennifer.wolf@eamc.org>
**Cc:** Genia Odom <Genia.Odom@eamc.org>; Penny Stewart <penny.stewart@eamc.org>; Kelli Truitt <kelli.truitt@eamc.org>
**Subject:** RE: Employee Timecard issues

Hi Ursula,

I can request the Citrix access to allow clocking for the two employees.

Are both "primarily" onsite workers who work remote from time-to-time (or strictly remote workers)?

I see that Laqueshia lives in Montgomery and would not be subject to Opelika City Tax if wholly remote. Same for Nicholas living in Lanett.

Thanks,
Scotty

**From:** Ursula Means <ursula.means@eamc.org>
**Sent:** Thursday, December 28, 2023 12:12 PM
**To:** Jennifer Wolf <jennifer.wolf@eamc.org>
**Cc:** Genia Odom <Genia.Odom@eamc.org>; Scotty Brown <Scotty.Brown@eamc.org>; Penny Stewart
<penny.stewart@eamc.org>; Kelli Truitt <kelli.truitt@eamc.org>; Ursula Means <ursula.means@eamc.org>
**Subject:** RE: Employee Timecard issues

Hello Jennifer,

You are correct. The problem you mentioned below is the issue.  The system will not allow Nicholas to clock
  /out if I havent approved his punches. I have another Team member who will also need access to
Citrix.  LaQuesha Lassiter works remotely as well.

    EAMC/Barnes_00481

Do I submit an at-home remote clocking request to Scotty Brown through TMA? If not, do you mind pointing me in the right direction?

Sincerely,

**Ursula Means**
Value Analysis/Contracts Manager
Supply Chain Services

East Alabama Health
2000 Pepperall Pkwy
Opelika, Alabama 36801
**Office:** 334.528.4474
**Fax:** 334.528.1506

Email: ursula.means@eamc.org
www.eastalabamahealth.org

**From:** Jennifer Wolf <jennifer.wolf@eamc.org>
**Sent:** Thursday, December 28, 2023 9:26 AM
**To:** Ursula Means <ursula.means@eamc.org>
**Cc:** Genia Odom <Genia.Odom@eamc.org>; Scotty Brown <Scotty.Brown@eamc.org>; Penny Stewart penny.stewart@eamc.org>; Kelli Truitt <kelli.truitt@eamc.org>
**Subject:** Employee Timecard issues

Good morning Ursula, in doing timecard audits we have noticed that one of your employees Nicholas Barnes E14483 is consistently having missing punches. When we look at his attendance records these have just started recently and he is up to 19 misses. We are concerned that this is an issue with how the employee is clocking when working remotely. It appears that there is a timing issue with his submitted time. Nicholas is submitting the correct clocking times in Kronos for approval, but the payroll audit is getting done before his time is approved by you.

I have spoken with my director (Genia Odom) and Scotty Brown (HRIS) and there is a way that the employee can have access to Citrix so he can clock in and out on his computer when working remotely without having to submit his time to you or submit corrections. For him to have this access, you would need to submit an at-home remote clocking request to Scotty Brown so he could get this added to the employee's profile. We feel like this solution would fix the missing punches problem.

Also, as the manager you can go in and forgive these missed punches, so they do not go against his attendance policy. We feel that the current 19 missed punches may be in error due to the above process. If you are unsure on how to do this, please reach out to Penny Stewart and she can walk you through it or with your permission fix them for you.

Thank You

Jennifer Wolf
Payroll Specialist
511 East Thomason Circle
   elika Al, 36801

334-528-5604
334-528-1868

EAMC/Barnes_00483

## Ursula Means

| | |
|---|---|
| m: | Penny Stewart |
| Sent: | Thursday, December 28, 2023 4:07 PM |
| To: | Ursula Means |
| Subject: | RE: Nicholas Barnes 14483 |

MP = zero as of 12/28/2023



View  Full

Thu  12/28/2023

| Discipline Level Day Start | Level Name<br>Normal |
|---|---|
| Period End Balance:<br>Absence Occurrences | Balance Amount<br>0 0 |
| Period End Balance: MP<br>Occurrences | Balance Amount<br>0 0 |
| Period End Balance: Tardy<br>Occurrences | Balance Amount<br>4 0 |

Fri  12/22/2023

Level Name

**From:** Ursula Means <ursula.means@eamc.org>
**Sent:** Thursday, December 28, 2023 3:58 PM
**To:** Penny Stewart <penny.stewart@eamc.org>
**Subject:** RE: Nicholas Barnes 14483

Much appreciated!

Happy New Year 😊

**From:** Penny Stewart <penny.stewart@eamc.org>
**Sent:** Thursday, December 28, 2023 3:53 PM
**To:** Ursula Means <ursula.means@eamc.org>
**Subject:** RE: Nicholas Barnes 14483

Be happy to.

**From:** Ursula Means <ursula.means@eamc.org>
**Sent:** Thursday, December 28, 2023 3:43 PM
**To:** Penny Stewart <penny.stewart@eamc.org>
**Cc:** Payroll Services <PayrollServices@eamc.net>
**bject:** RE: Nicholas Barnes 14483

Penny,

EAMC/Barnes_00464

Do you mind removing the occurrences that have been charged to Nicholas Barnes please.

Thank You,

**Ursula Means**
Value Analysis/Contracts Manager
Supply Chain Services

East Alabama Health
2000 Pepperall Pkwy
Opelika, Alabama 36801
**Office:** 334.528.4474
**Fax:** 334.528.1506

Email: ursula.means@eamc.org
www.eastalabamahealth.org

**From:** Penny Stewart <penny.stewart@eamc.org>
**Sent:** Thursday, December 28, 2023 3:03 PM
: Ursula Means <ursula.means@eamc.org>
c: Payroll Services <PayrollServices@eamc.net>
**Subject:** Nicholas Barnes 14483

Hello,
Please let me know if I can go out and forgive these 19 missed punches that have been charged to Nicholas Barnes. I believe being a at home employee(partial) he should have been set up through Citrix.
These missed punches are more of a timing issue that actual missed punches. Let me know if you would like for me to remove these or if you are going to do this so more occurrences will not happen.
Thank you for your review.
Penny Stewart
Kronos System Analyst/Payroll
East Alabama Health
penny.stewart@eamc.org/ 334-528-1754

EAMC/Barnes_00485

## Ursula Means

| | |
|---|---|
| **From:** | Nicholas Barnes |
| **Sent:** | Monday, February 19, 2024 3:31 PM |
| **To:** | Ursula Means |
| **Subject:** | Two weeks Notice |

Good afternoon Mrs. Ursula,

I am writing to notify you that I am providing two weeks' notice and will be resigning from my position as Contract Coordinator with EAMC. My last day of employment will be March 1st.

I wish you and the company success in the future. Thank you so much for all the support you have provided me during my tenure with the company.

Best regards,

**Nicholas Barnes**
**Contract Coordinator**
**Supply Chain Services**
**The East Alabama Health Care Authority**
**2000 Pepperell Pkwy**
**Opelika, AL 36801**
**Office: (334)528-4247**
**Mobile:** ▮▮▮▮▮▮▮▮▮
Sent from Mail for Windows

East Alabama
Health ⊹



CONFIDENTIAL                    EAMC/Barnes_00172

**Kelli Truitt**

| | |
|---|---|
| **From:** | Kelli Truitt |
| **Sent:** | Wednesday, March 6, 2024 4:20 PM |
| **To:** | Nick Barnes |
| **Subject:** | RE: Urgent Matter |

Hello Nick,

Yes, you will be paid for all of last week through Friday, March 1

Thank you,

Kelli

-----Original Message-----
From: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Sent: Wednesday, March 6, 2024 2:31 PM
To: Kelli Truitt <kelli.truitt@eamc.org>
Subject: Urgent Matter

[You don't often get email from ▮▮▮▮▮▮▮▮▮▮▮▮▮ Learn why this is important at https://aka.ms/LearnAboutSenderIdentification ]

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.
CAUTION: Please report all questionable emails using the Microsoft Outlook Reporter button. Business-critical emails may be sent directly to ITSecurity@eamc.org for review.

Good evening Mrs. Truitt,

I spoke with Mrs. Nancy Ling last Thursday and she stated that I should not come back into work. She stated that you all would pay me for that Wednesday, Thursday, and Friday. I was looking over my statement for the days and I have not seen any changes towards those days. Will I be paid for those days?

Sincerely,
Nicholas Barnes
Sent from my iPhone

1

CONFIDENTIAL

EAMC/Barnes_00291

DEFENDANT'S
EXHIBIT
Barnes

## Kelli Truitt

| | |
|---|---|
| **From:** | Kelli Truitt |
| **Sent:** | Tuesday, February 27, 2024 3:53 PM |
| **To:** | Nicholas Barnes |
| **Subject:** | Re: Urgent Matter |

Nicholas,

We take your concerns seriously. Due to this, we'd like to let today be your last day of employment and will pay you through Friday. Please return your hospital badge, computer and any other hospital property to Human Resources by Friday, March 1st.

Kelli

Get Outlook for iOS

**From:** Kelli Truitt <kelli.truitt@eamc.org>
**Sent:** Tuesday, February 27, 2024 3:21 PM
**To:** Nicholas Barnes <nicholas.barnes@eamc.org>
**Subject:** RE: Urgent Matter

Thank you, Nicholas. We are investigating your concerns.

Kelli

**From:** Nicholas Barnes <nicholas.barnes@eamc.org>
**Sent:** Tuesday, February 27, 2024 3:13 PM
**To:** Kelli Truitt <kelli.truitt@eamc.org>
**Subject:** RE: Urgent Matter

I spoke with Mrs. Nancy numerous times about the things that keep happening and she asked me would I like to have a sit down with the three of us but I feel like that she will try to intimate me into saying the things she wants me to say in the meeting honestly. Mrs. Kelli, I have worked here 5 years and everyone knows me for being a hard worker and not confrontational. For me and to feel uncomfortable about working this job is not right at all. I am not the only employee that is being treated like this. I may get treated worse for speaking out about the situation from her at times because but there are other employees that are treated in a horrible way also. I am sorry if I caused any problems but I feel like my wellbeing should mattered here at EAMC and I should not have to look around while going to my car because of threats from her.

1

CONFIDENTIAL

EAMC/Barnes_00292

**Nicholas Barnes**
Contract Coordinator
Supply Chain Services
The East Alabama Health Care Authority
2000 Pepperell Pkwy
Opelika, AL 36801
Office: (334)528-4747
Mobile: ▓▓▓▓▓▓
Sent from Mail for Windows

East Alabama
Health ✧

---

**From:** Kelli Truitt <kelli.truitt@eamc.org>
**Sent:** Tuesday, February 27, 2024 2:45:19 PM
**To:** Nicholas Barnes <nicholas.barnes@eamc.org>
**Subject:** RE: Urgent Matter

Nicholas,

Thank you again for bringing these concerns to my attention. I will continue to investigate this with Nancy Ling.
Could you please specify which Vice Presidents you spoke to about this?

Thank you,

Kelli

**From:** Nicholas Barnes <nicholas.barnes@eamc.org>
**Sent:** Tuesday, February 27, 2024 12:05 PM
**To:** Kelli Truitt <kelli.truitt@eamc.org>
**Subject:** Urgent Matter

Hey Mrs. Kelli,

I have reached out to numerous directors and vice presidents about my issues with Ursula Means. Mrs. Ursula has harassed me constantly to the point of making me put in my two weeks notice. I do not feel safe at all going to my car after work because of the comments that she has made towards me. There have been incidents happening over and over. I spoke with Nancy Ling, John Morris, Chris waits , Chuck beams, Brenda Clarke, Sutricia Johnson, and others about the problem that is going on.

2

CONFIDENTIAL

EAMC/Barnes_00293

I have spoke with Mrs. Nancy Ling the director of the department on the matter numerous times and she has not done anything about the matter of the constant harassment from Mrs. Ursula Means. I fear that she has not done anything because she brought Mrs. Ursula in with her from her previous company. There has been numerous things that has happened.

1. I was told that I should stop wearing my formal clothing to work and only wear scrubs into work. I agreed to only wear scrubs to work but I mentioned that Mrs. Nancy stated that it was fine to wear them to work sometimes and Mrs. Ursula stated that she would rather seem me in scrub pants and made a sexual look at me. I acted as I didn't hear her and started back doing my work.
2. I also had a meeting with Mrs. Ursula in her office because she wanted to have a heart to heart talk. I took the meeting with her and stated that I would not like to be friends but I would like to keep things professional while working. She got upset and stated that I should leave her office with my ugly face.

3. The next day she came back to my office and stated that I look like a scary employee. That she could get someone to whoop on me.

4. Ursula Means stated that she was going to fire me or make me quit to a employee name Laquesha Lester that is in the department. Her and Laquesha are best friends in the department because they were brought into EAMC together by Mrs. Nancy from a different hospital. Laquesha told me this because she stated that I should start looking for a new job. Because Mrs. Ursula wanted to bring in someone named Ashley for my position.
5. I was working at my desk upstairs in the department and she stated that I should get my things and move them to the EVS closet because I was useless. I asked to please be moved some where else because the EVS utility closet is not for office use. She moved me to the Cath lab materials room. And gave my office to her Laquesha Lester.
6. Also I have noticed that my times were not being approved on time and it was giving me missed punches. It gave me 19 missed punches and I have never been over 7 before she came. I reach out to Mrs. Penny in payroll and she stated that it was not being approved by Ursula Means. And that she would talk to her. I asked Mrs. Penny and Lisa wolf please not state that I asked about it because it would only make the situation that I am in worse. After they reached out to Mrs. Ursula she called me into her office the same day and asked did I snitch on her. And stated that if she gets fired or in trouble she will have her son and nephew to mess me up and whoop me in the parking lot.
7. Today she called me into a meeting and she stated that she understands that I may have checked out and I stated that I have not checked out I am a loyal worker until the end, I have been a hard worker for 5 years but I can not continue to receive the parking lot threats. She pulled her glasses on top of her head and stated that she does and says whatever she chooses. They are not threats that they are promises.

**Nicholas Barnes**
Contract Coordinator
Supply Chain Services
The East Alabama Health Care Authority
2000 Pepperell Pkwy
Opelika, AL 36801
**Office:** (334)528-4247
**Mobile:**
Sent from Mail for Windows

3

CONFIDENTIAL

EAMC/Barnes_00294

**Ursula Means**

| | |
|---|---|
| ɔm: | Nicholas Barnes |
| **Sent:** | Tuesday, February 20, 2024 8:18 AM |
| **To:** | Ursula Means |
| **Cc:** | Nancy Ling; Ursula Means |
| **Subject:** | RE: Two weeks Notice |

I don't have transportation on Monday and Friday

**Nicholas Barnes**
Contract Coordinator
Supply Chain Services
The East Alabama Health Care Authority
2000 Pepperell Pkwy
Opelika, AL 36801
**Office:** (334)528-4247
**Mobile** ▮▮▮▮▮▮▮▮
Sent from Mail for Windows

East Alabama
Health ⠿

**From:** Ursula Means <ursula.means@eamc.org>
˙nt: Monday, February 19, 2024 4:59:50 PM
ப: Nicholas Barnes <nicholas.barnes@eamc.org>
**Cc:** Nancy Ling <nancy.ling@eamc.org>; Ursula Means <ursula.means@eamc.org>
**Subject:** RE: Two weeks Notice

Nancy and I just spoke. We will need you report in person to the office for the next two weeks (M-F). This is to transition your workload.

Thank You,

**Ursula Means**
Manager - Value Analysis/Contracts
Supply Chain Services
2000 Pepperall Pkwy
Opelika, Alabama 36801
**Office:** 334.528.4474
**Fax:** 334.528.1506
Email: ursula.means@eamc.org

East Alabama
Health ⠿

**From:** Ursula Means
**Sent:** Monday, February 19, 2024 4:47 PM



EAMC/Barnes_00393

**To:** Nicholas Barnes <nicholas.barnes@eamc.org>
**Subject:** RE: Two weeks Notice

ank you, and congratulations! I wish you the best.


**Ursula Means**
Manager - Value Analysis/Contracts
Supply Chain Services
2000 Pepperall Pkwy
Opelika, Alabama 36801
**Office:** 334.528.4474
**Fax:** 334.528.1506
Email: ursula.means@eamc.org

East Alabama
Health ⠿


**From:** Nicholas Barnes <nicholas.barnes@eamc.org>
**Sent:** Monday, February 19, 2024 3:31 PM
**To:** Ursula Means <ursula.means@eamc.org>
**Subject:** Two weeks Notice

Good afternoon Mrs. Ursula,

I am writing to notify you that I am providing two weeks' notice and will be resigning from my position as Contract Coordinator with EAMC. My last day of employment will be March 1st.

I wish you and the company success in the future. Thank you so much for all the support you have provided me during my tenure with the company.

Best regards,

**Nicholas Barnes**
Contract Coordinator
Supply Chain Services
The East Alabama Health Care Authority
2000 Pepperell Pkwy
Opelika, AL 36801
**Office:** (334)528-4247
**Mobile:** ▓▓▓▓▓▓▓
Sent from Mail for Windows

East Alabama
Health ⠿