# Exhibit C – Transcript of Nancy Ling's Deposition w/ exhibits

# NICHOLAS BARNES

## vs

# EAST ALABAMA MEDICAL CENTER FOUNDATION, et al.

## NANCY LING

## April 30, 2025



www.alabamareporting.com  *  877.478.3376

Page 1

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE MIDDLE DISTRICT OF ALABAMA
3   EASTERN DIVISION
4   CIVIL ACTION NO.: 3:24-cv-00512
5
6 NICHOLAS BARNES,
7   Plaintiff,
8 v.
9 EAST ALABAMA MEDICAL CENTER
10 FOUNDATION d/b/a EAST ALABAMA
11 MEDICAL CENTER,
12   Defendant.
13
14   DEPOSITION TRANSCRIPT OF
15   NANCY LING
16   April 30, 2025
17   12:35 P.M.
18   The deposition of NANCY LING was
19 taken before Karen Smith, CCR, on April 30, 2025,
20 by Jon-Kaden Mullen, Esq., commencing at
21 approximately 12:35 P.M., via Zoom, pursuant to
22 the stipulations set forth herein.
23

Page 2

1   S T I P U L A T I O N
2   IT IS STIPULATED AND AGREED by and
3 between the parties through their respective
4 counsel that the deposition of NANCY LING may be
5 taken before Karen Smith, CCR and Notary Public,
6 State of Alabama at Large, via Zoom, on April 30,
7 2025, commencing at approximately 12:35 P.M.
8   IT IS FURTHER STIPULATED AND AGREED that
9 it shall not be necessary for any objections to
10 be made by counsel to any questions, except as to
11 form or leading questions and that counsel for
12 the parties may make objections and assign
13 grounds at the time of trial or at the time said
14 deposition is offered in evidence, or prior
15 thereto.
16   IT IS FURTHER STIPULATED AND AGREED that
17 notice of filing of the deposition by the
18 Commissioner is waived.
19
20
21
22
23

Page 3

1   A P P E A R A N C E S
2
3 ON BEHALF OF THE PLAINTIFF, NICHOLAS BARNES:
4   Jon-Kaden Mullen, Esq.
5   VITRUS LAW GROUP
6   2017 Morris Avenue, Suite 100
7   Birmingham, AL 35203
8   jm@vlgal.com
9
10 ON BEHALF OF THE DEFENDANT, EAST ALABAMA MEDICAL
11 CENTER FOUNDATION d/b/a EAST ALABAMA MEDICAL
12 CENTER:
13   Warren B. Lightfoot, Jr., Esq.
14   MAYNARD NEXSEN, P.C.
15   1901 6th Avenue North, Suite 1700
16   Birmingham, AL 35203
17   wlightfoot@maynardsexsen.com
18
19 ALSO PRESENT:
20   Kelli Truitt
21
22
23

Page 4

1   EXAMINATION INDEX
2 NANCY LING
3   BY MR. MULLEN   6
4   BY MR. LIGHTFOOT   68
5   BY MR. MULLEN   69
6   BY MR. LIGHTFOOT   70
7   BY MR. MULLEN   71
8   BY MR. LIGHTFOOT   73
9   BY MR. MULLEN   76
10   BY MR. LIGHTFOOT   76
11   BY MR. MULLEN   77
12   BY MR. LIGHTFOOT   78
13
14   EXHIBIT INDEX
15 Plaintiff's
16   1   Email thread (310-315)   35
17
18
19
20
21
22
23



ALABAMA
COURT REPORTING

Page 5

1     I, Karen Smith, a Court Reporter of
2  Birmingham, Alabama, and a Notary Public for the
3  State of Alabama at Large, acting as
4  Commissioner, certify that on this date, as
5  provided by the Alabama Rules of Civil Procedure
6  and the foregoing stipulation of counsel, there
7  came before me on the 30th day of April, 2025,
8  via Zoom, commencing at approximately 12:35 P.M.,
9  NANCY LING, witness in the above cause, for oral
10  examination, whereupon the following proceedings
11  were had:
12               NANCY LING,
13  being first duly sworn, was examined and
14  testified as follows:
15       COURT REPORTER:  The attorneys
16  participating in this proceeding acknowledge that
17  I am not physically present with the witness and
18  that I will be reporting this proceeding
19  remotely.
20        They further acknowledge that the witness
21  will be sworn in remotely by me.
22        The parties acknowledge that, due to the
23  nature of technology, connections may drop or

Page 6

1  freeze during the deposition and the reporter may
2  have to interrupt for clarity.
3        The parties acknowledge that if they do
4  not wish to consent to this proceeding being held
5  remotely, they should state their objections at
6  this time.
7        Are there any objections?
8        MR. LIGHTFOOT:  No objections.
9        MR. MULLEN:  No objections.
10        COURT REPORTER:  Otherwise, are we under
11  the usual stipulations?
12        MR. MULLEN:  Yes.
13        MR. LIGHTFOOT:  From the defendants, yes,
14  except, Nancy, we will read and sign as well
15  which will mean you'll have the opportunity to
16  review it like 30 days after the court reporter
17  gives us the record and make any edits and then
18  sign it. So yes.
19               EXAMINATION
20  BY MR. MULLEN:
21       Q. All right.  Can you please state your
22  name for the record, please?
23       A. Nancy Ling.

Page 7

1       Q. Now, I know that you were sitting in here
2  for the deposition earlier, but I want to just go
3  over some background information.
4       A. Okay.
5       Q. My name is Jon-Kaden Mullen.  I'm an
6  attorney with the Virtus Law Group.  I represent
7  the plaintiff, Nicholas Barnes, in this matter
8  against your employer, East Alabama Medical
9  Center.  If I say EAMC, do you understand that
10  I'm referencing your employer?
11       A. Yes.
12       Q. Okay.  So just like with the last
13  deposition that you were sitting in on, please
14  answer all of my questions with a verbal
15  response.  Because we're here on Zoom, it can be
16  very difficult for the court reporter to record
17  shaking your head, like yes or no.  And so it's
18  very difficult for our court reporter to record
19  that.  So I just ask that you try to always
20  verbalize your answer.  Along that same line, the
21  record is very difficult to keep clear with
22  answers like uh-huh and huh-uh.  So, if you
23  could, just try to verbalize yes or no to those

Page 8

1  questions instead of -- and refrain from saying
2  uh-huh and huh-uh, that would help keep the
3  record clear.
4        If you ever have any kind of question
5  about a question that I ask you, feel free to ask
6  me to restate the question.  I'm not trying to
7  ask any trick questions.  I'm not trying to trip
8  you up.  So if there's ever anything that you
9  don't understand, just ask me to rephrase.  I'd
10  be happy to.
11        Along that same lines, if you ever have
12  to take a break, feel free to let me know.  If
13  you need to use the restroom, water, et cetera,
14  I'd be happy to let you take a break whenever you
15  need to.  My only request is make sure that you
16  answer any pending question before we go on that
17  break.  So if you need to use the restroom, if
18  you would, please just answer whatever question I
19  have pending on the record, and then I'm happy
20  for us to take that break.
21        Do you have any questions?  Do you
22  understand everything that I have told you thus
23  far?



Page 9

1    A. Yes.  Yes.
2    Q. Okay.  We had a little bit of delay on
3 the audio.
4    A. I'm sorry.
5    Q. No.  That's not a problem.  It's one of
6 the risks when it comes to Zoom.
7      All right.  So can you please state your
8 full name for the record?
9    A. Nancy Ling.
10   Q. And Ms. Ling, have you ever been deposed
11 before?
12   A. No.
13   Q. Okay.  Now, since you haven't been
14 deposed before, just to give you a little
15 background, this is an opportunity for me to ask
16 you some questions about what you know regarding
17 the facts of this case.  And I'm sure that you
18 spoke with your attorney some prior to today.
19 But do you understand that you're testifying
20 under oath today and everything that you testify
21 to is under the penalty of perjury?
22   A. Yes.
23   Q. Have you ever been a plaintiff or a

Page 10

1 defendant in another lawsuit?
2    A. No.
3    Q. Have you ever been arrested or convicted
4 of a crime?
5    A. No.
6    Q. Do you have any medical condition or are
7 taking any medication that may affect your
8 memory, your ability to testify, or to read any
9 documents that I present to you today?
10   A. No.
11   Q. Ms. Ling, can you describe your
12 educational background?
13   A. I have an associate's degree, a
14 bachelor's degree, and an MBA.
15   Q. Where did you go to high school?
16   A. Hueytown High School.
17   Q. And what year did you graduate?
18   A. 1980.
19   Q. After you graduated from Hueytown, did
20 you go to college or what college did you go to?
21   A. I went to -- it's called Bessemer State
22 Technical College right after high school.
23   Q. Did you receive your associate's from

Page 11

1 Bessemer State?
2    A. I did.
3    Q. What year did you receive your
4 associate's?
5    A. '81 or '82 maybe.  I don't --
6    Q. That's fine.
7    A. I can't recall.
8    Q. Did you go to another college after that?
9    A. Not then.
10   Q. Okay.  So did you take a break from
11 education?
12   A. I did.
13   Q. Okay.  How long was that break?
14   A. Approximately ten to 12 years.
15   Q. Did you work during those ten to 12
16 years?
17   A. Some of the time.
18   Q. Okay.  Where did you work?
19   A. I sold real estate.
20   Q. How long did you do that?
21   A. Approximately ten years.
22   Q. Do you have a date range?  Like when did
23 you start and when did you stop?

Page 12

1    A. I do not remember.
2    Q. Okay.  And after you sold real estate for
3 ten years, did you go back to education -- go
4 back to school after that or did you have another
5 job?
6    A. I had another job.  I had two other jobs
7 before I went back to college.
8    Q. Okay.  What were those two?
9    A. I worked for Colonial Bank and briefly
10 for Alabama Power.
11   Q. How long did you work for Colonial Bank?
12   A. I do not remember my dates.
13   Q. Do you remember what your job was?
14   A. I was a bank teller.
15   Q. Okay.  And then you said you worked for
16 Alabama Power?
17   A. I did.
18   Q. Do you remember how long you worked for
19 them?
20   A. Approximately four years, but I don't
21 remember exactly.
22   Q. Do you know the year that you stopped
23 working for Alabama Power?



Page 13

1    A. I stopped working for Alabama Power in
2 1993 I believe.
3    **Q. And what was your job at Alabama Power?**
4    A. An AP clerk.
5    **Q. I'm sorry. I didn't catch that first**
6 **part.**
7    A. Accounts payable clerk, an AP clerk.
8    **Q. Thank you. Okay. And after working at**
9 **Alabama Power, you returned to school and went to**
10 **college. What college did you go to?**
11    A. I went to Liberty University.
12    **Q. How long did you go to Liberty?**
13    A. Two and a half to three years for
14 undergrad.
15    **Q. And you received your bachelor's degree**
16 **from Liberty?**
17    A. I did.
18    **Q. What did you receive your bachelor's**
19 **degree in?**
20    A. Business management.
21    **Q. What year did you receive your degree?**
22    A. I really do not remember.
23    **Q. And then -- so you also have your**

Page 14

1 **master's in business administration. Where did**
2 **you go for your master's in business**
3 **administration?**
4    A. Liberty University.
5    **Q. So during that same two and a half, three**
6 **years, did you also get your master's?**
7    A. That was an additional year. I don't
8 remember how long the break was between my
9 bachelor's and my master's, but I got my MBA I
10 believe in 2011.
11    **Q. Okay. But there was some break. You're**
12 **just not sure what the break was in between**
13 **those?**
14    A. Correct.
15    **Q. Were you working while also attending**
16 **school?**
17    A. Yes.
18    **Q. Okay. So after Alabama Power, when was**
19 **your next -- where did you work next?**
20    A. Jefferson County Commission.
21    **Q. And how long did you work there?**
22    A. Approximately five years.
23    **Q. And what was the year that you started**

Page 15

1 **and the year that you stopped?**
2    A. I don't remember.
3    **Q. What was your position with the Jefferson**
4 **County Commission?**
5    A. I went from a buyer to an inventory
6 manager.
7    **Q. You said supplier to inventory manager?**
8    A. Buyer.
9    **Q. After you worked with the Jefferson**
10 **County Commission, where did you work?**
11    A. I started working with St. Vincent's
12 Hospital or Ascension Health after about a year.
13    **Q. So I don't know how that buyout and**
14 **everything worked. Was it St. Vincent's at the**
15 **time?**
16    A. It was St. Vincent's initially. My
17 employment began with St. Vincent's.
18    **Q. Okay. Do you remember when you started**
19 **working, like the year that you worked -- were**
20 **hired on at St. Vincent's?**
21    A. I'm sorry. I do not. I don't remember
22 all my dates of when I worked where.
23    **Q. That's perfectly fine. Do you know when**

Page 16

1 **you left?**
2    A. Let's see if I can count backwards. I
3 really do not. I'm sorry. I don't.
4    **Q. No, that's fine. That's fine. All**
5 **right. So after St. Vincent's, where did you**
6 **go -- and Ascension Health during that merger**
7 **where did you go after that?**
8    A. I worked for Surgical Care Affiliates for
9 one year.
10    **Q. What was your position?**
11    A. Manager of the onboarding.
12    **Q. And after Surgical Care Affiliates?**
13    A. Princeton Baptist Hospital.
14    **Q. Do you recall the dates that you worked**
15 **there?**
16    A. Approximately 11 years ago.
17    **Q. Okay. So 2014? Does that sound correct?**
18    A. That sounds about the right time.
19    **Q. What was your position?**
20    A. Director of supply chain.
21    **Q. And after Princeton Baptist Health, where**
22 **did you go?**
23    A. I worked for Smith's Medical for three



Page 17

1 years.
2    Q.  Do you know approximately when you left
3 Smith's Medical?
4    A.  2019.
5    Q.  And what was your position --
6    A.  No.  Early 2020.
7    Q.  Early 2020?
8    A.  2020, yes.
9    Q.  And what was your position at Smith's
10 Medical?
11    A.  Vascular access rep.
12    Q.  And after Smith's Medical, did you start
13 working at East Alabama Medical Center?
14    A.  No.  I worked for Baptist Health
15 Center -- I mean Baptist Health System for one
16 year.
17    Q.  And so you left there in early 2021 or
18 late 2021, early 2022?
19    A.  I left there in 2021.
20    Q.  And what was your position at Baptist
21 Health System?
22    A.  Director of supply chain.  Excuse me.
23 Director of purchasing and contracts.

Page 18

1    Q.  Okay.  And after Baptist Health System?
2    A.  I finally arrived at East Alabama Health.
3    Q.  All right.
4    MR. LIGHTFOOT:  You weathered the hardest
5 part of the deposition.
6    Q.  (BY MR. MULLEN) That was the hardest
7 part.
8    And do you remember your start date with
9 East Alabama Medical?
10    A.  I do not.  I think it was August of 2021
11 but I am not for sure.
12    Q.  Okay.  That's fine.  And what position
13 were you hired at EAMC at?
14    A.  Director of supply chain.
15    Q.  Is that your current position with EAMC?
16    A.  No, it is not.
17    Q.  Okay.  How long did you work as the
18 director of supply chain?
19    A.  Three years.
20    Q.  So roughly August of 2024 you received a
21 promotion --
22    A.  October --
23    Q.  -- or a change in position?

Page 19

1    A.  October 2024.
2    Q.  Okay.  And what is that new position that
3 you started in October 2024?
4    A.  Executive director of supply chain
5 services.
6    Q.  Okay.  Now, while my client was
7 employed -- my client, Nicholas Barnes, was
8 employed at EAMC, you were the director of supply
9 chain; is that correct?
10    A.  Yes.
11    Q.  He had left EAMC prior to you becoming
12 the executive director of supply chain services;
13 is that correct?
14    A.  Yes.
15    Q.  So during your time as the director of
16 supply chain, can you give me an idea of what
17 your job duties were?
18    A.  The job duties for director of supply
19 chain involve warehousing, inventory,
20 distribution, logistics, purchasing, contracts,
21 corporate moves.  I think I named most of them.
22    Q.  And were you a supervisor over all the
23 employees in those -- are each one of those

Page 20

1 departments?
2    A.  They were areas of supply chain.
3    Q.  Okay.  Would the department be considered
4 like the supply chain department?  Kind of give
5 me an idea of, you know, how that was set up, if
6 you recall.
7    A.  So at the time that I came, the
8 department was called material management.
9    Q.  Okay.
10    A.  The name changed --and I don't remember
11 when the name changed -- to supply chain services
12 which incorporate all of what I just named off to
13 you.  But ultimately, there were managers in the
14 department that ultimately as the director,
15 ultimately it all reported up to me.
16    Q.  Okay.  Did you have any -- did you report
17 to anyone above you in that department?
18    A.  I reported to a vice president in
19 administration.
20    Q.  During your time as the -- I want to make
21 sure I get this correct -- the director of supply
22 chain, did you work with my client, Nicholas
23 Barnes?



Page 21

1    A.  Yes.
2    Q.  Was he ever under your direct
3 supervision?
4    A.  I believe he was during the time when we
5 were minus a manager.
6    Q.  Do you recall when that time was?
7    A.  It was sometime in 2022.  I do not know
8 exact dates.
9    Q.  That's okay.  So when you were his direct
10 supervisor and you worked with him, would you
11 have considered Nicholas Barnes to be a good
12 employee?
13    A.  Yes.
14    Q.  To your knowledge, did he ever get in any
15 kind of trouble or written up while he was under
16 your supervision?
17    A.  Not to my knowledge.
18    Q.  Did you ever know of a time that
19 Mr. Barnes had a problem with any other employees
20 during your time as his supervisor?
21    A.  Not to my knowledge.
22    Q.  Do you know if any other employees had a
23 problem with Nicholas Barnes while you were his

Page 22

1 supervisor?
2    A.  Not to my knowledge.
3    Q.  Do you recall when you stopped being his
4 direct supervisor?
5    A.  I don't know the exact time frame, but it
6 would have been after I hired a replacement
7 manager for Russ Ballard.
8    Q.  Do you recall who that supervisor was?
9    A.  Ursula Means.
10    Q.  Did Ursula Means, to your knowledge,
11 become Mr. Barnes' direct supervisor after you
12 hired her?
13    A.  Not initially, but after a period of
14 time, yes.
15    Q.  Okay.  Now, when you say not initially,
16 was there a probationary period?  Why not
17 initially?
18    A.  Well, yes.  So the -- she was hired as
19 manager of value analysis and contracts.  The
20 department had been without value analysis for
21 approximately two years, and so I wanted her to
22 focus on the value analysis piece right out of
23 the gate.  So that's one of the reasons there was

Page 23

1 a delay in moving the contract piece underneath
2 her.  I wanted the value analysis to get up and
3 running and focus on that initially.
4    Q.  Okay.  Do you know how long that initial
5 period where she was focusing on the value
6 analysis took?
7    A.  I would say probably -- no, I don't.  I
8 do not know the exact time.  I don't.
9    Q.  And I understand if you can't recall, you
10 know, how long the initial time period is.  You
11 might not be able to recall when -- when did
12 Ursula step into her full authority as the
13 supervisor over value analysis and contracts?
14    A.  I would say the first full quarter after
15 she was hired, but, again, I don't -- which would
16 be within probably three months of her
17 employment, but I apologize I do not know exact
18 dates.
19    Q.  And that's okay.  So when it comes to
20 value analysis and the contracts, and I
21 understand that it also involved warehouse and
22 inventory; is that correct?
23    A.  Supply chain services, yes.

Page 24

1    Q.  Okay.  To the best of your knowledge, was
2 there ever a dress code that employees had to
3 have in their position working in contracts?
4    A.  Not specifically for contracts, just, you
5 know, business casual I guess is the best way to
6 describe it.
7    Q.  And you said not specifically for supply
8 chain contracts.  That was just kind of a company
9 policy or do you know who mandated the business
10 casual dress code?
11    A.  So in supply chain services, we have
12 several different business environments.  Some
13 require, you know, scrubs because you're going
14 into procedural areas.  Some require -- like
15 warehouse and the dock, our employees out there
16 generally wear either scrubs or khakis and a polo
17 shirt, and they're told that when they're hired.
18 And then our other employees, if they're in the
19 hospital like our buyers, contract coordinators,
20 they are welcome to wear scrubs and/or business
21 casual.
22    Q.  Okay.  Now, my client, Mr. Barnes, worked
23 in contracting; is that correct?



Page 25

1    A. He did.
2    Q. Did he have to -- was he part of the
3 business casual dress code, the scrub dress code,
4 or the and/or business casual/scrub dress code?
5    A. Well, it depends. And the reason I say
6 that is because if we have inventory, everybody
7 is expected regardless of their position to pitch
8 in when we have inventory. That requires
9 storeroom or warehouse. We would not expect
10 people to wear business casual being in our
11 warehouse or our storeroom during inventory. Or
12 if there are situations where we are shorthanded
13 at work and we, you know, kind of have an
14 all-hands-on-deck-type atmosphere for a specific
15 period of time, then that would kind of dictate
16 what folks were wearing.
17    Q. Now, I know that you said they could wear
18 scrubs. And correct me if I'm wrong, but you
19 said they weren't expected to wear business
20 casual while in the warehouse; is that right?
21    A. I would not expect someone to wear
22 business casual in the warehouse, if that's what
23 you're asking me.

Page 26

1    Q. If they wanted to wear business casual,
2 could they have?
3    A. Working in the warehouse? No. That is
4 khakis and polo. If your job is in the
5 warehouse, that was khakis and polo for the
6 employees that work out there.
7    Q. Okay. So there was an instance while --
8 let me ask this. I know you're not a party.
9 You're a fact witness here. So, you know, I'm
10 not expecting you to know everything that the
11 company knows. So I wanted to ask, have you
12 reviewed the complaint that my client has filed
13 against EAMC in this matter?
14    A. Yes.
15    Q. Okay. And are you aware that as part of
16 those allegations, my client is claiming that his
17 supervisor at the time, Ursula Means, forced him
18 to wear scrub pants. Were you aware of that?
19    A. I have heard that allegation, yes.
20    Q. Okay. And so I want to speak directly to
21 that allegation regarding her forcing him to wear
22 scrub pants. I had asked you, you know, if
23 contracts is business casual, and you said yes.

Page 27

1 But then you said inventory may require scrubs,
2 and if we're shorthanded, that might require, you
3 know, a dress code change; is that correct?
4    A. Yes.
5    Q. And so when my client was asked to wear
6 scrubs, did he have the option of staying in
7 business casual if he so chose?
8    MR. LIGHTFOOT: Object to the form.
9 Assumes facts not in evidence.
10    Go ahead.
11    A. Can you rephrase the question, please?
12    Q. (BY MR. MULLEN) Yeah, absolutely. So to
13 your knowledge, did Ursula Means tell my client,
14 Nicholas Barnes, that he had to wear scrubs?
15    A. At the time when everyone in the
16 department was asked to wear scrubs, it was
17 during a period of time where we were extremely
18 shorthanded and we were all hands on deck in the
19 department, so yes. It was not -- it was not an
20 everyday -- it was not expected that they had to
21 do that every day. They could if they wanted to.
22 But if we knew that we were going to have -- that
23 we were shorthanded, we had folks that were

Page 28

1 calling out or we had people on vacation or
2 things of that nature, we did ask them to wear
3 scrubs so that they could participate.
4    Q. Okay. And if you don't know, that's
5 fine. Do you know if Ursula -- because it made
6 it sound -- let me strike all that.
7       So you said y'all were shorthanded when
8 Ursula asked my client, Mr. Barnes, to wear scrub
9 pants. Do you know if Ursula told him that it
10 was because everyone was -- because EAMC was
11 shorthanded?
12    MR. LIGHTFOOT: Object to the form.
13    Go ahead.
14    A. I do not know what Ursula Means told him.
15    Q. (BY MR. MULLEN) Okay. Do you know if --
16 if my client chose not to wear scrub pants, he
17 decided to continue to wear business casual,
18 would that have been acceptable?
19    MR. LIGHTFOOT: Object to the form.
20    A. Rephrase your question, please.
21    Q. (BY MR. MULLEN) So based on what you've
22 told me the policy was at EAMC and the reason why
23 someone might have to wear scrub pants, if my



Page 29

1  client who was in contracts decided that he
2  didn't want to wear scrubs, would that have been
3  okay?
4        MR. LIGHTFOOT:  Same objection.
5     A.  Okay.  At the time, if we had -- Nic
6  Barnes was also experienced in providing supplies
7  for procedural areas.  Procedural areas require
8  scrubs, not just scrub pants, but scrubs.  It's a
9  set.  And he is experienced.  He has done that
10  numerous times.  And so, you know, hypothetically
11  if there was a time when he chose to wear his
12  business casual and I needed him because he is
13  familiar and experienced in a procedural area, we
14  probably would have had to do something
15  different.  So, you know, I don't know that I can
16  answer question completely.
17     Q.  (BY MR. MULLEN) Okay.  Did my client,
18  Nicholas Barnes, ever come to you and complain
19  about Ursula's request for him to wear scrub
20  pants?
21     A.  No.
22     Q.  Are you aware that prior to Mr. Barnes
23  leaving EAMC, he reported -- he made a report to

Page 30

1  HR regarding Ursula Means and some harassment and
2  retaliation against him?  Were you aware of that?
3     A.  I was made aware the day that the -- that
4  allegation was provided to HR, which was -- I
5  don't know if it was the Monday or Tuesday of his
6  second week of his resignation.
7     Q.  How were you made aware of Mr. Barnes'
8  complaint regarding Ursula?
9     A.  I was contacted by Kelli Truitt.
10     Q.  Did you conduct an investigation to that
11  complaint after you were made aware?
12     A.  Yes.
13     Q.  When did you start your investigation?
14     A.  Immediately.
15     Q.  And by immediately -- and just so you
16  know, the email came in on February 27th, 2024.
17  Was it the same day?
18     A.  Yes.
19     Q.  How did you conduct your investigation?
20     A.  I asked questions.
21     Q.  Who did you ask questions to?
22     A.  I asked questions to Ursula and to
23  Laquesha Lasseter.

Page 31

1     Q.  And I understand why you would ask
2  question to Ursula.  Did you ever -- why did you
3  ask Laquesha questions?
4     A.  In my investigation with Ursula, she
5  mentioned that Laquesha -- she was the other
6  contract coordinator during the majority of that
7  time period.  She worked with Nic.  That
8  Ursula -- I mean that Laquesha was in those
9  meetings.  She had meetings with both of them
10  and, you know, felt like Laquesha could provide
11  an additional perspective.
12     Q.  Okay.  Did you talk with anyone else?
13     A.  I did not.
14     Q.  Why didn't you speak with anyone else?
15     A.  I spoke to the parties involved.
16     Q.  Did you do anything else to investigate
17  Mr. Barnes' claims?
18     A.  Such as?
19     Q.  I mean, is there anything else that you
20  did?  I know that you started the investigation
21  by asking questions and you asked Ursula and
22  Laquesha questions.  Did you do anything else?
23     A.  I asked them both to put their responses

Page 32

1  in writing.
2     Q.  And they both gave you those responses in
3  writing?
4     A.  Laquesha gave me her response in writing,
5  and if I'm not mistaken, Ursula's response was
6  sent to HR.
7     Q.  When you said was sent to HR, was it in
8  writing or did you just tell them what the
9  responses were?
10     A.  My response to HR was in writing to them
11  based on the conversations that I had had with
12  the both of them.
13     Q.  Okay.  And you said that Ursula's
14  responses were sent to HR.  Did she have her own
15  responses?
16     A.  Beg your pardon?
17     Q.  Did she have her own responses separate
18  from your response to HR?
19        MR. LIGHTFOOT:  Objection, just to try to
20  clarify.  I think she said she might have --
21  Ursula might have sent hers, just to be clear,
22  Jon-Kaden, but you can ask her.
23     Q.  (BY MR. MULLEN) Yeah.  I'm just trying to



Page 33

1  clarify.  I might have misheard.  Did you say she
2  might have sent her response to HR or that she
3  sent them?
4      A.  I do not know for a fact, but she might
5  have sent those responds to HR.  I didn't get her
6  responses in writing.  My responses to HR were in
7  writing based on my verbal conversation and
8  investigation with Ursula and the written
9  statement from Laquesha.
10     Q.  Thank you so much for clarifying that.
11         MR. MULLEN:  And thank you, Warren --
12  Mr. Lightfoot, for clarifying that.  I missed
13  that through the Zoom.
14         MR. LIGHTFOOT:  Yeah.
15     Q.  (BY MR. MULLEN)  Now, when you sent your
16  responses to HR, how did you send your response
17  to HR?
18     A.  In an email.
19     Q.  In an email?  Okay.  I am going to --
20  give me one second to try to get this where it
21  can be shared.  All right.  I have an email here.
22  Let's see.  I might even full screen to see if
23  that helps.  Does it make it easier or harder to

Page 34

1  read based on...
2      A.  That's harder for me to read, but I don't
3  know about...
4      Q.  I'm trying to see if I can blow this up
5  any.  So I'm showing you here -- this is part of
6  the defendant's production of documents starting
7  with Page 310 and it goes down to 315.  I will
8  give you a second to review this document.  If I
9  need to scroll down, let me know.
10     A.  Okay.
11     Q.  Have you been able to read through?
12     A.  I have.  You can scroll down.
13     Q.  Okay.  That's 310.  I want to make sure
14  that everything looks accurate.
15     A.  Yes, sir.
16     Q.  And just let me know when you're done
17  reviewing that and I can scroll down.
18     A.  Yes, I'm finished.  Okay.  I'm finished.
19  Is there anything additional below that?
20     Q.  Yes, ma'am.  That was 312.  We have until
21  315.
22     A.  Okay.
23         MR. LIGHTFOOT:  Jon-Kaden, we've been

Page 35

1  going a long time.  Can we take our first break,
2  please?
3         MR. MULLEN:  Yeah.  If you don't mind, if
4  I can just get this entered in as a exhibit.
5  That way nothing is pending.  I will enter it in
6  as an exhibit and we will take a break.
7         MR. LIGHTFOOT:  So just to be clear,
8  Ms. Ling, this does appear to be the email
9  thread, right?
10        THE WITNESS:  Yes.
11        MR. MULLEN:  Then I'm going to offer this
12  as the plaintiff's Exhibit 1 into the record.
13  And with that, we can take a ten-minute break.
14     (Whereupon, Plaintiff's Exhibit 1
15      was marked for identification
16      and copy of same is attached hereto.)
17         (Short recess.)
18     Q.  (BY MR. MULLEN)  So we just got back from
19  a quick ten-minute break.  The last thing that we
20  discussed was this email that we just entered as
21  Exhibit 1.  And so I want to talk with you about
22  your response here on February 27th at 5:45 p.m.,
23  and then I wanted to talk about some things later

Page 36

1  on down in the exhibit where it looks like some
2  additional language was put into Mr. Barnes'
3  initial complaint which looks like it's
4  after-added wording to describe or explain from a
5  perspective.
6          So regarding this first page, I see that
7  you completed the additional investigation.  Your
8  responses are blue and red.  Is that regarding
9  those -- the red letters --
10     A.  Yes.
11     Q.  -- that are found later on in the email
12  chain?
13     A.  Yes.
14     Q.  Okay.  Now, I wanted to ask because --
15  and part of this that -- on February 27th at
16  3:56 p.m., you sent to Ms. Truitt, "I have not
17  had any complaints.  I can tell you that he and
18  Laquesha were asked to wear scrubs due to helping
19  out in other areas, dock, storeroom, et cetera,
20  because we were short staffed and we didn't want
21  them to get their clothes messed up.  Nic has
22  referred to Ursula as his mama several times, and
23  her response has always been, I am not your



Page 37

1  mother.  That was said just last week, but he
2  said that multiple times.  I have a call at 4:00
3  with Commure.  I will answer more in detailed
4  fashion shortly.  For the record, Nic has a
5  reputation of stretching the true."
6       So I wanted to ask you, when my client
7  allegedly called Ursula his mama, were you
8  present for those instances?
9     A.  No.
10    Q.  Okay.  How did you learn of my client's
11 alleged use of calling Ursula his mama?
12    A.  During the investigation.
13    Q.  Okay.  At what point during
14 investigation?  When you were asking questions to
15 Ursula?
16    A.  Yes.
17    Q.  Okay.  What about Laquesha?
18    A.  I don't recall.
19    Q.  Okay.  I want to make sure that I
20 understand the, "I have a call at 4:00 with
21 Commure."  Is that a person?  A department?  I
22 just want to make sure I understand that
23 statement.

Page 38

1     A.  I have a call with -- Commure is a
2  company.  Basically I have another call at 4:00
3  but I will get back with you.
4     Q.  Okay.  I just wanted to make sure I
5  understood that and it wasn't anything part of
6  EAMC.
7        And then I want to ask about this, "Nic
8  has a reputation for stretching the true."  And
9  you put quotation a marks around it.  You know,
10 did someone tell you he has the reputation for
11 stretching the true?
12    A.  His previous manager was Russ Ballard,
13 and Russ had made mention of that several times.
14 I personally have heard some things that seemed
15 embellished.
16    Q.  Okay.  When Russ mentioned -- was he the
17 one that used the term "stretching the true"?
18    A.  That term was used a couple of times in
19 conversation.
20    Q.  With Russ?
21    A.  With Russ, during the investigation with
22 Ursula.  And also just, you know, my explanation
23 of embellishment that I have heard.

Page 39

1     Q.  So you've heard Nicholas Barnes embellish
2  it, and you classify it as stretching the true?
3     A.  Correct.  I actually believe that's a
4  typo.  It probably should be "truth."
5     Q.  Okay.  That makes sense.  And you
6  firsthand heard instances that you believe that
7  my client was stretching the truth?
8     A.  Yes.
9     Q.  What instances have you personally
10 witnessed of Mr. Barnes stretching the truth?
11    A.  I have heard Mr. Barnes brag about how
12 much money he had in the bank.  I have heard
13 Mr. Barnes brag about being a professional
14 international basketball player.  I have heard
15 him brag about having several rental properties.
16    Q.  Anything else other than those three
17 instances?
18    A.  I have heard him brag about living in
19 Midtown Atlanta and having to drive back and
20 forth every day to East Alabama.
21    Q.  Any other instances?
22    A.  I have heard on several occasions
23 Mr. Barnes mention the fact that if he was out or

Page 40

1  gone over a weekend that he was in some country
2  or island playing basketball.
3     Q.  Any other instances?
4     A.  Those are the specific ones that I can
5  recall at the moment.
6     Q.  Okay.  So it sounds like most of these
7  instances are him bragging on something; is that
8  correct?
9     A.  Define bragging.  What does bragging
10 mean?
11    Q.  I'm not trying to be -- I'm just using
12 the word -- you said he's bragged about the money
13 he had in the bank, bragged about being a pro
14 basketball player, bragged about rental
15 properties, bragged about living in Midtown
16 Atlanta and having to drive to East Alabama every
17 day, and then bragged about, you know, if he was
18 gone for a weekend, it's because he was traveling
19 abroad playing basketball.
20    A.  I think it's -- I don't know that I would
21 use the terminology "brag."
22    Q.  Okay.  What term would you use?
23    A.  Embellishment.



Page 41

1    Q. Out of these instances, would it be fair
2 to say that you've heard him embellishing things
3 positive to make his life sound better?
4    A. Can you rephrase that question? I'm
5 sorry.
6    Q. Yeah. So these embellishments that you
7 gave examples of, it sounds like everything is a
8 positive on his life, you know, bragging about
9 money in the bank. We all like having more money
10 in the bank. You know, bragging on being a pro
11 basketball player, rental properties, you know,
12 having to live in Midtown Atlanta, and then
13 traveling abroad playing basketball, would you
14 agree those all sound like positive things?
15    A. They could be.
16    Q. Okay.
17    A. Mr. Barnes has also bragged about going
18 to law school for two years.
19    Q. He also bragged about going to law school
20 for two years? Okay.
21    A. Yeah.
22    Q. Did you ever hear him embellish any
23 instances complaining about someone?

Page 42

1    A. In what way?
2    Q. I mean, just complaining about an
3 individual.
4    A. I don't really understand your -- I don't
5 really know how to answer that because I'm not
6 sure --
7    Q. Let me try to see if I can rephrase.
8 These instances that you gave me and you saying
9 that you experienced him stretching the truth,
10 have you ever heard him stretch the truth when it
11 comes to complaining about another person? Like,
12 for example -- and I'm not saying this happened.
13 I'm just trying to -- you know, when you see
14 someone driving really fast and you're walking
15 down the road, I know I've said, That guy almost
16 hit me. He was really far away. He didn't
17 really hit me. It's just I exaggerated it for
18 effect. Any kind of embellishment like that that
19 would be, you know, about another person in a
20 negative way? Like this person said this to me
21 and turned out they didn't actually say that or
22 they didn't say it like that?
23    A. Not to my recollection, no.

Page 43

1    Q. Okay. Have you ever known Mr. Barnes to
2 lie about anything?
3    A. I don't know that I really know how to
4 answer that question.
5    Q. Has Mr. Barnes ever lied about something
6 regarding his job to your recollection?
7    A. Not to my recollection.
8    Q. So what did you mean when you told
9 Ms. Truitt that -- and I'm asking -- I know what
10 you said and I know we've had some examples. My
11 goal is what were you trying to convey to
12 Ms. Kelli Truitt when you said that Mr. Barnes
13 has a reputation for stretching the true?
14    MR. LIGHTFOOT: Objection, asked and
15 answered.
16    Go ahead.
17    A. My opinion and perspective on the
18 allegations that were made were so wild to me
19 that it was very difficult for me to believe that
20 there was not some level of embellishment or
21 false accusations that were being made in those
22 allegations. So although I don't remember
23 exactly why I put that in there, I would say that

Page 44

1 because I was so caught off guard about the
2 allegations, that that's probably why I said
3 something.
4    Q. Okay. When you finished your
5 investigation, what was your conclusion based on
6 your investigation?
7    MR. LIGHTFOOT: Object to the form.
8    A. Honestly, I did not come to a conclusion.
9 I just provided results of the investigation
10 questions that I had asked.
11    Q. (BY MR. MULLEN) During the remaining time
12 in your position, which was the -- let me make
13 sure -- director of supply chain?
14    A. Right.
15    Q. Did you ever know of any -- did anyone
16 else ever come to you with complaints regarding
17 Ms. Ursula Means?
18    A. No.
19    Q. Since you've been the executive director
20 of supply chain services, do you know of any
21 complaints being filed against Ursula Means?
22    A. I'm not aware of any.
23    Q. Are you aware of any other investigations



Page 45

1 that have taken place?

2    A.  Against Ms. Means?

3    Q.  Against Ms. Means, yes.

4    A.  I am not aware of any.

5    Q.  In your current position, would that be

6 something that you would be made aware of?

7    A.  I don't know.  I guess it would -- I

8 really don't know.  I guess it would have to do

9 with what the allegations or what the

10 investigation was about.  I don't really know.

11    Q.  Okay.  Have you been a part of any other

12 investigations regarding any other complaints

13 since Mr. Barnes' complaint about Ms. Means?

14    A.  Regarding Ms. Means?

15    Q.  No.  Just in general.

16    A.  Yes.

17    Q.  Okay.  Have you been involved in any

18 investigations since being the executive director

19 of supply chain services?

20    A.  I'd have to look at the calendar but it's

21 possible.

22    Q.  Okay.  And as you may recall from the

23 30(b)(6) deposition, I asked if there had been

Page 46

1 any investigations on Ms. Means, and the 30(b)(6)

2 rep said that she didn't know.  And when I asked

3 who would, she said that the department head, and

4 ultimately said Ms. Nancy Ling would have the

5 answer to that question.

6    A.  Uh-huh.

7    Q.  Do you agree with that statement that if

8 there was an investigation on Ms. Means after my

9 client left EAMC, that you would be aware of any

10 follow-up investigations regarding Ms. Means?

11    A.  Follow-up to this specific one or

12 anything additional?

13    Q.  Any additional or follow-up, either one

14 regarding Ms. Means.

15    A.  To me, that's kind of a hypothetical

16 situation because I don't know.  I don't know if

17 a particular allegation was made, if that would

18 involve me, if it would involve someone else.

19 I'm not HR and so, you know, I'm not for sure.

20 But if it had anything to do with anything going

21 on in my department, then I would be made aware

22 of it.

23    Q.  Okay.  And this is hypothetically if a

Page 47

1 complaint was made against someone in your

2 department, you would be made aware of any

3 investigation that needed to be made?

4    A.  Yes.

5    Q.  Okay.  And to your knowledge, there

6 hasn't been any kind of investigation on

7 Ms. Means since the one that you conducted in

8 February?

9    A.  Yes.

10    Q.  Okay.  Again, you were sitting in for the

11 deposition of the 30(b)(6) witness, and we went

12 over some text messages between Ms. Ursula Means

13 and my client, Nicholas Barnes, where she made

14 the statement that she just wanted to see his

15 pretty face.  I wanted to -- I want to ask you,

16 is that something that you would conduct an

17 investigation on if there was an investigation

18 that followed up?  Would that be something that

19 would be started by you?  Or do you think that

20 you would be told by HR to conduct the

21 investigation?  I just want to make sure I

22 understand how any investigation, follow-up

23 investigation would start.

Page 48

1    A.  If I am made aware of anything of that

2 nature and it dealt with my department, I would

3 be involved in follow-up.

4    Q.  Okay.  You've seen the text messages,

5 correct?

6    A.  I did earlier this morning.

7    Q.  Based on those text messages that you saw

8 and the understanding of what you heard the

9 30(b)(6) deponent reference to it, is that

10 something that under normal circumstances

11 Ms. Means, in your opinion, would qualify as a

12 reason to investigate Ms. Means?

13       MR. LIGHTFOOT:  Object to the form.

14       Answer it if you understand the question.

15    A.  Can you rephrase the question?

16    Q.  (BY MR. MULLEN)  Yeah.  In your opinion,

17 the text messages that -- or the text message

18 that Ms. Means sent to my client, I just wanted

19 to see your pretty face, in your opinion, is that

20 grounds to conduct an investigation against

21 Ms. Means?

22    A.  I think it would depend on the context.

23 I saw one snippet of something that -- so I don't



Page 49

1 know. I would have to have -- there would have
2 to be something else that I could see to
3 determine, you know, to what level something
4 needed to be discussed, investigated. You know,
5 it's kind of hard for me to answer that by just
6 looking at one snippet of something.
7    Q. Okay. What context would you need to be
8 comfortable to have an opinion?
9        MR. LIGHTFOOT: Objection to the extent
10 she just asked and answered that.
11        Go ahead.
12    A. Again, without knowing the context --
13 without knowing the full extent of the context, I
14 don't know if I'm looking at something harmless,
15 something inappropriate, something -- I don't
16 know the level to what, if anything, I'm looking
17 at by looking at a text message. I don't have
18 the context or anything else surrounding that for
19 me to make -- you know, to make an opinion based
20 on seeing one screenshot of some texts. I think
21 I would need more substantial meat to be able to
22 discuss that.
23    Q. (BY MR. MULLEN) Now, I want to go back --

Page 50

1 when we first were starting your deposition
2 talking about my client and the time that you
3 spent working with my client, you said that you
4 had never known my client, Nicholas Barnes, to
5 have a problem with any other employee and no
6 other employee having a problem with Mr. Barnes;
7 is that correct?
8        MR. LIGHTFOOT: Objection, asked and
9 answered.
10    A. Yes.
11    Q. (BY MR. MULLEN) Later on you said that
12 his previous supervisor, Russ, had told you that
13 Mr. Barnes stretches the truth. But you agree
14 that Russ didn't have a problem with Mr. Barnes?
15    A. I am not aware of any -- I'm not aware.
16    Q. That's fine. And you're not aware of
17 Mr. Barnes ever having a complaint against
18 anybody else in the company?
19    A. I'm not aware of Mr. Barnes having any
20 complaints against anyone in the company up
21 until --
22    Q. Aside from Ursula Means?
23    A. Up until -- yes, that, correct.

Page 51

1    Q. Okay. And no one else after that in the
2 short time that he was with EAMC?
3    A. No.
4    Q. Now, I want to talk about him moving his
5 office. So according to your email, you are the
6 one that moves employees around. And so did you
7 move Mr. Barnes from his office that he had to
8 the cath labs?
9    A. I moved Nicholas Barnes down to the
10 office on the first floor with the cath lab
11 coordinator, David Rose.
12    Q. Now, you interviewed Laquesha because
13 Mr. Barnes worked with her and they were both on
14 the contract team. Did Nicholas Barnes share
15 that office with anyone or share the office you
16 moved him to with anyone?
17    A. When I moved him downstairs to the first
18 floor?
19    Q. Yes.
20    A. That was an office with David Rose.
21    Q. Did you ever interview David Rose?
22    A. No.
23    Q. Why did you not interview David?

Page 52

1    A. He was not mentioned in any of the
2 complaints or the allegations. I didn't feel it
3 was necessary.
4    Q. But you said that you interviewed
5 Laquesha because she worked with Mr. Barnes?
6    A. I interviewed Laquesha because her name
7 came up when I was interviewing and investigating
8 with Ursula.
9    Q. So you interviewed Laquesha because
10 Ursula gave you her name?
11    A. Correct. Yes, that's correct.
12    Q. And just to make sure on the email, that
13 he sent to Kelli Truitt and Kelli Truitt
14 forwarded to you --
15    A. Can you share what you're looking at?
16    Q. Sorry. I did not realize I unshared the
17 screen. Let me share that again. Okay. So I'm
18 looking at -- it's Plaintiff's Exhibit 1,
19 Defendant's production 314. I'm looking
20 specifically at Paragraph 4.
21    A. Okay.
22    Q. Where he says, Her and Laquesha are best
23 friends in the department because they were



Page 53

1  brought into EAMC together by Ms. Nancy from a
2  different hospital. Laquesha told me this
3  because she stated I should start looking for a
4  new job because Ms. Ursula wanted to bring
5  someone named Ashley for my position.
6      And then you have the response, Ursula
7  stated she has never threatened Nic or anyone
8  else with firing or making them quit. While it's
9  true that both Laquesha and Ursula did come from
10 Baptist, they were co-workers and not friends
11 outside of the office setting. As a caveat, I
12 know the Ashley he is referring to, and neither
13 Ursula nor I would hire her to work here nor
14 suggest anyone here to hire her.
15     Did I read that correctly?
16     A. You did.
17     Q. Okay. And you received this email and
18 responded to it after you conducted your
19 investigation knowing that it was at least
20 Mr. Barnes' position and contention that the
21 person that he was complaining against,
22 Ms. Means, was Laquesha's best friend, at least
23 according to him?

Page 54

1      A. According to what was written in the
2  allegations.
3      Q. Who is this Ashley that's being referred
4  to?
5      A. Ashley was a person that worked at
6  Baptist.
7      Q. Okay. Is she currently working for EAMC?
8      A. No, she is not.
9      Q. Okay. Did Ms. Means ever bring up or ask
10 you to hire this Ashley?
11     A. No, she did not.
12     Q. And I might have asked this and I might
13 have missed it. What was Ashley's last name?
14     A. I don't remember.
15     Q. But you can affirmatively state she's not
16 working for EAMC, at least in your department?
17     A. She is not working for East Alabama
18 Health.
19     Q. Okay. Did you give any consideration to
20 Mr. Barnes saying that Ms. Means and Laquesha
21 were best friends in the department?
22     A. Repeat that question.
23     Q. Did you give any consideration, any

Page 55

1  weight, to -- during your investigation that
2  Mr. Barnes said that Laquesha and Ursula were
3  best friends in the department?
4      A. No.
5      Q. Why didn't you?
6      A. Because I knew that -- I knew that was
7  not true.
8      Q. How did you know that was not true?
9      A. Let's see. Let me see how to answer
10 that. They -- to my knowledge, they have
11 absolutely no interaction at all after work.
12 They are in different periods of their lives,
13 times of their lives. They do different things,
14 have different hobbies, different whatever. And
15 there is no indication that they are best
16 friends.
17     Q. Okay. And you see that I moved my screen
18 down?
19     A. Yes.
20     Q. I wanted to ask you about Number 6. So
21 in Number 6, Mr. Barnes complained in a nutshell
22 that he noticed that his time wasn't being
23 approved and that he had 19 missed punches. And,

Page 56

1  you know, according to Mr. Barnes, he went to
2  this Ms. Penny in payroll about it. He
3  instructed -- she instructed him to go to Ursula.
4  And that he was worried about the situation being
5  worse, and then after you reached out -- after
6  they reached out, she called him a snitch. Did
7  you investigate that?
8      A. I did.
9      Q. How did you investigate that specific
10 allegation?
11     A. Well, I did ask Ursula if -- you know,
12 what was the issue with the Nic's missed punches,
13 and she explained to me that that was occurring
14 for both he and Laquesha. One of the issues for
15 Nic was that he was clocking in under Eastern
16 Standard Time. The issue was not his time card
17 not being approved. It was that Ursula was not
18 aware that when he clocked in under Eastern
19 Standard Time on his laptop, she needed to go in
20 there before the next clock-in period and click
21 "okay." It gives a little red thing on there
22 that you just need to go in there. She was not
23 aware that she needed to do that. So once she



Page 57

1  had that conversation with Penny and they
2  explained that they needed to clock in under
3  Infor, that problem resolved itself for both he
4  and Laquesha.
5      Q.  Okay.  Was Laquesha also clocking in on
6  the Eastern time zone?
7      A.  Not Eastern time but on her laptop.
8      Q.  Okay.  And to the best of your
9  knowledge -- well, strike that.
10      Also on the second part of that, my
11  client stated that, If she, Ursula, gets fired or
12  in trouble, she will have her son and nephew mess
13  me up and whoop me in the parking lot.  Did you
14  investigate those threats?
15      A.  I did ask that question, if there had
16  been any threats, if anything was said, what was
17  said, and, you know, Ursula responded that she
18  had never made any threatening comments about
19  violence or causing harm to anyone, Nic or
20  otherwise.
21      Q.  Did you ask anyone else about any of
22  these comments?
23      A.  No.

Page 58

1      Q.  Did your investigation on the comments
2  just involve asking Ursula if they were true or
3  not?
4      A.  My investigation involved asking Ursula
5  those questions and asking Laquesha if she had
6  ever seen or heard anything concerning between
7  Nic and Ursula.
8      Q.  And with Laquesha, did you mention
9  specifically -- like reference specifically the
10  "whoop me" comment?
11      A.  No, sir.  I didn't reference anything
12  specifically.  I just asked the question, Have
13  you ever seen or heard anything concerning?
14      Q.  Okay.  And then on 7, Mr. Barnes says, I
15  have been a hard worker for five years, but I
16  cannot continue to receive parking lot threats.
17  She pulled her glasses on top of her head and
18  said that she does and says whatever she chooses
19  and they are not threats, that they are promises.
20      Did you investigate that statement?
21      A.  I did ask if that statement was heard or
22  overheard by anyone and if Ursula made that
23  statement.

Page 59

1      Q.  And heard or overheard by anyone, did you
2  ask that to Laquesha?
3      A.  Yes.
4      Q.  And then you asked Ursula specifically?
5      A.  Yes.
6      Q.  Now, when you say had anyone heard or
7  overheard, is this, again, another general
8  question like you said for -- I guess it was
9  Paragraph 6?  Or did you give specifics on the,
10  These aren't threats, they're promises question
11  to Laquesha?
12      A.  No.  Anything I asked Laquesha was, I
13  just need to know if you saw or overheard
14  anything that was concerning or concerning to you
15  between Nic and Ursula.
16      Q.  Okay.  And then this final paragraph on
17  the bottom, it said that, Nic has felt that
18  Ursula is picking on him because there are
19  several times that POs have needed to be
20  corrected and that he made the statement to me
21  that he knows what he's doing.  However, these
22  statements have been made and Ursula has been
23  trying to work with him and Laquesha, Charlotte

Page 60

1  and Kay on new process.  Much of this is due to
2  our new system that we will be putting in place.
3  We have been working with the buyers, contract
4  coordinators, inventory staff, et cetera,
5  updating processes, making changes across the
6  board.
7      Did I read that correctly?
8      A.  You did.
9      Q.  All right.  Now, you said that, Nic has
10  felt that Ursula is picking on him because of --
11  and PO stands for punch out?
12      A.  Purchase order.
13      Q.  -- purchase orders that need to be
14  corrected.  And he made the statement to me that
15  he knows what he's doing.  However, these
16  mistakes have been made, and Ursula has been
17  trying to work with him and Laquesha.  Have you
18  had previous conversations with Nic feeling like
19  Ursula was picking on him?
20      A.  When we had a conversation -- and I don't
21  remember at what point -- Nic made the comment to
22  me that he and Laquesha were being called into
23  Ursula's office.  This was just a general



Page 61

1  conversation. That they were being called into
2  her office. She was going over how to process
3  something. Nic does -- did service purchase
4  orders and contract purchase orders. Ursula was
5  going over some new ways -- new procedures on how
6  to do that that were going to be in our new
7  system, so trying to get everybody up to speed,
8  so to speak. And Nic made the comment, you know,
9  that he thought Ursula was picking on him, you
10 know, and that he knew what he was doing.
11      Now, he did not make that statement to me
12 in any accusatory way or, you know, of any
13 concern. It was just in a casual conversation.
14 And I made the comment that, We're just trying to
15 get all the purchase orders in a standard format.
16 Nobody's picking on anybody. You know, you're
17 having more meetings than normal because this is
18 what we're trying to do. I did not take that in
19 any way that Nic was, you know, making any -- I
20 mean, it was just kind of a sidebar comment that
21 was made. So I added that here so that everyone
22 would understand, you know, we were requiring
23 multiple people, not just Nic and Laquesha, to

Page 62

1  make changes to the way that they were doing
2  things.
3      **Q. Okay. And so it sounds like you're**
4  **saying that he had made the statement, Ursula is**
5  **picking on him, but you thought it was a sidebar**
6  **comment, you know, not accusatory, not worth**
7  **investigating?**
8      A. Correct.
9      **Q. Is there now looking back any other**
10 **sidebar statements that you didn't think were**
11 **accusatory that Nic had mentioned about Ursula?**
12     A. Not that I can recall.
13     **Q. Not that you can recall? Do you ever**
14 **recall Nic being frustrated with Ursula or, you**
15 **know, how Ursula was treating him in any way?**
16     A. Not that I recall.
17     **Q. And I understand that you don't recall.**
18 **Let's say my client says he has, would you have**
19 **any reason to believe that he was not telling the**
20 **truth that he had?**
21     MR. LIGHTFOOT: Object to the form. Had
22 what?
23     A. Can you rephrase that question?

Page 63

1      **Q. (BY MR. MULLEN) Yes, ma'am. So you said**
2  **that you didn't recall any other comments or**
3  **anything that Nic had said. You couldn't recall**
4  **any other times that he might have been**
5  **frustrated with Ursula or how she'd been treating**
6  **him. But I said that if my client were to say**
7  **that he had spoken with you, would you have any**
8  **reason to believe that he was not telling the**
9  **truth?**
10     A. If you can give me a specific instance or
11 question, I can be more specific with my answer.
12     **Q. Well, do you believe Mr. Barnes to be**
13 **truthful?**
14     A. In regards to just in general do I
15 believe him to be truthful?
16     **Q. In general. Have you ever known him to**
17 **lie about work?**
18     MR. LIGHTFOOT: Object to the form.
19     A. I don't really know how to answer that
20 question. There's too many variables on that.
21     MR. MULLEN: Okay. Why don't we take a
22 five-minute break. I think I'm close to the end
23 of my line of questioning. Let's just

Page 64

1  reconvene -- it's 2:23 right now. So let's
2  reconvene at 2:30.
3      (Short recess.)
4      **Q. (BY MR. MULLEN) All right. So we're back**
5  **from a short break. Ms. Ling, I just have a few**
6  **follow-up questions for you. So we had some**
7  **conversation regarding conversations that my**
8  **client alleges that he had with you regarding**
9  **Ms. Ursula, and you didn't recall any**
10 **conversations outside of the "picking on me"**
11 **statement regarding purchase orders; is that**
12 **correct?**
13     A. That's correct.
14     **Q. Okay. Do you recall having a**
15 **conversation with Mr. Barnes in late 2023**
16 **regarding Ursula not treating him fairly?**
17     A. No.
18     **Q. Do you recall any conversations with Nic**
19 **in 2024 regarding Ursula calling him a snitch?**
20     A. No.
21     **Q. Do you recall any conversations in 2024**
22 **regarding Ursula saying that she would have**
23 **someone beat him up?**



Page 65

1    A.  No.

2    **Q.  Do you recall having any conversation**
3  **with Mr. Barnes regarding Ursula and you asking**
4  **if he would like to sit down with her with you as**
5  **a -- and you in a meeting, but him saying no**
6  **because he felt like she would try to intimidate**
7  **him?**

8    A.  Yes.

9    **Q.  You do recall that?**

10    A.  Yes.

11    **Q.  When did that happen?**

12    A.  So that was when he had tendered his
13  resignation.

14    **Q.  Okay.**

15    A.  But if you'd like to share the document
16  you're looking at, I could probably answer --

17    **Q.  Absolutely.  Again, this is Plaintiff's**
18  **Exhibit 1, and this is after the initial**
19  **complaint email.  As you can see, the response**
20  **from Kelli and then his response to Kelli.  You**
21  **were not included on this email, at least at this**
22  **point.**

23    A.  Right.

Page 66

1    **Q.  You know, it was in the email chain.**

2    A.  Correct.

3    **Q.  That he was stating that he and you had a**
4  **conversation and said, I spoke with Ms. Nancy**
5  **numerous times about these things that kept**
6  **happening, and she asked me would I like to have**
7  **a sit-down with the three of us.  I feel like she**
8  **will try to intimidate me into saying things she**
9  **wants me to say in the meeting honestly.**

10    A.  Well, there's only part of that sentence
11  that's true.

12    **Q.  Okay.**

13    A.  So Mr. Barnes did not speak with me
14  numerous times.

15    **Q.  Okay.**

16    A.  Mr. Barnes, when he tendered his
17  resignation, I spoke to him, and he told me at
18  that time that -- because I said, you know, Nic,
19  we hate to lose you, you're a good employee, that
20  sort of thing.  And he -- is there anything that
21  we can do?  You know, what do we need to do?  He
22  informed me then that he was retiring and that,
23  you know, he felt like, you know, he did not want

Page 67

1  to have any -- because I suggested that we sit
2  down with Ursula to try to work -- if there was
3  something that we needed to work out, was there
4  an issue, was there a problem, that sort of
5  thing.  And he told me no, that it would only
6  make things worse, that he was retiring.  And so
7  he turned down my offer of help at that time.

8    Now, when he said he spoke to me numerous
9  times, Nic never spoke to me about any of that.

10    **Q.  Okay.  So outside of the part that you**
11  **said was true, you don't recall having any other**
12  **conversations with Mr. Barnes regarding Ursula?**

13    A.  No.

14    **Q.  In your opinion, based on the evidence**
15  **that you have seen and you conducted during your**
16  **investigation and your conversations with EAMC**
17  **following Mr. Barnes leaving the company, is it**
18  **your opinion that Ms. Means did not breach any of**
19  **the policies of EAMC?**

20    MR. LIGHTFOOT:  Object to the form.

21    You can answer.

22    A.  It's really not my place to make that --
23  to opine about something like that.  But when I

Page 68

1  submitted what I submitted to HR, it's my opinion
2  that the allegations that Mr. Barnes was bringing
3  were untruthful.

4    MR. MULLEN:  Okay.  No further questions.

5    EXAMINATION

6  BY MR. LIGHTFOOT:

7    **Q.  Ms. Ling, before February 27th of 2024,**
8  **did Mr. Barnes ever make a complaint to you that**
9  **Ursula Means had harassed him in any way?**

10    A.  No.

11    **Q.  Mr. Mullen asked you some questions about**
12  **this incident about Mr. Barnes saying that he**
13  **believed Ursula was picking on him relating to**
14  **purchase orders.  Do you remember some questions**
15  **about that?**

16    A.  Yes.

17    **Q.  Did Mr. Barnes ever say that Ms. Means**
18  **was picking on him because he was a man?**

19    A.  No.

20    **Q.  Or anything even close to that?**

21    A.  No.

22    MR. LIGHTFOOT:  Okay.  No further
23  questions, Jon-Kaden.



Page 69

1      FURTHER EXAMINATION
2  BY MR. MULLEN:
3      Q.  Just a few follow-ups, just quick ones.
4  All right.  So your attorney asked you that
5  you -- and you testified to your attorney's
6  question that no other complaint had been
7  tendered to you by Mr. Barnes about Ms. Means
8  prior to February 27th; is that correct?
9      A.  Uh-huh, yes.
10     Q.  And that you testified that when you did
11 have a conversation with Mr. Barnes regarding
12 Ursula picking on you, it did not involve any --
13 he didn't say that it was because he was a man or
14 anything like that, correct?
15     A.  Yes.
16     Q.  But you also testified that you don't
17 recall all the conversations that you had with
18 Mr. Barnes prior to this complaint; that's
19 correct?
20     A.  Conversations around -- general
21 conversations?
22     Q.  Regarding Ursula.  When I asked if you
23 could recall any other conversations where he

Page 70

1  might have -- and you had another sidebar comment
2  or something that you felt like wasn't worth
3  investigating, your testimony was you can't
4  recall, correct?
5      A.  Correct.
6      MR. MULLEN:  No further questions.
7      FURTHER EXAMINATION
8  BY MR. LIGHTFOOT:
9      Q.  I think it seems like there's a
10 disconnect.  Did Mr. Barnes ever make a complaint
11 to you about mistreatment by Ursula Means prior
12 to February 27th other than that he believed she
13 was picking on him regarding the purchase orders?
14     A.  No.
15     Q.  Okay.  And -- well, let's -- we will
16 leave it there.  Okay?
17     A.  Okay.
18     MR. MULLEN:  No further questions.
19     MR. LIGHTFOOT:  Thank you.
20     MR. MULLEN:  I will email everybody over
21 the exhibits.  I have three for the 30(b)(6) and
22 one for Ms. Ling.
23     MR. LIGHTFOOT:  Before we go off the

Page 71

1  record, let me ask another follow-up question.
2  What did you number the exhibit that had his
3  complaint, Jon-Kaden?
4      MR. MULLEN:  That had his complaint?  For
5  this one, this is Plaintiff's Exhibit 1 for Nancy
6  Ling.
7      Q.  (BY MR. LIGHTFOOT)  All right.  As to any
8  allegation that you've seen that Mr. Barnes has
9  made, whether it is in the email that he sent to
10 Kelli Truitt on February 27th, whether it was in
11 the EEOC charge, did Mr. Barnes ever raise any
12 complaint to you about harassing or hostile or
13 offensive treatment by Ms. Means at any time?
14     A.  No.
15     Q.  Okay.  Did he on one occasion prior to
16 February 27th say to you that he thought
17 Ms. Means was picking on him?
18     A.  Yes.
19     Q.  And what was that topic about?
20     A.  About purchase orders.
21     MR. LIGHTFOOT:  Okay.  No further
22 questions.
23     FURTHER EXAMINATION

Page 72

1  BY MR. MULLEN:
2      Q.  Okay.  One follow-up.  So you testified
3  to your attorney that no other complaint -- that
4  you're not aware of any other complaint regarding
5  Ms. Means prior to February 27th; is that
6  correct?
7      A.  By Nic Barnes?  Are you talking about had
8  Nic Barnes --
9      Q.  Yeah, for the purpose of this, by
10 Mr. Barnes.
11     A.  I was not made aware of -- I mean, no.
12 No.  There was no other complaint made to me.
13     Q.  Okay.  Then prior to February 27th, you
14 testified that you recalled having a conversation
15 with Mr. Barnes regarding Ms. Means or him
16 feeling like Ms. Means was picking on him because
17 of purchase orders.
18     A.  Correct.
19     Q.  But you also testified that you can't
20 recall every time you had a conversation with
21 Mr. Barnes at which point he might have made a
22 sidebar statement that you said was not worth --
23 sidebar statement that was not worth having a



Page 73

1 formal investigation on; is that correct?
2    MR. LIGHTFOOT:  Object to the form.
3    Go ahead.
4    A.  Mr. Barnes has never made any statement
5 to me in any way that I felt like was a formal
6 complaint that needed investigation other --
7 until he submitted something to HR.
8    Q.  Thank you.  I understand that was your
9 testimony and answer to your question from your
10 attorney.  I'm not asking about formal
11 complaints.  I'm asking about conversations that
12 you had with Mr. Barnes where he mentioned
13 something that you felt was a sidebar comment
14 that you didn't feel was worth investigating.
15 You can't recall if you had any other
16 conversations, or if you did, how many they were;
17 is that correct?
18    A.  Yes.
19    MR. MULLEN:  No further questions.
20    FURTHER EXAMINATION
21 BY MR. LIGHTFOOT:
22    Q.  Are you trained under the EAMC rules
23 about the sexual harassment policy?

Page 74

1    A.  Yes.
2    Q.  And how have you been trained?
3    A.  We have our handbook and we have annual
4 electronic refresher courses that we are required
5 to review.
6    Q.  Okay.  If Mr. Barnes complained to you
7 that the air-conditioning was too cold in the
8 office one day -- first, do you remember him
9 making any -- could he have complained to you on
10 occasion about things like that?
11    A.  Yes.
12    Q.  Does that rise to the level to you of
13 something that could be a complaint of sexual
14 harassment that needs to be looked into or
15 investigated under the sexual harassment policy?
16    A.  No.
17    Q.  Okay.  Are you clear on every time that
18 Nic Barnes made a complaint to you that got even
19 close to a complaint of mistreatment by Ms. Means
20 or sexual harassment pursuant to EAMC's policy?
21 In other words, would you -- if you got a
22 complaint from him during his employment at any
23 time that related to, I believe I'm being

Page 75

1 mistreated by my supervisor or I'm being
2 harassed, would you understand that to be a
3 complaint that needed to be looked into?
4    A.  Yes.
5    Q.  Did you ever get one of those before
6 February 27th?
7    A.  No.
8    Q.  So did you have some sidebar
9 conversations with -- what he's been calling
10 sidebar conversations with Mr. Barnes on occasion
11 about various topics?
12    A.  Yes.
13    Q.  Do you remember any of them?  I mean,
14 family stuff?  Or where you ate lunch?  Do you
15 remember any conversations that you had with him?
16    A.  No.
17    Q.  Okay.  So I assume that's what you meant
18 when you said you didn't recall every
19 conversation with him.
20    A.  Correct.
21    Q.  I want you to be very clear and tell all
22 of us, tell the plaintiff's lawyer, tell me, tell
23 this court any time that he made any complaint to

Page 76

1 you that could have related to the sexual
2 harassment policy or to being mistreated by
3 Ursula Means.  How many times did that ever
4 happen during your employment?
5    A.  Only when he made it clear -- only when
6 he submitted it to HR on February 27th.
7    Q.  Okay.
8    A.  Nothing prior to that.
9    MR. LIGHTFOOT:  No further questions.
10    FURTHER EXAMINATION
11 BY MR. MULLEN:
12    Q.  Ms. Ling, did you consider the
13 conversation that you had with Mr. Barnes when he
14 said that he felt as if Ursula was picking on
15 him, did you feel as if that was a complaint?
16    A.  I did not.
17    MR. MULLEN:  No further questions.
18    FURTHER EXAMINATION
19 BY MR. LIGHTFOOT:
20    Q.  Did you explain to him when he said he
21 felt that you were picking on him, did you talk
22 through the issue with him?
23    A.  Yes.  I explained and I told him that



Page 77

1  they were not the only people that were being
2  called in and having meetings, and I explained to
3  him why we were going through the changes.
4      Q.  Was he satisfied with the answer on that?
5      A.  Yes.
6      Q.  Did he continue doing his job just as
7  well as he had before?
8      A.  Yes.
9      MR. LIGHTFOOT:  No further questions.
10          FURTHER EXAMINATION
11  BY MR. MULLEN:
12      Q.  Ms. Ling, when did you have that
13  conversation with Mr. Barnes?
14      A.  I do not know the exact date.
15      Q.  Do you have a whereabouts of when it
16  would be?
17      A.  No.
18      Q.  So you do not recall the date that it
19  took place.  You just recall that the
20  conversation happened?
21      A.  Yes.
22      Q.  And you recall in detail how that
23  conversation took place?

Page 78

1      A.  Yes.
2      Q.  Do you recall every time that Mr. Barnes
3  had some kind of sidebar comment?
4      A.  No.
5      Q.  Do you recall the subject of each time
6  that Mr. Barnes had some kind of sidebar comment
7  that you didn't think gives rise to a complaint?
8      A.  No.
9      MR. MULLEN:  No further questions.
10          FURTHER EXAMINATION
11  BY MR. LIGHTFOOT:
12      Q.  Did you work with him?  Were you the
13  supervisor of the department over him for like a
14  two- or three-year period?
15      A.  Yes.
16      Q.  Did you see him every week?
17      A.  No.
18      Q.  All right.  Would you see him -- how
19  often would you see him?
20      A.  Well, maybe once a week if they were
21  working in the office.  They were allowed to work
22  remotely so they did not always come into the
23  office.

Page 79

1      Q.  Did you ever have casual conversation
2  with Mr. Barnes?
3      A.  Yes.
4      MR. LIGHTFOOT:  No further questions.
5      MR. MULLEN:  No further questions.
6
7  FURTHER DEPONENT SAITH NOT.

Page 80

1          C E R T I F I C A T E
2  STATE OF ALABAMA
3  AT LARGE
4
      I hereby certify that the above and foregoing
5  deposition of NANCY LING was taken down by me in
  stenotype and the questions and answers thereto
6  were transcribed by means of computer-aided
  transcription, and that the foregoing represents
7  a true and correct transcript of the testimony
  given by said witness upon said hearing.
8
      I further certify that I am neither of
9  counsel, nor of kin to the parties to the action,
  nor am I in anywise interested in the result of
10  said cause.
11      I further certify that I am duly licensed by
  the Alabama Board of Court Reporting as a
12  Certified Court Reporter as evidenced by the ACCR
  number following my name found below.
13
      So certified on this date, May 15, 2025.
14
15
16
17      /s/Karen Smith
  Karen Smith, CCR
18      ACCR #96, Expires 9/30/2025
  Commissioner for the State
19      Of Alabama at Large
  My Commission Expires 1/10/2028
20
21
22
23



**EXHIBIT**

1

**Kelli Truitt**

| | |
|---|---|
| **From:** | Nancy Ling |
| **Sent:** | Tuesday, February 27, 2024 5:45 PM |
| **To:** | Susan Johnston; Kelli Truitt |
| **Subject:** | RE: Urgent Matter |

I have completed additional investigations and my responses are below in red- I also have a statement in writing from Laquesha that at 3:17PM today that Nic called her and told her that he was going to get Ursula fired for messing with him. She verbally stated that Nic said if I have to go, Ursula is going too as well as MANY other things.. I will scan this document to you and send in a separate email. ......with everything that Nic said about myself and Ursula as listed below I am concerned about our safety as well. The false statements below are so untrue, especially the ones regarding violence that his statement to Laquesha today really bothers me. The statement he made to Laquesha is a direct threat to Ursula and myself. I can speak in person to you regarding other concerns with Nic's track record of untrue statements. Nic has gone around telling people he has 1.1 M in the bank and he doesn't need to work, he tried to show me as well as Laquesha his bank balances and said, I'm retiring and going to play basketball overseas. I have several people stop me to tell me that Nic was saying things about Ursula and that she was the reason he was leaving....he stated to me that Ursula didn't like him and that's why he was leaving, I told him that was not the case, and to talk with her or that we could all have a meeting. He refused saying it would only make things worse.

Laquesha's written statement will be forthcoming in a separate email.

Thank you

**Nancy W Ling**
Director- Supply Chain Services
2000 Pepperell Parkway
Opelika, AL. 36801
Office- 334-528-4227
Mobile- ███████
Email- nancy.ling@eamc.org
East Alabama
Health ✛

**From:** Susan Johnston <susan.johnston@eamc.org>
**Sent:** Tuesday, February 27, 2024 4:23 PM
**To:** Nancy Ling <nancy.ling@eamc.org>; Kelli Truitt <kelli.truitt@eamc.org>
**Subject:** Re: Urgent Matter

CONFIDENTIAL

EAMC/Barnes_00310

Thanks Nancy

Get Outlook for iOS

---

**From:** Nancy Ling <nancy.ling@eamc.org>
**Sent:** Tuesday, February 27, 2024 3:56:15 PM
**To:** Kelli Truitt <kelli.truitt@eamc.org>; Susan Johnston <susan.johnston@eamc.org>
**Subject:** Re: Urgent Matter

I have not had any complaints- I can tell you that he and Laquesha were asked to wear scrubs due to helping out in other areas, dock, storeroom, etc because we are short staffed and we didn't want them to get their clothes messed up- Nic has referred to Ursula as "his momma" several times and her response has always been "I'm not your mother" that was said just last week but he's said it multiple times- I have a call at 4 with Commure but I will answer more in more detailed fashion shortly- for the record, Nic has a reputation of "stretching the true"-

Nancy W.Ling
Director- Supply Chain Services
2000 Pepperell Parkway
Opelika, AL. 36801
Office: 334-528-4227
Mobile ▮▮▮▮▮▮▮▮
Email: Nancy.ling@eamc.org

---

**From:** Kelli Truitt <kelli.truitt@eamc.org>
**Sent:** Tuesday, February 27, 2024 3:45:01 PM
**To:** Susan Johnston <susan.johnston@eamc.org>; Nancy Ling <nancy.ling@eamc.org>
**Subject:** Re: Urgent Matter

Yes, I agree.  I will let him know.

Kelli

Get Outlook for iOS

---

**From:** Susan Johnston <susan.johnston@eamc.org>
**Sent:** Tuesday, February 27, 2024 3:42:33 PM

CONFIDENTIAL

EAMC/Barnes_00311

**To:** Nancy Ling <nancy.ling@eamc.org>; Kelli Truitt <kelli.truitt@eamc.org>
**Subject:** RE: Urgent Matter

I agree Nancy that these statements are incredibly inflammatory.  We do have a responsibility to investigate to be sure that they are false statements.  Have you had any other complaints related to Ursula's leadership or leadership style that we should be aware of?

Kelli, I say we tell Nicholas that we take his complaints seriously and do not want him to feel that he needs to stay in the environment.  He is welcome to not return to the office and we will pay him out the remainder of his notice.

**From:** Nancy Ling <nancy.ling@eamc.org>
**Sent:** Tuesday, February 27, 2024 3:27 PM
**To:** Kelli Truitt <kelli.truitt@eamc.org>; Susan Johnston <susan.johnston@eamc.org>
**Subject:** Re: Urgent Matter

Kelli-

The depth of these false statements is alarming- I will go through each one and provide my perspective but not one thing in these statements, except maybe who he talked to outside our office recently, is true to my knowledge and specifically anything with my name attached- If anything, it is a serious character assassination on both my and Ursula's character and integrity. I do not think it would be wise for him to return back to the office-

Nancy

Nancy W.Ling
Director- Supply Chain Services
2000 Pepperell Parkway
Opelika, AL. 36801
Office: 334-528-4227
Mobile: ██████████
Email: Nancy.ling@eamc.org

**From:** Kelli Truitt <kelli.truitt@eamc.org>
**Sent:** Tuesday, February 27, 2024 3:15:32 PM
**To:** Nancy Ling <nancy.ling@eamc.org>; Susan Johnston <susan.johnston@eamc.org>
**Subject:** FW: Urgent Matter

CONFIDENTIAL

EAMC/Barnes_00312

**From:** Nicholas Barnes <nicholas.barnes@eamc.org>
**Sent:** Tuesday, February 27, 2024 3:13 PM
**To:** Kelli Truitt <kelli.truitt@eamc.org>
**Subject:** RE: Urgent Matter

I spoke with Mrs. Nancy numerous times about the things that keep happening and she asked me would I like to have a sit down with the three of us but I feel like that she will try to intimate me into saying the things she wants me to say in the meeting honestly. Mrs. Kelli, I have worked here 5 years and everyone knows me for being a hard worker and not confrontational. For me and to feel uncomfortable about working this job is not right at all. I am not the only employee that is being treated like this. I may get treated worse for speaking out about the situation from her at times because but there are other employees that are treated in a horrible way also. I am sorry if I caused any problems but I feel like my wellbeing should mattered here at EAMC and I should not have to look around while going to my car because of threats from her.

**Nicholas Barnes**
Contract Coordinator
Supply Chain Services
The East Alabama Health Care Authority
2000 Pepperell Pkwy
Opelika, AL 36801
**Office:** (334)528-4247
**Mobile** ███████████
Sent from Mail for Windows

East Alabama
Health ⊹

---

**From:** Kelli Truitt <kelli.truitt@eamc.org>
**Sent:** Tuesday, February 27, 2024 2:45:19 PM
**To:** Nicholas Barnes <nicholas.barnes@eamc.org>
**Subject:** RE: Urgent Matter

Nicholas,

Thank you again for bringing these concerns to my attention. I will continue to investigate this with Nancy Ling.
Could you please specify which Vice Presidents you spoke to about this?

Thank you,

Kelli

4

CONFIDENTIAL

EAMC/Barnes_00313

**From:** Nicholas Barnes <nicholas.barnes@eamc.org>
**Sent:** Tuesday, February 27, 2024 12:05 PM
**To:** Kelli Truitt <kelli.truitt@eamc.org>
**Subject:** Urgent Matter

Hey Mrs. Kelli,

I have reached out to numerous directors and vice presidents about my issues with Ursula Means. Mrs. Ursula has harassed me constantly to the point of making me put in my two weeks notice. I do not feel safe at all going to my car after work because of the comments that she has made towards me. There have been incidents happening over and over. I spoke with Nancy Ling, John Morris, Chris waits , Chuck beams, Brenda Clarke, Sutricia Johnson, and others about the problem that is going on.

I have spoke with Mrs. Nancy Ling the director of the department on the matter numerous times and she has not done anything about the matter of the constant harassment from Mrs. Ursula Means. I fear that she has not done anything because she brought Mrs. Ursula in with her from her previous company. There has been numerous things that has happened.

1. I was told that I should stop wearing my formal clothing to work and only wear scrubs into work. I agreed to only wear scrubs to work but I mentioned that Mrs. Nancy stated that it was fine to wear them to work sometimes and Mrs. Ursula stated that she would rather seem me in scrub pants and made a sexual look at me. I acted as I didn't hear her and started back doing my work. We asked them both to wear scrubs when they were in the office because we might need their help in others areas (storeroom, loading dock, warehouse, etc) and we did not want them to ruin their work attire. This is one reason you see most of us in scrubs on a daily basis. We help out if multiple areas. Ursula stated she never made any comments, sexual or otherwise, to Nic regarding scrubs other than what I explained above.

2. I also had a meeting with Mrs. Ursula in her office because she wanted to have a heart to heart talk. I took the meeting with her and stated that I would not like to be friends but I would like to keep things professional while working. She got upset and stated that I should leave her office with my ugly face. I asked Ursula if she had ever had a meeting with Nic in her office where any inappropriate comments were made by her or Nic, she stated she has never made the comments above but Nic has called her "his momma" on several occasions and Ursulas has responded to him that I am not your mother.

3. The next day she came back to my office and stated that I look like a scary employee. That she could get someone to whoop on me. Ursula stated she has never spoken to anyone in those words nor ever threatened anyone, including Nic.

4. Ursula Means stated that she was going to fire me or make me quit to a employee name Laquesha Lester that is in the department. Her and Laquesha are best friends in the department because they were brought into EAMC together by Mrs. Nancy from a different hospital. Laquesha told me this because she stated that I should start looking for a new job. Because Mrs. Ursula wanted to bring in someone named Ashley for my position. Ursula stated she has never threatened Nic or anyone else with firing or to make them quit. While it is true that both Laquesha and Ursula did come from Baptist, they are co-workers and not friends outside of the office setting. As a caveat, I know the Ashley he is referring to and neither Ursula nor I would hire her to work here nor suggest to anyone here to hire her.

5. I was working at my desk upstairs in the department and she stated that I should get my things and move them to the EVS closet because I was useless. I asked to please be moved some where else because the EVS utility closet is not for office use. She moved me to the Cath lab materials room. And gave my office to her Laquesha Lester. I was the one who moved the employees around and it was never suggested to Nic that he was being moved to any

5

EVS closet. We had moved Marie downstairs in Radiology and they needed that space back so we moved Nic to the Cath Lab area with David. We did not move Laquesha down there because she was helping the buyers with pricing/contracting/etc and it made more sense to keep her near the two buyers upstairs. I have no idea where the EVS closet even is-Laquesha's office was already upstairs. We moved Marie in to Nic's old office, not Laquesha.

6. Also I have noticed that my times were not being approved on time and it was giving me missed punches. It gave me 19 missed punches and I have never been over 7 before she came. I reach out to Mrs. Penny in payroll and she stated that it was not being approved by Ursula Means. And that she would talk to her. I asked Mrs. Penny and Lisa wolf please not state that I asked about it because it would only make the situation that I am in worse. After they reached out to Mrs. Ursula she called me into her office the same day and asked did I snitch on her. And stated that if she gets fired or in trouble she will have her son and nephew to mess me up and whoop me in the parking lot. Ursula spoke to Penny on several occasions regarding Nic's punches. The issue was he was clocking in on his computer in EST and Ursula and Penny realized that if she didn't approve it the day the entry was made, it wouldn't allow him to clock in the next day. Once they had he and Laquesha begin using Infor to do this, the issue resolved itself. There was no comment made to Nic about snitching, or threatening to have her son or nephew cause violence toward him.

7. Today she called me into a meeting and she stated that she understands that I may have checked out and I stated that I have not checked out I am a loyal worker until the end, I have been a hard worker for 5 years but I can not continue to receive the parking lot threats. She pulled her glasses on top of her head and stated that she does and says whatever she chooses. They are not threats that they are promises. "Laquesha and Nic were both in Ursula's office today and this conversation that he is stating did not happen, no threats were made and no comments regarding promises were made. They discussed a contract and PO that was not done correctly.

Nic has felt that Ursula is "picking on him" because there are several times that PO's have needed to be corrected and he made the statement to me "that he know's what he's doing"....however, these mistakes have been made and Ursula has been trying to work with him and Laquesha, Charlotte, and Kay on new processes, much of this is due to our new system that we will be putting in place. We have been working with the buyers, contract coordinators, inventory staff, etc updating processes and making changes across the board.

**Nicholas Barnes**
Contract Coordinator
Supply Chain Services
The East Alabama Health Care Authority
2000 Pepperell Pkwy
Opelika, AL 36801
Office: (334)528-4247
Mobile ███████████
Sent from Mail for Windows

East Alabama
Health ✚

CONFIDENTIAL

EAMC/Barnes_00315