## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **NICHOLAS BARNES,** | ) | |
| **an individual,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO:** |
| | ) | |
| **EAST ALABAMA MEDICAL** | ) | **3:24-cv-00512** |
| **CENTER FOUNDATION, d/b/a** | ) | |
| **EAST ALABAMA MEDICAL** | ) | |
| **CENTER,** | ) | |
| **a nonprofit corporation,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## PLAINTIFF'S EVIDENTIARY SUBMISSION IN SUPPORT OF HIS REPSONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Exhibit A – Transcript of Kelli Truitt's Deposition w/ exhibits.

                                        */s/ Jon-Kaden Mullen*
                                        D. Jeremy Schatz
                                        Jon-Kaden Mullen
                                        *Attorneys for Plaintiff*

OF COUNSEL:
Virtus Law Group
2017 Morris Ave, Ste 100
Birmingham, AL 35203
js@vlgal.com
jm@vlgal.com
205-946-1924

# EXHIBIT A

# NICHOLAS BARNES

## vs

## EAST ALABAMA MEDICAL CENTER FOUNDATION, et al.

## KELLI TRUITT

### April 30, 2025



www.alabamareporting.com  *  877.478.3376

**Page 1**

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE MIDDLE DISTRICT OF ALABAMA
3        EASTERN DIVISION
4    CIVIL ACTION NO.: 3:24-cv-00512
5
6   NICHOLAS BARNES,
7    Plaintiff,
8   v.
9   EAST ALABAMA MEDICAL CENTER
10   FOUNDATION d/b/a EAST ALABAMA
11   MEDICAL CENTER,
12    Defendant.
13
14      DEPOSITION TRANSCRIPT OF
15        KELLI TRUITT
16        April 30, 2025
17        9:05 A.M.
18      The deposition of KELLI TRUITT was
19   taken before Karen Smith, CCR, on April 30, 2025,
20   by Jon-Kaden Mullen, Esq., commencing at
21   approximately 9:05 A.M., via Zoom, pursuant to
22   the stipulations set forth herein.
23

**Page 2**

1      S T I P U L A T I O N
2     IT IS STIPULATED AND AGREED by and
3   between the parties through their respective
4   counsel that the deposition of KELLI TRUITT may
5   be taken before Karen Smith, CCR and Notary
6   Public, State of Alabama at Large, via Zoom, on
7   April 30, 2025, commencing at approximately 9:05
8   A.M.
9     IT IS FURTHER STIPULATED AND AGREED that
10   it shall not be necessary for any objections to
11   be made by counsel to any questions, except as to
12   form or leading questions and that counsel for
13   the parties may make objections and assign
14   grounds at the time of trial or at the time said
15   deposition is offered in evidence, or prior
16   thereto.
17     IT IS FURTHER STIPULATED AND AGREED that
18   notice of filing of the deposition by the
19   Commissioner is waived.
20
21
22
23

**Page 3**

1     A P P E A R A N C E S
2
3 ON BEHALF OF THE PLAINTIFF, NICHOLAS BARNES:
4    Jon-Kaden Mullen, Esq.
5    VITRUS LAW GROUP
6    2017 Morris Avenue, Suite 100
7    Birmingham, AL 35203
8    jm@vlgal.com
9
10 ON BEHALF OF THE DEFENDANT, EAST ALABAMA MEDICAL
11 CENTER FOUNDATION d/b/a EAST ALABAMA MEDICAL
12 CENTER:
13    Warren B. Lightfoot, Jr., Esq.
14    MAYNARD NEXSEN, P.C.
15    1901 6th Avenue North, Suite 1700
16    Birmingham, AL 35203
17    wlightfoot@maynardsexsen.com
18
19 ALSO PRESENT:
20    Nancy Ling
21
22
23

**Page 4**

1      EXAMINATION INDEX
2 KELLI TRUITT
3    BY MR. MULLEN            6
4
5       EXHIBIT INDEX
6 Plaintiff's
7   1    Deposition notice          18
8   2    Text messages           59
9   3    Defendant's production 292-295     65
10
11
12
13
14
15
16
17
18
19
20
21
22
23



Page 5

1    I, Karen Smith, a Court Reporter of
2  Birmingham, Alabama, and a Notary Public for the
3  State of Alabama at Large, acting as
4  Commissioner, certify that on this date, as
5  provided by the Alabama Rules of Civil Procedure
6  and the foregoing stipulation of counsel, there
7  came before me on the 30th day of April, 2025,
8  via Zoom, commencing at approximately 9:05 A.M.,
9  KELLI TRUITT, witness in the above cause, for
10  oral examination, whereupon the following
11  proceedings were had:
12            KELLI TRUITT,
13  being first duly sworn, was examined and
14  testified as follows:
15       COURT REPORTER:  The attorneys
16  participating in this proceeding acknowledge
17  that I am not physically present with the
18  witness and that I will be reporting this
19  proceeding remotely.
20       They further acknowledge that the
21  witness will be sworn in remotely by me.
22       The parties acknowledge that, due to
23  the nature of technology, connections may drop

Page 6

1  or freeze during the deposition and the
2  reporter may have to interrupt for clarity.
3       The parties acknowledge that if they do
4  not wish to consent to this proceeding being
5  held remotely, they should state their
6  objections at this time.
7    Are there any objections?
8       MR. LIGHTFOOT:  No objections.
9       MR. MULLEN:  No objections.
10       COURT REPORTER:  Otherwise, are we
11  under the usual stipulations?
12       MR. MULLEN:  Yes.
13       MR. LIGHTFOOT:  On the usual
14  stipulations, Kelli -- I'm talking to you
15  now -- you have the right to read and sign in
16  case you think -- our court reporter is going
17  to do her best and will do probably a great job
18  getting every single word right.  You have the
19  ability to read and sign after your deposition.
20  Why don't we just go ahead and do that.
21       Let's do that.  So we will do read and
22  sign, Karen, and then otherwise we're good.
23            EXAMINATION

Page 7

1  BY MR. MULLEN:
2    Q.  Good morning, everyone.  My name is a
3  Jon-Kaden Mullen.  I'm here with the Virtus Law
4  Group, and I represent Nicholas Barnes, the
5  plaintiff in this matter.  I just want to go
6  over a few housekeeping things before we move
7  forward.  Please do your best to answer all my
8  questions verbally.  Especially here on Zoom,
9  there might be some things that aren't picked
10  up very well, one of those being physical
11  movements like head nodding or head shaking.
12  The court reporter may not be able to see or
13  record that information.  So if you can make
14  sure that you answer each of my questions
15  verbally, and since we're via Zoom,, you know,
16  make sure to project your voice.  That way we
17  can ensure that the mic picks everything up and
18  our court reporter can hear everything.
19       You know, please wait until I finish my
20  question before answering.  I don't want any
21  instance where the record becomes unclear
22  because I was asking -- answered a question
23  before I completed asking just to make sure

Page 8

1  everything stays clean.  Along the same lines,
2  when you answer verbally, please do your best
3  to say yes or no.  Try not to say words like
4  uh-huh and huh-uh, especially here on Zoom.
5  They will sound extremely similar, and the
6  court reporter may not be able to distinguish
7  the two and it will appear the very same on a
8  deposition transcript.  So please make sure to
9  always try to answer yes or no.
10       If you ever have a question, please ask
11  me to rephrase the question that I've asked.
12  I'm not trying to ask any gotcha questions or
13  trip you up on anything.  So if I ever ask a
14  question that you don't quite understand,
15  please don't hesitate to say, Hey, I don't
16  understand.  Would you mind rephrasing that
17  question?  And I will be happy to do so to the
18  best of my ability.
19       Finally, if you ever need to take a
20  break, just let me know.  If you ever need to
21  stop and get some water, go to the restroom,
22  I'm happy for us to take a short break.  That
23  way you can do whatever you need to do.  My



Page 9

1  only request is that we don't take a break
2  while a question is standing.  Let's go ahead
3  and get any kind of response to my question,
4  and then we can take that break.
5      Do you understand everything that I
6  just asked you?
7      A.  Yes.
8      Q.  Okay.  Now, can you please state your
9  name -- your full name for the record?
10     MR. LIGHTFOOT:  And one other quick
11  thing, Kelli.  This is all just as if Jon-Kaden
12  were here and the court reporter were here.
13  We're just able to do this by technology.  What
14  I would say is when he asks a question -- on
15  his earlier questions you don't need to worry
16  about it, but as we start getting into it, just
17  make sure that you don't answer him real fast
18  because I may need the opportunity to jump in
19  to object.  And then you will probably still
20  end up answering.  Just give me a chance to
21  object.
22     THE WITNESS:  Yes, sir.
23     Q.  (BY MR. KADEN)  Okay.  And can you

Page 10

1  please state your full name for the record?
2      A.  Kelli Truitt.
3      Q.  And, Ms. Truitt, have you ever been
4  deposed before?
5      A.  I have.
6      Q.  You have?
7      A.  Yes.
8      Q.  How many times have you been deposed?
9      A.  One time.
10     Q.  So you understand that the questions
11  that I'm asking you today and your testimony
12  here is under oath and under the penalty of
13  perjury?
14     A.  Yes.
15     Q.  Have you ever been a plaintiff or a
16  defendant in a lawsuit before?
17     A.  No.
18     Q.  Have you ever been arrested or
19  convicted of a crime before?
20     A.  No.
21     Q.  Are you taking any medication or have a
22  medical condition that could affect your
23  memory, your ability to testify truthfully, or

Page 11

1  the ability to read any documents that I put
2  before you today?
3      A.  No.
4      Q.  Thank you.  Ms. Truitt, can you
5  describe your education background?
6      A.  I have -- I'm a registered nurse, and I
7  have an associate's degree, a bachelor's
8  degree, and a master's degree in nursing.  My
9  master's degree is specifically in nursing
10  administration and education.
11     Q.  Where did you attend high school?
12     A.  Auburn High School.
13     Q.  What year did you graduate?
14     A.  1998.
15     Q.  Did you go to college right after
16  graduation?
17     A.  Yes.
18     Q.  What college did you attend?
19     A.  Immediately following high school
20  graduation, Southern Union State Community
21  College.
22     Q.  How long were you at Southern Union?
23     A.  Three years.

Page 12

1      Q.  Did you obtain your associate's degree
2  from Southern Union?
3      A.  Yes.
4      Q.  Where did you go after Southern Union?
5      A.  The University of South Alabama in
6  Mobile.
7      Q.  How long were you there?
8      A.  Approximately 18 months.
9      Q.  Did you receive your bachelor's degree
10  from University of South Alabama?
11     A.  Yes.
12     Q.  What was that bachelor's degree in?
13     A.  Nursing.
14     Q.  Where did you go after South Alabama?
15     A.  Auburn University.
16     Q.  How long were you at Auburn University?
17     A.  Approximately 18 months to two years.
18     Q.  So somewhere between 18 months and two
19  years?
20     A.  Yes.
21     Q.  When did you graduate from Auburn
22  University?
23     A.  2011.



Page 13

1   Q. And is that where you received your
2   master's in nursing administration?
3   A. Yes.
4   Q. Did you go anywhere else after Auburn
5   University?
6   A. No.
7   Q. Following going to Auburn University,
8   where did you go to work after that?
9   A. East Alabama Health. East Alabama
10  Medical Center.
11  Q. Okay. So you started working for East
12  Alabama Medical Center directly after getting
13  your master's degree at Auburn?
14  A. I was employed at the time I completed
15  my master's degree with East Alabama Medical
16  Center.
17  Q. When did you start at East Alabama
18  Medical Center?
19  A. 2005.
20  Q. What was your first position with East
21  Alabama Medical Center?
22  A. I was a charge nurse in one of our
23  nursing departments.

Page 14

1   Q. How long were you a charge nurse?
2   A. About two and a half years.
3   Q. What department was this in?
4   A. Our Progressive Care Unit.
5   Q. I'm sorry. Can you say that one more
6   time?
7   A. Yes. Progressive Care Unit.
8   Q. So you started in 2005. So about 2007
9   you stopped being a charge nurse at EAMC?
10  A. I was promoted to the manager position
11  in 2007 on the Progressive Care Unit.
12  Q. What were your duties as the manager of
13  the progressive care unit?
14  A. It was an 18-bed critical care unit.
15  So I was responsible for the day-to-day
16  operations, ensuring that staff were present
17  and available to care for the patients. I had
18  the financial responsibility of the department,
19  employee concerns. All pieces of what was
20  required to run the department fell to me as
21  the manager.
22  Q. Okay. How long were you the manager of
23  the progressive care unit?

Page 15

1   A. Almost 12 years.
2   Q. So in 2019, you quit being the manager
3   of the progressive care unit?
4   A. It was actually 2018.
5   Q. Okay. So what position did you have
6   with the company -- and let me rephrase it. If
7   I say "the company" or "EAMC," you understand
8   that I'm referring to the defendant in this
9   matter?
10  A. Yes.
11  Q. Okay. So in 2018, what position did
12  you take with the company?
13  A. Manager of human resources.
14  Q. And is that your current role today?
15  A. I'm currently the director of human
16  resources.
17  Q. What were your responsibilities as the
18  manager of human resources?
19  A. I had direct responsibility for our
20  recruiting team. I assisted the director with
21  work comp matters, benefit matters, and
22  employee relations, and anything else that
23  falls into the scope of HR.

Page 16

1   Q. Okay. When were you promoted the
2   director of human resources?
3   A. 2019.
4   Q. Did you say 2019?
5   A. Yes.
6   Q. As director of human resources, what is
7   your job role?
8   A. I have full responsibility for the
9   human resources department, and underneath our
10  umbrella includes recruiting, FMLA, work comp,
11  benefits, our, you know, HRS reporting, again,
12  any responsibility up under HR.
13  Q. So you've been in human resources for
14  the entire time that's relevant in this
15  complaint starting with when my client began
16  working with the company in 2018; is that
17  correct?
18  A. Yes.
19  Q. Who do you report to?
20  A. Susan Johnston.
21  Q. And what is Ms. Johnston's position?
22  A. She is the vice president of human
23  resources and chief human resources officer.



Page 17

1  Q. Ms. Truitt, you understand that today
2 you've been designated by the company to
3 testify on specific topics; is that correct?
4  A. Yes.
5  Q. Have you had an opportunity to review
6 those topics with your attorney prior to today?
7  A. Yes.
8  Q. I'm going to share my screen. That way
9 you have a chance to see these topics as I have
10 sent them to your counsel and we can make --
11 enter them as an exhibit. Ms. Truitt, do you
12 see the document that I put on the screen here?
13  MR. LIGHTFOOT: Jon-Kaden, why don't
14 you make it bigger?
15  MR. MULLEN: All right. Let's see
16 here. And I just want to make sure. Do y'all
17 see it in Adobe? I can't see what it's showing
18 on my screen.
19  MR. LIGHTFOOT: It's just tiny. It
20 just needs blowing up.
21  Q. (BY MR. MULLEN) And so, Ms. Truitt, I
22 understand it's small so it's difficult to see
23 and we will work on seeing if we can find a way

Page 18

1 for future exhibits. But what I'm showing you
2 is the notice of 30(b)(6) deposition to the
3 East Alabama Medical Center and it includes the
4 16 matters that you and your attorney have
5 previously discussed today. And I'm going to
6 enter this in officially as Exhibit 1.
7  (Whereupon, Plaintiff's Exhibit 1
8   was marked for identification
9  and copy of same is attached hereto.)
10  MR. LIGHTFOOT: That's fine.
11  Q. (BY MR. MULLEN) So, Ms. Truitt, with
12 your understanding -- and I don't know if your
13 attorney has the notice with him today to make
14 it easier for you to review it. I'm going to
15 stop sharing and see if I can fix something.
16  MR. LIGHTFOOT: You just need to make
17 it full screen.
18  MR. MULLEN: Is that visible for
19 everyone?
20  THE WITNESS: Yes.
21  Q. (BY MR. MULLEN) And as I scroll through
22 on this screen, you see the matters to which
23 examination is requested. You see 1 through 4

Page 19

1 on the screen currently. Are you prepared
2 today to testify on matters that include the
3 Paragraphs 1 through 4?
4  A. Yes.
5  Q. And then I've now scrolled down to
6 Paragraphs 5 through 9 or matters 5 through 9.
7 Have you reviewed the documents and are
8 prepared to testify to the items listed in 5
9 through 9 today?
10  MR. LIGHTFOOT: Objection as to
11 "reviewed the documents." But is she prepared
12 to testify?
13  MR. MULLEN: Prepared to testify on the
14 matters.
15  MR. LIGHTFOOT: She's prepared to
16 testify on every one of these topics. And you
17 saw our objection as to Number 8 for sure.
18 That is not relevant to this lawsuit. So we
19 object to that. But everything else is
20 probably fair game.
21  Q. (BY MR. MULLEN) Okay. All right. Then
22 we will move forward with asking questions
23 related specifically to those 30(b)(6)

Page 20

1 documents and we will enter in the notice as
2 Exhibit 1.
3  Ms. Truitt, what did you do to prepare
4 for today's deposition?
5  A. I met with our lawyers.
6  Q. Did you do anything else besides
7 meeting with your lawyers?
8  A. I did review the document that you had
9 previously on the screen and other documents
10 related to this case.
11  Q. What other documents did you review?
12  A. Our response.
13  Q. Response to discovery?
14  A. Yes.
15  Q. Okay. Does that include your document
16 production?
17  A. I don't know what you're considering
18 document production.
19  Q. So you said, Your response. I asked,
20 Your discovery responses? You said, Yes. And
21 I'm asking did that review include the
22 documents that you sent over in discovery.
23  A. Yes. I don't know that I reviewed



Page 21

1  every single one.
2  **Q. Okay. Well tell me which ones you did**
3  **review.**
4      A. The -- as stated previously, the
5  interrogatories and our response.
6  **Q. Okay. Did you review anything else?**
7      A. Our employee handbook.
8  **Q. Anything else?**
9      A. No.
10  **Q. So for today's deposition, am I correct**
11  **in summarizing your review as the**
12  **interrogatories, your responses, and the**
13  **employee handbook?**
14      A. To the best of my ability, yes.
15  **Q. Okay. And you didn't review any other**
16  **documents for today?**
17      MR. LIGHTFOOT: Object to the form.
18      Go ahead, Kelli. You can try to answer
19  his question as best you can.
20      A. I believe I have reviewed some of the
21  email documents that were produced for this
22  case.
23  **Q. (BY MR. MULLEN) Okay. Some of the**

Page 22

1  **email documents? What email documents did you**
2  **review?**
3      MR. LIGHTFOOT: You need to answer his
4  question. It's sort of a silly question, but
5  you can try to tell him everything that you
6  remember reviewing since he seems to want to
7  know that.
8      I actually think I could object, but I
9  will go ahead and give you some latitude on
10  that question.
11      A. Emails that were sent to me while we
12  were looking and investigating this case.
13  **Q. (BY MR. MULLEN) Okay. Besides those**
14  **emails -- and I'm going to ask -- I mean, I**
15  **understand I asked that, but we are adding**
16  **documents each time I ask the question. So**
17  **anything else that was reviewed in preparation**
18  **for today?**
19      MR. LIGHTFOOT: Object to the
20  mischaracterization.
21      A. That's all.
22      MR. MULLEN: Is she free to answer?
23      MR. LIGHTFOOT: Sure.

Page 23

1      A. I don't recall.
2  **Q. (BY MR. MULLEN) Okay. Did you meet**
3  **with anybody to prepare for today's deposition**
4  **besides your attorneys?**
5      MR. LIGHTFOOT: Objection, asked and
6  answered.
7      I will let you answer it again, Kelli.
8      A. No.
9  **Q. (BY MR. MULLEN) Have you brought any**
10  **notes or any other documents to this deposition**
11  **today?**
12      A. No.
13  **Q. Did you have a role in collecting any**
14  **of the documents that were produced in this**
15  **litigation?**
16      A. Yes.
17  **Q. What was your role?**
18      A. I pulled documents that were required
19  that would need to be produced and sent those
20  to our lawyers.
21  **Q. Okay. Where does EAMC store their**
22  **documents?**
23      MR. LIGHTFOOT: Objection, vague.

Page 24

1      If you understand the question, you can
2  answer, Kelli.
3      A. That is -- it's difficult to answer
4  without having a specific document to speak to.
5  **Q. (BY MR. MULLEN) Okay. Well, let me**
6  **narrow it down some. The documents that were**
7  **produced for this litigation, where did EAMC**
8  **keep the documents that were produced in this**
9  **litigation?**
10      MR. LIGHTFOOT: Same objection. It's
11  vague.
12      Unless you know exactly every document
13  that we produced six months ago, Kelli, again,
14  you can do the best you can. I don't
15  understand the question, but you can answer the
16  best you can.
17      A. We have a policy center, policy program
18  where policies are kept, and we have a human
19  resources information system where other files
20  are kept.
21  **Q. (BY MR. MULLEN) What's the name of that**
22  **policy program?**
23      A. I don't recall.



Page 25

1    Q. Who would recall?
2        MR. LIGHTFOOT: Object to the form.
3    Go ahead.
4    A. Our director or manager in that area.
5    Q. (BY MR. MULLEN) Who is that director or
6 manager?
7    A. Michelle Blackmon.
8    Q. How did you collect the documents that
9 you produced in today's litigation?
10        MR. LIGHTFOOT: Objection.
11        If you remember everything that was
12 produced, you can answer the best you can.
13    A. I don't recall.
14    Q. (BY MR. MULLEN) Who would recall?
15        MR. LIGHTFOOT: Object to the form.
16        Do the best you can. I don't
17 understand questions like this, but do the best
18 you can.
19    A. Can you repeat your question?
20        MR. MULLEN: Madam Court Reporter, can
21 you repeat my question?
22        (Record read.)
23        MR. LIGHTFOOT: Object to the form,

Page 26

1 object to the vagueness, object to the
2 hypothetical. I don't understand it at all who
3 would recall.
4        But you go ahead, Kelli.
5    Q. (BY MR. MULLEN) Well, who would know
6 how the documents were collected?
7        MR. LIGHTFOOT: Now I understand that
8 question.
9    A. Okay. That makes -- yes. So, again,
10 we have a system, two systems that were used
11 for this, our policy system that we have -- any
12 employee has access to to look at policies. So
13 those can be pulled. And then our HRIS, we
14 have access to in HR to pull documents out of.
15    Q. (BY MR. MULLEN) Now, Ms. Truitt, were
16 you ever personally involved or have any
17 firsthand experience with any of the facts or
18 allegations that were listed in my client's
19 complaint?
20    A. Can you say that in a different way or
21 ask it in a different way? I don't understand.
22    Q. Absolutely. So my client has filed
23 their complaint, and they're alleging that

Page 27

1 certain actions have taken place. For any of
2 those actions, do you have any firsthand
3 knowledge that was not gathered through an
4 investigation of, you know, third-party
5 sources?
6    A. No.
7    Q. How many employees does EAMC currently
8 employ?
9    A. Approximately thirty-nine hundred.
10    Q. And how many employees did EAMC employ
11 while my client was employed at EAMC?
12    A. Approximately the same. Probably
13 closer to thirty-eight hundred.
14    Q. And it's my understanding that EAMC had
15 an employee handbook at the time my client was
16 employed; is that correct?
17    A. Yes.
18    Q. Who created the handbook?
19    A. I don't know. I don't recall.
20    Q. Is there anyone who would know?
21    A. I don't recall.
22    Q. You don't recall if anyone would know
23 the answer to that question?

Page 28

1    A. I would say that Susan Johnston may
2 have knowledge of that.
3    Q. When was the handbook created?
4    A. I don't have an exact date. We have
5 had the handbook for many, many years.
6    Q. Was the handbook altered at any time
7 during my client's employment with EAMC?
8    A. We do revisions at times. I do believe
9 it was revised in 2022.
10    Q. Prior to the 2022 revision, when was
11 the last time it was revised?
12    A. I don't recall.
13    Q. Who would know?
14    A. Maybe Susan Johnston.
15    Q. Has the handbook been revised since my
16 client's employment with EAMC ended?
17        MR. LIGHTFOOT: Objection. Object to
18 the form.
19        Go ahead. You can answer.
20    A. No.
21    Q. (BY MR. MULLEN) Who is responsible for
22 making alterations to the handbook?
23    A. Human resources, specifically Susan



Page 29

1  Johnston.
2  **Q. How does EAMC distribute its handbook**
3  **to the employees?**
4   A. It is provided at hire to our new
5  employees, and then every employee each year is
6  given information through our education system
7  regarding our handbook.
8  **Q. Okay. When you say every year they're**
9  **given information, is it the handbook -- like**
10  **the handbook all over again? Is it just**
11  **changes? Kind of give me an idea of what**
12  **information is given to them every year.**
13   A. It is a lesson reminding them about the
14  handbook, where it is located. And if there
15  are changes, those are made known. But, again,
16  that is not something that is done yearly.
17  **Q. Does EAMC provide training on the**
18  **handbook?**
19   A. Yes.
20  **Q. Can you please describe that training?**
21   A. The handbook is given to all new
22  employees during orientation, and then each
23  year every employee is given an electronic

Page 30

1  lesson explaining what the handbook is and
2  where it is located.
3  **Q. And you say that's an electronic**
4  **training. Is that a video that employees have**
5  **to sit through and watch? Do they have to**
6  **answer interactive questions? How does that**
7  **electronic training work?**
8   A. It's a PowerPoint presentation that
9  they are required to view and then answer
10  questions.
11  **Q. At the time that my client was employed**
12  **with EAMC, did EAMC have an anti-harassment**
13  **policy?**
14   A. Yes.
15  **Q. Can you please describe the harassment**
16  **policy at the time that my client was employed**
17  **with EAMC?**
18   MR. LIGHTFOOT: Object to the form.
19  Jon-Kaden, do you want her to refer to what
20  we've produced to you or do you just kind of
21  want her best description of it?
22   MR. MULLEN: She can give a best
23  description. I can put it up on the screen

Page 31

1  later and we can talk about it, but I just want
2  to hear her describe it first.
3   MR. LIGHTFOOT: Okay.
4   Kelli you can tell him what you
5  remember from the policy.
6   A. So it's outlined that we at East
7  Alabama Medical Center want our employees to
8  have a safe place to work and that we do not
9  tolerate harassment of any sort whether that be
10  sexual, age, race, gender, national origin, and
11  that we take it seriously if things like these
12  happen in our departments or on our campus and
13  we want those brought forward. If we are not
14  made aware of issues, those cannot be
15  investigated.
16  **Q. (BY MR. MULLEN) To the best of your**
17  **knowledge, did that policy ever change during**
18  **my client's employment?**
19   A. I don't recall.
20  **Q. Who would know?**
21   A. Possibly Susan Johnston.
22  **Q. Do both supervisors and nonsupervisor**
23  **employees have the same training regarding the**

Page 32

1  **handbook?**
2   A. Yes.
3  **Q. Do supervisors receive any special or**
4  **additional training regarding reporting or the**
5  **policies in the handbook?**
6   A. I don't recall.
7  **Q. Who would recall or who would know?**
8   A. Susan Johnston.
9  **Q. How does EAMC enforce its**
10  **anti-harassment policy?**
11   MR. LIGHTFOOT: Object to the form.
12   Go ahead and answer if you can.
13   A. Can you repeat that? I don't quite
14  understand what you're trying to say here.
15  **Q. (BY MR. MULLEN) When there is a**
16  **violation of anti-harassment policy, how does**
17  **EAMC enforce the policy on that person that**
18  **violates it?**
19   MR. LIGHTFOOT: Object to the form.
20   A. If we have something brought to us,
21  because, again, we cannot investigate anything
22  we are not aware of, we investigate the
23  allegation.



Page 33

1    Q. (BY MR. MULLEN) Okay. And we will get
2 back to the investigation later. Does EAMC
3 inform their employees of the right to file
4 complaints for violation of any kind of policy?
5       MR. LIGHTFOOT: Object to the form.
6 Asked and answered.
7       Go ahead you can answer it again.
8    A. Yes, as outlined in the our handbook.
9    Q. (BY MR. MULLEN) Are all employees
10 required by EAMC's policy to report instances
11 of violation of any kind of policy?
12    A. Yes.
13    Q. And that's both supervisors and
14 nonsupervisors, correct?
15    A. Yes.
16    Q. How can employees report instances of
17 harassment?
18    A. They can use the chain of command in
19 their department. So they can go to a
20 supervisor, manager, or director. If they are
21 not comfortable with that, they can reach out
22 to human resources.
23    Q. If an employee is not comfortable using

Page 34

1 the chain of command, can he report it to
2 another supervisor?
3    A. Yes.
4    Q. Is that supervisor then required to
5 report that to EAMC?
6    A. Yes.
7    Q. How does EAMC record complaints made by
8 employees?
9    A. I'm sorry. Repeat your question.
10    Q. How does EAMC record and make record of
11 complaints filed by employees?
12    A. We ask that the employee put their
13 concern or complaint in writing.
14    Q. What if the employee wants to make a
15 verbal complaint?
16    A. They have the right do that, but we
17 would ask that they put their complaint still
18 in writing so that we have record of that
19 complaint.
20    Q. If an employee were to report an
21 instance of a violation of one of these
22 policies to a supervisor, would that supervisor
23 make a written report?

Page 35

1       MR. LIGHTFOOT: Object to the form,
2 hypothetical.
3       Go ahead.
4    A. We would request that they also put it
5 in writing.
6    Q. (BY MR. MULLEN) Can you describe the
7 investigation process that EAMC takes when it
8 receives a harassment complaint?
9    A. Once the complaint is received, we take
10 it back to department heads where the complaint
11 has occurred and start an investigation.
12    Q. Describe the process that EAMC takes
13 for those investigations.
14    A. As stated, once we receive a complaint,
15 we consider where the complaint has occurred
16 and involvement and go back to the management
17 in that department to start the investigation.
18    Q. And my question is, when you start that
19 investigation, what is that investigation?
20    A. We ask them to review the complaint,
21 investigate, and respond with what they have
22 found.
23    Q. Okay. What investigation is the

Page 36

1 department head supposed to take?
2    A. I would say that depends on the
3 complaint.
4    Q. Okay. A harassment complaint. If EAMC
5 receives a harassment complaint, they go to
6 their department head and ask that department
7 head to investigate, what actions does that
8 department head -- what actions is that
9 department head supposed to take in order to
10 investigate?
11       MR. LIGHTFOOT: Object to the form.
12       You can answer.
13    A. They are expected to speak to any
14 involved parties and receive feedback regarding
15 the complaint and then provide that
16 investigation back to human resources.
17    Q. (BY MR. MULLEN) What information as
18 part of this investigation does EAMC take and
19 record?
20    A. Can you define what you mean by take
21 and record?
22    Q. So when they conduct these
23 investigations, what kind of information does



Page 37

1 EAMC include in a report?

2   A. The investigation regarding

3 conversations had during the investigation with

4 any parties that were involved.

5   Q. How long does EAMC retain the results

6 of the investigation?

7       MR. LIGHTFOOT: Object to the form.

8       Answer if you can.

9   A. We keep it as part of record in the

10 employee's file.

11   Q. (BY MR. MULLEN) So do they keep it in

12 perpetuity? Do they keep it five years? How

13 long does EAMC keep these records?

14       MR. LIGHTFOOT: Object to the form.

15   A. I don't recall.

16   Q. (BY MR. MULLEN) Who would know?

17       MR. LIGHTFOOT: Object to the form.

18   A. I would say our records department.

19   Q. (BY MR. MULLEN) Who is over the records

20 department?

21       MR. LIGHTFOOT: Object to the form.

22       Go ahead.

23   A. I don't recall.

Page 38

1   Q. (BY MR. MULLEN) Who would know?

2       MR. LIGHTFOOT: Objection.

3       Go ahead.

4   A. Marcilla Gross.

5   Q. (BY MR. MULLEN) Can you say that name

6 one more time?

7   A. Marcilla, M-A-R-C-I-L-L-A, Gross,

8 G-R-O-S-S.

9   Q. How does EAMC determine whether a

10 complaint has merit or is substantiated?

11       MR. LIGHTFOOT: Same objection. I'm

12 sorry. Object to the form.

13       Go ahead.

14   A. Once we complete our investigation, we

15 review the investigation and then determine

16 whether or not we feel the allegations were

17 substantiated.

18   Q. (BY MR. MULLEN) How do you make that

19 determination?

20   A. Based off whether we were able to

21 factualize any of the allegations.

22   Q. Discuss EAMC provide any kind of

23 training on how to investigate complaints of

Page 39

1 discrimination or retaliation?

2       MR. LIGHTFOOT: Object to the form to

3 the extent it's been asked and answered.

4       Go ahead.

5   A. As stated earlier, all employees

6 receive a yearly reminder of our handbook that

7 does show expectation around harassment.

8   Q. (BY MR. MULLEN) And I understand that

9 EAMC provides the handbook on what the

10 expectation is. My question is, does EAMC

11 provide any specific training to the human

12 resources or department heads on how to conduct

13 an investigation when a complaint is filed?

14       MR. LIGHTFOOT: Objection.

15       Go ahead.

16   A. I don't recall.

17   Q. (BY MR. MULLEN) Who would recall or who

18 would know?

19   A. Susan Johnston.

20   Q. When an employee submits a complaint,

21 are they kept up to date as to the status of

22 the investigation?

23       MR. LIGHTFOOT: Object to the form.

Page 40

1       Go ahead.

2   A. It would depend on if we were able to

3 substantiate concerns.

4   Q. (BY MR. MULLEN) So when you say it

5 depends on whether you're able to substantiate

6 it, does that mean the in some instances they

7 wouldn't be kept up to date regarding the

8 investigation?

9       MR. LIGHTFOOT: Object to the form.

10   A. I don't recall.

11   Q. (BY MR. MULLEN) Who would know?

12       MR. LIGHTFOOT: Object to the form.

13   A. I don't know that I can say anyone who

14 would know that because that is specific to

15 each situation.

16   Q. (BY MR. MULLEN) So EAMC does not have a

17 standard procedure on keeping employees up to

18 date?

19       MR. LIGHTFOOT: Object to the form.

20   A. I don't recall.

21   Q. (BY MR. MULLEN) Who would know whether

22 EAMC has a standard procedure on whether they

23 keep employees up to date regarding



Page 41

1  investigations?
2      MR. LIGHTFOOT:  Same objection.
3      A.  Susan Johnston.
4      Q.  (BY MR. MULLEN)  Okay.  I would like to
5  turn our attention to more focused off of the
6  policies and procedures of EAMC and more
7  focused in on specifically the allegations of
8  my client.
9      MR. LIGHTFOOT:  Jon-Kaden, we've been
10  going for an hour so let's take our first
11  break, please.
12      MR. MULLEN:  Let's take a five-minute
13  break.
14      MR. LIGHTFOOT:  Ten-minute break.
15      (Short recess.)
16      Q.  (BY MR. MULLEN)  So we're back from a
17  short ten-minute break.  Just before the break
18  I was saying how I'm wanting to move out of the
19  policies and procedures of EAMC and move
20  into some of the facts regarding my client's
21  employment.  My client began working at EAMC in
22  2018; is that correct?
23      A.  Yes.

Page 42

1      Q.  And what does EAMC's record show as my
2  client's start date?
3      A.  I don't recall the exact start date.
4      MR. LIGHTFOOT:  Do you have the
5  documents that we produced?  Jon-Kaden, didn't
6  we produce the personnel file?
7      MR. MULLEN:  I do have the documents
8  you produced.
9      MR. LIGHTFOOT:  I don't know why it
10  matters, the exact date.  I think it was 2018
11  too, but who cares.  Go ahead.  You can ask
12  whatever you want.  I bet it's on tons of the
13  personnel file paperwork.  Do you want me to
14  look around for it?
15      MR. MULLEN:  What's that?
16      MR. LIGHTFOOT:  Do you want me to look
17  around for it?
18      MR. MULLEN:  I'm looking for it right
19  now.  That way I can get that exact date.
20      MR. LIGHTFOOT:  Okay.  Most personnel
21  files show a hire date.
22      Q.  (BY MR. MULLEN)  I have December 18,
23  2018.  Does that sound correct?

Page 43

1      A.  Yes.
2      Q.  Okay.  And how long did my client work
3  for EAMC before Ursula Means was hired?
4      A.  Approximately four years.
5      Q.  Prior to Ursula Means being hired by
6  EAMC, did my client ever get in any kind of
7  trouble that required him being written up?
8      A.  Not that I am aware of.
9      Q.  So just to clarify, is that a no?
10      A.  I don't --
11      MR. LIGHTFOOT:  What did she say on her
12  answer?
13      MR. MULLEN:  Not that she's aware of.
14      MR. LIGHTFOOT:  Okay.  So that's what
15  her answer is.
16      Q.  (BY MR. MULLEN)  Well, I'm just trying
17  to clarify is it a no or an I don't know.
18      A.  I don't know.
19      Q.  Who would know?
20      MR. LIGHTFOOT:  Well, it's not always a
21  person.  I mean, I guess the file would say it.
22      THE WITNESS:  Right, the employee file.
23      MR. LIGHTFOOT:  I didn't see any.  I

Page 44

1  don't think there are any disciplines in there
2  that I'm aware of.
3      A.  I don't think so.
4      Q.  (BY MR. MULLEN)  Prior to Ursula Means
5  being hired by EAMC, does EAMC have any reason
6  to believe that my client was known to stretch
7  the truth?
8      MR. LIGHTFOOT:  Object to the form.
9      A.  I wouldn't have knowledge of that.
10      Q.  (BY MR. MULLEN)  Who would?
11      MR. LIGHTFOOT:  Object to the form.
12      A.  Maybe a previous supervisor.
13      Q.  (BY MR. MULLEN)  What previous
14  supervisor?
15      MR. LIGHTFOOT:  Object to the form.
16      A.  I don't know.
17      Q.  (BY MR. MULLEN)  When did Ursula Means
18  become my client's supervisor?
19      A.  Do you have the paper that we provided
20  with that date?
21      Q.  But I am asking you.
22      MR. LIGHTFOOT:  You can give him your
23  best memory.



Page 45

1    A. I believe around February 2023.
2    Q. (BY MR. MULLEN) At the time prior to
3  Ursula Means becoming my client's supervisor,
4  did my client have a dress code as part of his
5  job description?
6    A. I don't know.
7    Q. Who would know?
8    A. The supervisor in that department.
9    Q. Who is the current supervisor in that
10  department?
11    A. Nancy Ling.
12    Q. Does EAMC have any documents reflecting
13  a dress code for my client's -- for what was my
14  client's job role?
15    A. I don't know if there -- we have an
16  overall policy, but I don't know if there is
17  specific guidelines for the department.
18    Q. Who would know?
19    A. The department head.
20    Q. Who is the department head of the
21  department that my client was in?
22    A. Nancy Ling.
23    Q. Does EAMC have any records related to

Page 46

1  my client being asked to stop wearing khaki
2  pants and start wearing scrub pants?
3    A. Are you asking me that, if I was aware,
4  or are you asking --
5    Q. Asking if EAMC.
6    A. I don't know.
7    Q. Who would know?
8      MR. LIGHTFOOT: Object to the form.
9    A. I don't know. I don't know if we have
10  it. I don't know who would have it.
11    Q. (BY MR. MULLEN) Does EAMC have any
12  records reflecting that my client went to
13  either HR or another supervisor to complain
14  about Ursula Means requesting that he wear
15  scrub pants?
16    A. Can you repeat your question?
17      MR. MULLEN: Madam Court Reporter, can
18  you repeat my question?
19        (Record read.)
20    A. The only time that HR was made aware
21  was when Mr. Barnes brought a complaint during
22  his resignation period the last week he was
23  employed. I otherwise do not know.

Page 47

1    Q. (BY MR. MULLEN) On the otherwise that
2  you do not know, who would know?
3    A. I don't know if there was a report made
4  or not so I don't know that I can answer that
5  question.
6    Q. If my client did go to another
7  supervisor and complained, would that
8  supervisor be required to file a report?
9      MR. LIGHTFOOT: Object to the form.
10    A. We request that supervisors bring
11  information forward, but, again, we only know
12  what is brought to us. I don't know if
13  something was brought or not.
14    Q. (BY MR. MULLEN) So it's just requested
15  that a report is made?
16      MR. LIGHTFOOT: Object to the form.
17    A. Ask your question again, please.
18      MR. MULLEN: Madam Court Reporter, can
19  you repeat my question again?
20        (Record read.)
21      MR. LIGHTFOOT: Object to the form.
22    A. Do you have our handbook, Mr. Mullen,
23  that you could bring up?

Page 48

1    Q. (BY MR. MULLEN) Yes, I have the
2  handbook. I'm pulling it up on my screen. Can
3  everyone see that all right?
4    A. Yes.
5    Q. All right. So this is the table of
6  contents of the employee handbook.
7    A. Could you go down to Page 4?
8    Q. So this is Page 4. You have the equal
9  employment statement, the no harassment policy.
10  That's 5. How to report, how to investigate
11  reports, commitment to a noneffective -- to an
12  effective no harassment policy, open-door
13  policy, and then that starts the history.
14    A. Can you go back up one page, please?
15    Q. Yes. That's the bottom of Page 4.
16    A. As it says here, Any employee who
17  experiences or who witnesses an act of
18  harassment at work has a responsibility to
19  bring the matter to EAMC's attention
20  immediately.
21    Q. Okay. So my question is, is that they
22  must or they're requested?
23      MR. LIGHTFOOT: Object to the form.



Page 49

1  The document speaks for itself.
2      Go ahead.
3      A. As written.
4      Q. (BY MR. MULLEN) Would EAMC consider it
5  appropriate for one supervisor to request that
6  an employee under them has a dress code change
7  from khakis to scrub pants?
8      MR. LIGHTFOOT: Object to the form.
9      A. Not knowing the situation, I can't
10 answer that.
11     Q. (BY MR. MULLEN) So it's situational?
12     MR. LIGHTFOOT: Objection, asked and
13 answered.
14     A. (No response.)
15     Q. (BY MR. MULLEN) Do you need me to
16 repeat my question?
17     MR. LIGHTFOOT: She just literally
18 answered the question and said, It depends on
19 the situation. And I said, Objection, asked
20 and answered. Do you really want her to answer
21 it again, Jon-Kaden?
22     MR. MULLEN: Yes.
23     MR. LIGHTFOOT: So he just repeated the

Page 50

1  exact same question, so please repeat your
2  answer.
3      A. It would be based on the situation.
4      Q. (BY MR. MULLEN) Is it an EAMC policy
5  that men and women cannot work together?
6      A. I'm sorry. What?
7      Q. Is it an EAMC policy that a man and a
8  woman should not work together?
9      A. No.
10     Q. Would EAMC consider it inappropriate
11 for a supervisor to tell an employee that a man
12 and a woman should not work together?
13     A. Will you repeat your question?
14     MR. MULLEN: Madam Court Reporter, can
15 you repeat my question, please?
16     (Record read.)
17     A. Is this a hypothetical question?
18     Q. The question is as I asked it.
19     MR. LIGHTFOOT: Objection,
20 hypothetical.
21     Go ahead, Kelli.
22     A. I really, without having a situation to
23 relate this to, am having a hard time answering

Page 51

1  this question. I would say no in most
2  situations.
3      Q. (BY MR. MULLEN) In most situations.
4  Okay. Would EAMC consider it -- per your
5  situation, a supervisor says to an employee
6  that a man should not work with a woman.
7  That's the situation. Would that statement
8  violate EAMC's policies?
9      MR. LIGHTFOOT: Object to the form,
10 asked and answered.
11     Go ahead.
12     A. I would say yes based off the
13 expectation that there can be nothing in
14 regards to gender, age, all of those things as,
15 again, outlined in our policy.
16     Q. (BY MR. MULLEN) Does EAMC consider a
17 supervisor telling an employee that they have a
18 pretty face appropriate?
19     MR. LIGHTFOOT: Object to the form.
20     A. Again, I don't know the situation.
21     Q. (BY MR. MULLEN) The situation is a
22 supervisor tells an employee that she wanted to
23 see his pretty face. Is that appropriate?

Page 52

1      MR. LIGHTFOOT: Object to the form.
2      A. I don't feel I can answer that not
3  knowing the full situation.
4      Q. (BY MR. MULLEN) Okay. I'm showing you
5  what you produced as Bates-labeled 354 and 355
6  in your production of documents. Do you
7  recognize these two text messages? If you need
8  me to scroll back up, I will.
9      A. Yes.
10     Q. So you understand that these are text
11 messages between Ursula Means, a supervisor,
12 and my client, Nicholas Barnes, who she was
13 supervising, correct?
14     A. Yes.
15     Q. And do you see as I'm putting my cursor
16 over this Wednesday, August 30, 2023?
17     A. Yes.
18     Q. And in the first text message at
19 1:07 p.m. where Ursula Barnes [sic] sends my
20 client, Nicholas Barnes, a text, Come and see
21 me please. Is that correct?
22     A. Yes.
23     Q. And at 1:12 my client, Nicholas Barnes,



Page 53

1  replied, I am working from home today.  I come
2  in the office this week on Thursday and Friday.
3  And he sent that at 1:12 p.m.
4     A. Yes.
5     Q. And then there's a reply that's been
6  cut off so I'm going to the next page on 355
7  that says -- and it looks like a typo that's
8  supposed to be, Oh, yeah.  Today is Wednesday.
9  I just wanted to see your pretty face.  See you
10  tomorrow.  Is that correct?
11    A. Yes.
12    Q. Is that appropriate communication
13  between a supervisor and an employee?
14    A. No.
15    Q. Now, is that a violation of EAMC's
16  policies?
17    A. I don't recall.
18    Q. Who would know whether that's a
19  violation of EAMC's policy?
20    A. Susan Johnston.
21    Q. Do I need to bring up EAMC's policy
22  again regarding sexual harassment?  Would that
23  refresh your memory on whether you can recall

Page 54

1  whether that is a violation of the policy or
2  not?
3     A. You can bring it back up.  Can you
4  repeat your question?
5        MR. MULLEN:  Madam Court Reporter, can
6  you please repeat my question?
7        (Record read.)
8     A. Under sexual harassment that you
9  have -- the section that you have on the screen
10  it says, Unwelcome sexual advances,
11  propositions, comments, or requests for sexual
12  favors under B there.  So if that were taken in
13  the context of someone not appreciating that
14  comment, yes, we would not want that to be
15  said.
16    Q. But my question is, does it violate
17  company policy.
18       MR. LIGHTFOOT:  Object to the form,
19  asked and answered.
20    Q. (BY MR. MULLEN) All right.  So we can
21  agree the answer was yes, then.
22       MR. LIGHTFOOT:  Well, so she just
23  explained exactly what it was.

Page 55

1        MR. MULLEN:  She said that's not
2  something that they would want.
3        MR. LIGHTFOOT:  No.
4        MR. MULLEN:  So if I take that as a
5  yes, we're in agreement.  That means yes,
6  right?  That's a violation of the policy.
7        MR. LIGHTFOOT:  What you heard is she
8  said was it welcome or unwelcome I think is one
9  of the parts that she just answered.  Yeah.  I
10  don't know if she knows that fact.
11    Q. (BY MR. MULLEN) If it was unwelcome,
12  would it be a violation of the policy?
13       MR. LIGHTFOOT:  Okay.  That's a
14  different question.
15    A. Yes.
16    Q. (BY MR. MULLEN) In a situation where a
17  supervisor tells an employee that they would
18  have people meet them in a parking lot and beat
19  them up, would that violate EAMC's company
20  policy?
21       MR. LIGHTFOOT:  Objection to the
22  hypothetical.
23       You can answer.

Page 56

1     A. Agree, hypothetical.  I don't know the
2  situation.  We would not condone someone being
3  beat up in our parking lot.
4     Q. (BY MR. MULLEN) So yes?
5        MR. LIGHTFOOT:  I think he's asking
6  another question.  So if you understand it --
7  if you understand whatever the question is --
8     A. I don't -- what is the rest of your
9  question, Mr. Mullen?
10    Q. (BY MR. MULLEN) So given your answer,
11  boiling it down to one word, is it a violation,
12  yes or no?  Your answer is yes?
13       MR. LIGHTFOOT:  Objection.
14       Get him to ask the question so you can
15  make sure exactly what he's asking.
16    A. Please ask your question again because,
17  again, I don't have a situation to relate this
18  to.
19       MR. MULLEN:  Madam Court Reporter, can
20  you please give the witness her last answer and
21  then my follow-up answer?
22       MR. LIGHTFOOT:  Just remember,
23  Jon-Kaden -- I assume you're perfectly fine



Page 57

1  with the witness any time asking you to clarify
2  your question.
3       MR. MULLEN:  Absolutely.
4       MR. LIGHTFOOT:  If she doesn't
5  understand, it doesn't do any good for the
6  court reporter to repeat a question.
7       MR. MULLEN:  She asked what my last
8  question was.
9       MR. LIGHTFOOT:  I thought she asked for
10  clarification.  Go ahead.
11       MR. MULLEN:  I can clarify it.  We can
12  strike that.  I will clarify.
13       Q.  (BY MR. MULLEN) The situation is
14  Ms. Ursula Means told my client, Nicholas
15  Barnes, that she was going to have two
16  individuals meet him in the parking lot and
17  beat him up.  If that were true, would that be
18  a violation of company policy?
19       A.  If it were true, yes.
20       Q.  And if my client reported that to a
21  supervisor, say, for instance, Nancy Ling,
22  Nancy Ling would have the obligation to report
23  that to EAMC, correct?

Page 58

1       A.  As previously outlined in what is on
2  the screen, let's see.  How to report instances
3  of harassment.  Any employee who experiences or
4  who witnesses an act of harassment at work has
5  a responsibility to bring the matter to EAMC's
6  attention immediately.
7       Q.  Is that your answer?
8       A.  Yes, per what we have provided.
9       MR. MULLEN:  Okay.  Let's take a
10  ten-minute break and we will be back in ten
11  minutes.
12       (Short recess.)
13       Q.  (BY MR. MULLEN) We just came back from
14  a brief ten-minute break.  During the break I
15  realized we had talked about some text messages
16  but I didn't get them entered as an exhibit.
17  So I am going to bring my screen back up with
18  the text messages that we described earlier.
19  Okay.  So I just started screen sharing.  This
20  is Defendant's production Bates-labeled 355 --
21  354 and 355; is that correct?
22       MR. LIGHTFOOT:  Are you asking this
23  question of Ms. Truitt?

Page 59

1       MR. MULLEN:  Yes.  That was to
2  Ms. Truitt.
3       A.  I'm sorry.  What was your question?
4       Q.  This is Page 354 and 355 of EAMC's
5  production, correct?
6       A.  Yes.
7       Q.  And we discussed this text message
8  exchange between my client, Nicholas Barnes,
9  and his supervisor, Ursula Means?
10       A.  Yes.
11       MR. MULLEN:  Okay.  I'm going to enter
12  Defendant's production Bates-labeled 354 and
13  355 as Exhibit 2, please.
14       (Whereupon, Plaintiff's Exhibit 2
15       was marked for identification
16  and copy of same is attached hereto.)
17       Q.  All right.  So we've discussed some
18  particular incidences and some hypotheticals.
19  Can we agree that EAMC now knows about my
20  client's allegations that Ms. Means harassed
21  him and retaliated against him?
22       A.  Ask your question in a different way.
23  Are you asking me --

Page 60

1       Q.  I can ask it in a different way.  So
2  EAMC has seen the complaint that my client has
3  filed against them in this matter, correct?
4       A.  Yes.
5       Q.  And they've read through the
6  allegations.
7       A.  Yes.
8       Q.  And EAMC asked him some questions in
9  discovery and he answered.
10       A.  Yes.
11       Q.  And EAMC had the opportunity to ask my
12  client questions at a deposition and he
13  answered those questions.
14       A.  Yes.
15       Q.  And as part of those questions, it
16  included each instance that my client is
17  claiming that Ursula Means harassed him or
18  retaliated against him.
19       A.  Claiming, yes.
20       Q.  So EAMC is now aware of all these
21  allegations, correct?
22       A.  Yes.
23       Q.  Does Ursula Means still work at EAMC?



Page 61

1    A. Yes.
2    Q. Has EAMC conducted any investigation
3 regarding these claims?
4    A. Yes.
5    Q. When did they conduct investigation?
6    A. We were not made aware of any concerns
7 from Mr. Barnes until the last week of his
8 employment with us, and at that time we did
9 conduct an investigation.
10    Q. So it's fair to say that EAMC conducted
11 the investigation -- an investigation after my
12 client sent it in an email after he provided
13 his two-weeks' notice?
14    A. Yes. Until we were made aware of the
15 concerns, we didn't have anything to
16 investigate.
17    Q. Has EAMC investigated each instance
18 that my client complained about in his
19 complaint?
20    A. Could you bring up the complaint?
21 Could you bring up the email where he sent that
22 in?
23    Q. Yes, I can. So I am sharing my screen,

Page 62

1 and this is Defendant's production 292 through
2 295. I will give you a second. If I need to
3 scroll down, I'm happy to. If I need to scroll
4 back up, just let me know. That way you have
5 plenty of time to review the document.
6    A. Can you scroll down to the bottom and
7 start -- go up one. Thank you.
8    MR. LIGHTFOOT: Does he need to make it
9 bigger, Kelli, or are you good?
10    THE WITNESS: I think I'm okay. Thank
11 you.
12    MR. MULLEN: And I'm happy to try my
13 best to make it bigger.
14    A. Yes. These have been investigated.
15    Q. (BY MR. MULLEN) Okay. Did EAMC
16 investigate any claim that Ms. Means was going
17 too have two people beat up my client,
18 Mr. Barnes?
19    A. Is that outlined specifically here?
20 Are you referring to Number 3 where it said,
21 She could get someone to whoop me?
22    Q. Yes, and Number 6.
23    A. Yes. As stated, all of these have been

Page 63

1 investigated.
2    Q. Okay. Now, regarding the text messages
3 that we went over where we discussed where
4 Ursula Means sent my client that he has a
5 pretty face, was that specifically
6 investigated?
7    MR. LIGHTFOOT: Object to the form
8 and -- let's see. That's sort of post
9 litigation so I want to make sure we don't get
10 into the attorney/client privilege here in any
11 way or work product.
12    Q. (BY MR. MULLEN) I'm not going to ask
13 any conversation that you've had with your
14 attorney. I'm just asking has EAMC
15 investigated Ms. Means for her text message to
16 my client, Nicholas Barnes, saying that he has
17 a pretty face?
18    A. I don't recall.
19    Q. Who would know?
20    A. I don't know that I have an answer on
21 who would know because it's not here in this
22 document to be investigated.
23    Q. Is it fair to say that EAMC knows that

Page 64

1 Ursula Means sent that text message to my
2 client?
3    A. What time are you saying that we would
4 have known that that text message was sent?
5    Q. Today does EAMC know about it?
6    A. Yes. Today we know about it.
7    Q. Have they investigated it?
8    A. I don't recall that specific piece.
9    Q. Who would know?
10    A. A department head.
11    Q. Who is the department head that would
12 investigate this?
13    A. Nancy Ling.
14    MR. LIGHTFOOT: Object to the relevance
15 of this line of questions. Go ahead.
16    Q. (BY MR. MULLEN) In this email -- and
17 let me back up. So we discussed Defendant's
18 production 292 through 295. I'm going to give
19 you a second to look at each page to make sure
20 each are correct according to what you produced
21 to us. So we've already talked about 294.
22 295, does that look correct?
23    A. Yes.



Page 65

1    Q. Does 293 look correct?
2    A. Yes.
3    Q. Does 292 look correct?
4    A. Yes.
5        MR. MULLEN: Okay. I'm going to enter
6  Defendant's production 292 through 295 as
7  Exhibit 3.
8        (Whereupon, Plaintiff's Exhibit 3
9          was marked for identification
10        and copy of same is attached hereto.)
11    Q. Okay. Going back to 294 -- and I'm
12  actually going to go up to 293 because it cuts
13  off halfway -- my client, Nicholas Barnes, sent
14  you an email on February 27, 2024, at
15  12:05 p.m.; is that correct?
16    A. Per what you're showing, yes.
17    Q. Okay. And it says, Hey, Ms. Kelli, I
18  have reached out to numerous directors and vice
19  presidents about my issues with Ursula Means.
20  Ms. Ursula has harassed me constantly to the
21  point of making me put in my two-weeks' notice.
22  I do not feel safe at all to go to my car
23  because of the comments she has made towards

Page 66

1  me. There have been incidents happening over
2  and over. I have spoke with Nancy Ling, John
3  Morris, Chris Waits, Chuck Beams, Brenda
4  Clark -- and I apologize if I mispronounce
5  this -- Sutricia Johnson and others about the
6  problem that is going on. Is that correct?
7    A. As it is written, yes.
8    Q. And then at 2:45 p.m. that same day you
9  replied, Nicholas, thank you again for bringing
10  these to my attention. I will continue to
11  investigate this with Nancy Ling. Could you
12  please specify which vice presidents you spoke
13  to about this?
14    A. Are you asking me if I agree with
15  what's written?
16    Q. Yeah. Is that what's stated there?
17    A. Yes.
18    Q. Okay. So you said, Thank you again.
19  When was another time that my client reported
20  this to you?
21    A. This same morning.
22    Q. The same morning?
23    A. Correct.

Page 67

1    Q. Okay. And so EAMC investigated each
2  one of these instances that my client -- strike
3  that.
4        During my client's employment, did he
5  ever get in trouble for punch card violations?
6    A. Get in trouble? Not that I'm aware of.
7    Q. Did he receive any kind of warnings?
8    A. Not that I am aware of.
9    Q. Did he come close to the maximum of
10  allowed punch card -- missed punch cards before
11  termination?
12    A. Can you tell me what number or what
13  you're referring to?
14    Q. I'm asking if my client ever got to the
15  point on his missed punch cards that he was
16  approaching EAMC's policy for termination due
17  to missed punch cards.
18    A. Not that I am aware.
19    Q. Do you recall any issue with my
20  client's punch cards while working at EAMC?
21    A. No.
22    Q. Who would know?
23        MR. LIGHTFOOT: Object to the form.

Page 68

1    A. I would assume a supervisor or a
2  manager in the department. That is who
3  controls an employee's time.
4    Q. (BY MR. MULLEN) Does EAMC have an
5  attendance policy?
6    A. Yes.
7    Q. What is that attendance policy?
8    A. What is your question? What does it
9  entail?
10    Q. What is EAMC's attendance policy?
11    A. Our attendance policy has three pieces
12  to it. It includes attendance, tardies, and
13  missed punches.
14    Q. What is EAMC's missed punches portion
15  of its attendance policy?
16    A. I don't have it directly in front of me
17  so I could not tell you exactly how it's
18  worded.
19    Q. Is it in the handbook?
20    A. No.
21    Q. Did you have an opportunity to review
22  EAMC's policy regarding missed punch cards
23  prior to today?



Page 69

1    A.  Because of this case?
2    **Q.  Did you have -- the question is, did**
3    **you have an opportunity to review EAMC's**
4    **policies and procedures regarding attendance**
5    **and specifically the missed punch cards prior**
6    **to today?**
7        MR. LIGHTFOOT:  Object to the form.  Is
8    that a topic?  I can't remember.
9    A.  Is your question --
10       MR. LIGHTFOOT:  I can look and see if
11   it's a topic.  I don't think she did but we can
12   look.
13       MR. MULLEN:  Well, it's information
14   about plaintiff's employment, including job
15   descriptions, minimum required or desirable
16   qualifications to the job description.
17       MR. LIGHTFOOT:  No, it's not.
18       MR. MULLEN:  The employment history --
19   his employment history.
20       MR. LIGHTFOOT:  It's not but you can
21   ask her?
22       MR. MULLEN:  And the facts and
23   circumstances concerning the collection of

Page 70

1    production of documents in this litigation, and
2    EAMC produced punch card information in their
3    production.
4        MR. LIGHTFOOT:  You can ask her
5    anything you want about it, Jon-Kaden, that's
6    relevant.  Ask her anything.  But I don't think
7    she reviewed anything and I don't think it's a
8    topic.  Let me back up when I say you can ask
9    anything.  I may or may not let you ask
10   anything that's outside of the scope of the
11   deposition, but I'll take it question by
12   question.  I get there's an issue about missed
13   punches so I will let you ask that for sure.
14       MR. MULLEN:  There's a missed punch
15   problem.  Policy and procedures directly
16   related to that.  We've also claimed that
17   Ms. Ursula Means retaliated against my client.
18   Part of that retaliation was her refusing to
19   let him work on punch cards.  That's been
20   talked about in discovery.  That was talked
21   about in my client's deposition.  So now I'm
22   asking EAMC, have you had an opportunity to
23   review the policy regarding attendance and

Page 71

1    specifically the missed punch cards prior to
2    today.
3        MR. LIGHTFOOT:  Objection.  It is
4    outside the scope of this deposition.  My guess
5    is she did not review anything about that.  Let
6    me see if I'm even going to let her answer that
7    question.  Hold on.  Let me look at your
8    topics.  I don't see anything on there about
9    attendance or punch cards.  So, yeah.  So I'm
10   tempted just to say, Don't even bother
11   answering any of Jon-Kaden's questions.  But,
12   you know, I'm trying to work with you here.  I
13   certainly know he wasn't happy because he said
14   in his deposition about a missed punch issue.
15   So I'll give you a little leeway, but I'm not
16   going to let you badger her and suggest that
17   she was supposed to review some attendance
18   policy because I'm pretty sure she didn't.
19       MR. MULLEN:  Okay.  Then I will just --
20   we will just limit it to this.
21   **Q.  (BY MR. MULLEN) So after that exchange**
22   **that you heard between me and your attorney, is**
23   **it fair to say that you did not review EAMC's**

Page 72

1    **attendance policy or missed punch card policy**
2    **prior to today's deposition?**
3    A.  Yes.
4    **Q.  Moving on to the investigation.  So I**
5    **understand that according to EAMC, my client**
6    **reported Ursula Means on February 27, 2024,**
7    **after he put in his two-weeks' notice.  Did**
8    **EAMC investigate -- and we agreed that EAMC**
9    **investigated those claims.  What did EAMC do to**
10   **investigate those claims?**
11   A.  Once the email was received from
12   Mr. Barnes, we the same day took those concerns
13   to management in the department who would then
14   have the ability to investigate those and
15   provide us their feedback.  We did that --
16   started that investigation the same day.
17   **Q.  When you say you took it to management,**
18   **who was management at that time?**
19   A.  Nancy Ling.
20   **Q.  And how did Nancy Ling investigate the**
21   **claims?**
22   A.  I don't know that I can speak to
23   specifically how she did it, but our



Page 73

1   expectation is anybody that had allegations
2   brought against them, she's going to go and
3   speak to those people and hear their side of
4   the story.
5   **Q. Did Nancy Ling provide any kind of**
6   **report to EAMC?**
7   A. Yes.
8   **Q. Did EAMC review that report that Nancy**
9   **gave EAMC?**
10   A. Yes.
11   **Q. And what was EAMC's findings after that**
12   **report was done?**
13   A. We were not able to substantiate the
14   allegations that were brought by Mr. Barnes.
15   MR. MULLEN: All right. Let's take a
16   ten-minute break.
17   (Short recess.)
18   **Q. (BY MR. MULLEN) All right. Thank you**
19   **so much. So I have a few last questions. We**
20   **discussed today the allegations that my client**
21   **has made regarding his former supervisor,**
22   **Ursula Means, and we've discussed some text**
23   **messages that -- and correct me if I'm wrong,**

Page 74

1   **but you previously testified under the**
2   **assumption that the text message was an**
3   **unwilling advance by Ursula Means, was a**
4   **violation of EAMC's anti-harassment policy; is**
5   **that correct?**
6   MR. LIGHTFOOT: Hang on. Objection.
7   That makes no sense at all. What she said is
8   she can't determine -- part of the standard is
9   was it welcome or unwelcome, and she doesn't
10   know the answer to that so she couldn't answer.
11   MR. MULLEN: And I said under the
12   assumption that it was unwelcome, would
13   it be --
14   MR. LIGHTFOOT: Oh, yeah. She did that
15   night.
16   A. Yes, if it was unwelcome.
17   **Q. (BY MR. MULLEN) If it was unwelcome, it**
18   **was a violation.**
19   MR. LIGHTFOOT: Objection on violation.
20   Go ahead, Kelli.
21   **Q. (BY MR. MULLEN) So if it was unwelcome,**
22   **it was a violation?**
23   A. If it was unwelcome, we would not want

Page 75

1   that to be happening in our hospital. Correct.
2   MR. MULLEN: So just to make sure --
3   and I'm not trying to ask her -- you know, to
4   repeat the same question.
5   **Q. (BY MR. MULLEN) I'm just trying to make**
6   **sure that when you say correct, that means yes,**
7   **it was a violation.**
8   A. If it was unwelcome.
9   **Q. And given that conversation that we**
10   **had -- and Ursula Means is still employed by**
11   **EAMC, correct?**
12   A. Yes.
13   **Q. With that understanding, why is Ursula**
14   **Means still employed by EAMC?**
15   MR. LIGHTFOOT: Object to the form.
16   Completely irrelevant to this lawsuit.
17   I guess, Kelli, you can try to answer
18   if you understand the question.
19   A. Can you repeat your question,
20   Mr. Mullen?
21   **Q. (BY MR. MULLEN) Yes. Why is Ursula**
22   **Means still employed by EAMC?**
23   MR. LIGHTFOOT: Same objection,

Page 76

1   completely irrelevant, and facts learned in
2   litigation and so it has nothing to do with the
3   claims of harassment and retaliation during
4   employment. I'm debating on letting her answer
5   that or not, but I have given some leeway
6   before. The whole line of questions is
7   irrelevant.
8   With all that said, go ahead, Kelli.
9   If you understand the question, you can answer.
10   A. Are you asking me why she is still
11   employed directly related to this incident?
12   **Q. (BY MR. MULLEN) Yes.**
13   A. Because we did not substantiate the
14   claims.
15   **Q. You did not substantiate that regarding**
16   **the "pretty face" text?**
17   A. We did not substantiate any of
18   Mr. Barnes' claims.
19   MR. MULLEN: Okay. No further
20   questions.
21   MR. LIGHTFOOT: I have no questions.
22   (Off the record.)
23   MR. MULLEN: So thank y'all for letting



ALABAMA
COURT REPORTING

Page 77

1   us go back on the record real quick.  I want to
2   start out by thanking you, Ms. Truitt, for your
3   testimony today.  I greatly appreciate you
4   talking with me.
5        As we went off the record there for a
6   little bit and we had some conversations with
7   your attorney, I just want to put on the record
8   that I'd like for the deposition to remain
9   open.  During some of the time there was some
10  "I don't recalls" where I asked for some
11  people.  I'm just going to ask that this record
12  remain open.  That way, in case we need to
13  revisit any further testimony, we're able to do
14  so.
15       MR. LIGHTFOOT:  And that's fine.  You
16  absolutely can make that statement.  I do not
17  agree to leave it open and may very well
18  object, but that's probably something,
19  Jon-Kaden, you and I will talk about if you
20  were to want to reopen it.  So I'm just in no
21  way waiving my ability to say I'm not sure I
22  agree with that at all.
23 FURTHER DEPONENT SAITH NOT.

Page 78

1           C E R T I F I C A T E
2   STATE OF ALABAMA
3   AT LARGE
4
5       I hereby certify that the above and
    foregoing deposition of KELLI TRUITT was taken
6   down by me in stenotype and the questions and
    answers thereto were transcribed by means of
7   computer-aided transcription, and that the
    foregoing represents a true and correct
8   transcript of the testimony given by said
    witness upon said hearing.
9       I further certify that I am neither of
    counsel, nor of kin to the parties to the
10  action, nor am I in anywise interested in the
    result of said cause.
11
        I further certify that I am duly licensed
12  by the Alabama Board of Court Reporting as a
    Certified Court Reporter as evidenced by the
13  ACCR number following my name found below.
14      So certified on this date, May 15, 2025.
15
16
17
        /s/Karen Smith
18      Karen Smith, CCR
        ACCR #96, Expires 9/30/2025
19      Commissioner for the State
        Of Alabama at Large
20      My Commission Expires 1/10/2028
21
22
23



**Exhibits**

**Truitt Ex 1** 18:6,7 20:2
**Truitt Ex 2** 59:13,14
**Truitt Ex 3** 65:7,8

**#**

**#96** 78:18

**1**

**1** 4:7 18:6,7,23 19:3 20:2
**1/10/2028** 78:20
**100** 3:6
**12** 15:1
**12:05** 65:15
**15** 78:14
**16** 18:4
**1700** 3:15
**18** 4:7 12:8,17,18 42:22
**18-bed** 14:14
**1901** 3:15
**1998** 11:14
**1:07** 52:19
**1:12** 52:23 53:3

**2**

**2** 4:8 59:13,14
**2005** 13:19 14:8
**2007** 14:8,11
**2011** 12:23
**2017** 3:6
**2018** 15:4,11 16:16 41:22
42:10,23
**2019** 15:2 16:3,4
**2022** 28:9,10
**2023** 45:1 52:16
**2024** 65:14 72:6

**2025** 1:16,19 2:7 5:7
78:14
**27** 65:14 72:6
**292** 62:1 64:18 65:3,6
**292-295** 4:9
**293** 65:1,12
**294** 64:21 65:11
**295** 62:2 64:18,22 65:6
**2:45** 66:8

**3**

**3** 4:9 62:20 65:7,8
**30** 1:16,19 2:7 52:16
**30(b)(6)** 18:2 19:23
**30th** 5:7
**35203** 3:7,16
**354** 52:5 58:21 59:4,12
**355** 52:5 53:6 58:20,21
59:4,13
**3:24-cv-00512** 1:4

**4**

**4** 18:23 19:3 48:7,8,15

**5**

**5** 19:6,8 48:10
**59** 4:8

**6**

**6** 4:3 62:22
**65** 4:9
**6th** 3:15

**8**

**8** 19:17

**9**

**9** 19:6,9

**9/30/2025** 78:18
**9:05** 1:17,21 2:7 5:8

**A**

**A.M.** 1:17,21 2:8 5:8
**ability** 6:19 8:18 10:23
11:1 21:14 72:14 77:21
**absolutely** 26:22 57:3
77:16
**access** 26:12,14
**ACCR** 78:13,18
**acknowledge** 5:16,20,
22 6:3
**act** 48:17 58:4
**acting** 5:3
**action** 1:4 78:10
**actions** 27:1,2 36:7,8
**adding** 22:15
**additional** 32:4
**administration** 11:10
13:2
**Adobe** 17:17
**advance** 74:3
**advances** 54:10
**affect** 10:22
**age** 31:10 51:14
**agree** 54:21 56:1 59:19
66:14 77:17,22
**agreed** 2:2,9,17 72:8
**agreement** 55:5
**ahead** 6:20 9:2 21:18
22:9 25:3 26:4 28:19
32:12 33:7 35:3 37:22
38:3,13 39:4,15 40:1
42:11 49:2 50:21 51:11
57:10 64:15 74:20 76:8
**Alabama** 1:2,9,10 2:6
3:10,11 5:2,3,5 12:5,10,
14 13:9,12,15,17,21 18:3
31:7 78:2,12,19
**allegation** 32:23
**allegations** 26:18 38:16,
21 41:7 59:20 60:6,21

73:1,14,20
**alleging** 26:23
**allowed** 67:10
**alterations** 28:22
**altered** 28:6
**answering** 7:20 9:20
50:23 71:11
**answers** 78:6
**anti-harassment** 30:12
32:10,16 74:4
**anywise** 78:10
**apologize** 66:4
**appreciating** 54:13
**approaching** 67:16
**approximately** 1:21 2:7
5:8 12:8,17 27:9,12 43:4
**April** 1:16,19 2:7 5:7
**area** 25:4
**arrested** 10:18
**asks** 9:14
**assign** 2:13
**assisted** 15:20
**associate's** 11:7 12:1
**assume** 56:23 68:1
**assumption** 74:2,12
**attached** 18:9 59:16
65:10
**attend** 11:11,18
**attendance** 68:5,7,10,
11,12,15 69:4 70:23
71:9,17 72:1
**attention** 41:5 48:19
58:6 66:10
**attorney** 17:6 18:4,13
63:14 71:22 77:7
**attorney/client** 63:10
**attorneys** 5:15 23:4
**Auburn** 11:12 12:15,16,
21 13:4,7,13
**August** 52:16
**Avenue** 3:6,15



**aware** 31:14 32:22 43:8, 13 44:2 46:3,20 60:20 61:6,14 67:6,8,18

**B**

**bachelor's** 11:7 12:9,12

**back** 33:2 35:10,16 36:16 41:16 48:14 52:8 54:3 58:10,13,17 62:4 64:17 65:11 70:8 77:1

**background** 11:5

**badger** 71:16

**Barnes** 1:6 3:3 7:4 46:21 52:12,19,20,23 57:15 59:8 61:7 62:18 63:16 65:13 72:12 73:14

**Barnes'** 76:18

**based** 38:20 50:3 51:12

**Bates-labeled** 52:5 58:20 59:12

**Beams** 66:3

**beat** 55:18 56:3 57:17 62:17

**began** 16:15 41:21

**BEHALF** 3:3,10

**benefit** 15:21

**benefits** 16:11

**bet** 42:12

**bigger** 17:14 62:9,13

**Birmingham** 3:7,16 5:2

**bit** 77:6

**Blackmon** 25:7

**blowing** 17:20

**Board** 78:12

**boiling** 56:11

**bother** 71:10

**bottom** 48:15 62:6

**break** 8:20,22 9:1,4 41:11,13,14,17 58:10,14 73:16

**Brenda** 66:3

**bring** 47:10,23 48:19

53:21 54:3 58:5,17 61:20,21

**bringing** 66:9

**brought** 23:9 31:13 32:20 46:21 47:12,13 73:2,14

**C**

**campus** 31:12

**car** 65:22

**card** 67:5,10 70:2 72:1

**cards** 67:10,15,17,20 68:22 69:5 70:19 71:1,9

**care** 14:4,7,11,13,14,17, 23 15:3

**cares** 42:11

**case** 6:16 20:10 21:22 22:12 69:1 77:12

**CCR** 1:19 2:5 78:18

**center** 1:9,11 3:11,12 13:10,12,16,18,21 18:3 24:17 31:7

**certified** 78:12,14

**certify** 5:4 78:4,9,11

**chain** 33:18 34:1

**chance** 9:20 17:9

**change** 31:17 49:6

**charge** 13:22 14:1,9

**chief** 16:23

**Chris** 66:3

**Chuck** 66:3

**circumstances** 69:23

**Civil** 1:4 5:5

**claim** 62:16

**claimed** 70:16

**claiming** 60:17,19

**claims** 61:3 72:9,10,21 76:3,14,18

**clarification** 57:10

**clarify** 43:9,17 57:1,11, 12

**clarity** 6:2

**Clark** 66:4

**clean** 8:1

**client** 16:15 26:22 27:11, 15 30:11,16 41:8,21 43:2,6 44:6 45:4,21 46:1, 12 47:6 52:12,20,23 57:14,20 59:8 60:2,12,16 61:12,18 62:17 63:4,16 64:2 65:13 66:19 67:2,14 70:17 72:5 73:20

**client's** 26:18 28:7,16 31:18 41:20 42:2 44:18 45:3,13,14 59:20 67:4,20 70:21

**close** 67:9

**closer** 27:13

**code** 45:4,13 49:6

**collect** 25:8

**collected** 26:6

**collecting** 23:13

**collection** 69:23

**college** 11:15,18,21

**comfortable** 33:21,23

**command** 33:18 34:1

**commencing** 1:20 2:7 5:8

**comment** 54:14

**comments** 54:11 65:23

**Commission** 78:20

**Commissioner** 2:19 5:4 78:19

**commitment** 48:11

**communication** 53:12

**Community** 11:20

**comp** 15:21 16:10

**company** 15:6,7,12 16:16 17:2 54:17 55:19 57:18

**complain** 46:13

**complained** 47:7 61:18

**complaint** 16:15 26:19, 23 34:13,15,17,19 35:8,

9,10,14,15,20 36:3,4,5, 15 38:10 39:13,20 46:21 60:2 61:19,20

**complaints** 33:4 34:7,11 38:23

**complete** 38:14

**completed** 7:23 13:14

**completely** 75:16 76:1

**computer-aided** 78:6

**concern** 34:13

**concerns** 14:19 40:3 61:6,15 72:12

**condition** 10:22

**condone** 56:2

**conduct** 36:22 39:12 61:5,9

**conducted** 61:2,10

**connections** 5:23

**consent** 6:4

**constantly** 65:20

**contents** 48:6

**context** 54:13

**continue** 66:10

**controls** 68:3

**conversation** 63:13 75:9

**conversations** 37:3 77:6

**convicted** 10:19

**copy** 18:9 59:16 65:10

**correct** 16:17 17:3 21:10 27:16 33:14 41:22 42:23 52:13,21 53:10 57:23 58:21 59:5 60:3,21 64:20,22 65:1,3,15 66:6, 23 73:23 74:5 75:1,6,11 78:7

**counsel** 2:4,11,12 5:6 17:10 78:9

**court** 1:1 5:1,15 6:10,16 7:12,18 8:6 9:12 25:20 46:17 47:18 50:14 54:5 56:19 57:6 78:12



**created** 27:18 28:3

**crime** 10:19

**critical** 14:14

**current** 15:14 45:9

**cursor** 52:15

**cut** 53:6

**cuts** 65:12

---

### D

**d/b/a** 1:10 3:11

**date** 5:4 28:4 39:21 40:7, 18,23 42:2,3,10,19,21 44:20 78:14

**day** 5:7 66:8 72:12,16

**day-to-day** 14:15

**debating** 76:4

**December** 42:22

**defendant** 1:12 3:10 10:16 15:8

**Defendant's** 4:9 58:20 59:12 62:1 64:17 65:6

**define** 36:20

**degree** 11:7,8,9 12:1,9, 12 13:13,15

**department** 14:3,18,20 16:9 33:19 35:10,17 36:1,6,8,9 37:18,20 39:12 45:8,10,17,19,20, 21 64:10,11 68:2 72:13

**departments** 13:23 31:12

**depend** 40:2

**depends** 36:2 40:5 49:18

**DEPONENT** 77:23

**deposed** 10:4,8

**deposition** 1:14,18 2:4, 15,18 4:7 6:1,19 8:8 18:2 20:4 21:10 23:3,10 60:12 70:11,21 71:4,14 72:2 77:8 78:5

**describe** 11:5 29:20 30:15 31:2 35:6,12

**description** 30:21,23 45:5 69:16

**descriptions** 69:15

**designated** 17:2

**desirable** 69:15

**determination** 38:19

**determine** 38:9,15 74:8

**difficult** 17:22 24:3

**direct** 15:19

**directly** 13:12 68:16 70:15 76:11

**director** 15:15,20 16:2,6 25:4,5 33:20

**directors** 65:18

**disciplines** 44:1

**discovery** 20:13,20,22 60:9 70:20

**discrimination** 39:1

**Discuss** 38:22

**discussed** 18:5 59:7,17 63:3 64:17 73:20,22

**distinguish** 8:6

**distribute** 29:2

**DISTRICT** 1:1,2

**DIVISION** 1:3

**document** 17:12 20:8, 15,18 24:4,12 49:1 62:5 63:22

**documents** 11:1 19:7, 11 20:1,9,11,22 21:16,21 22:1,16 23:10,14,18,22 24:6,8 25:8 26:6,14 42:5, 7 45:12 52:6 70:1

**dress** 45:4,13 49:6

**drop** 5:23

**due** 5:22 67:16

**duly** 5:13 78:11

**duties** 14:12

---

### E

**EAMC** 14:9 15:7 23:21 24:7 27:7,10,11,14 28:7,

16 29:2,17 30:12,17 32:9,17 33:2 34:5,7,10 35:7,12 36:4,18 37:1,5, 13 38:9,22 39:9,10 40:16,22 41:6,19,21 43:3,6 44:5 45:12,23 46:5,11 49:4 50:4,7,10 51:4,16 57:23 59:19 60:2,8,11,20,23 61:2,10, 17 62:15 63:14,23 64:5 67:1,20 68:4 70:2,22 72:5,8,9 73:6,8,9 75:11, 14,22

**EAMC's** 33:10 42:1 48:19 51:8 53:15,19,21 55:19 58:5 59:4 67:16 68:10,14,22 69:3 71:23 73:11 74:4

**earlier** 9:15 39:5 58:18

**easier** 18:14

**East** 1:10 3:10,11 13:9, 11,15,17,20 18:3 31:6

**EASTERN** 1:3

**education** 11:5,10 29:6

**effective** 48:12

**electronic** 29:23 30:3,7

**email** 21:21 22:1 61:12, 21 64:16 65:14 72:11

**emails** 22:11,14

**employ** 27:8,10

**employed** 13:14 27:11, 16 30:11,16 46:23 75:10, 14,22 76:11

**employee** 14:19 15:22 21:7,13 26:12 27:15 29:5,23 33:23 34:12,14, 20 39:20 43:22 48:6,16 49:6 50:11 51:5,17,22 53:13 55:17 58:3

**employee's** 37:10 68:3

**employees** 27:7,10 29:3,5,22 30:4 31:7,23 33:3,9,16 34:8,11 39:5 40:17,23

**employment** 28:7,16 31:18 41:21 48:9 61:8 67:4 69:14,18,19 76:4

**end** 9:20

**ended** 28:16

**enforce** 32:9,17

**ensure** 7:17

**ensuring** 14:16

**entail** 68:9

**enter** 17:11 18:6 20:1 59:11 65:5

**entered** 58:16

**entire** 16:14

**equal** 48:8

**Esq** 1:20 3:4,13

**evidence** 2:15

**evidenced** 78:12

**exact** 28:4 42:3,10,19 50:1

**examination** 4:1 5:10 6:23 18:23

**examined** 5:13

**exchange** 59:8 71:21

**exhibit** 4:5 17:11 18:6,7 20:2 58:16 59:13,14 65:7,8

**exhibits** 18:1

**expectation** 39:7,10 51:13 73:1

**expected** 36:13

**experience** 26:17

**experiences** 48:17 58:3

**Expires** 78:18,20

**explained** 54:23

**explaining** 30:1

**extent** 39:3

**extremely** 8:5

---

### F

**face** 51:18,23 53:9 63:5, 17 76:16

**fact** 55:10

**facts** 26:17 41:20 69:22 76:1



factualize 38:21

fair 19:20 61:10 63:23
71:23

falls 15:23

fast 9:17

favors 54:12

February 45:1 65:14
72:6

feedback 36:14 72:15

feel 38:16 52:2 65:22

fell 14:20

file 33:3 37:10 42:6,13
43:21,22 47:8

filed 26:22 34:11 39:13
60:3

files 24:19 42:21

filing 2:18

Finally 8:19

financial 14:18

find 17:23

findings 73:11

fine 18:10 56:23 77:15

finish 7:19

firsthand 26:17 27:2

five-minute 41:12

fix 18:15

FMLA 16:10

focused 41:5,7

follow-up 56:21

foregoing 5:6 78:5,7

form 2:12 21:17 25:2,15,
23 28:18 30:18 32:11,19
33:5 35:1 36:11 37:7,14,
17,21 38:12 39:2,23
40:9,12,19 44:8,11,15
46:8 47:9,16,21 48:23
49:8 51:9,19 52:1 54:18
63:7 67:23 69:7 75:15

forward 7:7 19:22 31:13
47:11

found 35:22 78:13

FOUNDATION 1:10

3:11

free 22:22

freeze 6:1

Friday 53:2

front 68:16

full 9:9 10:1 16:8 18:17
52:3

future 18:1

**G**

G-R-O-S-S 38:8

game 19:20

gathered 27:3

gave 73:9

gender 31:10 51:14

give 9:20 22:9 29:11
30:22 44:22 56:20 62:2
64:18 71:15

good 6:22 7:2 57:5 62:9

gotcha 8:12

graduate 11:13 12:21

graduation 11:16,20

great 6:17

greatly 77:3

Gross 38:4,7

grounds 2:14

Group 3:5 7:4

guess 43:21 71:4 75:17

guidelines 45:17

**H**

half 14:2

halfway 65:13

handbook 21:7,13
27:15,18 28:3,5,6,15,22
29:2,7,9,10,14,18,21
30:1 32:1,5 33:8 39:6,9
47:22 48:2,6 68:19

Hang 74:6

happen 31:12

happening 66:1 75:1

happy 8:17,22 62:3,12
71:13

harassed 59:20 60:17
65:20

harassment 30:15 31:9
33:17 35:8 36:4,5 39:7
48:9,12,18 53:22 54:8
58:3,4 76:3

hard 50:23

head 7:11 36:1,6,7,8,9
45:19,20 64:10,11

heads 35:10 39:12

Health 13:9

hear 7:18 31:2 73:3

heard 55:7 71:22

hearing 78:8

held 6:5

hereto 18:9 59:16 65:10

hesitate 8:15

Hey 8:15 65:17

high 11:11,12,19

hire 29:4 42:21

hired 43:3,5 44:5

history 48:13 69:18,19

Hold 71:7

home 53:1

hospital 75:1

hour 41:10

housekeeping 7:6

HR 15:23 16:12 26:14
46:13,20

HRIS 26:13

HRS 16:11

huh-uh 8:4

human 15:13,15,18 16:2,
6,9,13,22,23 24:18 28:23
33:22 36:16 39:11

hundred 27:9,13

hypothetical 26:2 35:2
50:17,20 55:22 56:1

hypotheticals 59:18

**I**

idea 29:11

identification 18:8
59:15 65:9

immediately 11:19
48:20 58:6

inappropriate 50:10

incidences 59:18

incident 76:11

incidents 66:1

include 19:2 20:15,21
37:1

included 60:16

includes 16:10 18:3
68:12

including 69:14

INDEX 4:1,5

individuals 57:16

inform 33:3

information 7:13 24:19
29:6,9,12 36:17,23 47:11
69:13 70:2

instance 7:21 34:21
57:21 60:16 61:17

instances 33:10,16 40:6
58:2 67:2

interactive 30:6

interested 78:10

interrogatories 21:5,12

interrupt 6:2

investigate 32:21,22
35:21 36:7,10 38:23
48:10 61:16 62:16 64:12
66:11 72:8,10,14,20

investigated 31:15
61:17 62:14 63:1,6,15,22
64:7 67:1 72:9

investigating 22:12

investigation 27:4 33:2
35:7,11,17,19,23 36:16,
18 37:2,3,6 38:14,15



39:13,22 40:8 61:2,5,9,
11 72:4,16

**investigations** 35:13
36:23 41:1

**involved** 26:16 36:14
37:4

**involvement** 35:16

**irrelevant** 75:16 76:1,7

**issue** 67:19 70:12 71:14

**issues** 31:14 65:19

**items** 19:8

---

**J**

jm@vlgal.com 3:8

**job** 6:17 16:7 45:5,14
69:14,16

**John** 66:2

**Johnson** 66:5

**Johnston** 16:20 28:1,14
29:1 31:21 32:8 39:19
41:3 53:20

**Johnston's** 16:21

**Jon-kaden** 1:20 3:4 7:3
9:11 17:13 30:19 41:9
42:5 49:21 56:23 70:5
77:19

**Jon-kaden's** 71:11

**Jr** 3:13

**jump** 9:18

---

**K**

**KADEN** 9:23

**Karen** 1:19 2:5 5:1 6:22
78:18

**keeping** 40:17

**Kelli** 1:15,18 2:4 4:2 5:9,
12 6:14 9:11 10:2 21:18
23:7 24:2,13 26:4 31:4
50:21 62:9 65:17 74:20
75:17 76:8 78:5

**khaki** 46:1

**khakis** 49:7

**kin** 78:9

**kind** 9:3 29:11 30:20
33:4,11 36:23 38:22 43:6
67:7 73:5

**knowing** 49:9 52:3

**knowledge** 27:3 28:2
31:17 44:9

---

**L**

**Large** 2:6 5:3 78:3,19

**latitude** 22:9

**Law** 3:5 7:3

**lawsuit** 10:16 19:18
75:16

**lawyers** 20:5,7 23:20

**leading** 2:12

**learned** 76:1

**leave** 77:17

**leeway** 71:15 76:5

**lesson** 29:13 30:1

**letting** 76:4,23

**licensed** 78:11

**Lightfoot** 3:13 6:8,13
9:10 17:13,19 18:10,16
19:10,15 21:17 22:3,19,
23 23:5,23 24:10 25:2,
10,15,23 26:7 28:17
30:18 31:3 32:11,19 33:5
35:1 36:11 37:7,14,17,21
38:2,11 39:2,14,23 40:9,
12,19 41:2,9,14 42:4,9,
16,20 43:11,14,20,23
44:8,11,15,22 46:8 47:9,
16,21 48:23 49:8,12,17,
23 50:19 51:9,19 52:1
54:18,22 55:3,7,13,21
56:5,13,22 57:4,9 58:22
62:8 63:7 64:14 67:23
69:7,10,17,20 70:4 71:3
74:6,14,19 75:15,23
76:21 77:15

**limit** 71:20

**lines** 8:1

**Ling** 3:20 45:11,22
57:21,22 64:13 66:2,11
72:19,20 73:5

**listed** 19:8 26:18

**literally** 49:17

**litigation** 23:15 24:7,9
25:9 63:9 70:1 76:2

**located** 29:14 30:2

**long** 11:22 12:7,16 14:1,
22 37:5,13 43:2

**lot** 55:18 56:3 57:16

---

**M**

**M-A-R-C-I-L-L-A** 38:7

**Madam** 25:20 46:17
47:18 50:14 54:5 56:19

**made** 2:11 29:15 31:14
34:7 46:20 47:3,15 61:6,
14 65:23 73:21

**make** 2:13 7:13,16,23
8:8 9:17 17:10,14,16
18:13,16 34:10,14,23
38:18 56:15 62:8,13 63:9
64:19 75:2,5 77:16

**makes** 26:9 74:7

**making** 28:22 65:21

**man** 50:7,11 51:6

**management** 35:16
72:13,17,18

**manager** 14:10,12,21,22
15:2,13,18 25:4,6 33:20
68:2

**Marcilla** 38:4,7

**marked** 18:8 59:15 65:9

**master's** 11:8,9 13:2,13,
15

**matter** 7:5 15:9 48:19
58:5 60:3

**matters** 15:21 18:4,22
19:2,6,14 42:10

**maximum** 67:9

**MAYNARD** 3:14

**means** 43:3,5 44:4,17
45:3 46:14 52:11 55:5
57:14 59:9,20 60:17,23
62:16 63:4,15 64:1 65:19
70:17 72:6 73:22 74:3
75:6,10,14,22 78:6

**medical** 1:9,11 3:10,11
10:22 13:10,12,15,18,21
18:3 31:7

**medication** 10:21

**meet** 23:2 55:18 57:16

**meeting** 20:7

**memory** 10:23 44:23
53:23

**men** 50:5

**merit** 38:10

**message** 52:18 59:7
63:15 64:1,4 74:2

**messages** 4:8 52:7,11
58:15,18 63:2 73:23

**met** 20:5

**mic** 7:17

**Michelle** 25:7

**MIDDLE** 1:2

**mind** 8:16

**minimum** 69:15

**minutes** 58:11

**mischaracterization**
22:20

**mispronounce** 66:4

**missed** 67:10,15,17
68:13,14,22 69:5 70:12,
14 71:1,14 72:1

**Mobile** 12:6

**months** 12:8,17,18
24:13

**morning** 7:2 66:21,22

**Morris** 3:6 66:3

**move** 7:6 19:22 41:18,19

**movements** 7:11

**Moving** 72:4

**Mullen** 1:20 3:4 4:3 6:9,
12 7:1,3 17:15,21 18:11,
18,21 19:13,21 21:23
22:13,22 23:2,9 24:5,21
25:5,14,20 26:5,15 28:21
30:22 31:16 32:15 33:1,9
35:6 36:17 37:11,16,19
38:1,5,18 39:8,17 40:4,
11,16,21 41:4,12,16

---



42:7,15,18,22 43:13,16
44:4,10,13,17 45:2
46:11,17 47:1,14,18,22
48:1 49:4,11,15,22 50:4,
14 51:3,16,21 52:4 54:5,
20 55:1,4,11,16 56:4,9,
10,19 57:3,7,11,13 58:9,
13 59:1,11 62:12,15
63:12 64:16 65:5 68:4
69:13,18,22 70:14 71:19,
21 73:15,18 74:11,17,21
75:2,5,20,21 76:12,19,23

**N**

**Nancy**  3:20 45:11,22
57:21,22 64:13 66:2,11
72:19,20 73:5,8

**narrow**  24:6

**national**  31:10

**nature**  5:23

**NEXSEN**  3:14

**Nicholas**  1:6 3:3 7:4
52:12,20,23 57:14 59:8
63:16 65:13 66:9

**night**  74:15

**nodding**  7:11

**noneffective**  48:11

**nonsupervisor**  31:22

**nonsupervisors**  33:14

**North**  3:15

**Notary**  2:5 5:2

**notes**  23:10

**notice**  2:18 4:7 18:2,13
20:1 61:13 65:21 72:7

**number**  19:17 62:20,22
67:12 78:13

**numerous**  65:18

**nurse**  11:6 13:22 14:1,9

**nursing**  11:8,9 12:13
13:2,23

**O**

**oath**  10:12

**object**  9:19,21 19:19

21:17 22:8,19 25:2,15,23
26:1 28:17 30:18 32:11,
19 33:5 35:1 36:11 37:7,
14,17,21 38:12 39:2,23
40:9,12,19 44:8,11,15
46:8 47:9,16,21 48:23
49:8 51:9,19 52:1 54:18
63:7 64:14 67:23 69:7
75:15 77:18

**objection**  19:10,17 23:5,
23 24:10 25:10 28:17
38:2,11 39:14 41:2
49:12,19 50:19 55:21
56:13 71:3 74:6,19 75:23

**objections**  2:10,13 6:6,
7,8,9

**obligation**  57:22

**obtain**  12:1

**occurred**  35:11,15

**offered**  2:15

**office**  53:2

**officer**  16:23

**officially**  18:6

**open**  77:9,12,17

**open-door**  48:12

**operations**  14:16

**opportunity**  9:18 17:5
60:11 68:21 69:3 70:22

**oral**  5:10

**order**  36:9

**orientation**  29:22

**origin**  31:10

**outlined**  31:6 33:8 51:15
58:1 62:19

**P**

**P.C.**  3:14

**p.m.**  52:19 53:3 65:15
66:8

**pants**  46:2,15 49:7

**paper**  44:19

**paperwork**  42:13

**Paragraphs**  19:3,6

**parking**  55:18 56:3
57:16

**part**  36:18 37:9 45:4
60:15 70:18 74:8

**participating**  5:16

**parties**  2:3,13 5:22 6:3
36:14 37:4 78:9

**parts**  55:9

**patients**  14:17

**penalty**  10:12

**people**  55:18 62:17 73:3
77:11

**perfectly**  56:23

**period**  46:22

**perjury**  10:13

**perpetuity**  37:12

**person**  32:17 43:21

**personally**  26:16

**personnel**  42:6,13,20

**physical**  7:10

**physically**  5:17

**picked**  7:9

**picks**  7:17

**piece**  64:8

**pieces**  14:19 68:11

**place**  27:1 31:8

**plaintiff**  1:7 3:3 7:5
10:15

**plaintiff's**  4:6 18:7 59:14
65:8 69:14

**plenty**  62:5

**point**  65:21 67:15

**policies**  24:18 26:12
32:5 34:22 41:6,19 51:8
53:16 69:4

**policy**  24:17,22 26:11
30:13,16 31:5,17 32:10,
16,17 33:4,10,11 45:16
48:9,12,13 50:4,7 51:15
53:19,21 54:1,17 55:6,
12,20 57:18 67:16 68:5,
7,10,11,15,22 70:15,23
71:18 72:1 74:4

**portion**  68:14

**position**  13:20 14:10
15:5,11 16:21

**Possibly**  31:21

**post**  63:8

**Powerpoint**  30:8

**preparation**  22:17

**prepare**  20:3 23:3

**prepared**  19:1,8,11,13,
15

**present**  3:19 5:17 14:16

**presentation**  30:8

**president**  16:22

**presidents**  65:19 66:12

**pretty**  51:18,23 53:9
63:5,17 71:18 76:16

**previous**  44:12,13

**previously**  18:5 20:9
21:4 58:1 74:1

**prior**  2:15 17:6 28:10
43:5 44:4 45:2 68:23
69:5 71:1 72:2

**privilege**  63:10

**problem**  66:6 70:15

**procedure**  5:5 40:17,22

**procedures**  41:6,19
69:4 70:15

**proceeding**  5:16,19 6:4

**proceedings**  5:11

**process**  35:7,12

**produce**  42:6

**produced**  21:21 23:14,
19 24:7,8,13 25:9,12
30:20 42:5,8 52:5 64:20
70:2

**product**  63:11

**production**  4:9 20:16,18
52:6 58:20 59:5,12 62:1
64:18 65:6 70:1,3

**program**  24:17,22

**progressive**  14:4,7,11,
13,23 15:3



**project** 7:16

**promoted** 14:10 16:1

**propositions** 54:11

**provide** 29:17 36:15
38:22 39:11 72:15 73:5

**provided** 5:5 29:4 44:19
58:8 61:12

**Public** 2:6 5:2

**pull** 26:14

**pulled** 23:18 26:13

**pulling** 48:2

**punch** 67:5,10,15,17,20
68:22 69:5 70:2,14,19
71:1,9,14 72:1

**punches** 68:13,14 70:13

**pursuant** 1:21

**put** 11:1 17:12 30:23
34:12,17 35:4 65:21 72:7
77:7

**putting** 52:15

**Q**

**qualifications** 69:16

**question** 7:20,22 8:10,
11,14,17 9:2,3,14 21:19
22:4,10,16 24:1,15
25:19,21 26:8 27:23 34:9
35:18 39:10 46:16,18
47:5,17,19 48:21 49:16,
18 50:1,13,15,17,18 51:1
54:4,6,16 55:14 56:6,7,9,
14,16 57:2,6,8 58:23
59:3,22 68:8 69:2,9
70:11,12 71:7 75:4,18,19
76:9

**questions** 2:11,12 7:8,
14 8:12 9:15 10:10 19:22
25:17 30:6,10 60:8,12,
13,15 64:15 71:11 73:19
76:6,20,21 78:5

**quick** 9:10 77:1

**quit** 15:2

**R**

**race** 31:10

**reach** 33:21

**reached** 65:18

**read** 6:15,19,21 11:1
25:22 46:19 47:20 50:16
54:7 60:5

**real** 9:17 77:1

**realized** 58:15

**reason** 44:5

**recall** 23:1 24:23 25:1,
13,14 26:3 27:19,21,22
28:12 31:19 32:6,7
37:15,23 39:16,17 40:10,
20 42:3 53:17,23 63:18
64:8 67:19

**recalls** 77:10

**receive** 12:9 32:3 35:14
36:14 39:6 67:7

**received** 13:1 35:9
72:11

**receives** 35:8 36:5

**recess** 41:15 58:12
73:17

**recognize** 52:7

**record** 7:13,21 9:9 10:1
25:22 34:7,10,18 36:19,
21 37:9 42:1 46:19 47:20
50:16 54:7 76:22 77:1,5,
7,11

**records** 37:13,18,19
45:23 46:12

**recruiting** 15:20 16:10

**refer** 30:19

**referring** 15:8 62:20
67:13

**reflecting** 45:12 46:12

**refresh** 53:23

**refusing** 70:18

**registered** 11:6

**relate** 50:23 56:17

**related** 19:23 20:10
45:23 70:16 76:11

**relations** 15:22

**relevance** 64:14

**relevant** 16:14 19:18
70:6

**remain** 77:8,12

**remember** 22:6 25:11
31:5 56:22 69:8

**reminder** 39:6

**reminding** 29:13

**remotely** 5:19,21 6:5

**reopen** 77:20

**repeat** 25:19,21 32:13
34:9 46:16,18 47:19
49:16 50:1,13,15 54:4,6
57:6 75:4,19

**repeated** 49:23

**rephrase** 8:11 15:6

**rephrasing** 8:16

**replied** 53:1 66:9

**reply** 53:5

**report** 16:19 33:10,16
34:1,5,20,23 37:1 47:3,8,
15 48:10 57:22 58:2
73:6,8,12

**reported** 57:20 66:19
72:6

**reporter** 5:1,15 6:2,10,
16 7:12,18 8:6 9:12
25:20 46:17 47:18 50:14
54:5 56:19 57:6 78:12

**reporting** 5:18 16:11
32:4 78:12

**reports** 48:11

**represent** 7:4

**represents** 78:7

**request** 9:1 35:4 47:10
49:5

**requested** 18:23 47:14
48:22

**requesting** 46:14

**requests** 54:11

**required** 14:20 23:18
30:9 33:10 34:4 43:7
47:8 69:15

**resignation** 46:22

**resources** 15:13,16,18
16:2,6,9,13,23 24:19
28:23 33:22 36:16 39:12

**respective** 2:3

**respond** 35:21

**response** 9:3 20:12,13,
19 21:5 49:14

**responses** 20:20 21:12

**responsibilities** 15:17

**responsibility** 14:18
15:19 16:8,12 48:18 58:5

**responsible** 14:15
28:21

**rest** 56:8

**restroom** 8:21

**result** 78:10

**results** 37:5

**retain** 37:5

**retaliated** 59:21 60:18
70:17

**retaliation** 39:1 70:18
76:3

**review** 17:5 18:14 20:8,
11,21 21:3,6,11,15 22:2
35:20 38:15 62:5 68:21
69:3 70:23 71:5,17,23
73:8

**reviewed** 19:7,11 20:23
21:20 22:17 70:7

**reviewing** 22:6

**revised** 28:9,11,15

**revision** 28:10

**revisions** 28:8

**revisit** 77:13

**role** 15:14 16:7 23:13,17
45:14

**Rules** 5:5

**run** 14:20

**S**

**s/karen** 78:17

**safe** 31:8 65:22



SAITH 77:23

school 11:11,12,19

scope 15:23 70:10 71:4

screen 17:8,12,18 18:17, 22 19:1 20:9 30:23 48:2 54:9 58:2,17,19 61:23

scroll 18:21 52:8 62:3,6

scrolled 19:5

scrub 46:2,15 49:7

section 54:9

sends 52:19

sense 74:7

set 1:22

sexual 31:10 53:22 54:8, 10,11

shaking 7:11

share 17:8

sharing 18:15 58:19 61:23

short 8:22 41:15,17 58:12 73:17

show 39:7 42:1,21

showing 17:17 18:1 52:4 65:16

sic 52:19

side 73:3

sign 6:15,19,22

silly 22:4

similar 8:5

single 6:18 21:1

sir 9:22

sit 30:5

situation 40:15 49:9,19 50:3,22 51:5,7,20,21 52:3 55:16 56:2,17 57:13

situational 49:11

situations 51:2,3

small 17:22

Smith 1:19 2:5 5:1 78:17, 18

sort 22:4 31:9 63:8

sound 8:5 42:23

sources 27:5

South 12:5,10,14

Southern 11:20,22 12:2, 4

speak 24:4 36:13 72:22 73:3

speaks 49:1

special 32:3

specific 17:3 24:4 39:11 40:14 45:17 64:8

specifically 11:9 19:23 28:23 41:7 62:19 63:5 69:5 71:1 72:23

spoke 66:2,12

staff 14:16

standard 40:17,22 74:8

standing 9:2

start 9:16 13:17 35:11, 17,18 42:2,3 46:2 62:7 77:2

started 13:11 14:8 58:19 72:16

starting 16:15

starts 48:13

state 2:6 5:3 6:5 9:8 10:1 11:20 78:2,19

stated 21:4 35:14 39:5 62:23 66:16

statement 48:9 51:7 77:16

STATES 1:1

status 39:21

stays 8:1

stenotype 78:5

STIPULATED 2:2,9,17

stipulation 5:6

stipulations 1:22 6:11, 14

stop 8:21 18:15 46:1

stopped 14:9

store 23:21

story 73:4

stretch 44:6

strike 57:12 67:2

submits 39:20

substantiate 40:3,5 73:13 76:13,15,17

substantiated 38:10,17

suggest 71:16

Suite 3:6,15

summarizing 21:11

supervising 52:13

supervisor 33:20 34:2, 4,22 44:12,14,18 45:3,8, 9 46:13 47:7,8 49:5 50:11 51:5,17,22 52:11 53:13 55:17 57:21 59:9 68:1 73:21

supervisors 31:22 32:3 33:13 47:10

supposed 36:1,9 53:8 71:17

Susan 16:20 28:1,14,23 31:21 32:8 39:19 41:3 53:20

Sutricia 66:5

sworn 5:13,21

system 24:19 26:10,11 29:6

systems 26:10

---

**T**

table 48:5

takes 35:7,12

taking 10:21

talk 31:1 77:19

talked 58:15 64:21 70:20

talking 6:14 77:4

tardies 68:12

team 15:20

technology 5:23 9:13

telling 51:17

tells 51:22 55:17

tempted 71:10

ten 58:10

ten-minute 41:14,17 58:10,14 73:16

termination 67:11,16

testified 5:14 74:1

testify 10:23 17:3 19:2,8, 12,13,16

testimony 10:11 77:3,13 78:7

text 4:8 52:7,10,18,20 58:15,18 59:7 63:2,15 64:1,4 73:22 74:2 76:16

thanking 77:2

thereto 2:16 78:6

thing 9:11

things 7:6,9 31:11 51:14

third-party 27:4

thirty-eight 27:13

thirty-nine 27:9

thought 57:9

Thursday 53:2

time 2:14 6:6 10:9 13:14 14:6 16:14 22:16 27:15 28:6,11 30:11,16 38:6 45:2 46:20 50:23 57:1 61:8 62:5 64:3 66:19 68:3 72:18 77:9

times 10:8 28:8

tiny 17:19

today 10:11 11:2 15:14 17:1,6 18:5,13 19:2,9 21:16 22:18 23:11 53:1,8 64:5,6 68:23 69:6 71:2 73:20 77:3

today's 20:4 21:10 23:3 25:9 72:2

told 57:14

tolerate 31:9

tomorrow 53:10

tons 42:12

topic 69:8,11 70:8



**topics** 17:3,6,9 19:16
71:8

**training** 29:17,20 30:4,7
31:23 32:4 38:23 39:11

**transcribed** 78:6

**transcript** 1:14 8:8 78:7

**transcription** 78:6

**trial** 2:14

**trip** 8:13

**trouble** 43:7 67:5,6

**true** 57:17,19 78:7

**Truitt** 1:15,18 2:4 4:2
5:9,12 10:2,3 11:4 17:1,
11,21 18:11 20:3 26:15
58:23 59:2 77:2 78:5

**truth** 44:7

**truthfully** 10:23

**turn** 41:5

**two-weeks'** 61:13 65:21
72:7

**typo** 53:7

**U**

**uh-huh** 8:4

**umbrella** 16:10

**unclear** 7:21

**underneath** 16:9

**understand** 8:14,16 9:5
10:10 15:7 17:1,22 22:15
24:1,15 25:17 26:2,7,21
32:14 39:8 52:10 56:6,7
57:5 72:5 75:18 76:9

**understanding** 18:12
27:14 75:13

**Union** 11:20,22 12:2,4

**unit** 14:4,7,11,13,14,23
15:3

**UNITED** 1:1

**University** 12:5,10,15,
16,22 13:5,7

**unwelcome** 54:10 55:8,
11 74:9,12,16,17,21,23
75:8

**unwilling** 74:3

**Ursula** 43:3,5 44:4,17
45:3 46:14 52:11,19
57:14 59:9 60:17,23 63:4
64:1 65:19,20 70:17 72:6
73:22 74:3 75:10,13,21

**usual** 6:11,13

**V**

**vague** 23:23 24:11

**vagueness** 26:1

**verbal** 34:15

**verbally** 7:8,15 8:2

**vice** 16:22 65:18 66:12

**video** 30:4

**view** 30:9

**violate** 51:8 54:16 55:19

**violates** 32:18

**violation** 32:16 33:4,11
34:21 53:15,19 54:1
55:6,12 56:11 57:18
74:4,18,19,22 75:7

**violations** 67:5

**Virtus** 7:3

**visible** 18:18

**VITRUS** 3:5

**voice** 7:16

**W**

**wait** 7:19

**Waits** 66:3

**waived** 2:19

**waiving** 77:21

**wanted** 51:22 53:9

**wanting** 41:18

**warnings** 67:7

**Warren** 3:13

**watch** 30:5

**water** 8:21

**wear** 46:14

**wearing** 46:1,2

**Wednesday** 52:16 53:8

**week** 46:22 53:2 61:7

**whoop** 62:21

**witnesses** 48:17 58:4

**wlightfoot@
maynardsexsen.com**
3:17

**woman** 50:8,12 51:6

**women** 50:5

**word** 6:18 56:11

**worded** 68:18

**words** 8:3

**work** 13:8 15:21 16:10
17:23 30:7 31:8 43:2
48:18 50:5,8,12 51:6
58:4 60:23 63:11 70:19
71:12

**working** 13:11 16:16
41:21 53:1 67:20

**worry** 9:15

**writing** 34:13,18 35:5

**written** 34:23 43:7 49:3
66:7,15

**wrong** 73:23

**Y**

**y'all** 17:16 76:23

**year** 11:13 29:5,8,12,23

**yearly** 29:16 39:6

**years** 11:23 12:17,19
14:2 15:1 28:5 37:12
43:4

**Z**

**Zoom** 1:21 2:6 5:8 7:8,15
8:4



EXHIBIT

1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **NICHOLAS BARNES,** | ) | |
| **an individual,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO:** |
| | ) | |
| **EAST ALABAMA MEDICAL** | ) | **3:24-cv-00512** |
| **CENTER FOUNDATION, d/b/a** | ) | |
| **EAST ALABAMA MEDICAL** | ) | |
| **CENTER,** | ) | |
| **a nonprofit corporation,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

---

### NOTICE OF 30(B)(6) DEPOSITION TO EAST ALABAMA MEDICAL CENTER

---

Please take notice that the deposition of Defendant East Alabama Medical Center will be taken upon oral examination on a **April 30, 2025 at 9:00 AM** before a Notary Public or some other officer authorized by law to administer oaths, for the purpose of discovery, the use as evidence in this action, or both purposes, pursuant to the *Federal Rules of Civil Procedure* 30(b)(6), as amended. **Such deposition shall be taken via Zoom**. The testimony shall be recorded by stenographic means.

Defendant shall provide Plaintiff's counsel with written notice at least ten (10) business days before the date of the deposition of the name(s) and title(s) of the designee(s) who will testify on Defendant's behalf and shall identify the matters to

which each designee will testify. Plaintiff reserves the right to seek relief from the Court in the event that the designated deponent is not properly prepared to testify on behalf of Defendant with respect to each of the identified matters.

## MATTERS UPON WHICH EXAMINATION IS REQUESTED:

1. Allegations of the Complaint and the Answer, including any affirmative defenses.

2. The creation, adoption, amendment, and implementation of Defendant's anti-discrimination policy, including the individuals involved and the dates the policy was created, adopted, amended, or implemented.

3. Defendant's employee disciplinary policies.

4. Policies, procedures, and practices for enforcing Defendant's anti-discrimination policies, including the process for reporting, investigating, and resolving complaints of discrimination.

5. The contents of Plaintiff's EEOC Charge(s) and Defendant's response(s).

6. Plaintiff's employment history with Defendant.

7. The person or persons who were Plaintiff's supervisor(s).

8. The compensation system in effect during Plaintiff's employment and the procedure or method used to determine Plaintiff's wage or other monetary compensation including bonuses.

9. Defendant's record-keeping and document retention policies, procedures,

and practices.

10. The receipt of Plaintiff's EEOC Charge(s).

11. Information about Plaintiff's job(s) while employed by Defendant, including job descriptions and the minimum required or desirable qualifications for each position.

12. The responses of Defendant to Plaintiff's discovery requests, including, but not limited to, interpretation of the documents produced and identification of such documents.

13. Formal or informal complaints made by any employee of Defendant against Ursula Means, including formal and informal internal complaints, as well as complaints filed with the Equal Employment Opportunity Commission.

14. The employment history of Ursula Means.

15. Any investigation(s) by this Defendant of the alleged conduct described in Plaintiff's Complaint in this action.

16. The facts and circumstances concerning the collection and production of documents in this litigation.

Respectfully submitted,

*/s/ Jon-Kaden Mullen*
D. Jeremy Schatz
Jon-Kaden Mullen

*Attorneys for Plaintiff*

<u>OF COUNSEL:</u>
Virtus Law Group
2017 Morris Ave, Ste 100
Birmingham, AL 35203
js@vlgal.com
jm@vlgal.com
205-946-1924

## **CERTIFICATE OF SERVICE**

This is to certify that on this the 28th day of April 2025, a copy of the preceding has been served upon all counsel of record via the Electronic Mail system, Email and/or U.S. Mail.

      Warren B. Lighfoot, Jr.
      Brock Phillips
      Maynard Nexsen, P.C.
      1901 Sixth Avenue North
      1700 Regions/Harbert Plaza
      Birmingham, AL 35203
      wlightfoot@maynardsexsen.com
      bphillips@maynardsexsen.com
      *Attorney for Defendant*

                                                            */s/ Jon-Kaden Mullen*
                                                            OF COUNSEL







exhibitsticker.com

**EXHIBIT**

_3_

# Kelli Truitt

**From:**      Kelli Truitt
**Sent:**      Tuesday, February 27, 2024 3:53 PM
**To:**        Nicholas Barnes
**Subject:**   Re: Urgent Matter

Nicholas,

We take your concerns seriously. Due to this, we'd like to let today be your last day of employment and will pay you through Friday. Please return your hospital badge, computer and any other hospital property to Human Resources by Friday, March 1st.

Kelli

Get Outlook for iOS

**From:** Kelli Truitt <kelli.truitt@eamc.org>
**Sent:** Tuesday, February 27, 2024 3:21 PM
**To:** Nicholas Barnes <nicholas.barnes@eamc.org>
**Subject:** RE: Urgent Matter

Thank you, Nicholas.  We are investigating your concerns.

Kelli

**From:** Nicholas Barnes <nicholas.barnes@eamc.org>
**Sent:** Tuesday, February 27, 2024 3:13 PM
**To:** Kelli Truitt <kelli.truitt@eamc.org>
**Subject:** RE: Urgent Matter

I spoke with Mrs. Nancy numerous times about the things that keep happening and she asked me would I like to have a sit down with the three of us but I feel like that she will try to intimate me into saying the things she wants me to say in the meeting honestly. Mrs. Kelli, I have worked here 5 years and everyone knows me for being a hard worker and not confrontational. For me and to feel uncomfortable about working this job is not right at all. I am not the only employee that is being treated like this. I may get treated worse for speaking out about the situation from her at times because but there are other employees that are treated in a horrible way also. I am sorry if I caused any problems but I feel like my wellbeing should mattered here at EAMC and I should not have to look around while going to my car because of threats from her.

CONFIDENTIAL

EAMC/Barnes_00292

Nicholas Barnes
Contract Coordinator
Supply Chain Services
The East Alabama Health Care Authority
2000 Pepperell Pkwy
Opelika, AL 36801
Office: (334)528-4247
Mobile: (706)518-8993
Sent from Mail for Windows

East Alabama
Health

---

**From:** Kelli Truitt <kelli.truitt@eamc.org>
**Sent:** Tuesday, February 27, 2024 2:45:19 PM
**To:** Nicholas Barnes <nicholas.barnes@eamc.org>
**Subject:** RE: Urgent Matter

Nicholas,

Thank you again for bringing these concerns to my attention. I will continue to investigate this with Nancy Ling. Could you please specify which Vice Presidents you spoke to about this?

Thank you,

Kelli

**From:** Nicholas Barnes <nicholas.barnes@eamc.org>
**Sent:** Tuesday, February 27, 2024 12:05 PM
**To:** Kelli Truitt <kelli.truitt@eamc.org>
**Subject:** Urgent Matter

Hey Mrs. Kelli,

I have reached out to numerous directors and vice presidents about my issues with Ursula Means. Mrs. Ursula has harassed me constantly to the point of making me put in my two weeks notice. I do not feel safe at all going to my car after work because of the comments that she has made towards me. There have been incidents happening over and over. I spoke with Nancy Ling, John Morris, Chris waits , Chuck beams, Brenda Clarke, Sutricia Johnson, and others about the problem that is going on.

CONFIDENTIAL

EAMC/Barnes_00293

I have spoke with Mrs. Nancy Ling the director of the department on the matter numerous times and she has not done anything about the matter of the constant harassment from Mrs. Ursula Means. I fear that she has not done anything because she brought Mrs. Ursula in with her from her previous company. There has been numerous things that has happened.

1. I was told that I should stop wearing my formal clothing to work and only wear scrubs into work. I agreed to only wear scrubs to work but I mentioned that Mrs. Nancy stated that it was fine to wear them to work sometimes and Mrs. Ursula stated that she would rather seem me in scrub pants and made a sexual look at me. I acted as I didn't hear her and started back doing my work.

2. I also had a meeting with Mrs. Ursula in her office because she wanted to have a heart to heart talk. I took the meeting with her and stated that I would not like to be friends but I would like to keep things professional while working. She got upset and stated that I should leave her office with my ugly face.

3. The next day she came back to my office and stated that I look like a scary employee. That she could get someone to whoop on me.

4. Ursula Means stated that she was going to fire me or make me quit to a employee name Laquesha Lester that is in the department. Her and Laquesha are best friends in the department because they were brought into EAMC together by Mrs. Nancy from a different hospital. Laquesha told me this because she stated that I should start looking for a new job. Because Mrs. Ursula wanted to bring in someone named Ashley for my position.

5. I was working at my desk upstairs in the department and she stated that I should get my things and move them to the EVS closet because I was useless. I asked to please be moved some where else because the EVS utility closet is not for office use. She moved me to the Cath lab materials room. And gave my office to her Laquesha Lester.

6. Also I have noticed that my times were not being approved on time and it was giving me missed punches. It gave me 19 missed punches and I have never been over 7 before she came. I reach out to Mrs. Penny in payroll and she stated that it was not being approved by Ursula Means. And that she would talk to her. I asked Mrs. Penny and Lisa wolf please not state that I asked about it because it would only make the situation that I am in worse. After they reached out to Mrs. Ursula she called me into her office the same day and asked did I snitch on her. And stated that if she gets fired or in trouble she will have her son and nephew to mess me up and, whoop me in the parking lot.

7. Today she called me into a meeting and she stated that she understands that I may have checked out and I stated that I have not checked out I am a loyal worker until the end, I have been a hard worker for 5 years but I can not continue to receive the parking lot threats. She pulled her glasses on top of her head and stated that she does and says whatever she chooses. They are not threats that they are promises.

**Nicholas Barnes**
Contract Coordinator
Supply Chain Services
The East Alabama Health Care Authority
2000 Pepperell Pkwy
Opelika, AL 36801
**Office:** (334)528-4247
**Mobile:** (706)518-8993
Sent from Mail for Windows

CONFIDENTIAL

EAMC/Barnes_00294

EAMC/Barnes_00295

CONFIDENTIAL

East Alabama
Health

## CERTIFICATE OF SERVICE

This is to certify that on July 8, 2025, a copy of the preceding has been served upon all counsel of record via the Electronic Mail system, Email and/or U.S. Mail.

    Warren B. Lighfoot, Jr.
    Brock Phillips
    Maynard Nexsen, P.C.
    1901 Sixth Avenue North
    1700 Regions/Harbert Plaza
    Birmingham, AL 35203
    wlightfoot@maynardsexsen.com
    bphillips@maynardsexsen.com
    *Attorney for Defendant*

                              */s/ Jon-Kaden Mullen*
                              OF COUNSEL