# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF ALABAMA
# EASTERN DIVISION

| | |
|---|---|
| **NICHOLAS BARNES,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:24-cv-00512-ECM |
| ) | |
| **EAST ALABAMA MEDICAL** ) | |
| **CENTER FOUNDATION, D/B/A,** ) | |
| **EAST ALABAMA MEDICAL** ) | |
| **CENTER** ) | |
| ) | |
| Defendant. ) | |

## DEFENDANT'S REPLY BRIEF IN SUPPORT OF
## ITS MOTION FOR SUMMARY JUDGMENT

Defendant East Alabama Medical Center ("EAMC" or "Defendant"), pursuant to Federal Rule of Civil Procedure 56(a) and the Court's Text Order setting a briefing schedule on EAMC's Motion for Summary Judgment (Doc. 24), hereby submits this Reply Brief in support of its Motion for Summary Judgment. Because Plaintiff Nicholas Barnes' ("Barnes" or "Plaintiff") Response in Opposition ("Response") does not identify any material fact in dispute, EAMC respectfully submits that its Motion for Summary Judgment is due to be granted as a matter of law and that Barnes' claims should be dismissed with prejudice.

**BARNES HAS NOT PRESENTED ANY GENUINE DISPUTE OF MATERIAL FACT ON HIS SEXUAL HARASSMENT CLAIM.**

As Barnes acknowledged in deposition, the allegations covered in EAMC's Initial Brief and Plaintiff's Response constitute every instance underlying his sexual harassment claim, which is based solely on the alleged actions and comments of Ursula Means ("Means"). (Ex. A, 163:10-17.) This evidence is insufficient to maintain an actionable Title VII sexual harassment claim as a matter of law.

***Much of the Complained-of Conduct was Not Sexual Harassment or Otherwise Based on Barnes' Sex***

Plaintiff devotes only three sentences (with no citations to the evidentiary record) to his argument that the complained-of alleged harassment by Means was, in fact, based on Barnes' sex. (Doc. 25 at 14–15.) However, the evidence demonstrates that several of the instances of alleged harassment have no connection to Barnes' sex at all. For example, Barnes testified that one of Means' "harassing" acts was not approving his time-card punches, which he believed almost resulted in the termination of his employment. (Doc. 1, ¶¶ 33-36; Ex. A, 118.15-119:3.) In its Initial Brief, EAMC explained this underlying time-card issue and how Means was actually instrumental in resolving the issue, which was caused by Barnes' remotely clocking-in and clocking-out from another time zone. (Doc. 22 at 12-14, ¶¶ 46-55; Ex. B, ¶ 16, Ex. 5.) In any event, Barnes offers no explanation whatsoever as to how

Means' alleged failure to approve his time-cards was based on his sex or how it equates to sexual harassment.

After the time-clock issue was resolved, Barnes testified that Means asked him if he "snitched on her" and that Means then yelled out to Nancy Ling ("Ling") (who was nearby) that Barnes snitched on her. (Ex. A, 118:15-120:10.) According to Barnes, Ling laughed in response to this comment from Means. (Ex. A, 119:23-120:10.) To be clear, Barnes never received any disciplinary action related to this time-clock issue. (Ex. A, 126:9-13.) Even aside from the obvious joking nature of this comment, there is likewise no evidence to conclude that this joke was based on Barnes' sex or that it constituted sexual harassment—nor does Barnes argue as much in his Response. The same goes for Means' alleged comment to Barnes that she would get her nephew and son, "Pooki and John-John," to "whoop" him. (Ex. A, 118:15-120:10.) Barnes offers no explanation as to how this comment was based on his sex and fails to explain how this comment was sexually harassing.

Even the two instances that Barnes alleges Means touched him over the thirteen months she supervised him had no indication that they were based on Barnes' sex. Barnes testified that the first "touch" happened when Means entered his office and touched him on his left shoulder. (Ex. A, 86:2-87:8, 88:19-23.) Barnes testified that he objected to Means touching him to get his attention and that he told Means she should just say his name instead. (Ex. A, 87:9-15) ("You don't have to

touch me to get my attention. You can [say] 'Nicholas' …") The second "touch" came when Barnes and Means were taking inventory in EAMC's storeroom. (Ex. A, 89:20-22.) Barnes himself testified that the aisles in the store room "aren't that big" and that Means bumped her hip against Barnes' hip "a couple of times." (Ex. A, 92:13-23.) There is no evidence that either of these "touches" was sexually harassing, and there is no evidence that either was based on Barnes' sex. Barnes provides no evidence to the contrary in his Response.

### *Barnes' Allegations Do Not Establish Severe and Pervasive Conduct*

As Barnes acknowledges in his Response, a hostile work environment claim is only actionable where the work environment is "sufficiently suffused with intimidation, ridicule, and insult . . . to alter the conditions of the victim's employment." *Copeland v. Georgia Dep't of Corr.*, 97 F.4th 766, 775 (11th Cir. 2024) (internal citations omitted). As the Supreme Court has explained, this requirement prevents the transformation of Title VII into a "civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). To this end, Barnes must show that the alleged harassment he suffered was objectively severe and pervasive. *See Bryant v. Jones*, 575 F.3d 1281, 1296–97 (11th Cir. 2009). Courts in the Eleventh Circuit consider four factors to determine whether harassment of an employee meets this objective requirement: (1) its frequency, (2) its severity, (3) whether it is "physically threatening or humiliating," and (4) whether

it "unreasonably interferes with . . . job performance." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc).

### *Frequency*

Here, Barnes argues he was "subjected to constant sexual harassment that included physical contact, humiliation, changes in work conditions, and threats of violence." (Doc. 25 at 16.) However, the undisputed evidence says otherwise. During his deposition, Barnes provided testimony about approximately seven comments/actions and two touches from Means, whom he confirmed was the only EAMC employee he claims harassed him. (Ex. A, 163:10-17.) Again, many of these comments and both of these touches were not even sexually harassing in the first place, and there is no evidence that many of these instances were in any way based on Barnes' sex. But even taking all of these alleged instances into consideration, Barnes still has not shown the frequency of harassing conduct required to surpass summary judgment.

The Eleventh Circuit has held that as many as five harassing instances over an eleven-month period was "too infrequent" to establish severe and pervasive conduct. *See Mendoza*, 195 F.3d at 1250; *see also Guthrie v. Waffle House, Inc.*, 460 F. App'x 803 (11th Cir. 2012) (holding the allegations of "only a few dozen comments or actions by [the perpetrators], spread out over a period of eleven months, that could arguably be construed as harassment" was too infrequent to establish

5

severe or pervasive conduct). The evidence does not begin to approach the frequency of harassing conduct the Eleventh Circuit has found sufficient to advance beyond summary judgment. *See, e.g., Dees v. Johnson Controls World Servs., Inc.*, 168 F.3d 417 (11th Cir. 1999) (reversing summary judgment for employer when Plaintiff alleged "almost-daily abuse"); *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002) (holding that ethnic slurs made to the plaintiff three or four times a day over a two month period was sufficiently frequent).

### *Severity*

The alleged conduct by Means also lacks the necessary severity. The Eleventh Circuit has granted summary judgment to employers in cases where the alleged harasser's conduct was much more severe and overtly sexual than the conduct Barnes alleges here. For example, in *Guthrie v. Waffle House, Inc.*, the plaintiff alleged that her coworker regularly called her "babe," stated he wanted to "lick her all over," talked openly to her about having sex with someone else, and grabbed her butt on multiple occasions. *Guthrie*, 460 Fed. App'x at 804. Despite this conduct, the Eleventh Circuit concluded the plaintiff had not met the legal standard for "severe and pervasive" harassment and affirmed summary judgment for the employer. *Id.* at 807-808.

In *Lockett v. Choice Hotels Int'l*, Inc., 315 F. App'x 862, 866 (11th Cir. 2009), over a four-month period, the alleged harasser touched the plaintiff's butt, talked

6

about sexual positions to her, and told her "he would go down on [her] good," but the conduct was deemed not severe or pervasive as a matter of law. *Id.* at 863; *see also Stancombe v. New Process Steel LP*, 652 F. App'x 729, 734-35 (11th Cir. 2016) (finding no severe or pervasive conduct amounting to sexual harassment where, over a one-month period, plaintiff's coworker touched plaintiff's buttocks, then only days later, "grabbed [Plaintiff's] head, and made [ ] pelvic thrusts in his face").

To be sure, harassment may be "more severe when it involves the participation of supervisors rather than solely peers or subordinates." *Copeland*, 97 F.4th at 777-778. However, an employee's status as a supervisor does not automatically transform any of her actions into evidence of a hostile work environment. To the contrary, the case law demonstrates that the analytical framework is the same for mistreatment by coworkers and supervisors. For example, the court in *Mendoza* found that the following conduct by a <u>supervisor</u> was not severe or pervasive:

> Construing the evidence in the light most favorable to [plaintiff], she presented evidence of four categories of harassing conduct: (1) one instance in which [the supervisor] said to [plaintiff] "I'm getting fired up"; (2) one occasion in which [her supervisor] rubbed his hip against [plaintiff's] hip while touching her shoulder and smiling; (3) two instances in which [her supervisor] made a sniffing sound while looking at [plaintiff's] groin area and one instance of sniffing without looking at her groin; and (4) [her supervisor's] "constant" following and staring at [plaintiff] in a "very obvious fashion."

*Mendoza*, 195 F.3d at 1247. Similarly, in *Mitchell v. Pope*, the Eleventh Circuit held that 16 instances of conduct over 4 years, perpetrated by plaintiff's superior officer,

was not severe and pervasive. 189 Fed. App'x 911, 913-14 (11th Cir. 2006). If 16 incidents over four years, by a superior, including incidents of trying to kiss the plaintiff, rubbing against her, and reaching across her chest, is not severe and pervasive, then the two incidents of non-sexual touching and approximately seven comments/actions by Means over an approximately thirteen-month period must also be insufficient as a matter of law to show severe or pervasive harassment.

### *Physically Threatening/Humiliating*

The third severe-and-pervasive factor asks whether the alleged conduct was "physically threatening or humiliating" or rather a "mere offensive utterance." *Mendoza*, 195 F.3d at 1246. At most, Barnes alleges that Means stated: "she could win in a fight against him, and that she was going to get third-parties [*i.e.*, "Pooki and John-John"] to attack him." (Doc. 25 at 17.) It is important that the Court review these comments in the context they were made. Mere boorish, crude, and unprofessional conduct does not constitute unlawful harassment. *See Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993). One important piece of that context is that Barnes is 6 feet and 6 inches tall and previously played collegiate and professional basketball. (Ex. A, 20:3-22:12, 24:20-25:21, 205:20-206:3.) Another piece of context is that both of these comments appear mere jokes. On one occasion, Barnes claims Means said in front of co-workers (including Barnes) that Barnes would not protect others in an active shooter situation and that she could probably "whoop"

Barnes. (Ex. A, 103:23-105:4.) Likewise, the alleged comment from Means that she would get "Pooki and John-John" to "whoop" Barnes was a joking comment, as even Barnes admitted Ling laughed in response. (Ex. A, 119:23-120:10.) Barnes seems to have been the only employee to take these comments seriously—though even that is questionable. Barnes admitted he never spoke with anyone in Human Resources with concerns about his safety, and he never reported this alleged comment to either EAMC security or the police or requested that EAMC security escort him to his car. (Ex. A, 205:8-22.)

Again, the Eleventh Circuit's case law offers helpful guidance on the level of harassing conduct necessary to survive summary judgment. In *Gupta v. Florida Bd. of Regents*, over a seven-month period, the plaintiff's supervisor "frequent[ly]" called her home at 9:30 or 10:00 at night and asked about her boyfriend; during some of the calls, asked if she was in bed; once stared at her legs when she wore a skirt; once told her she was beautiful; put his hand on her right thigh; lifted the hem of her dress about four inches; told her "Caribbean and Western people are really promiscuous," but he could "look at [her]" and could tell she was "innocent" and "d[oes]n't have much experience"; stated he "considered men superior to women, that women are like meat, and that 'men need variety in women'"; touched her bracelet; touched a ring she was wearing; and stated after a "dark and stormy night," that he "would have come and spen[t] the night with" her. 212 F.3d 571, 579-85

(11th Cir. 2000).[1] The Eleventh Circuit held this conduct was not physically threatening or humiliating so as to constitute actionable conduct. *Id*.

In *Latrece Lockett*, the Eleventh Circuit affirmed summary judgment in favor of the defendant-employer, noting that the defendant's conduct was not physically threatening or humiliating even when a plaintiff's coworker made repeated sexually explicit comments to her and referred to plaintiff as a "ho" and "jumped in [the plaintiff's] face and acted like he was going to hit [the plaintiff.]" *See Latrece Lockett*, 315 Fed. App'x. at 864, 866. Barnes has not alleged any conduct from Means approaching this level.

### *Unreasonable Interference with Job Performance*

Finally, in analyzing the severity and pervasiveness of allegedly harassing conduct, the Eleventh Circuit asks whether such conduct "unreasonably interferes with . . . job performance." *See Mendoza*, 195 F.3d at 1246. There is simply no evidence that Means' alleged conduct had any effect on Barnes' job performance. Barnes testified that he understood he was meeting expectations in his job and that he never received any warnings or counselings related to his job performance. (Ex.

---

[1] One portion of the Court's holding in *Gupta* related to the required showing for an adverse employment action for a Title VII retaliation claim has been subsequently overruled. *See Crawford v. Carroll*, 529 F.3d 961, 973–74 (11th Cir. 2008) ("Thus, the *Burlington* Court effectively rejected the standards applied by this court in both *Stavropoulos* and *Gupta* that required an employee to show either an ultimate employment decision or substantial employment action to establish an adverse employment action for the purpose of a Title VII retaliation claim.") That holding is completely unrelated to the Court's hostile work environment analysis in *Gupta*, which remains good law.

A, 100:16-101:19.) In fact, Barnes testified that his "performance never slipped" during his employment with EAMC. (Ex. A, 112:17-18.) Again, even the alleged comments about "Pooki and John-John" did not interfere with Barnes' employment, as he confirmed he never raised concerns for his safety with anyone in Human Resources, EAMC security, or the police. (Ex. A, 205:8-19.) To be clear, no one named "Pooki" or "John-John" ever "whoop[ed]" Barnes. (Ex. A, 176:7-9.)

### BARNES HAS NOT PRESENTED ANY GENUINE DISPUTE OF MATERIAL FACT ON HIS RETALIATION CLAIM.

Plaintiff cites to the Supreme Court's recent decision in *Muldrow v. City of St. Louis, Missouri*, which held that a Title VII plaintiff challenging a job transfer must show that the transfer brought about some harm with respect to an identifiable term or condition of employment but that harm need not be significant. 601 U.S. 346, 350 (2024). Of course, there is no job transfer at issue in this case. Indeed, the primary point in EAMC's summary judgment argument on Barnes' retaliation claim is that he did not suffer any adverse employment action whatsoever, as he admittedly resigned his employment with EAMC. (Ex. A, 138:14-19, Ex. 11.)

Since the Supreme Court's decision in *Burlington Northern*, an adverse employment action for purposes of a Title VII retaliation claim is an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68 (internal citations omitted). Courts consider the entire context when evaluating whether an employment decision meets

the adverse action standard under the retaliation provisions. *Burlington*, 548 U.S. at 64 ("the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters."). On several occasions, for example, the Eleventh Circuit has held that a disciplinary reprimand that did not result in any tangible effect on the plaintiff's employment was not enough to constitute an adverse employment action. *See Rayner v. VA*, 684 F. App'x. 911, 915 (11th Cir. 2017) (finding that the plaintiff could not establish retaliation where the she failed to "point to any evidence that her pay or promotion prospects were negatively affected by the admonishment or the reprimand"); *see also Barnett v. Athens Reg'l Med. Ctr, Inc.*, 550 F. App'x. 711, 715 (11th Cir. 2013).

In his Response, Barnes identifies a number of alleged actions that he seemingly considers to be adverse employment actions. For example, Barnes argues he "was not able to apply for promotions within [EAMC] for other positions because [Means] did not believe that [Barnes], a man, should work with females because they would like him." (Doc. 25 at 19-20.) As an initial matter, this is simply not accurate. Barnes testified that Means told him that she didn't think he should apply for a position—not that he could not apply or that she had some authority to prevent him from applying for another position. (Ex. A, 111:2-10.) In any event, Barnes acknowledged he was fully able to apply for promotions and transfers to other positions at all times during his employment with EAMC. (Ex. A, 182:19-184:14.)

He never did so because he "wasn't skilled in those departments." (Ex. A, 182:19-23.)

Based on nothing more than textbook hearsay, Barnes also claims that a co-worker, LaQuesha Lasseter, told him that Means "was trying to get [Barnes] fired, or was going to try to make him quit." (Doc. 25 at 20.) Even putting aside the serious hearsay concerns, a rumor-mill does not constitute an adverse action. Barnes admitted in deposition that he never received a decrease in pay, was never demoted, and was never discharged during his time with EAMC. (Ex. A, 173:21-174:9.)

Barnes also again claims that Means "attempted to get Plaintiff terminated by not authorizing his punch cards." (Doc. 25 at 20.) As explained at length in EAMC's Initial Brief, Barnes' belief is based on nothing more than his own speculation, and the actual evidence fully demonstrates that his belief is completely mistaken. (Doc. 22 at 12-14, ¶¶ 46-55.) On December 28, 2023, one of EAMC's Payroll Specialists, Jennifer Wolf ("Wolf"), emailed Means about Barnes consistently missing time-clock punches, which she believed was due to Barnes' clocking into work remotely. (Ex. B, ¶ 16, Ex. 5.) Wolf provided an explanation as to how Barnes could avoid these clock-in issues and informed Means that she could "go in and forgive these missed punches, so they do not go against [Barnes'] attendance policy," which Means did. (Ex. B, ¶ 16, Ex. 5.) In other words, the undisputed evidence shows that Means helped to remedy this issue—not cause it.

13

Finally, Barnes claims that Means' joke about getting "Pooki and John-John" to "whoop" Barnes was an adverse employment action. Again, even Barnes acknowledged the joking context in which this comment was made. Means allegedly made the comment openly to others who were present, including Ling, who laughed. (Ex. A, 119:23-120:10.) Title VII does not protect against "those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington*, 548 U.S. at 68. "[T]he sporadic use of abusive language, gender-related jokes, [ ] occasional teasing," and the like generally do not rise to the level of material adversity. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). These two alleged comments about "whoop[ing]" Barnes were made in jest and at most constitute "occasional teasing" that is not actionable under Title VII.

In his Response, Barnes concludes his retaliation analysis by claiming that he had "no other option . . . but to resign" to avoid future harassment. (Doc. 25 at 20.) This, of course, is not true. To name just a few options, Barnes understood he had the opportunity to request to transfer to another department. (Ex. A, 182:19-184:14.) He never did so. (*Id*.) Similarly, Barnes could have spoken with Human Resources or called the HR hotline prior to his resignation, but he did not so. (Ex. A, 203:14-204:12; Ex. B, ¶ 19.) Barnes could have spoken with Means herself to tell her that her alleged conduct was causing him to rethink his continued employment with EAMC, but there is no evidence that he ever did so. Instead, in his email to Means

14

providing his two weeks' notice, Barnes wrote: "I wish you and the company success in the future. Thank you so much for all the support you have provided me during my tenure with the company." (Ex. A, Ex. 11.) This email highlights Barnes' own admission that he and Means had a "good, professional relationship," which is further corroborated by the over-one-year's worth of unmistakably positive and cordial day-in and day-out text messages with Means that Barnes authenticated during his deposition. (Ex. A, 38:19-22, 140:9-21, Ex. 2.)

Simply put, Barnes has not met the high threshold to show that his voluntary resignation was actually a constructive discharge, which is "higher than the standard for proving a hostile work environment." *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001) The undisputed evidence confirms Barnes has not shown that his working conditions were "so intolerable that a reasonable person in his position would have been compelled to resign." *Id.* at 1231; *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1317–18 (11th Cir. 1989); *Johnson v. Fla. Dep't of Corrs.*, 829 F. App'x 889, 894–95 (11th Cir. 2020). Because the undisputed evidence shows that Barnes' voluntary resignation did not amount to a constructive discharge, his retaliation claim fails as a matter of law.

## CONCLUSION

The evidence and Barnes' Response do not present any triable issue of material fact, and EAMC is entitled to judgment as a matter of law. Therefore,

EAMC respectfully submits that its Motion for Summary Judgment is due to be granted.

                                          Respectfully submitted,

                                          */s/ Brock Phillips*
                                          Warren B. Lightfoot, Jr.
                                          W. Brock Phillips
                                          Maynard Nexsen, PC
                                          1901 Sixth Avenue North
                                          1700 Regions Harbert Plaza
                                          Birmingham, AL  35203
                                          Telephone:  (205) 254-1000
                                          Facsimile:  (205) 254-1999
                                          Email: wlightfoot@maynardnexsen.com
                                                   bphillips@maynardnexsen.com
                                          *Attorneys for Defendant Onin Staffing, LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 22, 2025, I electronically filed the foregoing Reply Brief in Support of Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Jeremy Schatz
Jon-Kaden Mullen
Virtus Law Group
2017 Morris Ave., Suite 100
Birmingham, AL 35203
(205) 946-1924
js@vlgal.com
jm@vlgal.com


                                             */s/ Brock Phillips*
                                             OF COUNSEL