IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| NICHOLAS BARNES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:24-cv-512-ECM-SMD |
| ) | |
| EAST ALABAMA MEDICAL ) | |
| CENTER FOUNDATION, d/b/a ) | |
| EAST ALABAMA MEDICAL ) | |
| CENTER, ) | |
| ) | |
| Defendant. ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

Plaintiff Nicholas Barnes ("Barnes") brings this action against his former employer, Defendant East Alabama Medical Center Foundation, d/b/a East Alabama Medical Center ("EAMC"), alleging that EAMC subjected him to a sexually hostile work environment and retaliated against him in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* Before the Court is EAMC's motion for summary judgment. Mot. (Doc. 21); Br. (Doc. 22). For the following reasons, EAMC's motion should be granted and this case dismissed.

**I.      JURISDICTION**

The Court has original subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331. Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

## II.  LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a)). When the non-moving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to "make a showing sufficient to establish the existence of an element essential to [its] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The legal elements of a plaintiff's claim dictate which facts are material and which are irrelevant. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A fact is not material if a dispute over that fact will not affect the outcome of the case under the governing law. *Id*. "If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law." *Celotex*, 477 U.S. at 331 (White, J., concurring).

The court must view the proffered evidence in the light most favorable to the nonmovant and resolve all reasonable doubts about the facts in the nonmovant's favor. *Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1243 (11th Cir. 2001). However, a mere scintilla of evidence in support of a claim is insufficient; instead, the nonmovant must produce sufficient evidence to enable a jury to rule in his favor. *Id*. Importantly, to survive summary judgment "conclusory allegations without specific supporting facts have no probative value," *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924-25 (11th Cir. 2018) (citation omitted), and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The Eleventh Circuit explains that "[s]imply

put, the plain language of Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. (internal quotes and citations omitted).

**III.   UNDISPUTED FACTS**

The undisputed facts, viewed in the light most favorable to Barnes, are as follows:

EAMC owns and operates a healthcare facility in Opelika, Alabama. EAMC Ex. B (Doc. 23-2) p. 1. EAMC hired Barnes in December 2018 as a Supply Clerk. *Id*. In October 2020, Barnes transferred to a Contract Coordinator position, which required him to perform some work in EAMC's warehouse. *Id*.; EAMC Ex. A (Doc. 23-1) at 70:16-23.

In December 2022, EAMC hired Ursula Means ("Means") as a Value Analysis and Contract Manager. EAMC Ex. A (Doc. 23-1) p. 3. Means reported directly to Nancy Ling ("Ling"), who was the Director of Supply Chain Services. EAMC Ex. B (Doc. 23-2) p. 4. In February 2023, Means became Barnes's direct supervisor. *Id*. at 4.

*The Scrub Pants Incident*

In February 2023, Means told Barnes to wear scrub pants instead of more formal clothing to work. EAMC Ex. A (Doc. 23-1) at 76:14-84:2. She did not tell any of the other employees in contracts to wear scrub pants. *Id*. at 77:6-9. While directing Barnes to wear scrub pants, Means "looked [him] up and down" and "started smiling." *Id*. at 83:13-22. Barnes asked Means why he needed to wear scrub pants, and she replied: "Just get you some scrubs. That's over with." *Id*. at 83:15-18. Barnes told Ling about the incident that same day but did not tell Ling that Means looked him up and down. *Id*. at 93:19-97:5.

3

Barnes also told Edward Kirk ("Kirk"), who is a manager supervisor, and Kirk replied that Means "maybe wants some." *Id*. at 96:7-17. Barnes went to EAMC's Human Resources Department ("HR") to report the incident and spoke with a secretary who told him that someone would get back with him. *Id*. at 97:6-99:10. No one from HR contacted Barnes, and Barnes never filed a complaint. *Id*. at 98:12-99:3.

### The Text Message

Barnes and Means exchanged multiple text messages over the course of his tenure at EAMC. *Id*. at 53:1-7. One of the text messages from Means to Barnes stated that she wanted to see his "pretty face." *Id*. at 55:23-56:18. This was the only text message from Means that Barnes found offensive. *Id*. at 172:11-21. Barnes told Means the next day that he did not like the text, but he did not report the tect to anyone else at EAMC. *Id*. at 172:22-173:18.

### The Two Touching Incidents

Once in 2023, Means entered Barnes's office while he was seated facing away from the door, touched his left shoulder, and slid her hand approximately six inches down his chest. *Id*. at 86:2-88:23. Barnes asked Means to stop touching him. *Id*. at 89:4-12.

On another occasion, while Barnes and Means were doing inventory in the storeroom, Means bumped her hip against Barnes's hip a couple of times. *Id*. at 89:20-92:23. Each bump lasted approximately one second. *Id*. at 92:22-23.

### The Timecard Approval

As Barnes's manager, Means approved his timecard. EAMC Ex. 2 (Doc. 23-2) p. 30. At some point, an issue arose with the approval of Barnes's timecard. *Id*. A payroll

4

specialist emailed Means and informed her of the issue, stating that Barnes had accumulated multiple missing punches because "the payroll audit [was] getting done before [Barnes's] time [was] approved by [Means]." *Id*. The payroll specialist told Means that she could "forgive these missed punches," and Means did. *Id*. at 28-32. EAMC did not discipline Barnes regarding the timecard issue. EAMC Ex. 1 (Doc. 23-1) at 126:9-13.

### *The Four Comments*

While Means was Barnes's supervisor, Barnes heard that a new position was being created in EAMC's contracts department. *Id*. at 111:2-10. He asked Means about the position and she told him that he should not apply because she did not think that men and women should work around each other and because other women in the department liked him. *Id*. at 111:6-15. Barnes reported this comment to Ling. *Id*. at 112:11-113:23.

During an active-shooter training, Means commented to other employees that if there was a real shooting, Barnes would not protect them. *Id*. at 103:1-105:4. She also said that she could "whoop" Barnes. *Id*. at 103:23-105:4. Barnes perceived these comments to be based on his sex because he was the only male present when they were made. *Id*. at 103:18-22. However, he did not tell Means that he was offended, nor did he report the statements to anyone else at EAMC. *Id*. at 106:2-11.

After the timecard issue, Means asked Barnes if he "snitched on her" and then yelled out to Ling, who was in a nearby office, that Barnes snitched on her about his times not being approved. *Id*. at 118:15-120:10. Ling laughed in response. *Id*. at 119:23-120:10. Means then told Barnes that if she got in trouble, she would get her nephew and son to

"whoop" him. *Id*. at 118:15-120:10. Barnes reported the incident to Ling and Kirk but not to HR, EAMC's security, or the police. *Id*. at 204:13-205:19.

One of Barnes's co-workers told him that she had a conversation with Means and that Barnes should "be on [his] Ps and Qs because [Means] want[ed] to get [him] up out of here" and hire a female from Baptist Memorial. *Id*. at 106:12-108:15.

*The Office Exchange*

While Means was Barnes's supervisor, Barnes's former office was given to a female employee, and he was moved to a "utility closet," which he shared with another male. *Id*. at 134:10-2-18. Barnes testified that Means moved him because other women liked him and "it was messing with them." *Id*. at 136:2-8. Barnes complained to the Director of Clinical Engineering, Ling, and Riley about the move, but not to HR. *Id*. at 137:9-15. Ling avers that she—not Means—made the decision to move Barnes to another office. EAMC Ex. C (Doc. 23-3) at 51:5-11.

*Barnes's Resignation Letter & the Final Incident*

On February 19, 2024, Barnes sent an email to Means providing her with two-weeks' notice of his resignation with EAMC. EAMC Ex. A (Doc. 23-1) 138:14-19, Ex. 11. He wrote:

> Good afternoon, Mrs. Ursula,
>
> I am writing to notify you that I am providing two weeks' notice and will be resigning from my position as Contract Coordinator with EAMC. My last day of employment will be March 1st.
>
> I wish you and the company success in the future. Thank you so much for all the support you have provided me during my tenure with the company.

6

EAMC Ex. A (Doc. 23-1), Ex. 11. Barnes was already looking for another job when he wrote the letter. *Id*. at 140:2-4.

On February 27, 2024, while Barnes was finishing out his final week, Means asked Barnes during a meeting if he wanted her to take him to dinner that evening. *Id*. at 163:17-165:20. She also offered to take him home from work, which was approximately ninety minutes away from EAMC. *Id*. at 18:17-22; *Id*. at Ex. 7. Barnes rejected the offers, and Means became hostile. *Id*. at 164:15-17.

That same day, Barnes sent an email to EAMC's Human Resources Director Kelly Truitt ("Truitt") stating that Means had harassed him "to the point of making [him] put in [his] two weeks['] notice." *Id*. at 150:1-7. Truitt emailed back that she took his concerns seriously and told him that February 27th would be his last day of employment but that he would be paid through the end of the week. *Id*. at 156:1-8; EAMC Ex. B (Doc. 23-2), Ex. 2. Truitt investigated Barnes's complaint but was unable to substantiate his allegations against Means. EAMC Ex. B (Doc. 23-2).

## IV.   ANALYSIS

Based on these facts, Barnes brings Title VII claims for a sexually hostile work environment and retaliation. Compl. (Doc. 1) pp. 4-10. EAMC moves for summary judgment as to both claims. Mot. (Doc. 21). The undersigned examines each claim in turn.

### A. Title VII Hostile Work Environment Claim

To establish a hostile work environment based on sexual harassment from a supervisor, a plaintiff must show that (1) he belongs to a protected group; (2) he has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual

favors, and other conduct of a sexual nature; (3) the harassment was based on his sex; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work environment; and (5) there is a basis for holding the employer liable. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc).

The "severe or pervasive" requirement "is the element that tests the mettle of most sexual harassment claims." *Gupta v. Fla. Bd. of Regents,* 212 F.3d 571, 583 (11th Cir. 2000), abrogated on other grounds as recognized by *Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008) (citation omitted). In evaluating whether harassment is severe or pervasive, courts look to the totality of the circumstances, including factors such as (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with an employee's job performance. *See Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Notably, "[t]he employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." *Mendoza*, 195 F.3d at 1246 (quoting *Harris*, 510 U.S. at 21-22). "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (quoting *Harris*, 510 U.S. at 23).

Assuming that Barnes subjectively perceived Means's conduct as sufficiently harassing, the conduct, as explained below, is not objectively severe and pervasive enough to create a sexually hostile work environment.

*(1) The Frequency of the Conduct*

Means supervised Barnes for approximately one year. During that time, Barnes points to eleven comments and/or incidents that he found offensive.[1] Assuming that all of Means's conduct was sexually harassing or based on Barnes's sex, the conduct is not frequent enough to support Barnes's claim of a sexually hostile work environment. *See, e.g.*, *Guthrie v. Waffle House, Inc.*, 460 F. App'x 803 (11th Cir. 2012) (finding that allegations of "only a few dozen comments or actions . . . spread out over a period of eleven months" was too infrequent to establish severe or pervasive conduct); *Mitchell v. Pope*, 189 F. App'x 911, 913 (11th Cir. 2006) (finding that the offender's conduct, which

---

[1]These incidents include:

1) Means instructed Barnes to wear scrub pants to work and looked him up and down and smiled during the conversation.
2) Means texted Barnes that she wanted to see his pretty face.
3) Means touched Barnes on his shoulder and moved her hand approximately six inches down his chest.
4) Means bumped her hips into Barnes a couple of times while they were in the storeroom with each bump lasting approximately one second.
5) Means did not properly submit Barnes's timecard, causing issues with payroll.
6) Means told Barnes that men and women should not work around each other and that the women at EAMC like Barnes.
7) Means said she could "whoop" Barnes and that Barnes would not protect anyone if there was an emergency.
8) Means told Barnes that her son and nephew would "whoop" him if she got in trouble for him snitching on her about the timecard issue.
9) Means told Barnes's co-worker that she wanted Barnes gone and that she wanted to hire a female from another hospital.
10) Barnes's office was given to a female and he was moved to a "utility closet" with another male.
11) After Barnes resigned, Means asked Barnes if he wanted her to take him to dinner and if he wanted her to take him home after work.

9

included sixteen instances over four years, was not frequent); *Mendoza*, 195 F.3d at 1245 (finding that the frequency of the offender's conduct "for the most part lacking" where the conduct consisted of one comment, one occasion where he rubbed his hip against the plaintiff while touching her shoulder and smiling, two instances of sniffing while looking at the plaintiff's groin and one sniffing without looking, and constant staring).[2]

### (2) The Severity of the Conduct

Not all workplace harassment, even if it is based on sex, violates Title VII. *Mendoza*, 195 F.3d at 1245. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998). Workplace conduct is viewed cumulatively and in its social context. *Reeves*, 594 F.3d at 807.

Here, Means instructed Barnes to wear scrub pants to work and when Barnes asked why, she looked him up and down and smiled. Notably, Barnes does not point to any other incident where Means looked at him suggestively or made offensive comments related to him wearing scrub pants. Additionally, Means told Barnes that the women at EAMC liked him and that she wanted to see his pretty face. She also asked him—after his resignation—if he wanted her to take him to dinner and if he wanted her to drive him home. She further told Barnes that she could "whoop" him and that she would get her son and nephew to

---

[2] *But see Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 811 (11th Cir. 2010) (reversing the district court's grant of summary judgment for an employer on a hostile work environment claim, noting that the employee claimed that her co-workers made obscene and derogatory comments about her and women in general "on a daily basis"); *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002) (finding that the conduct of ethnic slurs directed at the plaintiff "three to four times a day . . . throughout the approximately one month period" was sufficiently frequent to constitute a hostile work environment).

"whoop" him. Finally, Means touched Barnes's shoulder and moved her hand down his chest and bumped her hip against him several times while in the storeroom.

Means's alleged conduct consists of a couple touching incidents and a few comments, none of which are objectively serious and appear to be mere banter and horseplay instead of harassment. Therefore, Means's alleged conduct is not severe enough by Eleventh Circuit standards to constitute a sexually hostile work environment. *See, e.g.*, *Guthrie*, 460 F. App'x at 807 (finding the plaintiff did not meet the "severe and pervasive" standard where a coworker regularly called her "babe," stated he wanted to "lick her all over," talked openly to her about having sex with someone else, and grabbed her butt on multiple occasions); *Leeth v. Tyson Foods, Inc.*, 449 F. App'x 849, 853 (11th Cir. 2011) (holding that conduct was not sufficiently severe or pervasive where a manager allegedly attempted to pull the plaintiff into his lap, made comments to the plaintiff about wanting to "ram his tongue down her throat," came to the plaintiff's house uninvited, and called her on multiple occasions to ask her to go out with him); *Lockett v. Choice Hotels, Int'l, Inc.*, 315 F. App'x 862, 863-66 (11th Cir. 2009) (finding no sexually hostile work environment where the plaintiff alleged that the harasser touched her butt, talked about sexual positions, and made other explicit sexual comments); *Webb-Edwards v. Orange Cnty. Sheriff's Off.*, 525 F.3d 1013, 1027-28 (11th Cir. 2008) (finding that weekly comments by a supervisor that the plaintiff "looked hot" and should wear tighter clothing, and a statement to her

husband that he was eating the plaintiff for lunch were not severe and pervasive) (abrogated as to what constitutes an adverse employment action).[3]

### (3) The Nature of the Conduct

Barnes points to two comments by Means that he considered physically threatening. On one occasion, Means said she could "whoop" Barnes and on another occasion stated she could get someone else to "whoop" him. Assuming *arguendo* that these comments were based on Barnes's sex, they are more akin to "mere offensive utterance[s]" and not actually "physically threatening or humiliating." *See Mendoza*, 195 F.3d at 1246. Notably, after Means told Barnes that she could get someone to "whoop" him, Ling laughed, and Barnes did not report Means's comments to HR, the police, or EAMC security, EAMC Ex. A (Doc. 21-3) at 106:2-1, 205:2-22, which suggests that Barnes did not have consider the comments physically threatening at the time they were made. Further, Means's other comments and actions were not physically threatening from an objective standpoint, nor were they sufficiently humiliating to constitute a sexually hostile work environment.

### (4) Interference with Work Performance

Barnes maintained his employment at EAMC throughout the entire period of the alleged harassment and was not subject to any discipline. He does not contend that the

---

[3] *But see Johnson v. Booker T. Washington Broadcasting Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (finding a male co-worker's conduct to be "severe" toward the female plaintiff because his behavior was "continuous" and "included giving [her] unwanted massages, standing so close to [her] that his body parts touched her from behind, and pulling his pants tight to reveal the imprint of his private parts"); *Hulsey v. Pride Rests., LLC*, 367 F.3d 1238 (11th Cir. 2004) (finding a male coworker's conduct directed to the female plaintiff was sufficiently severe involving "many direct as well as indirect propositions for sex," including "following her into the restroom, and repeated attempts to touch her breasts, place his hands down her pants, and pull off her pants," as well as "enlisting the assistance of others to hold her while he attempted to grope her").

conduct caused him to leave work early or take time off, nor does he otherwise show that the conduct had any negative effect on his job performance. Notably, when he resigned from his position, Barnes voluntarily stated that he would work out his two weeks' notice, which suggests that Means's conduct was not so severe and pervasive that he was unwilling to return to work and complete his responsibilities. *See Johnson v. Wal-Mart Stores, Inc.*, 987 F. Supp. 1376, 1394 (M.D. Ala. 1997) (giving three weeks' notice before resigning "strongly suggests that the conditions to which [the plaintiff] allegedly [was] subjected were not intolerable"). As such, Barnes has not shown that Means's conduct interfered with his work performance and therefore does not constitute a sexually hostile work environment.

Based on these four factors and the circumstances as a whole, the undersigned finds that Means's conduct is not sufficiently severe or pervasive to establish a hostile work environment based on sexual harassment. As such, EAMC's motion for summary judgment as to Barnes's hostile work environment claim should be granted and the claim dismissed.

## B. Title VII Retaliation Claim

Title VII prohibits retaliation against an employee who opposes any practice prohibited by Title VII, files a charge of discrimination under Title VII, or testifies, assists, or participates in an investigation or proceeding under Title VII. 42 U.S.C. § 2000e–3(a). To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) he participated in a statutorily protected activity; (2) he experienced an adverse

13

employment action; and (3) a causal link exists between the two. *Bailey v. Metro Ambulance Servs.*, 992 F.3d 1265, 1277 (11th Cir. 2021) (citation omitted). A plaintiff may also present "a convincing mosaic" of circumstantial evidence that raises a reasonable inference that the employer retaliated against him for engaging in the protected activity. *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1342 (11th Cir. 2023).

For purposes of this Recommendation, the undersigned assumes that Barnes engaged in protected activity when he reported Means's conduct to Ling and others. However, Barnes has not sufficiently shown that EAMC took any adverse action against him or that any adverse action taken was causally related to his protected activity. In terms of adverse action, Barnes contends that he was constructively discharged because (1) he "was not able to apply for promotions within [EAMC]" because Means "did not believe that [he] should work with females because they would like him"; (2) he was warned by a co-worker that Means "was trying to get [him] fired, or was going to try to make him quit"; (3) Means attempted to have him terminated by not timely approving his timecards; and (4) Means threatened to have her son and nephew "whoop" him. Resp. (Doc. 25) pp. 19-20.

To establish a constructive discharge, a plaintiff must show "that working conditions were so intolerable that a reasonable person in his position would have been compelled to resign." *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001) (internal quotations and alterations omitted). "In evaluating constructive discharge claims, [courts] do not consider the plaintiff's subjective feelings. Instead [they] employ an objective standard." *Id*. "Establishing a constructive discharge claim is a more onerous

14

task than establishing a hostile work environment claim." *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009). Therefore, if a plaintiff fails to meet the standard for a hostile work environment, he necessarily cannot meet the higher standard for constructive discharge. *Barrow v. Ga. Pacific Corp.*, 144 F. App'x 54, 59 (11th Cir. 2005).

As explained in the previous section, Barnes has not shown that he was subjected to a sexually hostile work environment. Therefore, he cannot meet the standard for constructive discharge. Accordingly, to the extent Barnes bases his retaliation claim on constructive discharge as the adverse action, the claim fails.

Further, to the extent that Barnes contends that any of the individual actions of which he complains constitutes adverse employment actions, Barnes has not shown that these actions were sufficiently adverse or causally related to protected activity. Barnes has provided no evidence showing that Means (or anyone else at EAMC) prevented him from applying for a promotion—only that he felt as though he could not apply. Similarly, any issues related to Barnes's timecard were resolved without any adverse employment action taken against him. Likewise, a co-worker telling Barnes that Means wanted Barnes gone is not an adverse action, nor are Means's alleged threats to have her son and nephew "whoop" him. And because these individual incidents are not adverse employment actions, and because Barnes has not presented evidence to show that these actions were tied to any protected activity, they are insufficient to support his retaliation claim.

In sum, Barnes has not met the high threshold to show that he was constructively discharged, and none of the individual incidents of which he complains are adverse

employment actions that were causally connected to his protected activity. As such, EAMC's motion for summary judgment as to Barnes's retaliation claim should be granted and the claim dismissed.

## V.   CONCLUSION

For these reasons, it is the

RECOMMENDATION of the undersigned Chief United States Magistrate Judge that EAMC's Motion for Summary Judgment (Doc. 21) be GRANTED and Barnes's Title VII claims for hostile work environment and retaliation be DISMISSED. It is further

ORDERED that the parties shall file any objections to this Recommendation **on or before September 16, 2025**.  A party must specifically identify the factual findings and legal conclusions in the Recommendation to which objection is made; frivolous, conclusive, or general objections will not be considered.  Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with the provisions of 28 U.S.C. § 636(b)(1) shall bar a party from a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of the party to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11TH CIR. R. 3-1.  *See Stein v. Lanning Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982).  *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

DONE this 2nd day of September, 2025.

_/s/ Stephen M. Doyle_
Stephen M. Doyle
CHIEF U.S. MAGISTRATE JUDGE