IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| NICHOLAS BARNES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL CASE NO. 3:24-cv-512-ECM |
| | ) | [WO] |
| EAST ALABAMA MEDICAL CENTER | ) | |
| FOUNDATION, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION and ORDER**

**I.  INTRODUCTION**

Plaintiff Nicholas Barnes ("Barnes") brings this action against his former employer, Defendant East Alabama Medical Center Foundation ("EAMC") asserting that EAMC discriminated and retaliated against him based on his sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). (Doc. 1).[1]  EAMC moves for summary judgment on Barnes' Title VII claims for hostile work environment and retaliation. (*See* doc. 21). The Chief Magistrate Judge ("Magistrate Judge") recommends that EAMC's motion for summary judgment (doc. 21) be granted in full. (Doc. 28).  Barnes timely objected to the Magistrate Judge's Recommendation. (Doc. 29).  Upon an independent review of the file, the Magistrate Judge's Recommendation, and Barnes' objections, the Court concludes that Barnes' objections are due to be overruled and the Magistrate Judge's Recommendation is due to be adopted with modifications.

---

[1] For clarity, the Court refers to the document and page numbers generated by CM/ECF.

## II.  STANDARDS OF REVIEW

### A.    Objections to the Report and Recommendation

When a party objects to a magistrate judge's report and recommendation, the district court must review the disputed portions *de novo*. 28 U.S.C. § 636(b)(1); *see also United States v. Raddatz*, 447 U.S. 667, 674 (1980).  The district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1)(C).  *De novo* review requires that the district court independently consider factual issues based on the record. *Jeffrey S. by Ernest S. v. State Bd. of Educ. of State of Ga.*, 896 F.2d 507, 513 (11th Cir. 1990) (per curiam). However, objections to a magistrate judge's report and recommendation must be sufficiently specific to warrant *de novo* review. *See LoConte v. Dugger*, 847 F.2d 745, 750 (11th Cir. 1988) ("Whenever any party files a timely and specific objection to a finding of fact by a magistrate, the district court has an obligation to conduct a *de novo* review of the record with respect to that factual issue.").  Otherwise, a report and recommendation is reviewed for clear error. *See Macort v. Prem, Inc.*, 208 F. App'x 781, 784 (11th Cir. 2006) (per curiam).[2]

### B.    Motion for Summary Judgment

"Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"

---

[2] The Court here and elsewhere in this Memorandum Opinion and Order cites to nonbinding authority. While the Court recognizes that these cases are nonbinding, it nonetheless finds them persuasive.

*Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (quoting FED. R. CIV. P. 56(a)). "[A] court generally must 'view all evidence and make all reasonable inferences in favor of the party opposing summary judgment.'" *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016) (citation omitted). However, "conclusory allegations without specific supporting facts have no probative value." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924–25 (11th Cir. 2018) (citation omitted). If the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute as to any material fact. *Hornsby-Culpepper*, 906 F.3d at 1311 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact, and the movant must identify the portions of the record which support this proposition. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); FED. R. CIV. P. 56(c). The movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Hornsby-Culpepper*, 906 F.3d at 1311. The burden then shifts to the nonmoving party "to establish, by going beyond the pleadings, that a genuine issue of material fact exists." *Id.* at 1311–12. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. Nonmovants must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or

declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A) & (B).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the nonmovant. *Fla. Int'l Univ. Bd. of Trs.*, 830 F.3d at 1252. Likewise, the reviewing court must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Id.* However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam).

### III. DISCUSSION[3]

The Magistrate Judge provided a thorough recitation of the facts and procedural history of this case in his Recommendation. Consequently, a full summary of the procedural history and facts related to summary judgment is not necessary, as the Court adopts the Magistrate Judge's findings of fact—subject to a few modifications. For context, the bulk of Barnes' complaints center on his relationship with his EAMC supervisor Ursula Means ("Means"). (*See* doc. 1 at 4–7, paras. 17–44). EAMC owns and operates a healthcare facility in Opelika, Alabama. (Doc. 23-2 at 2, para. 3). Barnes began working at EAMC in December 2018 as a supply clerk in the company's warehouse and

---

[3] Because this case comes before the Court on EAMC's motion for summary judgment, the Court construes the facts in the light most favorable to Barnes, the nonmovant. The Court draws all justifiable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Magistrate Judge also properly presented "[t]he undisputed facts . . . in the light most favorable to Barnes." (Doc. 28 at 3).

was later promoted in 2020 to a contract coordinator role. (Doc. 23-1 at 129, para. 2; doc. 23-2 at 2–3, paras. 4, 7).  In December 2022, EAMC hired Means as a "Value Analysis [and] Contracts Manager." (Doc. 23-2 at 3, para. 8).  Shortly thereafter—in February 2023—Means became Barnes' direct supervisor. (*Id.* at 3, para. 9).  In turn, Means reported to Nancy Ling ("Ling"), who served as EAMC's Director of Supply Chain Services. (*Id.* at 4, para. 13).

Although Barnes objects to portions of the Magistrate Judge's factual findings (*see, e.g.*, doc. 29 at 3, para. 2), these objections do not alter the Magistrate Judge's legal conclusions, and are due to be overruled, as discussed further below.[4]

## A.    Factual Objections[5]

### 1.    The Scrub Pants Incident

Barnes objects that the Recommendation "ignores critical facts asserted by [] Barnes that he made numerous reports to [EAMC] through its supervisors regarding Means'[] conduct." (Doc. 29 at 5).  Barnes, in part, cites the Recommendation's evaluation of the "scrub pants incident" for this omission. (*Id.*).  The Recommendation states that Barnes informed Ling and Edward Kirk ("Kirk") about Means' comments. (Doc. 28 at 3–4).  Upon *de novo* review and viewing the facts in the light most favorable to Barnes, he also informed Kelli Truitt ("Truitt") (via email) that he was "told that I should stop wearing my formal

---

[4] The Court will conduct a *de novo* review of the disputed portions of the record and independently consider the factual issues as required. *See State Bd. of Educ. of State of Ga.*, 896 F.2d at 513.

[5] For consistency, the Court uses the Recommendation's headings to outline the disputed portions of the factual record.  Because the Court adopts the Magistrate Judge's findings, the Court only evaluates the portions of the factual record that require clarification or to which Barnes specifically objects.

clothing to work and only wear scrubs into work." (Doc. 23-1 at 203, para. 1). The Recommendation correctly determined that Barnes reported the incident to Ling and Kirk. (*See* doc. 28 at 3–4).

### 2.    The Two Touching Incidents

Barnes objects to the Magistrate Judge's finding that Means' harassment was infrequent. (Doc. 29 at 6).   The Recommendation identifies two touching incidents: (1) Means touched the "top of [Barnes'] shoulder . . . down to the front to about midway off the front of his shoulder" (doc. 23-1 at 24, 87:16–22); and (2) Means "bump[ed]" or "brush[ed]-up against" Barnes "a couple of times" while the two categorized inventory in the EAMC storeroom (*id.* at 25, 90:8–92:21). (*See* doc. 28 at 4).

Upon *de novo* review and viewing the facts in the light most favorable to Barnes, Means also touched his shoulder on other occasions, evidenced by Barnes stating that "it happened so many times."[6] (Doc. 23-1 at 24, 86:4–7).   Additionally, the Court notes Barnes' testimony that he informed Kirk that he did not like Means' "bumping" into him. (*Id.* at 26, 93:1).

### 3.    The Four Comments

Barnes objects to the Recommendation's determination "that Barnes did not find Means'[] comment that she was going to physically attack him, or her comment [that] she was going to facilitate her son and nephew to physically attack him as physically

---

[6] Although Barnes testified that Means touched him "so many times," he later testified that other than the shoulder touch and "hip bumps" he could not recall any other time Means touched him. (*See* doc. 23-1 at 26, 93:10–12; *see also id.* at 28, 101:20–102:4).

6

threatening at the time the threat was made because he did not contact [EAMC] or the police at the time the threat was made." (Doc. 29 at 9). Although Barnes objects, the Magistrate Judge already *assumed* that "Barnes subjectively perceived Means'[] conduct as sufficiently harassing."[7] (Doc. 28 at 9).

Further, Barnes testified that he "worried about [his] safety" (doc. 23-1 at 53, 204:13–21) and reported that he "should not have to look around while going to [his] car because of threats from [Means]" (*id.* at 56). Upon *de novo* review and viewing the facts in the light most favorable to Barnes, this Court also assumes for the purposes of the motion that he subjectively felt that Means' comments were physically threatening.

### 4.    Additional Factual Objections

### a.    Failure to Include Barnes' Deposition Testimony

The Magistrate Judge identified eleven main events that form the primary basis of Barnes' claims—to which Barnes does not object. (*See* doc. 28 at 9 n.1). Barnes *does* object "to the Magistrate Judge's factual finding that he was subjected to *only* eleven instances of harassment from Means." (Doc. 29 at 3, para. 3) (emphasis added). Barnes contends that the eleven incidents do not comprise "an exhaustive list" of the harassment he experienced (*id.* at 7), pointing to his testimony that he was subjected to harassment "all the time" and that "[t]here was never a time when [Means] stopped" (*id.* at 6).

---

[7] The Magistrate Judge did note, when looking at Means' conduct *objectively*, that Barnes' failure to "report Means'[] comments to HR, the police, or EAMC security, . . . suggest[ed] that Barnes did not [] consider the comments physically threatening at the time they were made." (Doc. 28 at 12). However, it is clear that the Magistrate Judge did not determine that Barnes did not subjectively perceive the comments to be physically threatening.

Upon *de novo* review, and viewing the facts in the light most favorable to Barnes, he testified that the additional interactions occurred separate and apart from the eleven main events.  Barnes testified that Means' harassment was "constant[]" and ultimately led him to resign. (Doc. 23-2 at 14).  Still, Barnes also testified that the list of incidents comprised the most important events. (*See* doc. 23-1 at 11, 36:3–12).  Although this testimony was not included in the Recommendation, as explained below, it does not furnish grounds to disturb the Magistrate Judge's legal conclusions.

### b.    EAMC's Sexual Harassment Policy

Barnes objects to the Recommendation's failure to reference EAMC's "Corporate Representative['s] confirming that Means'[] comment regarding Barnes'[] 'pretty face' constituted sexual harassment by its own policies." (Doc. 29 at 12–13).  It is true that Truitt stated that if the comment was unwelcome, it would violate EAMC's policy. (Doc. 26 at 17, 53:5–55:15).  Though Barnes concedes that a violation of EAMC's "anti-harassment [policy] does not necessitate a violation of Title VII," he argues it supports his claims that he was sexually harassed by Means. (Doc. 29 at 13 n.1).  Consistent with that concern, and on *de novo* review, the undersigned considered this as part of the summary judgment record.

### c.    Humiliation

Barnes argues that the Recommendation "erred in its factual finding that Barnes was not humiliated by Means'[] harassment." (*Id.* at 11).  Again, the Magistrate Judge assumed that "Barnes subjectively perceived Means'[] conduct as sufficiently harassing." (Doc. 28 at 9).  To be clear, upon *de novo* review and considering the facts in the light most favorable

to Barnes, a reasonable jury could find that he was subjectively humiliated by Means' conduct.  Barnes testified that he felt mental distress and stopped eating at local restaurants for fear of seeing Means and her family. (Doc. 23-1 at 48–49, 181:10–182:5; 49, 185:2–186:7).

**B.      Legal Objections**

### 1.        Hostile Work Environment

To establish a hostile work environment based on sexual harassment, Barnes must demonstrate five essential elements:  (1) he belongs to a protected group; (2) he was subject to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of the employment; and (5) there is a basis for holding EAMC liable for the harassment.[8] *Fucron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1304–05 (11th Cir. 2016).

The Magistrate Judge found that Barnes' hostile work environment claim failed to satisfy the fourth element—that the harassment was sufficiently severe or pervasive to alter the terms and conditions of his employment. (Doc. 28 at 8–13).  Barnes objects to this determination and argues that the harassment he suffered was sufficiently severe or pervasive. (Doc. 29 at 13–14).

Barnes may prevail by showing "[e]ither severity *or* pervasiveness." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (en banc) (emphasis in original).  "The severe-or-pervasive element has two subrequirements: one subjective and

---

[8] For purposes of this Memorandum Opinion and Order, the Court assumes without deciding that Means' harassment was based on Barnes' sex.

the other objective." *Copeland v. Ga. Dep't of Corr.*, 97 F.4th 766, 775 (11th Cir. 2024). The Magistrate Judge assumed without deciding that Barnes "*subjectively* perceived Means'[] conduct as sufficiently harassing."[9] (Doc. 28 at 9) (emphasis added). Barnes contests the Magistrate Judge's determination that the conduct was not *objectively* severe or pervasive.

Courts consider four factors to determine whether harassment is objectively severe or pervasive: (1) its frequency; (2) its severity; (3) whether it is physically threatening or humiliating; and (4) whether it unreasonably interferes with an employee's job performance. *Copeland*, 97 F.4th at 775. "'[N]o single factor' is necessary to satisfy the objective inquiry of a hostile work environment claim." *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1156 (11th Cir. 2020) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). This "inquiry is highly contextual." *Copeland*, 97 F.4th at 776; *see also Bryant v. Jones*, 575 F.3d 1281, 1297 (11th Cir. 2009) ("[T]he objective element is not subject to mathematical precision . . . ."). "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in [Barnes'] position, considering 'all the circumstances.'" *Reeves*, 594 F.3d at 809 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)); *accord Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) ("[H]arassment is objectively severe and pervasive if a

---

[9] Barnes purports to object "[t]o the extent that the Magistrate [Judge's Recommendation] did conclude that Barnes did not meet the requirements of the subjective test." (Doc. 29 at 13 n.3). The Magistrate Judge assumed without deciding that the subjective prong was met for purposes of summary judgment. (Doc. 28 at 9). Thus, the Magistrate Judge made no adverse findings regarding whether Barnes subjectively perceived the harassment as sufficiently severe or pervasive. Thus, to the extent Barnes lodges any objection on this basis it is due to be overruled.

reasonable person in the plaintiff's position would adjudge the harassment severe and pervasive."). Importantly, the Court's inquiry "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target . . . . The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships, which are not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale*, 523 U.S. at 81–82.

### a. Frequency

The Magistrate Judge's frequency analysis focused on "eleven comments and/or incidents that" occurred during Means' one year tenure as Barnes' supervisor. (*See* doc. 28 at 9–10). The Magistrate Judge concluded that "the conduct is not frequent enough to support Barnes'[] claim of a sexually hostile work environment." (*Id.* at 9). Barnes contends that "[t]he report erred in only considering the incidents identified in his complaint and questioned about during his deposition." (Doc. 29 at 6–7). He argues that the eleven incidents "may have been the most memorable at the time Barnes complained, [but] it was not an exhaustive list." (*Id.* at 7).

During Barnes' deposition, he testified that Means' conduct occurred "all the time" and "[t]here was never a moment where she would stop." (Doc. 23-1 at 48, 182:10–14). In an email to Truitt, Barnes complained of the "constant harassment from Means." (*Id.* at 58). Finally, Barnes stated that Means "harassed [him] constantly to the point of making [him] put in [his] two weeks['] notice." (Doc. 23-2 at 14). For the reasons stated below, a reasonable jury could find that the conduct was more than infrequent. However, this factor only weighs slightly in Barnes' favor and the frequency of the harassing conduct "does not

11

compensate for the absence of the other factors." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1248 (11th Cir. 1999).

The Eleventh Circuit has not established a "'magic number' of instances of harassment sufficient to qualify as frequent." *Copeland*, 97 F.4th at 776 (quoting *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002)). Here, Barnes testified that Means "harassed [him] *constantly*." (Doc. 23-1 at 57) (emphasis added). Barnes is correct that the Eleventh Circuit has "cautioned district courts against discounting testimony . . . at the summary judgment stage." *Copeland*, 97 F.4th at 776. But as previously noted, Barnes testified that the list of incidents comprised the most important events and was not intended to be an exhaustive list. (Doc. 23-1 at 11, 36:3–12).

The Eleventh Circuit's case law notes that a plaintiff testifying that harassment occurred "constantly" can result in a finding that the harassment was frequent or infrequent.[10] *Cf. Fernandez*, 961 F.3d at 1153–54 (reasoning that the employee's testimony that harassment occurred "every other day" or "nearly every day," which coworkers corroborated, was more specific than vague testimony that harassment occurred "constantly"); *see, e.g.*, *Copeland*, 97 F.4th at 777 (holding that a jury could find that the harassment plaintiff experienced "was frequent" when plaintiff testified that radio harassment occurred "constantly" or "on a daily basis."). Viewing the evidence in the light

---

[10] In *Yelling v. St. Vincent's Health System*, the Eleventh Circuit found that a plaintiff's testimony that "her coworkers *generally* made racist comments multiple times" "lack[ed] the specificity necessary to show frequency." 82 F.4th 1329, 1335 (11th Cir. 2023) (per curiam); *see also Melton v. I-10 Truck Ctr. Inc*, 166 F.4th 905, 929–30 (11th Cir. Feb. 6, 2026) (Branch, J. concurring in part).

most favorable to Barnes, a reasonable jury could find that the conduct was more than infrequent.

### b.   Severity

Barnes objects to the Magistrate Judge's "legal conclusion that the harassment Barnes was subjected to by Means was not severe because none of the comments appeared to be 'objectively serious', but 'appear to be mere banter and horseplay instead of sexual harassment.'" (Doc. 29 at 7).   Barnes argues Means' conduct was severe noting that he experienced:  (1) unsolicited touching; (2) comments about his masculinity; (3) comments about "his pretty face"; (4) the inability to "receive a promotion because of [Means'] belief [that] men and women should not work together"; and (5) threats to his physical safety. (*Id.* at 8–10).

"Title VII . . . does not set forth 'a general civility code for the American workplace.'" *Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citing *Oncale*, 523 U.S. at 80).  "Title VII is implicated only where a workplace is 'permeated with discriminatory intimidation, ridicule[,] and insult,' in contrast to the 'mere utterance of an epithet.'" *Fernandez*, 961 F.3d at 1154 (citing *Harris*, 510 U.S. at 21).  For the reasons stated below, Barnes has not established that Means' conduct was severe.

A brief survey of Eleventh Circuit case law confirms that no reasonable jury could conclude that Means' conduct was sufficiently severe to amount to a hostile work environment.  The Eleventh Circuit has held that the following conduct, also involving a supervisor, was insufficient to establish a hostile work environment claim:  (1) ordering the employee to "sit near him after tightening his pants around his crotch"; (2) standing

close enough to the employee such that "she could feel [the supervisor's] breath on the back of her neck"; and (3) giving four compliments about the employee's looks or smell. *See Jackson v. Ala. Dep't of Corr.*, 643 F. App'x 889, 892 (11th Cir. 2016).

Here, Barnes alleges that Means instructed him to wear scrub pants, looked him up and down, and smiled. (*See* doc. 28 at 10). Barnes also highlights Means' touching incidents, when Means touched his shoulder and "bumped her hip against him several times." (*See id.* at 11). Further, Means commented that EAMC women liked Barnes and stated that she wanted to see his pretty face. (*See id.* at 10). Like the alleged harasser in *Jackson*, Means: (1) was physically close to Barnes; (2) commented on his appearance; and (3) served as his supervisor. These similarities counsel in favor of a finding that no reasonable jury could conclude that Means' conduct was sufficiently severe to create a hostile work environment. *See Jackson*, 643 F. App'x at 892.

### c.    Physically Threatening or Humiliating

The Court must also consider whether Means' conduct was "physically threatening or humiliating[] or a mere offensive utterance." *Melton v. I-10 Truck Ctr.*, 166 F.4th 905, 917 (11th Cir. Feb. 6, 2026). Barnes claims that the Magistrate Judge "erred in [his] conclusion that [the] nature of Means'[] harassment was not physically threatening nor humiliating." (Doc. 29 at 11). For clarity, the Court does not question Barnes' subjective feeling that Means' conduct physically threatened or humiliated him. However, the Court must evaluate Means' suggestion that she or her family members could "whoop" Barnes objectively—the inquiry is whether a reasonable person in Barnes' position would consider the events physically threatening or humiliating. (*See* doc. 28 at 12).

14

Because the "social context in which particular behavior occurs and is experienced by its target" matters, the Court cannot find that a reasonable person in Barnes' position, considering all the circumstances, would consider the events physically threatening or humiliating. *Oncale*, 523 U.S. at 81. While harassment by a supervisor is more likely to be physically threatening and humiliating, *see Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1247–48 (11th Cir. 2004), that Means was Barnes' supervisor is not enough, absent more, to render her conduct objectively physically threatening or humiliating.

Barnes cites the Eleventh Circuit's recent decision in *Copeland* for the proposition that "district court[s] may not take sides in a 'swearing match' between the parties." (Doc. 29 at 11 (quoting *Copeland*, 97 F.4th at 779)). Notably, the Eleventh Circuit in *Copeland* held that a reasonable jury *could* find the conduct at issue physically threatening and humiliating. 97 F.4th at 779. There, the plaintiff was physically "pushed" and the purported harasser, "while carrying a gun[,] . . . followed [plaintiff] outside, circled him in an armed vehicle, and parked behind him." *Id.* In comparison, Means' conduct constituted "offensive utterance[s]"—not physically threatening or humiliating conduct. *See Mukhina v. Walmart, Inc.*, 162 F.4th 1128, 1133 (11th Cir. 2025) ("Isolated incidents are ordinarily not sufficient to establish a hostile work environment."). Barnes did not allege that Means was close to him when she made each comment about her or her family members "whooping" Barnes. Indeed, even if Means "was excessively aggressive, angry" or "went 'ballistic'"—which the record does not support—it would still be insufficiently severe to alter the terms of Barnes' employment and create a hostile work environment. *See Smith v. Naples Cmty. Hosp., Inc.*, 433 F. App'x 797, 800 (11th Cir. 2011) (per curiam).

15

"Properly applied, [the standards for judging hostility] will filter out complaints attacking the ordinary tribulations of the workplace, such as the *sporadic use of abusive language*, gender-related jokes, and occasional teasing." *Tonkyro v. Sec'y, Dep't of Veterans Affs.*, 995 F.3d 828, 837 (11th Cir. 2021) (emphasis added) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). The context here shows that Means' comments were, at worst, sporadic or abusive language. Undoubtedly, her comments were inappropriate for the workplace, but an objectively reasonable person would not have perceived her statements to be physically threatening or humiliating.

### d.     Unreasonably Interferes with Barnes' Job Performance

Barnes objects to the Magistrate Judge's conclusion that Means' conduct did not unreasonably interfere with his job performance. (Doc. 29 at 12). Barnes argues that he: (1) was forced to change his uniform; (2) was nearly terminated because Means did not approve his timecard; (3) was restricted from seeking promotion; and (4) worked "in a mentally damaging hostile environment until his eventual resignation." (*Id.*). For the reasons stated below, Means' conduct did not unreasonably interfere with Barnes' job performance.

First, there is no evidence in the record that the uniform change affected Barnes' job performance. Second, Barnes concedes that the timecard issue was resolved, and he suffered no adverse employment consequences. Third, Barnes' mistaken belief that he could not apply for a promotion did not interfere with his current role. During his deposition, Barnes conceded that "his performance never slipped"—suggesting that even if Means discouraged or prevented him from applying for a promotion, it did not

16

unreasonably interfere with his performance in his current role. (*See* doc. 23-1 at 30, 112:13–18). Fourth, although Barnes alleges that he worked in a "mentally damaging" environment, the Eleventh Circuit has found stronger cases with worse facts to be insufficient when evaluating whether conduct interferes with job performance. For example, in *Fernandez*, the Eleventh Circuit noted that "stress" associated with "misconduct that drove [plaintiff] to depression and caused [plaintiff] to attempt suicide at a job site" was "more attenuated than typical interference-with-job performance arguments." *See Fernandez*, 961 F.3d at 1155. Here, the Magistrate Judge correctly concluded that Barnes "does not contend that the conduct caused him to leave work early or take time off, nor does he otherwise show that the conduct had any negative effect on his job performance." (Doc. 28 at 12–13). Upon *de novo* review, and based on this record, Barnes has not established that Means' conduct interfered with his job performance.

### e.   Objectively Severe or Pervasive

"The Supreme Court has emphasized that 'no single factor' is necessary to satisfy the objective inquiry of a hostile work environment claim." *Fernandez*, 961 F.3d at 1148 (quoting *Harris*, 510 U.S. at 23). Even though a reasonable jury could find that the harassment was more than infrequent, considering the totality of the circumstances, Barnes has not raised a material issue of fact regarding whether Means' harassment was objectively severe or pervasive. Thus, a reasonable jury could not find that the harassing conduct here "alter[ed] the terms or conditions of [Barnes'] employment." *See Mendoza*, 195 F.3d at 1246. The Magistrate Judge correctly granted EAMC's motion for summary judgment as to Barnes' hostile work environment claim.

2.      **Retaliation**

"Title VII prohibits an 'employer' from retaliating against any employee engaged in statutorily protected activity." *Vincent v. Jefferson Cnty. Bd. of Educ.*, 152 F.4th 1339, 1352 (11th Cir. 2025); *see also* 42 U.S.C. § 2000e-3(a).   Barnes claims that EAMC unlawfully "retaliat[ed] against him for reporting and opposing sexual harassment." (Doc. 1 at 9, para. 53).   Barnes can survive summary judgment either under the *McDonnell Douglas*[11] framework or by presenting a convincing mosaic of evidence. *See Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1307 (11th Cir. 2023).

a.      ***McDonnell Douglas* Framework**

To establish a prima facie case of unlawful retaliation under Title VII, Barnes must demonstrate that:  (1) he was engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) a causal link exists between his protected activity and the adverse employment action.[12] *See Fucron*, 843 F.3d at 1310 (11th Cir. 2016) (citations omitted).

In applying the *McDonnell Douglas* framework, the Magistrate Judge "assume[d] that Barnes engaged in protected activity when he reported Means'[] conduct to Ling and

---

[11] See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

[12] The *McDonnell Douglas* framework requires the plaintiff to first make out a prima facie case of retaliation.  If the plaintiff makes out a prima facie case, "the burden of production then shifts to the employer to rebut the presumption by articulating a legitimate, non-discriminatory reason for the employment action." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1135 (11th Cir. 2020) (en banc).   Then, if the employer rebuts this presumption, "the plaintiff then must demonstrate that the 'proffered reason was merely a pretext to mask [retaliatory] actions.'" *Id.* (alteration in original) (quoting *Bryant*, 575 F.3d at 1308).  Because Barnes fails to make out a prima facie case of retaliation, the Court pretermits discussion on the remainder of the *McDonnell Douglas* burden-shifting framework.

others." (Doc. 28 at 14).  The Magistrate Judge concluded that Barnes did not suffer an adverse employment action "against him or that any adverse action taken was causally related to his protected activity." (*Id.*).  Barnes objects, and argues that Means "engaged in conduct that would dissuade a reasonable person from making or supporting a charge of discrimination[,]" such that Barnes suffered an adverse employment action. (Doc. 29 at 16).

### i.    Adverse Employment Action

The Court reviews the record *de novo* when considering whether Barnes suffered an adverse employment action.  The Magistrate Judge considered Barnes' constructive discharge as the challenged adverse employment. (*See* doc. 28 at 14–15).  Barnes, on the other hand, argues that he suffered multiple adverse actions, only one of which was that he was constructively discharged. (*See* doc. 29 at 15–19).  Either way, Barnes fails to establish that he was subjected to an adverse employment action or constructively discharged.

In his objections, Barnes specifically identifies two instances that constitute an adverse employment action:  (1) Means "resist[ed] and refus[ed] to allow Barnes to apply for promotions within [EAMC]"; and (2) Means "purposefully [did] not approve Barnes'[] timecard punches in an attempt to have Barnes terminated."[13] (*See id.* at 16).  "[I]n the context of a Title VII retaliation claim, a materially adverse action 'means it well might have  dissuaded  a  reasonable  worker  from  making  or  supporting  a  charge  of

---

[13] Barnes also references that he "was warned by a co-employee that Means was trying to get Barnes fired, or make him quit." (Doc. 29 at 16).  The Court discusses this testimony in the convincing mosaic section. *See infra* Section III.B.2.b.

discrimination.'"[14] *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 861 (11th Cir. 2020) (per curiam) (citation modified).

Here, Barnes contends that "[he] was not able to apply for the promotion" because he believed "that [he] c[ould not] apply for a promotion without" Means' approval. (Doc. 29 at 16). Barnes points to no binding case law that establishes that an employee's mistaken belief that he is prevented from applying for a promotion constitutes an adverse employment action. Barnes bears the initial burden of showing that his mistaken belief that he was barred from submitting a job application might have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Monaghan*, 955 F.3d at 861. Barnes has not met his burden.[15]

Means' failure to approve Barnes' timecard punches cannot be considered an adverse employment action as Barnes conceded that he "wasn't disciplined" for not having punches. (Doc. 23-1 at 34, 126:9–11). Further, Barnes was never demoted, nor did he suffer a decrease in pay, or any negative consequences because of the timecard issue. (*See id.* at 46–47, 176:10–177:4). Barnes fails to establish that Means' initial failure (which was later resolved) to approve Barnes' timecards left him worse off such that a reasonable person would be dissuaded from making a claim of discrimination.

---

[14] Barnes cites *Muldrow v. City of St. Louis* in reference to his retaliation claim. (Doc. 29 at 15) (citing 601 U.S. 346, 350 (2024)). Barnes citation to *Muldrow* is misguided as it only clarified the standard in Title VII's anti-discrimination provision—not retaliation. *See West v. Butler Cnty. Bd. of Educ.*, 2024 WL 2697987, at *2 (11th Cir. May 24, 2024) (per curiam).

[15] When a plaintiff brings a failure to promote claim, a plaintiff must establish that he was qualified for and *applied* for the job. *See Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 (11th Cir. 2005) (per curiam). Although Barnes did not bring a failure to promote claim, it is notable that Barnes did not apply for the promotion. (*See* doc. 23-1 at 48, 183:22–184:14).

### ii.    Constructive Discharge

"Under Title VII, a constructive discharge is tantamount to an actual discharge, so it constitutes an adverse employment action." *Davis v. Legal Servs. Ala., Inc.*, 19 F.4th 1261, 1267 (11th Cir. 2021) (per curiam).  "Constructive discharge requires plausible allegations [that] the employer intentionally created conditions so 'intolerable' that a reasonable employee would feel compelled to resign." *Ounjian v. Globoforce, Inc.*, 89 F.4th 852, 858 (11th Cir. 2023).  "The existence of a constructive discharge is determined under an objective, '*reasonable* employee' standard, not by reference to a plaintiff's subjective feelings." *Id.* at 859 (emphasis in original) (quoting *White*, 548 U.S. at 68–69). "Establishing a constructive discharge claim is a more onerous task than establishing a hostile work environment claim." *Bryant*, 575 F.3d at 1298.

The alleged instances of Means' commentary, looks, failure to approve timecards, and promises to "whoop" Barnes, "taken individually or collectively, do not meet the high bar for stating a constructive discharge claim." *Ounjian*, 89 F.4th at 859.  Although Barnes *subjectively* argues that he was forced to resign, under an *objective* standard he fails to satisfy the relevant standard—that a reasonable employee would have felt compelled to do so. (*See* doc. 29 at 19).  Considering the entire record, Barnes voluntarily resigned and was not constructively discharged. (*See* doc. 23-1 at 46, 174:4–6).  A reasonable person may have found Means' conduct irksome or potentially discomforting, but, that is not the standard.

Barnes voluntarily resigned from EAMC on February 19, 2024. (*Id.* at 199).  Eight days after his resignation, Barnes emailed Truitt stating that Means had "harassed [him]

21

constantly to the point of making [him] put in [his] two weeks['] notice." (*Id.* at 202–03). Barnes "never made any complaints of harassment against Means to . . . anyone . . . in the Human Resources Department." (Doc. 23-2 at 5, para. 19). This series of events counsels against finding that Barnes' workplace was so intolerable that a reasonable person would have felt compelled to resign.[16]

### b. Convincing Mosaic

Under the convincing mosaic analysis, this Court "must consider the totality of a plaintiff's circumstantial evidence on summary judgment" such that the "evidence must still be enough to allow a reasonable jury to infer but-for causation." *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1342 (11th Cir. 2023) (per curiam). Although Barnes and the Magistrate Judge did not evaluate his retaliation claim as a convincing mosaic, the Court reviewed the record *de novo* and does not find that the evidence would permit a reasonable factfinder to find that EAMC retaliated against Barnes. *See Berry*, 84 F.4th at 1311.

Barnes points to the timing of his timecard approval as evidence of retaliation. (Doc. 29 at 17). Barnes argues that Means "regularly approve[d] [his] co-employee's time and she was not at risk for termination like Barnes." (*Id.* at 17 n.5). This purported differing treatment of a similarly situated employee does not permit a reasonable factfinder to find that EAMC retaliated against Barnes. Barnes' coworker also experienced timecard issues

---

[16] Because Barnes "failed to meet even the standard for a hostile work environment[,] [h]e cannot, therefore, meet the higher standard for constructive discharge." *Barrow v. Ga. Pac. Corp.*, 144 F. App'x 54, 59 (11th Cir. 2005) (per curiam).

and any problems with Barnes' timecard were resolved without disciplinary action, disruption in pay, or any adverse employment consequences. (*See* doc. 23-2 at 28–29).

Barnes also notes that he was "warned by a co-employee that Means was trying to get Barnes fired, or make him quit." (Doc. 29 at 16). Barnes testified that his coworker, Laquesha Lasseter ("Lasseter") said "you need to be on your Ps and Qs because [Means] wants to get you up out of here." (Doc. 23-1 at 29, 107:14–21). Setting aside that Barnes testified that he knew Lasseter to be dishonest, this piece of evidence does not permit a reasonable factfinder to find that EAMC retaliated against Barnes. Lasseter is not a decisionmaker and Barnes does not point to any suspicious timing or other factors that counsel in favor of inferring retaliation.[17]

The Court will not rehash its review of the other circumstantial evidence Barnes points to in support of his retaliation claim. In sum, on this record, the circumstantial evidence Barnes cites, even viewed in the light most favorable to him, does not create a reasonable inference of intentional retaliation. The Magistrate Judge correctly recommended dismissing Barnes' retaliation claim.

## IV. CONCLUSION

Accordingly, for the reasons stated, and for good cause, it is

ORDERED as follows:

1.      Barnes' objections (doc. 29) are OVERRULED;

---

[17] Although the Court must view the facts in the light most favorable to Barnes, the Court notes that Lasseter stated that Barnes "defame[d] [Means'] character and leadership." (Doc. 23-2 at 18).

23

2.      The Magistrate Judge's Recommendation (doc. 28) is ADOPTED as modified herein.

3.      EAMC's motion for summary judgment (doc. 21) is GRANTED.

4.      This case is DISMISSED with prejudice.

5.      All pending motions are DENIED as moot, and all pending deadlines are TERMINATED.

6.      A separate final judgment will be entered.

DONE this 26th day of March, 2026.

                    /s/ Emily C. Marks
                    EMILY C. MARKS
                    UNITED STATES DISTRICT JUDGE